# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

---

**In re:**

    **NLC Energy Denmark LLC,**              Case No. 25 -
                                                                Chapter 11 Proceedings

                        **Debtor.**

---

## DECLARATION OF WELLES HATCH IN SUPPORT OF
## THE DEBTOR'S FIRST DAY MOTIONS

---

I, Welles Hatch, declare under 28 U.S.C. § 1746, that the following is true to the best of my knowledge, information and belief:

1. I am the Chief Financial Officer and Treasurer for NLC Energy Denmark LLC (the "Debtor"). I have a B.A. from the University of Massachusetts at Amherst and an M.B.A. in international business finance from The George Washington University. My experience includes 20 years of commercial banking and managing reorganizations, recapitalizations, startups and re-starts for several growth stage companies in the New England area.

2. The facts stated in this declaration are from my personal knowledge, the business records of the Debtor or within my knowledge as an officer of the Debtor.

### General Background

**The Debtor from 2008 until 2016**

3. Individuals that are no longer associated with NLC Energy Denmark LLC (the "Debtor") formed it in 2008 as NEW Organic Digestion LLC. By 2016, it was a biogas developer and operator with an existing food waste digestor facility in Denmark, Wisconsin. NEW Organic Digestion owned one anaerobic digester that produced biomethane that was used to produce electricity that it sold.

**Joint Venture with NLC Energy in 2016 to expand the business**

4. In 2016, the NEW Organic Digestion's management met Bruce S. MacDonald and Douglas F. Blough. They decided to form a joint venture to expand the business. MacDonald and Blough formed NLC Energy Venture 30, LLC to participate in the joint venture. From the documents, it appears that NEW Organic Digestion owned the physical facility and that a related company, Big Ox Energy-Denmark LLC, operated it. They called the joint venture NLC Energy-Big Ox LLC. MacDonald and Blough, through NLC Energy Venture 30, were to provide capital and expertise in credit-tenant financing to fund growth. Big Ox was to provide management expertise and have operational control, utilizing their experience.

5. The joint venture acquired a facility in South Sioux City, Nebraska, through an entity, Big Ox Siouxland LLC. The acquisition involved complex financing and an agreement with the municipality that included implementing an industrial wastewater treatment plan and the municipality guaranteeing 20 years of payment for wastewater treatment services. Operational problems began shortly after operations started in early 2016. Sewers backed up into residents' homes resulting in multiple legal actions and fines that were settled for $1.8 million. Later, in 2019, a feedstock supplier switched food deliveries to a high fat slurry without notifying management. It causes a foaming event that lasted several weeks. This led to the facility closing in May 2019 for several years. In October 2018, the joint venture also acquired another biogas digestion facility in Riceville, Iowa for $3.2 million.

**Construction Expanding the Denmark Facility**

6. To expand the NEW Organic Digestion's physical facility in Denmark, Wisconsin (the "Denmark Facility"), the joint venture retained an engineering firm to design the expansion. NEW Organic Digestion's then existing management had prepared projections of the Denmark

Facility's production capabilities after construction was completed. Construction was to begin in the summer of 2016. At the time, the joint venture had determined that a new entity, EEC Denmark Tenant LLC, would operate the Denmark Facility.

7. As part of the planned construction, EEC Denmark Tenant executed a 20-year supply contract dated August 12, 2016, with The Regents of the University of California ("UCal"). In reliance on NEW Organic Digestion's production projections, UCal agreed to purchase, and EEC Denmark Tenant was required to deliver a minimum quantity certain biomethane produced from food waste that met certain requirements of California and Federal law to create environmental attributes.[1]

8. Construction was delayed. In part this was due to the joint venture changing construction plans to include building a gas transfer pipeline that feeds the Trans Canada pipeline and two decant stations to accept third-party biomethane.

9. Due to the delay, UCal and EEC Denmark Tenant executed Amendment 1 to the UCal contract dated as of February 1, 2017. The amendment extended the time for the Debtor to be considered to have passed the construction phase and in the full operating phase. It also granted UCal the right to inspect records and terminate the contract by March 17, 2017, with neither party having liability to the other party for the termination.

10. NLC Energy Venture 30 and/or the owner of all its member interests, NLC Energy LLC (collectively, NLC Energy"), funded the construction costs, which including machinery, equipment and other personal property, totaling $97.7 million.[2] The funding was intended to be for a short-term only. NLC Energy had arranged long-term financing after completion of

---

[1] Environmental attributes are used to determine environmental benefits such as carbon credits or renewable energy certificates, to encourage investment in sustainable solutions. They can be monetized.
[2] All amounts stated in this declaration are rounded or approximate unless the context suggest otherwise.

3

construction with institutions, most of which had provided financing for the unrelated real estate businesses of MacDonald and Blough.

**September 28, 2017, financing by the Senior Secured Lenders**

11.     NLC Energy used NEW Organic Digestion management's production projections and the UCal contract to obtain the post-construction financing. That financing closed on September 28, 2017. Under the financing, NEW Organic Digestion issued 6.25% Series A1 Senior Notes and 7.75% Series A2 Senior Notes (collectively, the "Senior Secured Notes"). As of July 31, 2025, the total amount outstanding on the Senior Secured Notes was $76 million. Liens against the Denmark Facility and all the Debtor's assets secured the Senior Secured Notes. Blough executed a guaranty that is subject to certain conditions being met. Ten investors presently hold the Senior Secured Notes (collectively, the "Senior Secured Lenders"). The Senior Secured Lenders are identified on Addendum 4.1(a).[3] The Senior Secured Lenders required an assignment of the payments under the UCal contract and other customers as security for the financing and retained Wells Fargo,[4] as their collateral trustee, to receive the assigned payments and manage the financing relationship with the Debtor.

**UCal amendments in the fall of 2017**

12.     In preparation of the closing of the financing and with UCal's consent, on August 3, 2017, EEC Denmark Tenant assigned the UCal contract to NEW Organic Digestion

13.     On September 17, 2017, EEC Demark Tenant and UCal executed Amendment 2 to the Transaction Confirmation. It reduced the minimum quality that the must be delivered during

---

[3] "Addenda" are attached to the Plan. All "Exhibits" are being filed with this declaration or attached to the Disclosure Statement.
[4] Unless otherwise defined, all defined terms have the meaning ascribed to them in the Prepackaged Plan of Reorganization of NLC Energy Denmark LLC that was filed on the Petition Date.

4

the first year after the Denmark Facility became operational. It also extended the date by which the Denmark Facility must become operational to when it in fact was operational.

14. As September 28, 2017, NEW Organic Digestion was entirely owned by NEW Organic Digestion Investors LLC, which was entirely owned by NEW Organic Digestion Holdings LLC. NEW Organic Digestion Holdings was owned and controlled equally by the two members of the joint venture, NLC Energy and Big Ox.

15. As of September 28, 2017, in conjunction with the lowering of the minimum biomethane under the UCal contract, NEW Organic Digestion Holdings executed a Pledge and Security Agreement with UCal (the "UCal Pledge Agreement"). Under it, NEW Organic Digestion Holdings pledged its entire equity securities of NEW Organic Digestion Investors. Effectively, this gave UCal the right to own and control NEW Organic Digestion upon a default and if conditions precedent were met. (NEW Organic Digestion is the present Debtor.) The conditions precedent included replacing Blough as guarantor of the Senior Secured Notes with a guarantor acceptable to the Senior Secured Lenders.

**Denmark Facility's production of biomethane did not meet projections**

16. NEW Organic Digestion/the Debtor completed construction and began started operations at the new facility in late 2017. The following is an aerial view of the Denmark Facility:

[Aerial view is on next page.]



17.     The new facility took time to become fully operational. However, production output drastically underperformed projections. Then existing management from Big Ox gave many excuses for the underperformance, including a "learning curve" with the new technology.

18.     The Debtor's inability to produce the projected biomethane volume meant that the Debtor could not deliver the already lowered minimum amounts required by the UCal contract after the first year or service the Senior Secured Notes. NLC Energy made loans to the Debtor to make up the shortfall and keep NEW Organic Digestion operating.

19.     NLC Energy retained its own experts to evaluate operational issues. NLC Energy's experts determined the Denmark Facility's maximum production capabilities and concluded that the projected biomethane volume of production could never be achieved by the Denmark Facility.

20.     In mid-2018, the then existing operators from Big Ox were refusing input from NLC Energy's engineers, obstructing the engineers' access to data and refusing assistance with operating the Denmark Facility. In mid-September 2018, NLC Energy stopped funding the

operational cash shortfalls. In 2019, the Denmark Facility shut down due to storage capacity limits being exceeded that led to near overflows of digesters and lagoons.

**NLC Energy acquires ownership and control of NEW Organic Digestion/the Debtor**

21.     NLC Energy started partial funding NEW Organic Digestion's operations in July 2019 as part of an agreement to gain control of the operations. By September 2019, the Denmark Facility was under control of management installed by NLC Energy. By August 2020, NLC Energy had gained full ownership of the NEW Organic Digestion/the Debtor and its operations.[5]

22.     The joint venture was dissolved by the execution of a Redemption Agreement executed on July 31, 2020. It provided for a reconciliation of the amounts due each other to be finalized in the future. The Debtor calculates that Big Ox entities owe the NLC Energy entities more than $8 million. The Debtor suspects the $8+ million is uncollectable.

**Addressing the financial issues through Cedar Holdings, LLC bridge note**

23.     By August 2020, the Debtor had fallen behind with its obligations on the Senior Secured Notes. The Debtor entered into a bridge note with Cedar Holdings, LLC in the amount of $12 million to bring the obligations current. The Debtor has paid nothing on the Cedar Holdings note and carries the note as a $24.4 million debt as of June 30, 2025, on the Debtor's books. Insiders of the Debtor now control Cedar Holdings.

**Addressing the financial issues with UCal**

24.     The Debtor's new management also approached UCal to renegotiate the UCal contract. The price that the Debtor sold biomethane to UCal was well below prevailing market

---

[5] After existing management obtain full control and ownership of NEW Organic Digestion, it is hereinafter referred to as the "Debtor."

rates. New management informed UCal of the Debtor's financial struggles as part of the renegotiations.

25. Those negotiations resulted in Transaction Confirmation #001A. It was executed on December 21, 2020, further amending the UCal contract. The amended terms lowered the volume that the Debtor was required to supply to UCal but also reduced the purchase price. The amended terms also addressed UCal's ability to cover any daily shortfall by purchasing replacement methane on the open market and charging the Debtor for the difference between the price under the UCal contract and that UCal paid on the open market. (With this amendment, which is the last amendment to the contract, the contract is defined as the "UCal Contract.").

26. In addition, the amended terms added three provisions to penalize the Debtor for breaching the UCal Contract. First, the Debtor was required to share revenue with UCal from the Debtor's sales of methane produced from livestock manure. Under the UCal Contract, UCal only purchased methane produced from food waste. Methane produced from livestock manure has greater $CO_2$ reductions. This meant that the Debtor could monetize environmental attributes from livestock manure at a higher price. Requiring the Debtor to share revenue from methane produced from manure removed the Debtor's financial incentive to shift production from methane derived from food waste to methane derived from manure waste. Effectively, this change limits the Debtor's ability to increase profits from the finite production capabilities of the Denmark Facility. The UCal Contract refers to this revenue-sharing as the "Operational Payment."

27. Second, to address future delivery shortfalls, the Debtor was required to provide an annually "true-up." The true-up calculated the amount of biomethane delivered to UCal during the year to the minimum amount required by the UCal Contract as amended. The Debtor was required to pay UCal "lost Environmental Attribute Damages" based upon a complex formula.

8

**The UCal liquidated damages provision**

28. Third, the amended terms included a liquidated damages provision that would expire after 6 years. Under the liquidated damages provision, if the Debtor failed to truthfully disclose the sale of biomethane, to pay any amount owed, to provide financial reports or information, or "otherwise engages in willful misconduct to circumvent this Contract," the Debtor commits a "Special Breach." The consequence of a Special Breach is UCal's right to file a stipulated judgment against the Debtor. The judgment amount started at $75 million and continually decreases by the Debtor's performance as determined by a complex formula based upon the benefits UCal receives. The liquidated damages provision expires on December 21, 2026 – less than 16 months from now. As of July 31, 2025, I and members of the Debtor's financial department calculated the liquidated damages were $62,914,798. The Debtor's biomethane advisor, William Tyndall, who I would consider an expert in the field, calculates UCal's actual damages for a breach of the UCal Contract without considering the liquidated damages provision to be $8,592,833 as of as of July 31, 2025.

29. The liquidated damages provision has no relationship to a reasonable estimate of UCal's damages for a breach of the UC Contract, nor was that the intent. Rather, UCal sought to ensure the Debtor's performance and penalize the Debtor for the failure to comply with the UCal Contract. Until December 2020, the UCal Contract never had a penalty or liquidated damages provision. Before the liquidated damages provision was inserted, the Debtor and UCal had no discussions that it was needed for the ease of calculating damages if the Debtor breached. No one perceived that damages from a breach would be difficult to prove.

**2022 efforts to seek additional relief from the UCal Contract**

30. In 2022, as the Debtor's financial problems continued, the Debtor went back to UCal to again seek an increase of the purchase price. The purchase price under the UCal Contract is materially lower than the existing market price and has been for some time. Renegotiating the price upward to bring the price to the prevailing market amount would be detrimental to California citizens that ultimately funded UCal. UCal stated that a price increase could not be agreed upon. Doing so would require approval by the California State Legislature. UCal described that obtaining the approval would be nearly impossible. This meant that the continued performance of the UCal Contract results in continuing losses to the Debtor as it sells UCal biomethane at an amount materially lower than the prevailing market rates.

**The Debtor's decision to file chapter 11**

31. As the Debtor's financial statements show, with no increase in price for the biomethane sold to UCal, the Debtor continues to operate at a loss. Historical financial information from January 1, 2022, through June 30, 2025, is marked as **Exhibit 1.** NLC Energy, which owns 100% of the EEC Property Holdings LLC, which in turn owns 100% of the Debtor,[6] has continued to fund the losses at the rate of approximately $1 million per month. The facilities at Riceville, Iowa, and Sioux City, Nebraska, are also operating at a loss. Collectively, their gross receipts from sales in 2023 were $14 million. There are no intercompany debts between Riceville, Sioux City and the Debtor entities. NLC Energy has funded their losses and has receivables against each of them.

---

[6] On December 31, 2022, and January 1, 2023, NLC Energy restructured the companies it directly and indirectly owned. NEW Organic Digestion Holdings and NEW Organic Digestion Investors were merged into EEC Property Holdings. The result is that EEC Property Holdings now owns all member interests of the Debtor subject to the UCal's lien in those interests under the UCal Pledge Agreement.

10

32. In February 2025, the Debtor approached the Senior Secured Lenders to discuss the possibility of filing chapter 11 to put the Debtor on a path toward profitability. Among other things, they requested that the Debtor obtain a valuation.

33. The Debtor retained a firm approved by the Senior Secured Lenders to provide a "current board advisory analysis." The Debtor and the Senior Secured Lenders sought an indication of value from an independent reputable firm. That firm applied several approaches to value and concluded a discounted cash flow analysis resulted in a range of values from $10.3 to $17.7 million.[7] The Debtor and, I think, the Senior Secured Lenders determined that the collateral securing their debt of $75.1 million was woefully less than the debt.

## The Need to Pay Prepetition Wages

34. The Debtor has 32 full-time employees. The next payroll is Friday, August 22, 2025. The Debtor will be submitting the payroll to the payroll service on Wednesday, August 20. Employees are paid one week in arrears. This means the August 22 payroll will be for the period August 3 through 16. Approximately all of the payroll will be incurred before August 16, the projected date for the chapter 11 filing. In addition to wages, the Debtor also pays benefits. They include a 401(k)-retirement savings plan with employer matching contributions of 50% of the employee contribution up to 3% of an employee's salary. The Debtor also provides medical, dental and vision insurance with employees paying toward the premiums. The Debtor electronically pays all employees. Until the chapter 11 filing, the Debtor was current with all its payroll obligations, including related taxes.

---

[7] The valuation firm required as part of the engagement that the report be kept confidential. It was prepared for a limited purpose. The valuation firm sought to eliminate risks associated with a valuation prepared for the limited purposes of assisting the lenders and the Debtor reaching agreement being used by third parties for other uses.

35. Each payroll, with 401(k) benefits but without insurance premiums, costs the Debtor approximately $97,200. The payroll register for July 25, 2025, is marked **Exhibit 7.** It is redacted to eliminate personal identifying information. The payroll for August 22, 2025, will be approximately the same as the July 25, 2025, payroll. Until the payroll is run, the actual amount cannot be determined. However, the Debtor's payroll varies only slightly, less than 5% of the gross amount. The amount earned before August 16 would be approximately the entire $97,200. Monthly insurance premiums cost the Debtor approximately $6,500 net of employee contributions toward them. They were paid for the month of August before August 15.

36. None of the employees to be paid on August 22, 2025, are owners of the Debtor. I am an officer of the Debtor. I am the Chief Financial Officer and Treasurer. My compensation is paid by NLC Energy, not the Debtor.

37. The Debtor typically pays regular employees through automated transactions deposited directly into their personal bank accounts. The Debtor withholds the employee portion of all federal and state withholding taxes, employer's share of federal, state and local taxes, and deducts any voluntary and non-voluntary deductions, including benefits, child support, and garnishment before remitting the balance of any wages or salary to the employees.

38. The Debtor funds the direct deposit portion of the payroll on the day before the pay day, here August 21. The Debtor intends to utilize the same pay period post-petition in the ordinary course of its business.

39. As of August 16, 2025, none of the employees that will be paid are owed more than $17,150, even with accrued vacation and other benefits.

40. The value of the Debtor depends upon its ability to continue as a going concern, including the maintenance of its workforce. Without continuing payments to the Debtor's

12

Case 25-24634-kmp    Doc 5    Filed 08/16/25    Page 12 of 18

employees, it is unlikely that the workforce would remain highly motivated to provide quality service, if the employees even remain in the Debtor's employment. Damage to the Debtor's business would be irreparable if employees are not paid. The employees would likely immediately leave the Debtor's employment. Jobs could not be performed. The Debtor would be unable to produce biomethane or other products to sell to customers.

41. Active employees are essential to processing farm manure and food waste into biomethane and other products that the Debtor sells. They are also necessary to administer this case and to preserve the value of the Debtor's business assets. Any delay or disruption in the payment of Prepetition Wages under these circumstances would damage the relationships with the employees and impair morale of the workforce at the very time when the dedication, confidence and cooperation of the employees are most critical. There are no practical or legal alternatives to the retention of the employees. The Debtor seeks to use the payment of Prepetition Wages as an effort to garner post-petition services from its employees. Not doing so would substantially jeopardize the value of the Debtor's business.

42. I anticipate that the Debtor will have access to sufficient funds from member advances from EEC Property Holdings LLC to pay all Prepetition Wages to the extent described in this motion as such amounts become due in the ordinary course of its business.

**Modification of the Automatic Stay, Use of Cash Collateral and Adequate Protection**

43. As stated earlier, the Debtor has financing of approximately $75.8 million from the Senior Secured Notes. The holders of those notes, the Senior Secured Lenders, are identified on Addendum 4.1(a) to the Plan.

44. In conjunction with the issuance of the Senior Secured Notes, Wells Fargo became the collateral trustee under a Collateral Trust Indenture dated September 28, 2017 (the "Indenture").

45. As collateral trustee, Wells Fargo provided administrative services for the Senior Secured Notes. The Debtor assigned its largest customer receipts, including from UCal, to Wells Fargo as collateral for the Senior Secured Notes. Wells Fargo also monitors the Debtor's compliance with various financing covenants under the Senior Secured Notes. From the payments received from the Debtor's customers and from the Debtor, Wells Fargo makes interest and principal installments to the Senior Secured Lenders due under the Senior Secured Notes

46. As the Debtor encountered financial issues, the parties amended the Indenture and related documents. This resulted in an Amended and Restated Escrow and Servicing Agreement dated June 9, 2021. The Second Amended and Restated Escrow and Servicing Agreement is in the process of being executed, which I expect to occur before the Petition Date was e (the "Amended Escrow Agreement"). (Sections 2 and 3 of the Amended Escrow Agreement are included in **Exhibit 4.**) Section 3 provided for reserves to ensure timely payment of certain obligations. The reserves included a reserve for note payments to Senior Secured Lenders, property taxes, insurance, maintenance, etc.

### Description of Liens Against Cash Collateral

47. The Debtor's attorneys, Kerkman & Dunn ("K&D"), searched the UCC financings statements filed in Wisconsin under the Debtor's name, and legal filings in Wisconsin Circuit Courts. The results of the search, K&D informed me, are marked **Exhibit 6.**

48. The Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement dated September 28, 2017, was amended by amendments

14

Case 25-24634-kmp    Doc 5    Filed 08/16/25    Page 14 of 18

on February 15, 2019, and on June 9, 2021, to address completion of construction of the Debtor's facility in Denmark, Wisconsin (collectively, the "Mortgage and Security Agreement"). It is **Exhibit 5.**

**Description of Cash Collateral**

49. As of July 31, 2025, (i) Debtor's deposit account at Settlers Bank, which is being closed with funds transferred to '576 held in the name of Debtor with Citizens Bank, N.A. ("Debtor's Operating Account") had a cash balance of $204,520 and (ii) Debtor's Escrow Reserves maintained with Wells Fargo in accordance with the Amended Escrow Agreement had a total cash balance of $520,825. In addition, the Debtor has an escrow account at Citizens Bank to secure the UCal contract of $550,000. I expect these accounts to be at the same levels on August 16, 2025, the petition date. In addition, the value of the business, including real estate, machinery and equipment, is between $10.3 and $17.7 million, a midpoint of $14 million. I have been told not to let the Debtor's Operating Account exceed $250,000 and will ensure that is the case.

**Cash Flow and Funding Immediately After the Petition Date**

50. Until the order approving the use of cash collateral is entered, the Debtor and Wells Fargo will receive and hold Cash Collateral. The Debtor will hold Cash Collateral in the Debtor's Operating Account but not use it.

51. Until the order approving the use of cash collateral is entered, EEC Property Holdings will fund the Debtor's operations with equity contributions. EEC Property Holdings owns 100% of the Debtor's equity securities.

### Agreement to Use Cash Collateral

52.     After the agreed order regarding modification of the stay, adequate protection and use of Cash Collateral is entered, the Debtor will use Cash Collateral and EEC Property Holdings will continue making equity contributions to make up any shortfall from the Debtor's operations.

53.     **Exhibit 3** are weekly financial projections that I and employees reporting to me prepared. They start on August 17, 2025, and run through October 18, 2025. They show projected expenses, revenue and capital contributions of EEC Property Holdings.

### Adequate Assurance of Payment for Future Utilities Services

54.     In the ordinary course of operating its business, the Debtor obtains electricity and natural gas (collectively, the "Utility Services") from WPS. A list of the types of services, location of the services and account numbers for the services is marked as **Exhibit 8.**

55.     WPS provide Utility Services to the Denmark Facility. The Denmark Facility requires continued provision of Utility Services to operate in the ordinary course and without disruption. Uninterrupted Utility Services are essential to the Debtor's ongoing business operations and, therefore, to the success of its reorganization. Any interruption of Utility Services, even for a brief period, would negatively affect the operations of the Denmark Facility. Additionally, the untreated manure and food waste could pose environmental issues. It is critical that Utility Services continue uninterrupted during this chapter 11 case.

56.     The Debtor is not in default and does not have any arrearages in their obligations for prepetition Utility Services to WPS.

57.     The Debtor intends to pay, when due, all undisputed post-petition obligations owed to WPS in a timely manner. All prepetition obligations will continue to be paid by the Debtor's parent company, EEC Property Holdings LLC. The Debtor will have funds from member

contributions from EEC Property Holdings, and then from the use of Cash Collateral to meet all the Debtor's post-petition obligations, including those to WPS, as necessary to supplement the cash flow from the Debtor's business operations are insufficient to meet its financial obligations.

**Retention of Cash Management System**

58. The Debtor's Operating Account is the Debtor's only account. It has a control agreement to reflect the interest of the Senior Secured Lenders. The Debtor recently moved its accounts to that one account and closed the other accounts.

59. It would be very disruptive to the Debtor's business to have to close this newly opened account and open a new one. The Debtor pays bills electronically. It receives funds electronically. Closing out the account would likely cause an interruption and delay receiving funds. The time and effort to transfer the electronic transactions for the expected 6 weeks in chapter 11 would tax the staff, which is already spread thin.

**Efforts to minimize the disruption and harm from a chapter 11 filing**

60. The longer the Debtor remains in chapter 11, the greater the damage to its business. Creditors unaffected by the filing, who are unimpaired under the Plan and who will be paid by EEC Property Holdings will become apprehensive and the uncertainty of the proceedings will cause issues with suppliers and vendors. Additionally, the Debtor's business requires skilled employees. The longer the Debtor is in chapter 11, the more likely there will be problems retaining skilled employees.

**Plan Projections**

61. I prepared the financial projections for the Debtor if the Plan is confirmed. They are marked **Exhibit 2.** Exhibit 2 shows the results of the rejection of the UCal Contract on the Debtor's finances. Exhibit 2 includes improved sales prices for methane derived from food waste,

productivity improvements that increase the output of methane from both manure and food waste and reduced overhead costs.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.**

Dated: August 15, 2025.

*/s/ Welles C. Hatch*
Welles C. Hatch

<u>Drafted by</u>:

Jerome R. Kerkman
Kerkman & Dunn
839 N. Jefferson St., Suite 400
Milwaukee, WI 53202-3744
Phone: 414.277.8200
Facsimile: 414.277.0100
Email: jkerkman@kerkmandunn.com

18

Case 25-24634-kmp    Doc 5    Filed 08/16/25    Page 18 of 18