**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

---

**In re:**

**NLC Energy Denmark LLC,** **Case No. 25-24634-kmp**
**Chapter 11 Proceedings**

**Debtor.**

---

# PREPACKAGED PLAN OF REORGANIZATION OF NLC ENERGY DENMARK LLC

---


Kerkman & Dunn
Attorneys for
NLC Energy Denmark LLC
839 N. Jefferson St., Suite 400
Milwaukee, Wisconsin 53202-3744
Phone: 414.277.8200
Facsimile: 414.277.0100
Email: jkerkman@kerkmandunn.com


Dated: Milwaukee, Wisconsin
August 14, 2025 as modified
on October 17, 2025

NLC Energy Denmark LLC (the "Debtor") proposes the following Prepackaged Plan of Reorganization for acceptance by Creditors entitled to vote before filing a chapter 11 case. Confirmation of the Plan will occur after the filing.

## ARTICLE I
## DEFINITIONS

Unless the context otherwise requires, the following terms shall have the following meanings when used in initially capitalized form in the Plan. The terms defined shall be equally applicable to both the singular and plural forms of each term unless the context otherwise requires. Any term used in the Plan that is not defined here, but that is defined in the Code shall have the meaning assigned to that term in the Code. Any term used in initially capitalized form in the Plan shall have the same meaning in the disclosure statement, filed and served with the Plan, unless the context otherwise requires.

1.1 *Addendum* means an addendum that is attached to the Plan.

1.2 *Administrative Expense* means administrative expenses as defined by § 503(b) of the Code.

1.3 *Allowed* means, with reference to any Claim or Interest, a Claim or Interest: (a) arising on or before the Effective Date as to which: (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to Code section 502(d) or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law; or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtor; (c) as to which the liability of the Debtor and the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (d) expressly allowed hereunder; provided, however, that notwithstanding the foregoing: (x) unless expressly waived in the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Code, including Code sections 502 and 503, to the extent applicable, and (y) the Debtor shall retain all claims and defenses with respect to Allowed Claims.

1.4 *Amended and Restated Operative Agreements* means, collectively, in substantially the same form as the following documents, which are subject to final modification and agreement before the Court considers confirmation of the Plan: the Amended and Restated Series A1 Senior Secured Notes by the Debtor in the form of Addendum 4.5(A); the Amended and Restated Series A2 Senior Secured Notes by the Debtor in the form of Addendum 4.5(B); the Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement from the Debtor in the form of Addendum 4.5(C); the Amended and Restated Assignment of Leases and Rents from the Debtor in the form of Addendum 4.5(D); a Reaffirmation of the existing Construction Completion Guaranty, the Hazardous Material Indemnity Agreement and the Indemnity and Guaranty Agreement from Blough in the form of Addendum 4.5(E); [Reserved] in the form of Addendum 4.5(F); the Third Amended and Restated Escrow and Servicing Agreement among the Debtor, Wells Fargo as collateral trustee and Wells Fargo as escrow agent in the form of Addendum 4.5(G); the Fourth Omnibus Amendment among Debtor, Wells Fargo as collateral trustee, Wells Fargo as escrow agent and the purchasers in the form of Addendum 4.5(H); the Amended and Restated Note Purchase Agreement among the Debtor and Wells Fargo as collateral trustee in the form of Addendum 4.5(I); and the Side Letter. Provided that the Amended and Restated Operative Agreements are to be in forms acceptable in all respects to holders and Wells Fargo as collateral trustee and escrow agent, as the case may be.

1.5 *Amended and Restated Senior Secured Notes* means, collectively, the Series A1 Notes and the Series A2 Notes.

1.6 *Avoidance Actions* means any and all actual or potential avoidance, recovery, subordination, or other Claims, causes of action, or remedies that may be brough by or on behalf of the Debtor or its estate or other authorized parties in interest under the Code or applicable non-bankruptcy law, including Claims, causes of action, or remedies under §§ 502, 510, 542, 544, 547 through 553, and 724(a) of the Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

1.7 *Blough* means Douglas F. Blough.

1.8 *Case* means the proceedings to be initiated by the filing of a voluntary petition for relief under chapter 11 of the Code with the Court by the Debtor on August 15, 2025.

1.9 *Claim* has the meaning ascribed to it by § 101(5) of the Code.

1.10 *Class* means the classes specified in Article III of the Plan.

1.11 *Code* means title 11 of the United States Code as amended from time to time.

1.12 *Confirmation Date* means the date on which the Court enters the Confirmation Order on the Court's docket.

1.13 *Confirmation Order* means the order entered by the Court confirming the Plan under § 1129 of the Code.

1.14 *Court* means the United States Bankruptcy Court for the Eastern District of Wisconsin and any federal court with concurrent or appellate jurisdiction.

1.15 *Creditor* has the meaning ascribed to it by § 101(10) of the Code.

1.16 *Cure Amount* means the monetary amount necessary to cure defaults of an executory contract or unexpired lease through the Confirmation Date.

1.17 *Debtor* means NLC Energy Denmark LLC, a limited liability company formed under Wisconsin laws.

1.18 *Denmark Facility* means the real property owned by the Debtor, located at 6601 County Road R. and 6541 – 6587 County Road R, Denmark, Wisconsin, that is used by the Debtor to operate its business. The legal description for the Denmark Facility is attached as Addendum 1.18.

1.19 *Disclosure Statement* means the Disclosure Statement prepared by the Debtor that was provided to Creditors and the Equity Interest holder to solicit their ballot to accept or reject the Plan and filed in the Case with Plan.

1.20 *EEC Property Holdings* means EEC Property Holdings LLC, a limited liability company formed under Delaware laws.

1.21 *Effective Date* means the date when all conditions set forth in Article XI of the Plan have been satisfied or waived.

1.22 *Equity Securities* means the member interests of the Debtor as of the Petition Date that are held by EEC Property Holdings and after the Effective Date of the Reorganized Debtor.

1.23 *Exculpated Parties* means the Released Parties.

1.24 *Final Order* means an order entered by the Court as to which the time to appeal or to seek review or rehearing has expired, and as to which no appeal or other proceedings for review or rehearing shall then be pending.

1.25 *Forbearance Period* means the period from the Effective Date until the Sale during which the Senior Secured Lenders agreed to forbear from taking any action against Blough on account of the Guaranties.

1.26 *Guaranties* mean that certain (i) Construction Completion Guaranty dated September 28, 2017 from Blough in favor of the Senior Secured Lenders and Wells Fargo, (ii) Hazardous Material Indemnity Agreement dated

September 28, 2017 from Blough and the Debtor in favor of the Senior Secured Lenders and Wells Fargo, and (iii) Indemnity and Guaranty Agreement dated September 28, 2017 from Blough in favor of the Senior Secured Lenders and Wells.

1.27 *Insider* has the meaning ascribed to it by § 101(31) of the Code.

1.28 *Lien* has the meaning ascribed to it by § 101(37) of the Code.

1.29 *MacDonald* means Bruce S. MacDonald.

1.30 *Net Proceeds* means the amount remaining after satisfying or paying all costs of the Sale.

1.31 *NLC Energy* means NLC Energy LLC, a Delaware limited liability company.

1.32 *Person* has the meaning ascribed to it by § 101(41) of the Code.

1.33 *Petition Date* means August 15, 2025, the date on which the Debtor anticipates filing its voluntary petition for relief under chapter 11 of the Code.

1.34 *Plan* means this Prepackaged Plan of Reorganization of NLC Energy Denmark LLC dated August 14, 2025, and any amendments, modifications or alterations to it in accordance with the Code.

1.35 *Prepetition Documents* means as to any Claim, executory contract or unexpired lease assumed, the valid and enforceable promissory notes, mortgages, security agreements, guaranties and related documents in effect as of the Petition Date between the Debtor and a Creditor, including the Senior Secured Lenders and Wells Fargo.

1.36 *Priority Claim* means a Claim for which the holder asserts, and is determined to be entitled to, priority under § 507 of the Code or under any other provision of the Code.

1.37 *Pro-Rata* means the proportional value of a part in comparison to its whole, which in the Plan is the proportion that a single amount in a group, as the numerator, bears to the total amounts in the group, as the denominator.

1.38 *Released Parties* means the Senior Secured Noteholders, Wells Fargo, and Computershare Trust Company, National Association, as agent for Wells Fargo.

1.39 *Reorganized Debtor* means the Debtor after the Effective Date.

1.40 *Rule* means the Federal Rules of Bankruptcy Procedure as amended from time to time.

1.41 *Sale* means the sale of all the Debtor's business, assets and all operations, including the Denmark Facility, through a purchase of the Debtor's Equity Securities or assets approved by the Senior Secured Lenders as described in Section 4.1(d).

1.42 *Section* means a numbered section of the Plan, such as this Section 1.42.

1.43 *Secured Claim* means a Claim secured by a valid and enforceable lien, security interest, mortgage or other recognized interest in property in which the Debtor has an interest which is not void or voidable under any state or federal law or subject to set off under § 553 of the Code, but only to the extent of the Claim's value pursuant to § 506(a) of the Code. The portion of a Claim that is not a Secured Claim shall be an Unsecured Claim except as otherwise provided for in this Plan.

1.44 *Senior Secured Lenders* means collectively, the Creditors listed on Addendum 4.1(a) that derived their Claims from the Series A1 Secured Notes and Series A2 Senior Secured Notes issued by the Debtor to such Creditors on September 28, 2017, as amended, modified and supplemented from time to time.

1.45 *Series A1 Notes* means the portion of the Secured Claims of the Senior Secured Lenders evidenced by the Amended and Restated Series A1 Senior Secured Notes consistent with the treatment described in Section 4.1(b)(i).

1.46 *Series A2 Notes* means the portion of the Secured Claims of the Senior Secured Lenders evidenced by the Amended and Restated Series A2 Senior Secured Notes consistent with the treatment described in Section 4.1(b)(ii).

1.47 *Side Letter* means that certain Restructuring Side Letter Agreement dated on or before the date hereof among Blough and the Senior Secured Lenders in the form attached hereto as Addendum 4.5(J).

1.48 *Trade Claim* means a Claim arising from supplying the Debtor with goods and services necessary for the operation of the Debtor's business to produce biomethane or other related products or saleable assets that is less than $250,000 and is not owed by the Debtor under an executory contract or unexpired lease.

1.49 *UCal* means The Board of Regents of the University of California.

1.50 *UCal Claim* means the Claim to which UCal shall be entitled due to the rejection of the UCal Contract.

1.51 *UCal Contract* means the contract with UCal initially dated August 12, 2016, as amended, which is more particularly described on Addendum 1.51.

1.52 *UCal Estimation Motion* means the motion that the Debtor files on the Petition Date to estimate the amount of the UCal Claim for voting purposes of the Plan.

1.53 *UCal Pledge Agreement* means the Pledge and Security Agreement between New Organic Digestion Holdings LLC (that was merged into EEC Property Holdings) that is dated September 28, 2017, and UCal.

1.54 *UCal Settlement* means the settlement described in Section 4.3(d).

1.55 *Unsecured Claim* means any Claim that is not a Secured Claim, Trade Claim, Priority Claim or Administrative Expense.

1.56 *Wells Fargo* means Wells Fargo Trust Company, National Association (formerly known as Wells Fargo Bank Northwest, National Association), in its capacities as the collateral trustee for the Series A1 Secured Notes and Series A2 Senior Secured Notes issued to the Senior Secured Lenders and as escrow agent pursuant to that certain Amended and Restated Escrow and Servicing Agreement, dated as of June 9, 2021, as may have been amended or supplemented from time to time.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS AND EXPENSES

2.1 ***Administrative Expenses.*** Administrative Expenses are unimpaired under the Plan. The legal, equitable, and contractual rights to which an Administrative Expense is entitled are unaltered by the Plan. To the extent an Administrative Expense is due, payable before the Effective Date and unpaid as of the Effective Date, the Debtor shall pay it (i) in full on or before the Effective Date or (ii) upon such other terms as may be agreed to in writing by the holder of any Administrative Expense and the Debtor. An Administrative Expense that arises after the Petition Date in the ordinary course of business of the Debtor shall be paid by the Debtor in the ordinary course of its business pursuant to the usual and customary terms with the Creditor. An Administrative Expense that is subject to approval by the Court shall be paid as soon as practicable after the Order approving it is entered.

2.2 ***Priority Claims.*** Priority Claims are unimpaired under the Plan. The legal, equitable, and contractual rights to which a Priority Claim is entitled are unaltered by the Plan. To the extent a Priority Claim is due, payable

before the Effective Date and unpaid as of the Effective Date, the Debtor shall pay it in full on or before the Effective Date.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS

The Plan classifies the Claims against the Debtor as follows:

3.1 Class 1 consists of the Secured Claims of Senior Secured Lenders.

3.2 Class 2 consists of Trade Claims.

3.3 Class 3 consists of Unsecured Claims.

3.4 Class 4 consists of Equity Securities.

## ARTICLE IV
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

The Classes of Claims are being treated as follows:

4.1 ***Class 1: Secured Claims of Senior Secured Lenders.*** The Secured Claims of Senior Secured Lenders are treated as follows:

(a) ***Amount.*** The Senior Secured Lenders shall be deemed to have an Allowed Claim in a collective amount of $75,845,244.43 as of the Petition Date with each Senior Secured Lender's Claim in the amount stated on Addendum 4.1(a). Each Senior Secured Lender shall be deemed to have an Allowed Secured Claim in a collective amount of $75,086,791.99 as of the Petition Date with each Senior Secured Lender's Secured Claim in the amount stated on Addendum 4.1(a). The difference between the Senior Secured Lender's Total Claim and its Secured Claim for each Senior Secured Lender is deemed to be an Unsecured Claim in the amount stated on Addendum 4.1(a). ***The amounts stated on Addendum 4.1(a) are from the Debtor's records and as of the record date of July 31, 2025. Before the Confirmation Date, the Debtor and the Senior Secured Lenders shall modify the Plan with an updated Addendum 4.1(a) to reflect the amounts as of the Petition Date.***

(b) ***Treatment.*** On the Effective Date, each Senior Secured Lender shall receive the following:

(i) ***Series A1 Notes.*** Its Pro Rata share of the Series A1 Notes issued by the Debtor in the aggregate principal amount of $20,000,0000, which shall provide for (i) monthly payments of interest only at the rate of 6.25% per annum for the first 24 months, commencing on the first day of the first month after the Effective Date and (ii) commencing on the 25th month after the Effective Date, equal monthly payments of principal and interest at the rate of 6.25% amortized over 15 years until each Senior Secured Lender's Series A1 Note is paid in full.

(ii) ***Series A2 Notes.*** Its Pro Rata share of the Series A2 Notes issued by the Debtor in the aggregate principal amount of $55,086,791.99, subject to modification of Addendum 4.1(a) as stated above, which shall provide for monthly payments of interest at the rate of 6.25% per annum in kind (in lieu of payment in cash), commencing on the first day of the first month after the Effective Date through and including 180 months thereafter. The aggregate outstanding principal amount of the Series A2 Notes shall be automatically increased on each such payment date by the amount of such interest paid in kind. The Series A2 Notes shall be repaid from the Net Proceeds of the Sale; provided that the Senior Secured Lender's receipt of the Net Proceeds of the Sale shall be a complete

satisfaction of the Series A2 Notes. The amounts of the Series A1 and A2 notes are stated on Addendum 4.1(b).The Senior Secured Lenders waive their rights to make an election under §1111(b) of the Code.

(iii) ***Retention and Release of Liens.*** The Debtor's obligations under the Amended and Restated Senior Secured Notes and the related Amended and Restated Operative Agreements shall be secured by the existing Liens securing the Secured Claims on the Petition Date. The Senior Secured Lenders shall release their Liens at the closing of a Sale as provided in Section 4.1(c) below or upon both Series A1 and A2 Notes being otherwise paid in full.

(c) ***Marketing and Sale of the Debtor's Business.*** The Debtor will actively market the Debtor's business for Sale in a commercially reasonable manner commencing no later than two months after the Effective Date. A representative appointed by the Senior Secured Lenders shall be involved with the Debtor in the marketing process, be provided with all offers to purchase received by the Debtor within 15 days of their receipt and must approve of any offer before the Debtor accepts it. Approval by the Senior Secured Lenders shall not be unreasonably withheld, conditioned or delayed.

(d) ***Distribution of Net Proceeds from a Sale.*** The Net Proceeds from any Sale shall be applied in the following order of priority: (i) payment in full of the Series A1 Notes; (ii) after payment in full in accordance with clause (i), payment in full of the Series A2 Notes; (iii) after payment in full in accordance with clauses (i) and (ii), payment of the Debtor's trade or other debts incurred in the normal course of operating the Reorganized Debtor's business; and (iv) after payment in full in accordance with clauses (i) and (ii), Equity Securities.

(e) ***Side Letter.*** Blough shall enter into that Side Letter pursuant to which Blough or a Person on his behalf shall provide funds to the Debtor so that it timely fulfills its obligations relating to the business operations and property expenses of the Debtor and payments due under the Plan, including the payments due the Senior Secured Lenders to the extent that the Debtor's revenue is insufficient to its pay operating expenses, other costs, debt service to the Senior Secured Lenders.

(f) ***Waiver of Avoidance Actions.*** The Debtor hereby waives all Avoidance Actions against the Senior Secured Lenders.

(g) ***Treatment of the Unsecured Portion of the Senior Secured Lenders' Claims.*** The portions of Senior Secured Lenders' Claims that are not Secured Claims are Unsecured Claims, which are conclusively determined to be the amounts listed on Addendum 4.1(a). The Unsecured Claims are included in Class 3, Unsecured Claims.

(h) ***Payment of Wells Fargo Fees and Expenses.*** In connection with the Plan and concurrently with the entry into the Amended and Restated Operative Agreements, the Debtor shall pay the outstanding pre-petition and post-petition fees and expenses of Wells Fargo. Section 5.06(a) of the Collateral Trust Indenture, dated as of September 28, 2017, by Wells Fargo, as Collateral Trustee, and the Senior Secured Lenders, and the Debtor, as amended from time to time, shall remain in full force and effect, and Wells Fargo shall be entitled to pay its outstanding pre-petition and post-petition fees and expenses, to the extent unpaid, as set forth therein.

(i) ***Impairment and Voting.*** Class 1 is impaired under the Plan. The Senior Secured Lenders are entitled to vote to accept or reject the Plan.

4.2 ***Class 2: Trade Claims.*** The legal, equitable, and contractual rights of the Creditors holding Trade Claims in Class 2 are unaltered by the Plan. The Reorganized Debtor shall pay Class 2 Trade Claims in full on the Effective Date if they have not been paid, or as under the payment terms of the Trade Claim. Class 2 is unimpaired. Creditors holding Class 2 are not entitled to vote to accept or reject the Plan.

4.3 ***Class 3: Unsecured Claims.*** Unsecured Claims in Class 3 (which include the Secured Lenders' Unsecured Claims) shall be satisfied as follows:

(a) Each Class 3 Unsecured Claim is deemed to be the amount listed on Addendum 4.3(a), subject to modification for Senior Secured Lenders as provided in Section 4.1(a).

(b) ***Pro-Rata Sharing in $ 500,000 Pot.*** Unsecured Claims in Class 3 shall receive their share Pro-Rata share of $500,000 on the 30th day after the Effective Date. The $500,000 will be funded by EEC Property Holdings. For purposes of the distribution on the 30th day, the amounts on Addendum 4.3(a) shall be used unless an objection is filed. UCal's share will be paid to EEC Property Holdings.

(c) ***[Intentionally left blank.]***

(d) ***UCal's Distribution.*** Pursuant to § 1123(b)(3) of the Code, the provisions of this Section 4.3(d) constitute a settlement of all Claims, Administrative Expeness, causes of action, and controversies between the Debtor and UCal (the "UCal Settlement"). All obligations of the Debtor for payments to UCal arising from this Section 4.3(d) shall be deemed an Allowed Claim. In full satisfaction of its Allowed Claim, UCal forgoes receiving a Pro-Rata share of the $500,000. Instead, UCal will receive the following treatment on account of its Allowed Claim:

(1) ***Retention of Letter of Credit Proceeds.*** On the Effective Date, the Debtor discharges, waives, and forever releases UCal from any and all Avoidance Actions and any other Claims that the Debtor has or may have, including an alleged preferential transfer claim of $550,000 arising from the issuance of a certain letter of credit issued by Citizens Bank, N.A. for the benefit of UCal dated May 22, 2025.

(2) ***Operational Payment.*** On the Effective Date, the Debtor shall pay UCal the "Operational Payment," as defined and determined in Transaction Confirmation #001A dated December 21, 2020 between the Debtor and UCal, for the year ending December 31, 2024, in the approximate amount of $79,549.

(3) ***HIB Payment.*** The Debtor shall pay UCal the "HIB Payment," as defined and determined in Transaction Confirmation #001A dated December 21, 2020 between the Debtor and UCal, that is earned through September 17, 2025 in two or more payments as provided below:

(i) On the Effective Date, the Debtor shall pay $338,352.12 to UCal, which is the HIB Payment due on account of HIB biomethane produced and sold through April 23, 2025; and

(ii) On or before December 1, 2025, the Debtor shall pay the remaining HIB Payment for the HIB biomethane produced through September 17, 2025, to UCal and shall provide UCal with documentation sufficient to substantiate the amount of the HIB Payment; provided however, if any HIB biomethane produced through September 17, 2025 is not sold by December 1, 2025, the Debtor shall use its reasonable best efforts to promptly sell such HIB biomethane and shall pay any remaining HIB Payment to UCal promptly upon such sale. Any dispute related to the HIB Payment that UCal and the Debtor are unable to consensually resolve shall be resolved by the Court.

(4) ***Receivable from UCal to the Debtor.*** The Debtor shall provide UCal with invoices, pipeline injection statements, and/or other documents sufficient to substantiate any amount that the Debtor asserts is owed by UCal for the delivery of biomethane by the Debtor to UCal under the UCal Contract, which is estimated to be approximately $326,500. Within 30 days after UCal receives such documentation, UCal shall pay all amounts due the Debtor for biomethane delivered by the Debtor to UCal under the UCal Contract or advise the Debtor that UCal disputes the amount due. If UCal and the Debtor are unable to resolve the amount due within three weeks after UCal

advises the Debtor of the dispute, UCal or the Debtor may seek to have the Court resolve the dispute. UCal and the Debtor agree that the Court may enter a final order determining the amount due.

(5) ***Mutual Releases.*** Except for their respective obligations under the Plan, as of the Effective Date, the Debtor and UCal each mutually release, waive, and discharge each other and their respective agents, employees, professionals, and representatives from any Claims that the Debtor or UCal may have against each other or each other's agents, professionals, employees or representatives.

(e) ***Impairment.*** Class 3 is impaired under the Plan. Creditors holding Unsecured Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.4 ***Class 4: Equity Securities.***

(a) ***Retention of Equity Securities.*** The existing holder of Equity Securities shall retain its Equity Securities subject to UCal's rights below and the rights of the Senior Secured Lenders.

(b) ***Member Contributions.*** The holder of Equity Securities as of the 30th day after the Effective Date shall contribute, as of 30 days after the Effective Date, (i) $500,000 to fund the pot for distribution to Unsecured Creditors in Class 3 as provided in Section 4.3(b), (ii) the amounts necessary to pay Administrative Expenses and Priority Claims as required in Sections 2.1 and 2.2, and (iii) capital contributions to the Reorganized Debtor as necessary for it to meet its obligations in the ordinary course of its business and under this Plan, including payments to the Senior Secured Lenders under Section 4.1(b).

(c) ***UCal's Rights Under the UCal Pledge Agreement.*** As of the Effective Date, UCal, waives and releases all its rights that exist or may exist against any Party under the UCal Pledge Agreement.

(d) ***Impairment.*** Class 4 is impaired under the Plan. The holder of the Equity Securities in Class 4 is entitled to vote to accept or reject the Plan.

4.5 ***Documenting the Rights of the Senior Secured Lenders Under Section 4.1.*** On the Effective Date, the Senior Secured Lenders, the Debtor, NLC Energy and Blough shall enter into documentation, including amended and restated notes, security interests, mortgages, financing statements and other instruments as the Senior Secured Lenders deem necessary to reflect the changes to the Prepetition Documents by the Plan as they relate to the Senior Secured Lenders' Secured Claims. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Amended and Restated Operative Agreements (i) shall be deemed granted, (ii) shall be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the Amended and Restated Operative Agreements; (iii) shall be deemed automatically perfected on the Effective Date (without any further action being required by Wells Fargo, the Senior Secured Lenders, the Reorganized Debtor, NLC Energy, or Blough), having first priority status on the subject collateral, subject only to such Liens and security interests as may be permitted under the Amended and Restated Operative Agreements; (iv) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purpose whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtor is authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## ARTICLE V
## PROVISION FOR TREATMENT OF DISPUTED CLAIMS

5.1 ***Senior Secured Lenders' Secured Claims deemed Allowed.*** Addendum 4.1(a) establishes the Senior Secured Lenders Secured Claims. Addendum 4.1(a) may be updated before the Confirmation Hearing. However, the final version of Addendum 4.1(a) shall establish the respective Secured Claims of each Senior Secured Lender for all purposes of this Plan.

5.2 ***Objection to Trade Claims.*** The Debtor will file no objections to Trade Claims and waives any causes of action based upon Avoidance Actions against Trade Claims. The Debtor and Creditors holding Trade Claims retain all their rights that existed on the Petition Date. The filing of a proof of claim shall have no effect, including issue or claim preclusion effect, on the rights of the Debtor to dispute the Claim under applicable nonbankruptcy law or of the Creditor to enforce its rights under applicable nonbankruptcy law.

5.3 ***[Intentionally left blank.]***

## ARTICLE VI
## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

6.1 ***Cash for Payments Shortly After the Effective Date.*** Cash necessary to fund payments on or shortly after the Effective Date shall be from the regular business income of the Reorganized Debtor, member capital contributions from EEC Property Holdings, and the Side Letter pursuant to which Blough shall make certain payments and the Senior Secured Lenders will forbear and grant certain releases all in accordance with such Side Letter.

6.2 ***Management of the Reorganized Debtor.*** Existing management shall manage the affairs of the Reorganized Debtor after the Effective Date. The managing member shall be Blough. However, the holders of the Equity Securities may determine changes to management as permitted under applicable non-bankruptcy law.

6.3 ***Withholding Taxes.*** The Reorganized Debtor shall withhold from installments, payments and distributions under the Plan any amount which must be withheld for taxes to the extent required by applicable law.

6.4 ***Professional Fees and Expenses.*** Each Person retained or requesting compensation in this case pursuant to §§ 327, 328, 330, 503(b) or 1103 of the Code shall be entitled to file an application for allowance of final compensation and reimbursement of expenses in the case by the date set by the Court.

6.5 ***Responsible Person.*** Welles C. Hatch, Chief Financial Officer, shall be the person responible for executing the and implementing the Plan, except as otherwise may be provided in this Plan on behalf of the Reorganized Debtor.

6.6 ***Debtor's Property After Confirmation.*** Except as provided in the Plan, and encumbrances of governmental authorities and utilities for easements and services, the Reorganized Debtor shall retain possession of its property, free and clear of all Liens and encumbrances.

6.7 ***Settlement of Actions or Objections.*** The Reorganized Debtor may settle or compromise any objection or action, including Avoidance Actions, without notice or Court approval, except as provided in Section 4.3(c) relating to Class 3 Unsecured Claim amounts.

6.8 ***Avoidance Actions.***

(a) ***Causes of Action Vest in the Reorganized Debtor.*** Except as otherwise provided in the Plan, all actions and Avoidance Actions, vest in the Reorganized Debtor on the Confirmation Date. The actions vested in the Reorganized Debtor include any derivative action of any Creditor.

(b) ***Action Against UCal.*** On the Effective Date, the Debtor discharges, waives and forever

releases UCal for any Avoidance Action that the Debtor may have, including an alleged preferential transfer of $550,000 arising from the Debtor's funding an account with $550,000 to secure a letter of credit issued for the benefit of UCal.

(c) ***[Intentionally left blank.]***

(d) ***[Intentionally left blank.]***

6.9 ***Confirmation Financing and Corporate Restructuring.***

(a) ***Corporate Governance.*** The Reorganized Debtor shall be governed and controlled by the managing member, Blough.

(b) ***Officer and Director Compensation.*** The compensation for officers and directors disclosed at the hearing to consider confirmation of the Plan shall continue until the managing member of the Reorganized Debtor determines otherwise.

6.10 ***Confirmation of the Plan Without Approval of Classes Entitled to Priority Over Class 4.*** If any Class entitled to vote rejects the Plan, the Debtor shall request that the Court approve the Plan pursuant to § 1129(b)(1) of the Code.

6.11 ***Payment of U.S. Trustee Fees.*** The Reorganized Debtor shall pay all fees due after the Confirmation Date pursuant to 28 U.S.C. § 1930 until the case is closed.

6.12 ***Professional Fees.*** The Reorganized Debtor shall not pay any professional fees or costs incurred before the Confirmation Date except as approved by the Court or otherwise permitted by law. The payment of any professional fees or costs after the Confirmation Date to implement the Plan shall only be made if such fees and costs are reasonable.

## ARTICLE VII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1 ***Assumption of Unexpired Leases and Executory Contracts.*** The Debtor shall assume all unexpired leases and executory contracts except for the UCal Contract as of the Effective Date. The assumed unexpired leases and executory contracts vest in the Reorganized Debtor on the Effective Date.

7.2 ***Curage Amount.*** The amount to cure any default of an unexpired leases or executory contracts under the Plan is deemed to be $0.00. ***Any counterparty to an executory contract or unexpired lease that fails to object to the proposed assumption or the deemed curage amount by the date set for objections to confirmation of the Plan will be deemed to have consented to the assumption and deemed to release any Claim and cause of action for monetary defaults under the executory contract or unexpired lease.***

7.3 ***Rejection of Unexpired Leases and Executory Contracts.*** The Debtor has filed a motion to reject the executory contract with UCal, and it will be rejected by the Order resolving that motion.

7.4 ***Rejection Damages.*** The amount of the Unsecured Claim from the rejection of the UCal Contract is deemed to be $8,600,000.

## ARTICLE VIII
## AMENDMENTS AND WAIVER

Except as otherwise provided in the Plan and § 1127 of the Code, any non-material term of the Plan may be amended or modified at any time, and the enforcement and observance of any term of the Plan may be waived at any

time provided that all Creditors affected by the amendment of waiver have received notice of the proposed non-material amendment or waiver and have not objected in writing within a reasonable period of time and, in any event, any period of time which may be set by the Court.

## ARTICLE IX
## EFFECT OF CONFIRMATION

9.1 ***Discharge of Debtor***. Except as otherwise provided in the Plan or in the Confirmation Order, the Debtor will obtain a discharge as provided in § 1141 of the Code upon the Effective Date.

9.2 ***Injunction.*** Except as otherwise provided in the Plan, all Persons who have held, hold, or may hold Claims as of the Effective Date are permanently enjoined from and after the Effective Date to the extent provided in § 1141.

9.3 ***Consummation***. Upon substantial consummation of the Plan, the Reorganized Debtor will move for a final decree closing the Case and requesting such orders as may be just and equitable.

9.4 ***Exculpation.*** Except as otherwise expressly provided by the Plan or the Confirmation Order or other Final Order of the Bankruptcy Court, on the Effective Date, ***the Exculpated Parties and each of their respective agents, representatives, successors and assigns, shall be deemed released and exculpated from any claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Case, including the formulation, dissemination and pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan,*** except for acts or omissions that constitute willful misconduct, gross negligence or fraud, and all such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

9.5 ***Limited Releases***. Except as otherwise expressly provided or contemplated in the Plan or the Confirmation Order, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of and other forms of consideration being provided by the Released Parties, ***the Debtor, the Debtor's chapter 11 estate and the Reorganized Debtor shall release, waive and discharge unconditionally and forever each of the Released Parties from any and all Claims***, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Petition Date in connection with or relating to the Debtor or any of its direct or indirect subsidiaries; and (ii) in connection with, related to, or arising out of this Chapter 11 Case, the formulation, dissemination or pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; provided that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct or the gross negligence of any Released Party unless such Released Party acted in good faith and in a manner that such Released Party reasonably believed to be in or not opposed to the best interests of the Debtor, and with respect to any criminal action or proceeding, had no reasonable cause to believe such Released Party's conduct was unlawful; provided, however, that the foregoing shall not operate as a waiver or release of any rights or obligations arising from and after the Effective Date in respect of any agreements expressly entered into or reaffirmed hereunder as of or following the Effective Date.

## ARTICLE X
## RETENTION OF JURISDICTION

To the extent not otherwise prohibited by applicable law, the Court may retain jurisdiction over this Case until the Plan has been fully consummated for all appropriate purposes including, but not limited to, the following:

10.1 To hear and determine all applications for compensation of professionals under § 330 of the Code.

10.2 To classify or reclassify a Claim, and to resolve all objections related to a Claim.

10.3 To determine all questions and disputes arising under the Plan including those regarding title to or interests in the Reorganized Debtor's assets as well as the resolution of all Claims, causes of action, controversies, disputes or conflicts, including any preference, fraudulent conveyance or avoidance action pending as of the Confirmation Date.

10.4 To correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order necessary to carry out the purposes and intent of the Plan.

10.5 To modify the Plan after confirmation.

10.6 To enforce and interpret the terms and conditions of the Plan, and to enforce all orders entered by the Court.

10.7 To enter any order, including orders for injunctive relief, necessary to enforce the title, rights and powers of the Debtor or Reorganized Debtor, as well as the imposition of such restrictions, limitations, terms, and conditions as the Court may deem necessary.

10.8 To supervise or approve any aspect of any Claim that might be pursued on behalf of the Debtor, Reorganized Debtor or any Creditor.

10.9 To resolve all adversary actions brought in the Case.

10.10 To enter any order concluding and terminating the Case.

10.11 To resolve any disputes between UCal and the Debtor of amounts that either of them may owe the other Party.

## ARTICLE XI
## CONDITIONS PRECEDENT TO EFFECTIVENESS

The Effective Date shall occur when each of the following conditions has been met, or Sections 11.2, 11.4 and 10.5 have been waived by the Debtor filing a notice of the waiver with the Court:

11.1 The Confirmation Order shall have been entered by the Court.

11.2 There has not been an appeal of the Confirmation Order filed.

11.3 There is no stay of the Confirmation Order entered by the Court.

11.4 Twenty business days have passed after the Confirmation Order becomes a Final Order.

11.5 The documents necessary to reflect the terms of the Plan for the Senior Secured Lenders as provided for in Section 4.5, including the Side Letter, the Amended and Restated Senior Secured Notes and the Amended and Restated Operative Agreements are executed and delivered and all conditions precedent to the effectiveness therein have been met.

## ARTICLE XII
## MISCELLANEOUS

12.1 "On the Effective Date" as to any action required to be done under the Plan means on the Effective Date itself or as soon as practicable that can be accomplished by a reasonably diligent Person. Time is not of the essence.

12.2 The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the text of the Plan.

12.3 The rules of construction used in § 102 of Code shall apply to the construction of the Plan.

12.4 All fees under 28 U.S.C. § 1930, due to the U.S. trustee, that have not been paid shall be paid within 10 days of the Effective Date.

12.5 Any orders entered or agreements approved by the Court for the use of cash collateral, for adequate protection or for payments in lieu of the lifting of the automatic stay shall terminate as of the Effective Date. As of the Effective Date, the relationship between the Debtor and all Creditors shall be governed by the Plan.

12.6 The fees and costs of attorneys or other professional Persons to administer consummation of the Plan shall be reasonable.

## ARTICLE XII
## CONCLUSION

The Plan reflects the Debtor's best efforts to reorganize its business in a manner that preserves its continued viability, advances the interests of Creditors, and complies in all aspects with the requirements of the Code.

Dated: August 14, 2025, as modified
on October 17, 2025.

*<u>/s/ Jerome R. Kerkman</u>*
Jerome R. Kerkman
Kerkman & Dunn

Attorneys for NLC Energy Denmark LLC

Contact Information:

839 N. Jefferson St., Suite 400
Milwaukee, Wisconsin 53202-3744
Phone: 414.277.8200
Facsimile: 414.277.0100
Email: jkerkman@kerkmandunn.com

**Addendum 1.18**
**Legal Description for the Denmark Facility**

Lot 1 of Certified Survey Map No. 9113, said map recorded on October 9, 2019, as Document No. 2878788, being all of Lot 1 and Lot 2 of Certified Survey Map, Volume 60 Page 361 #8591, being part of the Northeast of the Southwest of Section 35, Town 22 North, Range 22 East, Town of New Denmark, Brown County, Wisconsin.

That part of the Southwest 1/4 of the Southwest 1/4 of Section 21, Township 22 North, Range 22 East, in the Village of Denmark, Brown County, Wisconsin, being and lying West of U.S. Highway 141 as it existed on August 26, 1955, AND Part of the Southwest 1/4 of the Southwest 1/4 of Section 21, Township 22 North, Range 22 East, in the Village of Denmark, Brown County, Wisconsin described in Document No. 2259769, excepting therefrom that part thereof described in Volume 329 of Deeds on Page 143 and excepting that part thereof used for highway purposes. Also excepting part described in Jacket 5779 of records, image 26 as Document No. 988395.

EXCEPTING THEREFROM that part located and described as follows: Commencing at the Northwest corner of the said Southwest 1/4 of the Southwest 1/4, thence South 0°32' East 262.60 feet; thence North 89°01' East 521.9 feet to the centerline of old U.S. Highway 141; thence Northwesterly along the centerline of old U.S. Highway 141; 267.1 feet to the North line of the aforementioned Southwest 1/4 of the Southwest 1/4; thence South 89°01' West 473.5 feet to the point of commencement.

**Addendum 1.51**
**UCal Contract Description**

The Debtor's contract with UCal consists of the following documents, which are collectively defined as the "UCal Contract:"

(a) The "Base Contract for Sale and Purchase of Natural Gas," dated August 12, 2016, that was executed by UCal and EEC Denmark Tenant LLC, the Debtor's predecessor-in-interest;

(b) The "Special Provisions to the NAESB Standard 6.3.1, September 5, 2006 Base Contract for Sale and Purchase of Natural Gas," dated August 12, 2016, that was executed by UCal and EEC Denmark LLC;

(c) "Transaction Confirmation for Immediate Delivery, Transaction Confirmation #001," dated August 12, 2016, that was executed by UCal and EEC Denmark Tenant LLC;

(d) "Amendment 1 to Transaction Confirmation," dated January 1, 2017, that was executed by UCal and EEC Denmark Tenant LLC;

(e) "Amendment 2 to Transaction Confirmation," dated September 27, 2017, that was executed by UCal and "New Organic Digestion, LLC, as successor in interest to EEC Denmark Tenant LLC;" and

(f) "Transaction Confirmation # 001A," dated December 21, 2020, that was executed by UCal and New Organic Digestion LLC."

**Addendum 4.1(a)**[1]
**Senior Secured Lenders' Claims**

| Addendum 4.1(a) - Senior Secured Lenders' Claims | | | |
|---|---|---|---|
| | | | |
| **Description** | **Senior Secured Lender's Total Claim** | **Senior Secured Lender's Secured Claim** | **Lender's Unsecured Claim** |
| | | | |
| **Secured Claims of the Senior Secured Lenders** | | | |
| Catholic Order of Foresters | $ 2,669,162.37 | $ 2,642,470.75 | $ 26,691.62 |
| Federated Life Insurance Company | $ 6,405,989.68 | $ 6,341,929.78 | $ 64,059.90 |
| Federated Mutual Insurance Company | $ 12,811,979.35 | $ 12,683,859.56 | $ 128,119.79 |
| Federated Service Insurance Company | $ 1,708,263.91 | $ 1,691,181.27 | $ 17,082.64 |
| Fidelity & Guaranty Life Insurance Co. | $ 21,353,298.92 | $ 21,139,765.93 | $ 213,532.99 |
| First Farmers Bank & Trust | $ 7,781,604.12 | $ 7,703,788.08 | $ 77,816.04 |
| Granite RE, Inc. | $ 427,065.98 | $ 422,795.32 | $ 4,270.66 |
| Life Insurance Company of the Southwest | $ 8,541,319.57 | $ 8,455,906.37 | $ 85,413.20 |
| National Life Insurance Company | $ 7,473,654.62 | $ 7,398,918.07 | $ 74,736.55 |
| HARE & CO, as Nominee for Safety National Casu | $ 6,672,905.91 | $ 6,606,176.85 | $ 66,729.06 |
| **Totals** | **$ 75,845,244.43** | **$ 75,086,791.99** | **$ 758,452.44** |

[1] Secured Secured Lender's Total Claim and Senior Secured Lender's Secured Claim are subject to modification as provided in Section 4.1(a).

**Addendum 4.1(b)**
**Senior Secured Lenders' Series A1 Note and Series A2 Note Amounts**[2]

| Addendum 4.1(b) - Senior Secured Lenders' Series A1 and A2 Note Allocations | | | |
|---|---|---|---|
| **Description** | **Senior Secured Lender's Total Claim** | **Senior Secured Lenders' Series A1 Notes** | **Senior Secured Lenders' Series A2 Notes** |
| Catholic Order of Foresters | $ 2,642,470.75 | $ 703,844.36 | $ 1,938,626.39 |
| Federated Life Insurance Company | $ 6,341,929.78 | $ 1,689,226.46 | $ 4,652,703.33 |
| Federated Mutual Insurance Company | $ 12,683,859.56 | $ 3,378,452.91 | $ 9,305,406.64 |
| Federated Service Insurance Company | $ 1,691,181.27 | $ 450,460.39 | $ 1,240,720.88 |
| Fidelity & Guaranty Life Insurance Co. | $ 21,139,765.93 | $ 5,630,754.86 | $ 15,509,011.07 |
| First Farmers Bank & Trust | $ 7,703,788.08 | $ 2,051,968.89 | $ 5,651,819.18 |
| Granite RE, Inc. | $ 422,795.32 | $ 112,615.10 | $ 310,180.22 |
| Life Insurance Company of the Southwest | $ 8,455,906.37 | $ 2,252,301.94 | $ 6,203,604.43 |
| National Life Insurance Company | $ 7,398,918.07 | $ 1,970,764.20 | $ 5,428,153.87 |
| HARE & CO, as Nominee for Safety National ( | $ 6,606,176.85 | $ 1,759,610.89 | $ 4,846,565.96 |
| **Totals** | **$ 75,086,791.99** | **$ 20,000,000.00** | **$ 55,086,791.99** |

[2] Secured Secured Lender's Total Claim and Senior Secured Lender's Secured Claim are subject to modification as provided in Section 4.1(a). The modifications will affect the Series A2 Note amounts.

**Addendum 4.3(a)**
**Class 3 Unsecured Claims[3]**

| Addendum 4.3(a) - Class 3 Unsecured Claims | | |
|---|---|---|
| | | |
| **Description** | | **Unsecured Claims** |
| | | |
| Catholic Order of Foresters | $ | 26,691.62 |
| Federated Life Insurance Company | $ | 64,059.90 |
| Federated Mutual Insurance Company | $ | 128,119.79 |
| Federated Service Insurance Company | $ | 17,082.64 |
| Fidelity & Guaranty Life Insurance Co. | $ | 213,532.99 |
| First Farmers Bank & Trust | $ | 77,816.04 |
| Granite RE, Inc. | $ | 4,270.66 |
| Life Insurance Company of the Southwest | $ | 85,413.20 |
| National Life Insurance Company | $ | 74,736.55 |
| HARE & CO, as Nominee for Safety National Casualty Corporation | $ | 66,729.06 |
| | | |
| Cedar Holdings LLC | $ | 27,071,841.00 |
| NLC Energy LLC | $ | 59,133,885.00 |
| | | |
| The Regents for the University of California | $ | 8,600,000.00 |
| | | |
| **Total** | $ | 95,564,178.44 |

[3] Secured Secured Lender's Total Claim and Senior Secured Lender's Unsecured Claim are subject to modification as provided in Section 4.1(a). The Unsecured Claim amount is equal to 1% of each Senior Secured Lender's Total Claim.

**Addendum 4.5(A)**

**NLC Energy Denmark LLC**

6.25% Amended and Restated Series A1 Senior Secured Note Due on the Maturity Date (defined herein)

No. RA1-[_____]<br>$[____________]

[________]<br>PPN 64758# AA4

NLC Energy Denmark LLC, a limited liability company organized under the laws of the State of Wisconsin (the *"Company"*), for value received, hereby promises to pay to or to the order of [______________] or registered assigns, the original principal amount of $[____________________] together with interest from the date hereof until maturity at the rate of 6.25% per annum (computed on the basis of a 360-day year of 12 consecutive 30-day months) in installments as follows:

(i) installments of interest only, if any, each in the amount of as set forth on the schedule attached hereto as Annex I due and payable on the fifteenth (15th) day of each calendar month during the period beginning on [_______] until [______][1];

(ii) [________] installments, each consisting of principal and interest in the amount as set forth on the schedule attached hereto as Annex I due and payable on the fifteenth (15th) day of each month thereafter to but not including the Maturity Date; and

(iii) an amount equal to the outstanding principal and accrued interest due and payable on the Maturity Date.

As used herein, the term *"Maturity Date"* shall mean [_______].

The Company further promises to pay interest at the rate of 8.25% per annum (i) on each overdue installment of principal, premium, if any, and (to the extent legally enforceable) upon each overdue installment of interest in each case from and after the due date of each such installment, whether by acceleration or otherwise, until paid and (ii) during the continuance of an Event of Default, on the unpaid balance hereof and on any overdue payment of any Make-Whole Amount. Payments of principal, premium, if any, and interest shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for the payment of public and private debts by check mailed and addressed to the holder hereof at the address set forth on page 1 of the Note Purchase Agreement described below, or, at the option of the holder hereof, in such manner and at such other place in the United States of America as the holder hereof shall have designated to the Company in writing.

[1] The date that is 24 months later.

**Addendum 4.5(A)**

This Note is issued under and pursuant to the terms and provisions of the Amended and Restated Note Purchase Agreement dated as of [_______] (the *"Note Purchase Agreement"*) entered into by the Company and the purchasers listed on Schedule I attached thereto (the *"Purchasers"*) and secured by (i) an Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts, and Fixture Filing Statement (the *"Mortgage"*) from the Company to the Collateral Trustee for the benefit of the purchasers of the Note, (ii) an Amended and Restated Assignment of Leases and Rents from the Company to the Collateral Trustee assigning the Company's right, title and interest in and to any lease, any other leases and rents, (iii) a Collateral Assignment and Security Agreement, American Foods dated as of the date hereof (the *"Collateral Assignment"*) from the Company, assigning all of its right, title and interest in the American Foods Contract to the Collateral Trustee and (iv) that certain Construction Completion Guaranty dated as of September 28, 2017 (the *"Construction Completion Guaranty"*) from Douglas F. Blough, an individual (*"Construction Completion Guarantor"*) whereby the Construction Completion Guarantor guarantees certain obligations of the Company during construction of the Project, as reaffirmed by the Reaffirmations (as defined in the Mortgage). This Note and the holder hereof are entitled to all the benefits provided for by the Note Purchase Agreement, the Collateral Trust Indenture, the Mortgage, the Collateral Assignments, Assigned Contracts and the other Operative Agreements to which reference is hereby made for the statement thereof, including a description of the Mortgaged Property (as defined in the Mortgage), the nature and extent of the security and the rights of the holder of the Note and of the Company in respect thereof. Capitalized terms not otherwise defined herein shall have the respective meanings ascribed thereto in the Mortgage.

This Note and the other notes issued to the Purchasers on the date hereof under the Note Purchase Agreement hereby amend and restate those certain $67,500,000 original aggregate principal amount and $76,550,505 aggregate fully-accreted principal amount of 6.25% Series A1 Senior Secured Notes, dated as of September 28, 2017 (the "*Original Notes*") of the Company. This Note shall not constitute, nor be construed as, a novation of (a) any of the Original Notes or (b) the indebtedness or other obligations evidenced by the Original Notes.

**Addendum 4.5(A)**

This Note may be declared due prior to its expressed maturity date, voluntary prepayments may be made thereon by the Company and certain prepayments are required to be made thereon, all in the events, on the terms and in the manner and amounts as provided in the Mortgage.

NLC ENERGY DENMARK LLC,
a Wisconsin limited liability company

By:______________________________________
Name:
Title:

**Addendum 4.5(A)**

**ANNEX I**

**SCHEDULE**

**Addendum 4.5(B)**

**NLC Energy Denmark LLC**

6.25% Amended and Restated Series A2 Senior Secured Note Due on the Maturity Date (defined herein)

No. RA2-[_____]
$[____________]

[________]
PPN 64758# AB2

NLC Energy Denmark LLC, a limited liability company organized under the laws of the State of Wisconsin (the *"Company"*), for value received, hereby promises to pay to or to the order of [______________] or registered assigns, the original principal amount of $[____________________] together with interest from the date hereof until maturity at the rate of 6.25% per annum (computed on the basis of a 360-day year of 12 consecutive 30-day months) in installments as follows:

(i) installments of interest, each in the amount of as set forth on the schedule attached hereto as Annex I due and payable in kind (in lieu of payment in cash) and added to the outstanding principal balance on the fifteenth (15th) day of each calendar month to but not including the Maturity Date; *provided, however*, interest paid in cash under the Restructuring Side Letter (as defined in the Mortgage) to the holder hereof as set forth on the schedule attached hereto as Annex I shall reduce the amount to be paid in kind hereunder; and

(ii) an amount equal to the outstanding principal and accrued interest due and payable on the Maturity Date.

As used herein, the term *"Maturity Date"* shall mean [_______].

The Company further promises to pay interest at the rate of 8.25% per annum (i) on each overdue installment of principal, premium, if any, and (to the extent legally enforceable) upon each overdue installment of interest in each case from and after the due date of each such installment, whether by acceleration or otherwise, until paid and (ii) during the continuance of an Event of Default, on the unpaid balance hereof and on any overdue payment of any Make-Whole Amount. Payments of principal, premium, if any, and interest shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for the payment of public and private debts by check mailed and addressed to the holder hereof at the address set forth on page 1 of the Note Purchase Agreement described below, or, at the option of the holder hereof, in such manner and at such other place in the United States of America as the holder hereof shall have designated to the Company in writing.

This Note is issued under and pursuant to the terms and provisions of the Amended and Restated Note Purchase Agreement dated as of [_______] (the *"Note Purchase Agreement"*) entered into by the Company and the purchasers listed on Schedule I attached thereto (the *"Purchasers"*) and secured by (i) an Amended and Restated Mortgage, Security Agreement,

Assignment of Leases, Rents and Assigned Contracts, and Fixture Filing Statement (the *"Mortgage"*) from the Company to the Collateral Trustee for the benefit of the purchasers of the Note, (ii) an Amended and Restated Assignment of Leases and Rents from the Company to the Collateral Trustee assigning the Company's right, title and interest in and to any lease, any other leases and rents, (iii) a Collateral Assignment and Security Agreement, American Foods dated as of the date hereof (the *"Collateral Assignment"*) from the Company, assigning all of its right, title and interest in the American Foods Contract to the Collateral Trustee and (iv) that certain Construction Completion Guaranty dated as of September 28, 2017 (the *"Construction Completion Guaranty"*) from Douglas F. Blough, an individual (*"Construction Completion Guarantor"*) whereby the Construction Completion Guarantor guarantees certain obligations of the Company during construction of the Project, as reaffirmed by the Reaffirmations (as defined in the Mortgage). This Note and the holder hereof are entitled to all the benefits provided for by the Note Purchase Agreement, the Collateral Trust Indenture, the Mortgage, the Collateral Assignments, Assigned Contracts and the other Operative Agreements to which reference is hereby made for the statement thereof, including a description of the Mortgaged Property (as defined in the Mortgage), the nature and extent of the security and the rights of the holder of the Note and of the Company in respect thereof. Capitalized terms not otherwise defined herein shall have the respective meanings ascribed thereto in the Mortgage.

This Note and the other notes issued to the Purchasers on the date hereof under the Note Purchase Agreement hereby amend and restate those certain $10,500,000 original aggregate principal amount and $7,829,055 aggregate fully-accreted principal amount of 7.75% Series A2 Senior Secured Notes, dated as of September 28, 2017 (the "*Original Notes*") of the Company. This Note shall not constitute, nor be construed as, a novation of (a) any of the Original Notes or (b) the indebtedness or other obligations evidenced by the Original Notes.

**Addendum 4.5(B)**

This Note may be declared due prior to its expressed maturity date, voluntary prepayments may be made thereon by the Company and certain prepayments are required to be made thereon, all in the events, on the terms and in the manner and amounts as provided in the Mortgage.

NLC ENERGY DENMARK LLC,
a Wisconsin limited liability company

By:____________________________________
Name:
Title:

**Addendum 4.5(B)**

**ANNEX I**

**SCHEDULE**

**Addendum 4.5(C)**

Document Number

This is a Construction Mortgage

Recording Area

Name and Return Address
Philip M. J. Edison, Esq.
Chapman and Cutler LLP
320 South Canal Street
Chicago, Illinois 60606

Parcel Identification Number (PIN)

Tax Key No.: VD-ND436-2
Address: 5856 CTH R

Tax Key No: ND 756-2
Address: 6541-6587 CTH R

Tax Key No: ND 756-1
Address: 6601 CTH R

**THIS PAGE IS PART OF THIS LEGAL DOCUMENT – DO NOT REMOVE.**

Tl PIN (if
re on this
first page of the document or may be placed on additional pages of the document.

**Addendum 4.5(C)**

This is a Construction Mortgage

Town of New Denmark
County of Brown
State of Wisconsin

This instrument was prepared by and when recorded return to:
Philip M. J. Edison, Esq.
Chapman and Cutler LLP
320 South Canal Street
Chicago, Illinois 60606

---

AMENDED AND RESTATED MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES, RENTS AND ASSIGNED CONTRACTS
AND FIXTURE FILING STATEMENT

Dated as of _______,

From

NLC ENERGY DENMARK LLC

(the *"Mortgagor"*)

To

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS REPRESENTATIVE CAPACITY AS COLLATERAL TRUSTEE

(the *"Mortgagee"*)

**NOTICE: THIS INSTRUMENT SECURES FUTURE ADVANCES, THE PRIORITY OF WHICH DATE TO THE RECORDING DATE HEREOF.**

---

**Addendum 4.5(C)**

**TABLE OF CONTENTS**


| SECTION | HEADING | PAGE |
| --- | --- | --- |
| Parties | | 1 |
| Recitals | | 2 |
| Granting Clauses | | 4 |
| SECTION 1. | DEFINITIONS | 11 |
| SECTION 2. | GENERAL COVENANTS AND WARRANTIES | 19 |
| Section 2.1. | Office for Notices | 19 |
| Section 2.2. | Maintenance of Existence, Rights | 19 |
| Section 2.3. | Negative Covenants | 19 |
| Section 2.4. | Mergers and Consolidations | 24 |
| Section 2.5. | Financial Information and Reports | 24 |
| Section 2.6. | Notice of Default | 25 |
| Section 2.7. | Mortgage Title Insurance Policy | 25 |
| Section 2.8. | Payment of Certain Taxes | 26 |
| Section 2.9. | Ownership of Mortgaged Property | 26 |
| Section 2.10. | Further Assurances | 26 |
| Section 2.11. | Payment of Principal and Interest | 26 |
| Section 2.12. | Prepayment of Notes | 26 |
| Section 2.13. | Method and Place of Payment of Principal and Interest | 27 |
| Section 2.14. | Maintenance of Mortgaged Property, Other Liens, Compliance with Laws, Etc. | 28 |
| Section 2.15. | Insurance | 29 |
| Section 2.16. | Payment of Taxes and Other Charges | 31 |
| Section 2.17. | Limitation on Liens | 32 |
| Section 2.18. | Assignment; Obligations and Terms Respecting any Lease, the Assigned Contracts, the Other Contracts and any Lease Guaranties | 33 |
| Section 2.19. | Advances | 37 |
| Section 2.20. | Recordation | 38 |
| Section 2.21. | After-Acquired Property | 39 |
| Section 2.22. | Environmental Indemnity | 39 |
| Section 2.23. | Separate Identity | 39 |
| Section 2.24. | General Indemnity | 39 |
| Section 2.25. | No Forfeiture | 40 |
| Section 2.26. | Bankruptcy Proceedings | 41 |
| Section 2.27. | Conversion to Delaware Statutory Trust | 41 |
| Section 2.28. | Maintenance of Rating | 42 |
| Section 2.29. | Final Sale | 43 |

Section 2.30. Collateral Assignment of $CO_2$ Contracts .....43
Section 2.31. Compliance with Reporting Requirements in Conditional Use Permits .....43

SECTION 3. POSSESSION, USE AND RELEASE OF PROPERTY .....43

Section 3.1. The Mortgagor's Right of Possession .....43
Section 3.2. Release of Mortgaged Property - Event of Loss and Prepayment of Notes .....44
Section 3.3. Eminent Domain .....44

SECTION 4. APPLICATION OF INSURANCE AND CERTAIN OTHER MONEYS RECEIVED BY THE MORTGAGEE .....44

Section 4.1. Insurance Proceeds and Condemnation Awards .....44
Section 4.2. Title Insurance .....45
Section 4.3. Investment of Insurance Proceeds and Condemnation Awards or Compensation .....45
Section 4.4. Application If Event of Default Exists .....46

SECTION 5. DEFAULTS AND REMEDIES THEREFOR .....46

Section 5.1. Events of Default .....46
Section 5.2. Remedies .....48
Section 5.3. Application of Proceeds .....52
Section 5.4. Waiver of Extension, Appraisement and Stay Laws .....52
Section 5.5. Costs and Expenses of Foreclosure .....53
Section 5.6. Delay or Omission Not a Waiver .....53
Section 5.7. Restoration of Positions .....54
Section 5.8. Notes to Become Due upon Sale .....54

SECTION 6. MISCELLANEOUS .....54

Section 6.1. Successors and Assigns .....54
Section 6.2. Severability .....54
Section 6.3. Addresses for Notices and Demands .....54
Section 6.4. Headings and Table of Contents .....55
Section 6.5. Release of Mortgage .....55
Section 6.6. Counterparts .....55
Section 6.7. Governing Law .....56
Section 6.8. Time .....57
Section 6.9. Limitations of Liability .....57
Section 6.10. Expenses, Stamp Tax Indemnity .....57
Section 6.11. Cooperation .....58
Section 6.12. No Merger of Estates .....58
Section 6.13. NAIC Filing. .....59
Section 6.14. Commitment. .....59
Section 6.16. Usury Savings Clause .....59

SECTION 7. [RESERVED] ... 59

SECTION 8. CONCERNING THE MORTGAGEE ... 59

Section 8.1. Concerning the Mortgagee ... 59

SECTION 9. STATE SPECIFIC PROVISIONS. ... 60

ATTACHMENTS TO THE MORTGAGE:

EXHIBIT A — Legal Description of Real Property

ADDENDUM A — State Specific Provisions

**Addendum 4.5(C)**

AMENDED AND RESTATED MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES, RENTS AND ASSIGNED CONTRACTS AND FIXTURE FILING STATEMENT dated as of _______ (the *"Mortgage"*), from NLC ENERGY DENMARK LLC, a limited liability company organized under the laws of the State of Wisconsin (the *"Mortgagor"*), having its principal office at c/o Net Lease Capital Advisors, Inc., Ten Tara Boulevard, Suite 501, Nashua, New Hampshire 03062, to WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION (formerly known as Wells Fargo Bank Northwest, N.A.), not in its individual capacity but solely in its representative capacity as Collateral Trustee (the *"Mortgagee"*), under that certain Collateral Trust Indenture (the *"Collateral Indenture"*) whose address is c/o Computershare Trust Company, N.A., 9062 Old Annapolis Road, Columbia, Maryland 21045 and amends that certain Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement dated September 28, 2017 and recorded in the land records of Brown County, Green Bay, Wisconsin as Document Number 2803294, as amended by that certain First Amendment to Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement dated as of February 15, 2019 and recorded in the land records of Brown County, Green Bay, Wisconsin as Document Number 2851278, as amended by that certain Second Amendment to Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement dated as of June 9, 2021 and recorded in the land records of Brown County, Green Bay, Wisconsin as Document Number 2964644 and as amended by that certain Third Amendment to Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement dated as of March 24, 2023 and recorded in the land records of Brown County, Green Bay, Wisconsin as Document Number 3031542 (as amended, the "*Original Mortgage*").

This Mortgage, as amended, is also a Security Agreement and financing statement under the Uniform Commercial Code of the State of Wisconsin and in compliance therewith the following information is set forth:

1. The names and addresses of the Debtor and Secured Party are:

| | |
|---|---|
| Debtor: | NLC ENERGY DENMARK LLC<br>c/o Net Lease Capital Advisors, LLC<br>Ten Tara Boulevard, Suite 501<br>Nashua, New Hampshire 03062<br>Attention: Douglas F. Blough |
| Secured Party: | Wells Fargo Trust Company, National Association, as Collateral Trustee<br>c/o Computershare Trust Company, N.A.<br>9062 Old Annapolis Rd.<br>Columbia, MD 21045<br>Email: cctleasenotices@computershare.com |

2. The property covered by this Security Agreement and financing statement is the Mortgaged Property as described in the Granting Clauses hereof.

3. Some or all of the fixtures, equipment and other property described herein are or may become fixtures, and this Security Agreement and financing statement covers goods or items of personal property which are or may become fixtures.

4. The Debtor is the record fee owner of the real estate described in Exhibit A attached hereto and made a part hereof and has a fee interest in certain improvements constructed or to be constructed thereon.

## RECITALS

A. The Mortgagor and certain purchasers (the *"Purchasers"*) have executed and delivered the Note Purchase Agreement dated as of September 28, 2017 (as amended, the *"Note Purchase Agreement"*) providing for the commitment of the Purchasers to purchase (i) $67,500,000 original aggregate principal amount and $76,550,505 aggregate fully-accreted principal amount of 6.25% Series A1 Senior Secured Notes (the *"Original Series A1 Notes"*) and (ii) $10,500,000 original aggregate principal amount and $7,829,055 aggregate fully-accreted principal amount of 7.75% Series A2 Senior Secured Notes (the *"Original Series A2 Notes"*; and collectively with the Series A1 Notes, the *"Original Notes"*) of the Mortgagor.

B. The Mortgagor has filed a voluntary petition for relief on or about August 16, 2025 (the "*Chapter 11 Filing*") under chapter 11 of title 11 of the United States Code (the "*BK Code*") with the United States Bankruptcy Court in the Eastern District of Wisconsin (the "*WI Bankruptcy Court*") in accordance with the Prepackaged Plan of Reorganization of NLC Energy Denmark LLC filed in the WI Bankruptcy Court (the "*Plan*").

C. In connection with the confirmed Plan, the Mortgagor and certain purchasers (the *"Purchasers"*) shall execute and deliver the Amended and Restated Note Purchase Agreement dated as of _______ (as amended, the *"Note Purchase Agreement"*) providing for the issuance of (i) 6.25% Amended and Restated Series A1 Senior Secured Notes in the original aggregate principal amount of $20,000,000 (the *"Series A1 Notes"*) and (ii) 6.25% Amended and Restated Series A2 Senior Secured Notes in the original aggregate principal amount of $55,086,791.99 (the *"Series A2 Notes"* together with the Series A1 Notes, collectively, the *"Notes"*) of the Mortgagor.

D. To induce the Purchasers to vote in accordance with the Plan, Douglas F. Blough, an individual (the "*Indemnitor*") entered into that certain Restructuring Side Letter Agreement (the "*Restructuring Letter Agreement*") as of August 15, 2025 with each of the Purchasers and the Mortgagee in which the Indemnitor agreed to fund certain amounts related to the Plant, Mortgaged Property, the Original Notes and the Notes as more fully set forth therein.

E. All Notes are expressed to bear interest from the date of issue until maturity at the rate per annum set forth thereon and the Notes shall amortize as set forth in the amortization schedule attached thereto, as amended. Interest on the Notes, will be computed on the basis of a 360-day year of twelve 30-day months.

F. The Mortgagor is assigning all of its right, title and interest in and to any existing or future lease of all or any portion of the Property from the Mortgagor to another party (a or any *"lease"*) to the Mortgagee pursuant to this Mortgage, and pursuant to that certain Amended and Restated Assignment of Leases and Rents dated as of the date hereof, from the Mortgagor to the Mortgagee (as amended, the *"Assignment of Leases and Rents"*).

G. Douglas F. Blough, an individual to induce the Purchasers to purchase the Notes entered into that certain (i) Construction Completion Guaranty dated September 28, 2017 in favor of the Purchasers and the Mortgagee (the *"Construction Completion Guaranty"*), (ii) Hazardous Material Indemnity Agreement dated September 28, 2017 in favor of the Purchasers and the Mortgagee (the *"Hazardous Material Indemnity Agreement"*), and (iii) Indemnity and Guaranty Agreement dated September 28, 2017 in favor of the Purchasers and the Mortgagee (the *"Indemnity and Guaranty Agreement"*).

H. The Mortgagor and American Foods Group, LLC (*"American Foods"*) are party to that certain Services Agreement dated as of March 12, 2021 (as amended, supplemented or modified from time to time in accordance with the terms hereof and thereof, the *"American Foods Contract"* and together with all other contracts assigned in accordance with this Mortgage, the *"Assigned Contracts"*).

I. The Mortgagor has collaterally assigned all of its right, title and interest in the American Foods Contract to the Mortgagee pursuant to that certain Collateral Assignment and Security Agreement, American Foods dated September 28, 2017 (the *"Collateral Assignment"*).

J. Pursuant to that certain (i) Omnibus Amendment dated as of February 15, 2019 (the *"First Amendment"*) among the Mortgagor, the Mortgagee and each of the holders party thereto, (ii) Second Omnibus Amendment dated as of June 9, 2021 (the *"Second Amendment"*) among the Mortgagor, the Mortgagee and each of the holders party thereto, and (iii) Third Omnibus Amendment dated as of August 15, 2025 (the *"Third Amendment"*) among the Mortgagor, the Mortgagee and each of the holders party thereto, the Mortgagor entered into certain amendments of the Operative Agreements and the Mortgagee waived certain events of default under the Operative Agreements that existed prior to the date hereof, and in connection with the amendment and restatement of this Mortgage, the Mortgagor, the Mortgagee and the Purchasers shall enter into a Fourth Omnibus Amendment (the "*Fourth Amendment*" and together with the First Amendment, the Second Amendment and the Third Amendment, collectively, the "*Omnibus Amendments*").

K. The Notes, as such may be amended from time to time, and all principal thereof, premium, if any, and interest thereon, Make-Whole Amount, if any, and all additional amounts and other sums at any time due and owing from, and required to be paid by the Mortgagor under the terms of the Notes, the Note Purchase Agreement, this Mortgage, and the other Operative Agreements (as defined herein) are collectively hereinafter sometimes referred to as the *"Indebtedness Hereby Secured."*

L. The Mortgagor is duly authorized under all applicable provisions of law and its Organizational Documents (as defined herein) to issue the Notes, to execute and deliver this Mortgage, and to mortgage, convey and assign the Mortgaged Property (as defined herein) to the Mortgagee as security for the Indebtedness Hereby Secured and all action and all consents, approvals and other authorizations and all other acts and things necessary to make this Mortgage the valid, binding and legal instrument for the security of the Indebtedness Hereby Secured have been done and performed.

M. This Mortgage is issued in substitution and replacement for the Original Mortgage and from and after the date hereof, the Original Mortgage shall be replaced by this Mortgage, except that the priority of this Mortgage shall relate to September 28, 2017.

NOW, THEREFORE, THIS MORTGAGE WITNESSETH: That the Mortgagor, in consideration of the premises, the purchase and acceptance of the Notes, by the Purchasers and of the sum of Ten Dollars received by the Mortgagor from the Mortgagee and other good and valuable consideration, receipt whereof is hereby acknowledged, and in order to secure the payment of the principal of, premium, if any, interest on the Notes, according to its tenor and effect, Make-Whole Amount, if any, and to secure the payment of all other Indebtedness Hereby Secured and the performance and observance of all the covenants, agreements and conditions contained in or incorporated by reference into the Notes, this Mortgage, the Note Purchase Agreement or the other Operative Agreements, the Mortgagor does hereby grant, warrant, mortgage, assign, pledge, sell, demise, bargain, convey, transfer, set over and hypothecate unto the Mortgagee, its successors and assigns, forever, WITH POWER OF SALE, to the extent permitted by law, and grants to the Mortgagee, its successors and assigns, forever, a security interest in and to all and singular the following described properties, rights, interest and privileges and all of the Mortgagor's estate, right, title and interest therein, thereto and thereunder (all of which properties, rights, interests and privileges hereby mortgaged, assigned, pledged and hypothecated or intended so to be are hereinafter collectively referred to as the *"Mortgaged Property"*):

## GRANTING CLAUSE FIRST

## THE PROPERTY

All of the Mortgagor's estate, right, title, interest, claim and demand as tenant in, to and under, any lease, if any, including all extensions and renewals of the term thereof, and all existing or future amendments, supplements or modifications of any lease, and any leasehold interest created under such leases in and to the parcel of land in County of Brown, City of Denmark, State of Wisconsin, described in Exhibit A attached hereto and made a part hereof, together with the entire interest of the Mortgagor in and to all buildings, structures, improvements and appurtenances now standing, or at any time hereafter constructed or placed, upon such land, including the Project and all right, title and interest of the Mortgagor, if any, in and to all building material, building equipment and fixtures of every kind and nature whatsoever on said land or in any building, structure or improvement now or hereafter standing on said land which are classified as fixtures under applicable law and which are used in connection with the

operation, maintenance or protection of said buildings, structures and improvements as such (including, without limitation, all boilers, air conditioning, ventilating, plumbing, heating, lighting and electrical systems and apparatus, all communications equipment and intercom systems and apparatus, all sprinkler equipment and apparatus and all elevators and escalators) and the reversion or reversions, remainder or remainders, in and to said land, and together with the entire interest of the Mortgagor in and to all and singular the tenements, hereditaments, easements, rights of way, rights, privileges and appurtenances to said land, belonging or in anywise appertaining thereto, including, without limitation, the entire right, title and interest of the Mortgagor in, to and under any streets, ways, alleys, gores or strips of land adjoining said land, and all claims or demands whatsoever of the Mortgagor either in law or in equity, in possession or expectancy, of, in and to said land, it being the intention of the parties hereto that, so far as may be permitted by law, all property of the character hereinabove described, which is now owned or is hereafter acquired by the Mortgagor and is affixed or attached or annexed to said land, shall be and remain or become and constitute a portion of said land and the security covered by and subject to the lien of this Mortgage, together with all accessions, parts and appurtenances appertaining or attached thereto and all substitutions, renewals or replacements of and additions, improvements, accessions and accumulations to any and all thereof, and together with all rents, income, revenues, awards, issues and profits thereof, and the present and continuing right to make claim for, collect, receive and receipt for any and all of such rents, income, revenues, awards, issues and profits arising therefrom or in connection therewith (collectively, the *"Property"*).

## GRANTING CLAUSE SECOND

## ANY LEASE, THE ASSIGNED CONTRACTS, ASSIGNED CONSTRUCTION AGREEMENTS, THE OTHER CONTRACTS, RENTS AND ANY LEASE GUARANTIES

Any leases, the Collateral Assignment, the Other Contracts (defined below), if any, and all of the Mortgagor's estate, right, title, interest, claim and demand as landlord in, to and under any leases, the Assigned Contracts, Assigned Construction Agreements (both directly and through the Collateral Assignments) and the Other Contracts, including all extensions and renewals of the term thereof, and all existing or future amendments, supplements or modifications of any lease, Collateral Assignments, and the Other Contracts (and to any short memorandum form of any lease, Collateral Assignments, and the Other Contracts executed for recording purposes), together with all rights, powers, privileges, options and other benefits of the Mortgagor, if any, in, to and under any Lease Guaranties (as defined herein), if any, and all rights, powers, privileges, options and other benefits of the Mortgagor as landlord under any lease, the Assigned Contracts, Assigned Construction Agreements and the Other Contracts, including, without limitation, (a) the immediate and continuing right (whether or not an Event of Default under this Mortgage shall have occurred and be continuing, but subject to the terms hereof) to receive and collect all rents (whether as fixed rent, basic rent, percentage rent, additional rent or otherwise), income, revenues, issues, profits, insurance proceeds, condemnation awards, bankruptcy claims, liquidated damages, purchase price proceeds and other payments, tenders and security payable to or receivable by the landlord under any lease and the

Other Contracts or as party to or as assignee of rights under the Assigned Contracts, Assigned Construction Agreements and the Assigned Construction Agreements; (b) if any Off-taker exercises any right, or shall be required, to purchase the Mortgaged Property, the right and power (such power and right being coupled with an interest) to execute and deliver as agent and attorney-in-fact of the landlord under any lease and the Other Contracts and party to the Assigned Contracts and the Assigned Construction Agreements, an appropriate deed or other instruments of transfer necessary or appropriate for the conveyance and transfer to the purchaser of the Mortgaged Property or the portion thereof being so purchased, and all interest of the landlord therein and to perform in the name and for and on behalf of the landlord, as such agent and attorney-in-fact, any and all other necessary or appropriate acts with respect to any such purchase, conveyance and transfer; (c) the right to make all waivers, consents and agreements; (d) the right to give and receive copies of all notices and other instruments or communications delivered in connection with the Operative Agreements; (e) the right to take such action upon the occurrence of an event of default or default under any lease, the Assigned Contracts, Assigned Construction Agreements, the Other Contracts and any Lease Guaranties, including the commencement, conduct and consummation of legal, administrative or other proceedings, as shall be permitted by any lease, the Assigned Contracts, Assigned Construction Agreements, the Other Contracts, any Lease Guaranties, or by law; and (f) the right to do any and all other things whatsoever which the Mortgagor or any landlord is or may be entitled to do under any lease, the Assigned Contracts, Assigned Construction Agreements, the Other Contracts and any Lease Guaranties, or by law.

## GRANTING CLAUSE THIRD

## CONDEMNATION AWARDS

All of the right, title and interest of the Mortgagor in and to any award or awards or settlements or payments heretofore made or hereafter to be made by any municipal, county, state or federal authorities to the present or any subsequent owners of the Mortgaged Property, including without limitation any award or awards, or settlements or payments, hereafter made resulting from (i) condemnation proceedings or the taking of the Mortgaged Property, or any part thereof, under the power of eminent domain; or (ii) the alteration of grade or the location or the discontinuance of any street adjoining the Mortgaged Property or any portion thereof, or (iii) any other injury to or decrease in value of the Mortgaged Property; and the Mortgagor hereby agrees to execute and deliver from time to time such further instruments as may be requested by the Mortgagee to confirm such assignment to the Mortgagee of any such award, damage, payment or other compensation.

## GRANTING CLAUSE FOURTH

## PERSONAL PROPERTY

All tangible and intangible personal property now owned or at any time hereafter acquired by the Mortgagor of every nature and description, and used in any way in connection

with the Mortgaged Property, or any other portion of the same, including, without limitation, all inventory; goods; materials; supplies; equipment; furnishings; fixtures; accounts; accounts receivable; chattel paper; documents; instruments; investment property; money; bank accounts (including, without limitation, the Escrow Reserves (as defined in the Escrow and Servicing Agreement)), all rights, title and interests in the Assigned Contracts including any payments due under the Assigned Contracts, and any accounts or reserves held by the Mortgagee or by the Escrow Agent (as defined herein) under the terms of the Escrow and Servicing Agreement); deposit accounts; security deposits; claims to rebates, refunds or abatements of real estate taxes or any other taxes; contract rights, plans and specifications; permits, licenses and general intangibles; the rights of the Mortgagor under contracts, with respect to the Mortgaged Property or any portion thereof; signs, brochures, advertising and good will; and all roof warranties and all other construction warranties and guaranties whether for materials, workmanship or services.

## GRANTING CLAUSE FIFTH

## OTHER AND AFTER-ACQUIRED PROPERTY

Any and all moneys and other property (including each amendment or supplement to any and all instruments included in the Mortgaged Property) which may from time to time, by delivery to the Mortgagee or by any instrument, including this Mortgage, be subjected to the lien hereof by the Mortgagor or by anyone on the behalf of the Mortgagor or with the consent of the Mortgagor, or which may come into the possession or be subject to the control of the Mortgagee pursuant to this Mortgage, or pursuant to any instrument included in the Mortgaged Property, it being the intention of the Mortgagor and the Mortgagee and it being hereby agreed by them that all property hereafter acquired by the Mortgagor and required to be subjected to the lien of this Mortgage, or intended so to be shall forthwith upon the acquisition thereof by the Mortgagor be as fully embraced within the lien of this Mortgage, as if such property were now owned by the Mortgagor and were specifically described in this Mortgage, and granted hereby or pursuant hereto.

## GRANTING CLAUSE SIXTH

## PROCEEDS

All proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or other liquidated claims, including, without limitation, all proceeds of insurance and condemnation awards and payments and all products, additions, accessions, substitutions and replacements of any of the foregoing.

SUBJECT, HOWEVER, as to all property or rights in property at any time subject to the lien hereof (whether now owned or hereafter acquired), to the following:

(a) The agreement of the parties hereto that any and all improvements, trade fixtures, signs, furniture, furnishings, equipment, machinery or other tangible or

intangible personal property located on the Mortgaged Property not owned by the Mortgagor, whether or not classified as fixtures under applicable law, are expressly excluded from the lien and security interest created by this Mortgage, and that the same shall in no instance be deemed to be encompassed within the term "Mortgaged Property"; and

(b) The Permitted Encumbrances, as defined in Section 1 hereof.

TO HAVE AND TO HOLD the Mortgaged Property unto the Mortgagee and its successors and assigns forever, with the purpose of securing performance of each agreement, covenant and warranty of the Mortgagor contained in the Operative Agreements and payment of all Indebtedness Hereby Secured.

IN TRUST, NEVERTHELESS, WITH POWER OF SALE (to the extent permitted by law), upon the terms and trusts herein set forth for the benefit and security of all present and future holders of the Indebtedness Hereby Secured in accordance with its terms and all other sums payable hereunder or under the Notes, and for the performance and observance of the Notes, and this Mortgage, all as herein set forth.

PROVIDED, NEVERTHELESS, and these presents are upon the express condition that if the Mortgagor performs the covenants herein contained and pays to the Mortgagee, its successors or assigns, the full amount of all Indebtedness Hereby Secured, the estate, right and interest of the Mortgagee in the property hereby conveyed shall cease and this Mortgage, shall become null and void, but otherwise to remain in full force and effect.

It is agreed and understood by the parties hereto that:

1. This Mortgage is intended to and shall constitute security for the entire Indebtedness Hereby Secured.

2. Any part of the security herein described, and any security described in any other mortgage, assignment of lease or other instrument now or hereafter given to secure the indebtedness which is secured by this Mortgage may be released by the Mortgagee without affecting the lien hereof on the remainder.

3. The Mortgagor for itself and all who may claim through or under it waives any and all right to have the property and estates comprising the Mortgaged Property marshalled upon any foreclosure of the lien hereof, or to have the Mortgaged Property hereunder and the property covered by any other mortgage or assignment of lease securing the Notes, marshalled upon any foreclosure of any of said mortgages or assignments of leases, and agrees that any court having jurisdiction to foreclose such lien may order the Mortgaged Property sold as an entirety.

4. The rights of the Mortgagor, whether as a party thereto or as an assignee of rights thereunder, with respect to the Assigned Contracts, including the right to receive payments to be made by the American Foods thereunder have been assigned to the Mortgagee pursuant to Granting Clause Second and the Collateral Assignments.

5. The assignment made under Granting Clause Second and Section 2.18 hereof is executed as a present, unconditional and absolute assignment and not merely as collateral security, and the execution and delivery of this Mortgage, shall not in any way impair or diminish any obligations of the Mortgagor as landlord under any lease, nor as a party to any Assigned Contract, nor impair, affect or modify any of the terms and conditions of the Notes, or the Note Purchase Agreement, nor shall any of such obligations be imposed upon the Mortgagee, including but not limited to collecting rents or enforcing performance by (a) any Tenant under any lease and (b) American Foods under the Assigned Contracts. Without limiting the generality of the foregoing, until the Mortgagee, as directed by the Required Holders, takes possession of the Mortgaged Property through appointment of a receiver or otherwise in the exercise of its rights hereunder, the Mortgagee shall not be obligated to perform or discharge, nor does the Mortgagee hereby undertake to perform or discharge, any obligation, duty or liability under any lease or the Assigned Contracts, or under or by reason of this Mortgage; and it is further understood and agreed that this Mortgage, shall not operate to place responsibility for the control, care, management or repair of the Mortgaged Property upon the Mortgagee, nor for the carrying out of any of the terms and conditions of any lease or the Assigned Contracts, nor shall it operate to make the Mortgagee responsible or liable for any waste committed on the Mortgaged Property by any Tenant under any lease or any other parties, or for any dangerous or defective condition of the Mortgaged Property, or for any negligence of the management, upkeep, or repair or control of the Mortgaged Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. During the continuance of an Event of Default, the Mortgagee, as directed by the Required Holders, may, at its option, although it shall not be obligated to do so, after giving written notice to any off-taker (if applicable) and the Mortgagor, perform any Assigned Contract covenant for and on behalf of the Mortgagor and may recover any money advanced, for any such purpose from the Mortgagor on demand, with interest at the Default Rate (as defined herein) (or at the maximum rate permitted by applicable law, whichever is less) from date of advancement. The assignment of any lease and the Assigned Contracts contained herein are in all respects subject to the Mortgagor's right prior to the occurrence of a Default or an Event of Default, but not to the Mortgagee's exclusion (a) to receive from any Tenant under any lease and American Foods under the Assigned Contracts, as the case may be, payments, or certificates and other documents and information that any Tenant and each of American Foods (as applicable) is required to give or furnish to the Mortgagor in accordance with any lease or the Assigned Contracts, respectively (b) to inspect the Mortgaged Property and all records relating thereto, and (c) to demand performance or observance by any Tenant under any lease and American Foods under the Assigned Contracts of the applicable terms, conditions and agreements of any lease and the Assigned Contracts, respectively, as allowed by law,

equity, any lease or the Assigned Contracts; *provided*, *however*, the Mortgagor may not (1) accelerate payments due under any lease or any Assigned Contract or (2) give any notice, sue or pursue any remedy or take any action under any lease or any Assigned Contract that might have the effect of (A) terminating any lease or Assigned Contracts, (B) dispossessing any Tenant or American Foods, (C) declaring any lease or the Assigned Contracts forfeited or terminated, (D) reducing any of any Tenant's obligations under any lease or any of the obligations of American Foods under the Assigned Contracts, or (E) adversely affecting the rights of the Mortgagor as landlord under any lease, party to the Assigned Contracts, the value of the Mortgaged Property or the rights or interests of the Mortgagee under the Operative Agreements, without in each instance the Mortgagee's prior written consent which the Mortgagee may grant or withhold in its sole discretion.

6. Upon the occurrence and during the continuance of an Event of Default hereunder, the Mortgagee has, among other things, the right, at the direction of the Required Holders, to direct the Mortgagee to foreclose on the Mortgaged Property and dispose of the same. To the extent permitted by law, the Mortgagee's deed or other instrument of conveyance, transfer or release (which, if permitted by law, may be in the name of the Mortgagee or as attorney for the Mortgagor and the Mortgagee hereby is irrevocably appointed) shall be effective to convey and transfer to the grantee an indefeasible title to the property covered thereby, discharged of all rights of redemption by the Mortgagor or any person claiming under it, and to bar forever all claims by the Mortgagor or the said Mortgagee to the property covered thereby and no grantee from the Mortgagee shall be under any duty to inquire as to the authority of the Mortgagee to execute the same, or to see to the application of the purchase money.

7. Upon the occurrence and during the continuance of an Event of Default, the Mortgagor does hereby irrevocably constitute and appoint the Mortgagee, its true and lawful attorney with full power of substitution, for it and in its name, place and stead, to ask, demand, collect, receive, receipt for, sue for, compound and give acceptance for any and all rents, income and other sums which are assigned under the Granting Clauses of this Mortgage, with full power to sue for, settle, adjust or compromise any claim thereunder as surely as the Mortgagor could itself do and to endorse the name of the Mortgagor on all commercial paper given in payment or in part payment thereof, and in its discretion to file any claim or take any other action or proceedings either in its own name or in the name of the Mortgagor or otherwise, which the Mortgagee, at the direction of the Required Holders, may deem necessary or appropriate to protect and preserve the right, title and interest of the Mortgagee in and to such rents and other sums and the security intended to be afforded by this Mortgage.

8. Upon the payment of the principal of (and premium, if any) and all interest on the Notes, and of all other sums payable on the Notes, or under the Note Purchase Agreement or this Mortgage, or any other Operative Agreement and the performance and observance of the provisions thereof, this Mortgage, shall cease and terminate and all the estate, right, title, interest, claim and demand of the Mortgagor under any lease in and to

the above-described assigned property and in and to the Assigned Contracts shall revert to the Mortgagor under any lease, any of the Collateral Assignments, and the Assigned Contracts, respectively, and the Mortgagee shall at the request of the Mortgagor deliver to the Mortgagor an instrument cancelling the assignment of any lease and the Assigned Contracts set forth in this Mortgage, and reassigning without recourse the above-described assigned property to the Mortgagor.

SECTION 1. DEFINITIONS.

The following terms shall have the following meanings for all purposes of this Mortgage, (any capitalized terms not otherwise defined herein shall have the meanings set forth therefor in the Note Purchase Agreement):

*"Acceptable Rating Agency"* shall mean a nationally recognized statistical rating organization that is also an Acceptable Rating Organization as recognized and defined by the National Association of Insurance Commissioners for rating transactions of the type evidenced by the Operative Agreements.

*"Active Rating Agency"* shall mean, at any time, the Acceptable Rating Agency that is then rating the Notes.

*"Affiliate"* of any specified Person, shall mean any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person, and any immediate family member of such specified Person and their Affiliates. For the purposes of this definition, *"control"* when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms *"controlling"* and *"controlled"* have meanings correlative to the foregoing.

*"American Foods"* is defined in Recital H hereto.

*"American Foods Contract"* is defined in Recital H hereto.

*"Assigned Contracts"* is defined in Recital H hereto.

*"Assignment"* shall mean an assignment of any lease, any Assigned Contracts, any Other Contract, any Lease Guaranties and Rents set forth in Granting Clause Second and Section 2.18 of this Mortgage.

*"Assignment of Leases and Rents"* is defined in Recital F hereto.

*"Bankruptcy Claims"* is defined in Section 2.18(a) of this Mortgage.

*"Bankruptcy Code"* is defined in Section 2.18(a) of this Mortgage.

*"Borrower Party"* shall mean the Mortgagor, the Existing Indemnitor, the Existing Guarantor, any of the owners, Subsidiaries or Affiliates of any of the foregoing, and any of their successors and assigns, and each other Person who guarantees or otherwise becomes obligated under the Notes.

*"Closing Date"* is defined in the Note Purchase Agreement.

*"Collateral Assignments"* is defined in Recital I hereto.

*"Collateral Assignment, American Foods"* is defined in Recital H hereto.

*"Collateral Trust Indenture"* shall mean that certain Collateral Trust Indenture entered into by and among the Mortgagor, the Mortgagee and the Purchasers.

*"Consent to Assignments and Agreements"* shall mean that certain Consent to Assignment and Agreement, American Foods and entered into by and among the Mortgagor, the Mortgagee, and American Foods.

*"Construction Escrow Agreement"* shall mean that certain Construction Escrow and Security Agreement dated September 28, 2017 and entered into by and between the Mortgagor, the Mortgagee, Escrow Agent, and the Construction Monitor.

*"Default"* shall mean any event which would constitute an Event of Default if any requirement in connection therewith for the giving of notice, or the lapse of time, or the happening of any further condition, event or action had been satisfied.

"*Default Rate"* shall mean two percent (2%) per annum over the interest rate set forth on the Notes.

"*Account Control Agreement"* shall mean that certain Deposit Account Control Agreement with respect to a certain bank account with Citizens Bank, N.A., dated as of August 15, 2025 among the Mortgagee, the Mortgagor and Citizens Bank, N.A.

*"Environmental Legal Requirement"* shall mean any applicable local, state or federal law, statute, ordinance, rule or regulation relating to the environment, including, without limitation, relating to releases, discharges or emissions to air, water, land or groundwater, to the withdrawal or use of groundwater, to the use and handling of polychlorinated biphenyls or asbestos, to the disposal, transportation, treatment, storage or management of hazardous wastes or to exposure to toxic or hazardous materials, to the handling, transportation, discharge or release of hazardous gaseous or hazardous liquid substances and any regulation, order, notice or demand issued pursuant to such law, statute, ordinance, rule or regulation, in each case applicable to the property of the Mortgagor and its Subsidiaries or the operation, construction or modification of any thereof, including without limitation the following: the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Toxic Substances Control

Act, the Comprehensive Environmental Response Compensation and Liability Act as amended by the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act as amended by the Solid and Hazardous Waste amendments of 1984, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Materials Transportation Act and the Solid Waste Disposal Act, all as amended, and any local, state or federal laws, statutes, ordinances, rules or regulations addressing similar matters, and any local, state or federal law, statute, ordinance, rule or regulation providing for financial responsibility for cleanup or other actions with respect to the release or threatened release of hazardous substances.

*"Escrow Agent"* shall mean Wells Fargo Trust Company, National Association, as Escrow Agent under the Escrow and Servicing Agreement and the Construction Escrow Agreement, and its successors and assigns.

*"Escrow and Servicing Agreement"* shall mean that certain Third Amended and Restated Escrow and Servicing Agreement dated as of the date hereof among the Mortgagor, the Mortgagee and the Escrow Agent.

*"Escrow Shortfall"* is defined in the Escrow and Servicing Agreement.

*"Event of Default"* shall mean any events specified in Section 5.1 hereof including all notice, cure and grace periods.

*"Event of Loss"* with respect to the Mortgaged Property shall mean any casualty or condemnation described in any lease.

*"Existing Guarantor"* shall mean Douglas F. Blough acting as guarantor under the Indemnity and Guaranty Agreement and the Restructuring Letter Agreement.

*"Existing Indemnitor"* shall Douglas F. Blough acting as indemnitor under the Hazardous Material Indemnity Agreement.

*"Existing Owner"* is defined in Section 2.3(h) of this Mortgage.

"*Final Sale*" is defined in Section 2.29 of this Mortgage

"*Final Sale Proceeds*" is defined in Section 2.29 of this Mortgage.

*"Hazardous Material"* shall mean any hazardous, toxic or harmful chemical, substance, waste, material, byproduct, pollutant, contaminant, compound or product, including without limitation, asbestos, polychlorinated byphenyls, petroleum products (including crude oil or any fraction thereof), flammable explosives, radioactive materials, mold, mildew, infectious substances or raw materials which include hazardous constituents and any other substance or

material the exposure, use, disposal or handling of which is regulated by any Environmental Legal Requirement.

*"Hazardous Material Indemnity Agreement"* shall mean that certain Hazardous Material Indemnity Agreement dated September 28, 2017 from the Existing Indemnitor and the Mortgagor in favor of the Mortgagee.

*"Holder"* means, with respect to any Note, the Person in whose name such Note is registered in the Note Register maintained by the Mortgagee.

*"Improvements"* means all buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements, improvements and appurtenances now standing, or at any time hereafter constructed or placed, upon the land described on Exhibit A hereto.

*"Indebtedness"* of any Person shall mean, without duplication (a) all obligations of such Person for borrowed money or which have been incurred in connection with the acquisition of property or assets, (b) rents payable by such Person under all leases (whether or not capitalized on the books of such Person in accordance with generally accepted accounting principles) having a fixed term of one year or more from the original date or which are renewable or extendible by the lessee for a period or periods aggregating one year or more from the original date, (c) all indebtedness, obligations and liabilities secured by any lien existing on property owned by such Person subject to such lien, whether or not such indebtedness, obligations or liabilities have been assumed, and (d) all guarantees (whether by discount or otherwise), endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, or otherwise acquire, or become liable upon or in respect of, the indebtedness, obligations or liabilities of any Person or other entity whether or not reflected in the balance sheet of such Person.

*"Indebtedness Hereby Secured"* is defined in Recital K hereto.

*"Indemnified Liabilities"* is defined in Section 2.24 of this Mortgage.

*"Indemnitor"* shall mean any Existing Indemnitor or any Successor Indemnitor.

*"Indemnity and Guaranty Agreement"* shall mean that certain Indemnity and Guaranty Agreement dated September 28, 2017 from the Existing Guarantor in favor of the Mortgagee.

*"Investment Grade"* shall mean a rating of "BBB" or better, as rated by Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. or a rating of "Baa" or better, as rated by Moody's Investor Service, Inc.

*"lease"* is defined in Recital B hereto.

*"Lease Guarantor"* is defined in Section 2.18(a) of this Mortgage.

*"Lease Guaranty"* and *"Lease Guaranties"* are defined in Section 2.18(a) of this Mortgage.

*"Loan"* is defined in Section 6.11 of this Mortgage.

*"Make-Whole Amount"* means, with respect to any Note an amount equal to the greater of (i) 1.00% of the then outstanding principal amount of such Note and (ii) the excess, if any, of the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of such Note over the amount of such Called Principal, *provided* that the Make-Whole Amount may in no event be less than zero. For the purposes of determining the Make-Whole Amount, the following terms have the following meanings:

> *"Called Principal"* means, with respect to any Note, the principal of such Note that is to be prepaid pursuant to Section 2.12 of this Mortgage, or has become or is declared to be immediately due and payable pursuant to Section 5.2 of this Mortgage, as the context requires.
>
> *"Discounted Value"* means, with respect to the Called Principal of any Note, the amount obtained by discounting all Remaining Scheduled Payments with respect to such Called Principal from their respective scheduled due dates to the Settlement Date with respect to such Called Principal, in accordance with accepted financial practice and at a discount factor (applied on the same periodic basis as that on which interest on the Note is payable) equal to the Reinvestment Yield with respect to such Called Principal.
>
> *"Reinvestment Yield"* means, with respect to the Called Principal of the Note, 0.50% over the yield to maturity implied by (i) the yields reported, as of 10:00 A.M. (New York City time) on the second Business Day preceding the Settlement Date with respect to such Called Principal, on the display designated as "Page PX-1" on the Bloomberg Financial Markets (or such other display as may replace Page PX-1 on the Bloomberg Financial Markets) for actively traded U.S. Treasury securities having a maturity equal to the Remaining Average Life of such Called Principal as of such Settlement Date, or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the second Business Day preceding the Settlement Date with respect to such Called Principal, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity equal to the Remaining Average Life of such Called Principal as of such Settlement Date. Such implied yield will be determined, if necessary, by (a) converting U.S. Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (b) interpolating linearly between (1) the actively traded U.S. Treasury security with the duration closest to and greater than the Remaining Average Life and (2) the actively traded U.S. Treasury security with the duration closest to and less than the Remaining Average Life.

*"Remaining Average Life"* means, with respect to any Called Principal, the number of years (calculated to the nearest one-twelfth year) obtained by dividing (i) such Called Principal into (ii) the sum of the products obtained by multiplying (a) the principal component of each Remaining Scheduled Payment with respect to such Called Principal by (b) the number of years (calculated to the nearest one-twelfth year) that will elapse between the Settlement Date with respect to such Called Principal and the scheduled due date of such Remaining Scheduled Payment.

*"Remaining Scheduled Payments"* means, with respect to the Called Principal of any Note, all payments of such Called Principal and interest thereon that would be due after the Settlement Date with respect to such Called Principal if no payment of such Called Principal were made prior to its scheduled due date, *provided* that if such Settlement Date is not a date on which interest payments are due to be made under the terms of such Note, then the amount of the next succeeding scheduled interest payment will be reduced by the amount of interest accrued to such Settlement Date and required to be paid on such Settlement Date pursuant to Section 2.12 of this Mortgage, or Section 5.2 of this Mortgage.

*"Settlement Date"* means, with respect to the Called Principal of any Note, the date on which such Called Principal is to be prepaid pursuant to Section 2.12 of this Mortgage, or has become or is declared to be immediately due and payable pursuant to Section 5.2 of this Mortgage, as the context requires.

*"Material Adverse Change"* means (a) a material adverse change in the status of the business, results of operations or condition (financial or otherwise) of the Mortgagor, or (b) any event or occurrence of whatever nature which could reasonably be expected to have a material adverse effect on (i) the Mortgagor's ability to perform its obligations under this Mortgage, and the Notes, or (ii) the Mortgagor's security interests in the Property

*"Maturity Date"* is defined in the Notes.

*"Mortgagee"* shall mean Wells Fargo Trust Company, National Association, as Collateral Trustee under the Collateral Trust Indenture, and its successors and assigns.

*"Mortgagor"* shall mean not only NLC Energy Denmark LLC, but also its successors and assigns.

*"Mortgaged Property"* is defined in the Granting Clauses hereto.

*"Non-Consolidation Opinion"* means the opinion of counsel delivered on September 28, 2017 (and upon any subsequent sale of the Mortgaged Property in accordance with Section 2.3(g)) as to the non-consolidation of the Mortgagor with its members.

*"Non-Recourse Person"* is defined in Section 6.9 of this Mortgage.

*"Note Purchase Agreement"* is defined in Recital A hereto.

*"Note Register"* is defined in Section 4.11 of the Note Purchase Agreement.

*"Notes"* is defined in Recital A hereto.

*"Off-taker(s)"* shall mean, individually, American Foods and any other off-taker counterparties that the Mortgagor shall contract with after the date hereof.

*"Operative Agreements"* shall mean, collectively, the Note Purchase Agreement, the Assignment of Leases and Rents, the Hazardous Material Indemnity Agreement, the Indemnity and Guaranty Agreement, the Construction Escrow Agreement, the Reaffirmations, the Collateral Assignment, the Escrow and Servicing Agreement, the Construction Completion Guaranty, the Collateral Trust Indenture, the Notes, the Restructuring Letter Agreement, the Omnibus Amendments and the Account Control Agreement.

*"Organizational Documents"* of any entity shall mean (a) in the case of a corporation, the articles or certificate of incorporation (or the equivalent of such items under state law) and the by-laws of such corporation, (b) in the case of a limited liability company, the certificate or articles of existence or formation and the operating agreement of such limited liability company, (c) in the case of a limited partnership, the certificate of formation and limited partnership agreement of such limited partnership and the Organizational Documents of the general partner of such limited partnership, (d) in the case of a trust, the certificate of formation (if applicable) and the trust agreement for such trust, and (e) any equivalent documents, to the foregoing under the State law where such entity was organized or formed.

*"Original Closing Date"* shall mean September 28, 2017.

*"Other Contracts"* is defined in Section 2.18(a) of this Mortgage.

*"Permits"* shall mean all permits and approvals necessary for construction of the Project.

*"Permitted Encumbrances"* shall mean the liens described in clauses (a) through (h) of Section 2.17 of this Mortgage.

*"Permitted Subordinated Financing"* is defined in Section 2.17(i) of this Mortgage.

*"Person"* shall mean an individual, partnership, limited liability company, corporation, trust or unincorporated organization.

*"Personal Property"* shall mean the personal property described in Granting Clause Fourth of this Mortgage.

*"Plant"* shall mean a biomass digester/biogas production and sanitary sewer pretreatment plant to be constructed on the Property.

*"Project"* shall mean the Plant and certain other improvements that are to be constructed, or caused to be constructed, by the Mortgagor on the Property.

*"Purchaser" and "Purchasers"* are defined in the Note Purchase Agreement.

"*Reaffirmations*" shall mean, collectively, (i) that certain Reaffirmation of Indemnitor and Guarantor Obligations dated as of February 15, 2019 by Douglas F. Blough in favor of the Mortgagee, (ii) that certain Reaffirmation of Indemnitor and Guarantor Obligations dated as of June 9, 2021 by Douglas F. Blough in favor of the Mortgagee and (iii) that certain Reaffirmation of Indemnitor and Guarantor Obligations dated as of the date hereof by Douglas F. Blough in favor of the Mortgagee.

*"Rents"* is defined in Section 2.18(a) of this Mortgage.

*"Restoration"* is defined in Section 4.1 of this Mortgage.

*"Restoration Funds"* is defined in Section 4.1 of this Mortgage.

"*Restructuring Letter Agreement*" shall mean that certain Restructuring Side Letter Agreement dated as of August 15, 2025, among Douglas F. Blough, an individual, each of the Purchasers and the Mortgagee.

*"Required Holders"* means the Holders holding at least 51% of the aggregate principal amount of all Notes, at the time outstanding, voting as a single class.

*"Secondary Market Transaction"* is defined in Section 6.12 of this Mortgage.

*"Security"* shall have the same meaning as in Section 2(1) of the Securities Act of 1933, as amended.

*"Series A1 Notes"* is defined in Recital C hereto.

*"Series A2 Notes"* is defined in Recital C hereto.

*"Subsidiary"* shall mean any Person of which more than 50% (by number of votes) of the Voting Interest is owned and controlled by the Mortgagor and/or one or more Persons which are Subsidiaries of the Mortgagor.

*"Successor Indemnitor"* is defined in Section 2.3(g) of this Mortgage.

*"Successor Owner"* is defined in Section 2.3(h) of this Mortgage.

*"Successor Mortgagor"* is defined in Section 2.3(g) of this Mortgage.

*"Taxes"* is defined in Section 2.16 of this Mortgage.

*"Tenant"* shall mean not only any lessee under a lease of all or a part of the Mortgaged Property, but also its successors and assigns.

*"Uniform Commercial Code"* shall mean the Uniform Commercial Code as in effect in the State of Wisconsin, as amended.

*"Voting Interest"* shall mean Securities or equity ownership interest of any class or classes of a Person, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the corporate directors (or Persons performing similar functions).

SECTION 2. GENERAL COVENANTS AND WARRANTIES.

From and after the Closing Date (as defined in the Note Purchase Agreement) and continuing so long as the Indebtedness Hereby Secured, remains unpaid, the Mortgagor covenants that:

*Section 2.1. Office for Notices*. The Mortgagor will keep an office at c/o Net Lease Capital Advisors LLC, Ten Tara Boulevard, Suite 501, Nashua, New Hampshire 03062 where notices, presentations and/or demands to or upon the Mortgagor in respect of said Notes, or this Mortgage, may be given or made, until such time as the Mortgagor shall so notify the Mortgagee in writing of any change of location of such office.

*Section 2.2. Maintenance of Existence, Rights*. The Mortgagor will at all times preserve and keep in full force and effect its existence and will obtain and maintain in full force and effect all franchises, privileges, rights, licenses and permits and all other consents, approvals and authorizations of any governmental authority necessary for the ownership and efficient operation and maintenance of its business and property which failure to obtain and maintain would materially and adversely affect the properties, business, prospects, profits or condition of the Mortgagor.

*Section 2.3. Negative Covenants.* The Mortgagor will not:

(a) engage in any business other than the ownership, development and operation of the Property and the Project, performance under the Assigned Contracts, performance under any lease and any Other Contracts, the leasing of the Property, and the financing thereof through the issuance of the Notes, as expressly contemplated by the Operative Agreements to which the Mortgagor is a party, except as is permitted by, and in accordance with Section 2.17(i) hereof;

(b) be or become liable in respect of any guaranty, except for any guaranties that are part of, or permitted by the Operative Agreements, except as is permitted by, and in accordance with Section 2.17(i) hereof;

(c) incur any Indebtedness other than (i) Indebtedness Hereby Secured, Taxes not yet due and payable and items being contested pursuant to Section 2.16(b), (iii) trade payables incurred in the ordinary course of business paid within sixty (60) days of date incurred, (iv) obligations under any lease, (v) obligations under the Assigned Contracts and the Other Contracts, (vi) obligations in connection with the development and construction of the Project and (vii) Indebtedness permitted by Section 2.17(h) or (i) hereof;

(d) make, or permit to remain outstanding, any investment, loan or advance to, or own or acquire any stock or Securities of, any Person except that the Mortgagor may make any investment, loan or advance required to be made to satisfy its obligations under the Operative Agreements to which the Mortgagor is a party;

(e) pay or declare any dividend, or make any other distribution if, at such time or after giving effect thereto, a Default or Event of Default would exist;

(f) enter into any lease of any of the Mortgaged Property, whether as lessor or as lessee, other than any lease or any sublease or assignment permitted under Operative Agreements;

(g) sell, transfer, exchange or otherwise dispose of the Mortgaged Property or any part or portion thereof, except as expressly permitted by this Mortgage, *provided, however,* that in addition to sales and/or transfers permitted by this Mortgage, (A) the Mortgaged Property may be transferred to family members or trusts for estate planning purposes from time to time any number of times but not more frequently than once per twelve (12) month period and (B) the Mortgagor shall have the right to sell the entire Mortgaged Property to another entity (such entity is herein referred to as the *"Successor Mortgagor"*) including any Off-taker; *provided, further,* that in connection with any such transfer or sale, the following conditions are met:

(i) the Successor Mortgagor shall be a single purpose entity (the Organizational Documents of which shall contain provisions acceptable to the Mortgagee, as directed by the Required Holders, and similar to those required by the Mortgagee to be added to the Mortgagor's Organizational Documents in connection with the issuance of the Notes) and shall obtain all required governmental consents, approvals and authorizations;

(ii) after giving effect to the sale, the Successor Mortgagor shall be in compliance with this Mortgage, and no Default or Event of Default shall have occurred which shall then be continuing;

(iii) the Successor Mortgagor shall assume all rights, duties and obligations of the Mortgagor under the Operative Agreements arising after the date of such assumption;

(iv) the Successor Mortgagor shall have delivered to the Mortgagee an opinion of its counsel which is satisfactory in form to the Mortgagee, as directed by the Required Holders, covering the due authorization, execution, delivery and enforceability of documents entered into by the Successor Mortgagor to comply with the foregoing conditions of this paragraph (g) and covering such other related matters as the Mortgagee, as directed by the Required Holders, or special counsel to the Holders may reasonably require;

(v) the Successor Mortgagor shall have entered into and delivered to the Mortgagee a Hazardous Material Indemnity Agreement in the same form as such documents delivered to the Mortgagee on the Closing Date, and the beneficial owner or owners of equity interests in the Successor Mortgagor or their designee (the *"Successor Indemnitor"*) shall have entered into and delivered to the Mortgagee a Hazardous Material Indemnity Agreement and an Indemnity and Guaranty Agreement in the same form as such documents delivered to the Mortgagee on the Closing Date and the Successor Indemnitor must (a) be in compliance with the Office of Foreign Assets Control, not have any felony conviction, and not have claims or suits filed against the Mortgagee or any Holder, (b) have no voluntary or involuntary bankruptcy filings, (c) be reasonably acceptable to the Mortgagee and have a net worth not less the greater of (x) a net worth equal to or greater than the Existing Indemnitor at the time of such proposed such transfer or sale or (y) $35,000,000, (d) have experience in real estate management and ownership, all of which must be reasonably acceptable to the Mortgagee and (e) assume and reaffirm all obligations of Existing Guarantor under the Restructuring Letter Agreement ("*Restructuring Letter Assumption*"). Upon the execution and delivery of the Indemnity and Guaranty Agreement, the Restructuring Letter Assumption and the Hazardous Material Indemnity Agreement by the Successor Indemnitor and upon the execution and delivery of the Hazardous Material Indemnity Agreement by the Successor Mortgagor, as applicable, to the Mortgagee, the Mortgagor, the Existing Indemnitor and the Existing Guarantor shall be released from any future liability accruing from and after the effective date thereof;

(vi) all filings, recordings and title insurance date downs or endorsements which are deemed necessary by the Mortgagee, as directed by the Required Holders, or special counsel to the Holders shall have been made in appropriate public offices;

(vii) the Mortgagor shall (A) pay to the Mortgagee a fee equal to 1.0% of the then outstanding principal amount of the Notes; *provided, however,* no such fee shall be due if the Mortgaged Property is sold to family members or trusts for estate planning purposes or with respect to the Final Sale (as defined below), and (B) pay all of the reasonable legal fees and expenses of the Mortgagee and/or of

the special counsel representing the Holders in connection with the sale of the Mortgaged Property to the Successor Mortgagor; and

(viii) the Mortgagor shall deliver to the Mortgagee a copy of a waiver executed by a Tenant, if any, pursuant to which such Tenant waives any right of first refusal, right of first offer or other purchase option (if any) applicable to the subject matter of the sale vested in such Tenant pursuant to the terms of any lease or otherwise.

If the Mortgaged Property is sold in accordance with the terms of this Section 2.3(g), then upon satisfaction of the conditions set forth therein, the selling the Mortgagor (but not, for avoidance of doubt, the Successor Mortgagor) shall be released from all liability under this Mortgage and the other Operative Agreements, except for obligations accruing prior to the date of such sale.

(h) permit any direct or indirect holder or owner of an equity, ownership, membership, partnership, or voting interest in the Mortgagor (an *"Existing Owner"*) to sell, transfer, exchange or otherwise dispose of such interest in any transaction or series of transactions that would result in a different Person or entity (as *"Successor Owner"*) holding or owning, directly or indirectly, a controlling interest (with *"control"* having the meaning set forth in the definition of *"Affiliate"* herein) in the Mortgagor than held or owned such controlling interest immediately prior to such transfer, sale, exchange or disposition (each a *"Transfer"*), but nothing herein shall be deemed a limitation on (A) the transfer, directly or indirectly, of non-controlling ownership interests in the Mortgagor so long as the same Person or entity holding or owning a controlling interest in the Mortgagor immediately prior to such transfer continues to hold or own such controlling interest after giving effect to such transfer, or (B) any transfer which is a remedy of a lender of Indebtedness permitted under Section 2.17 hereof; *provided, however,* that interests may be transferred to family members or trusts for estate planning purposes from time to time any number of times but not more frequently than once every twelve (12) month period; *unless* in connection with such Transfer, the following conditions are met:

(i) after giving effect to the Transfer, the Mortgagor and the Successor Owner shall be in compliance with this Mortgage, and no Default or Event of Default shall have occurred which shall then be continuing;

(ii) Unless the Indemnity and Guaranty Agreement and the Hazardous Material Indemnity Agreement will remain in effect after the Transfer, the Successor Owner or designee thereof (the *"Successor Guarantor"*) that meets the qualifications set forth in clause (iii), below, shall have executed and delivered to the Mortgagee agreements in the same form as the Indemnity and Guaranty Agreement and the Hazardous Material Indemnity Agreement delivered on the Closing Date and shall have assumed and reaffirmed all obligations of Existing

Guarantor under the Restructuring Letter Agreement and upon such execution and delivery by the Successor Guarantor, the Existing Guarantor shall be released from any future liability accruing from and after the effective date thereof;

(iii) the Successor Owner and the Successor Guarantor must (a) be in compliance with the Office of Foreign Assets Control, not have any felony conviction, and not have claims or suits filed against the Mortgagee or any Holder, (b) have no voluntary or involuntary bankruptcy filings, and (c) have experience in real estate management and ownership, all of which must be reasonably acceptable to the Mortgagee, as directed by the Required Holders;

(iv) the Successor Guarantor must be reasonably acceptable to the Mortgagee and have a net worth not less than the greater of (A) a net worth equal to or greater than the Existing Guarantor at the time of such proposed Transfer, or (B) $35,000,000; and

(v) the Successor Owner shall (A) pay to the Mortgagee a fee equal to 1.0% of the then outstanding principal amount of the Notes; *provided, however,* no such fee shall be due if the transferred equity interest is transferred to family members or trusts for estate planning purposes or by operation of law or with respect to the Final Sale and (B) pay all of the reasonable legal fees and expenses of the Mortgagee and/or the special counsel representing the Holders in connection with the sale of such interest to the Successor Owner.

If a controlling interest in the Mortgagor is sold in accordance with the terms of this Section 2.3(h), then upon satisfaction of the conditions set forth therein, the Existing Owner shall be released from all liability under this Mortgage, and the other Operative Agreements, except for obligations accruing prior to the date of such sale.

(i) A Transfer within the meaning of Section 2.3(h) shall not include (1) transfers of ownership interests in Existing Owner in the Mortgagor or (2) a Transfer that results in a change of control of the Mortgagor, subject however, to all the following requirements: (A) written notice of any transfer under this Section 2.3(i) whether by will, trust or other written instrument, operation of law or otherwise, is provided to the Mortgagee, together with copies of such documents relating to the transfer as the Mortgagee, as directed by the Required Holders, may reasonably request, (B) control of at least fifty percent (50%) of the Board of Managers that controls the management and operation of the Mortgaged Property remains with Douglas F. Blough and/or Bruce S. MacDonald, individually or collectively, or thereafter is assumed by persons who are acceptable in all respects to the Mortgagee in its reasonable discretion, as directed by the Required Holders, (C) no such transfer will release the respective estate from any liability as an Existing Indemnitor (unless and until a Successor Indemnitor acceptable to the Holders has assumed, in writing, the obligations of the Existing Indemnitor), and (D) no such transfer, death or other event has any adverse effect either on the bankruptcy-remote

status of the Mortgagor or on the status of the Mortgagor as a continuing legal entity liable for the payment of the Indebtedness Hereby Secured and the performance of all other obligations secured hereby;

(j) institute proceedings to be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against it, or file a petition under state law relating to bankruptcy or insolvency, or consent to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Mortgagor, or a substantial part of its property, or make any assignment for the benefit of creditors, or, except as required by law, admit in writing its inability to pay its debts generally as they become due, or take any company action in furtherance of any such action;

(k) amend or modify the *"Special Purpose Entity"* provisions of the Organizational Documents of the Mortgagor;

(l) create, organize or establish any Subsidiary;

(m) conduct its business in any manner that would likely result in the substantive consolidation of the Mortgagor with its member or members in bankruptcy; or

(n) conduct its business in any manner such that the facts and assumptions made by the opinion giver with respect to the Mortgagor and its members in the Non-Consolidation Opinion are not true and correct in all material respects on and after the Closing Date.

*Section 2.4. Mergers and Consolidations.* The Mortgagor will not consolidate with or be a party to a merger with any other Person.

*Section 2.5. Financial Information and Reports.* The Mortgagor will keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the business and affairs of the Mortgagor in accordance with the accounting basis used for income tax purposes and will furnish to the Mortgagee:

(a) As soon as available and in any event within one hundred twenty (120) days after the close of each fiscal year of the Mortgagor, copies of:

(i) a balance sheet of the Mortgagor as of the close of such fiscal year, and

(ii) a statement of operating income, retained earnings and cash flows of the Mortgagor for such fiscal year,

in each case setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail and accompanied by a certificate of an officer of the Mortgagor to the effect that such financial statements have been prepared in accordance with the accounting basis used for tax purposes, are complete and correct and present fairly, in all material respects, the financial condition of the Mortgagor; *provided,* that if the financial statements required by this paragraph (a) shall be prepared by a firm of independent public accountants, then in lieu of a statement certified by an officer of the Mortgagor, copies of such statements shall be furnished to the Mortgagee at the times required by the preceding provisions of this paragraph (a);

(b) Within the periods provided in paragraph (a) above, the written statement of the Mortgagor, signed by an authorized officer of the Mortgagor, stating whether, to the best of his knowledge, there existed as of the date of such financial statements and on the date of the certificate any Default or Event of Default under this Mortgage, and specifying the nature and period of existence thereof and the action the Mortgagor is taking and proposes to take with respect thereto;

(c) Such additional information as the Mortgagee, as directed by the Required Holders, may reasonably request concerning the Mortgagor and the Indemnitor (including without limitation financial statements of the Indemnitor).

The Mortgagor will permit the Mortgagee (or such Persons as the Mortgagee may designate) to visit and inspect the Mortgaged Property under the Mortgagor's guidance, to examine all of its books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, agents and representatives, all at such reasonable times and as often as the Mortgagee as directed by any Holder may reasonably desire, *provided,* that at any time when an Event of Default shall have occurred and be then continuing, such visit and inspection shall be at the expense of the Mortgagor.

*Section 2.6. Notice of Default.* The Mortgagor will, immediately upon an officer or member of the Mortgagor acquiring actual knowledge of a Default or Event or Default, furnish a written notice to the Mortgagee specifying the nature and period of existence of such condition or event and what action the Mortgagor is taking or proposes to take with respect thereto.

*Section 2.7. Mortgage Title Insurance Policy.* The Mortgagor will, on the Closing Date, at its own cost and expense, procure and deliver to the Mortgagee or its counsel an endorsement or amendment to the ALTA Loan Policy CO-6440 of title insurance issued by Chicago Title Insurance Company, which policy shall conform to the commitment or pro forma, as applicable, for title insurance issued to the Mortgagee which policy shall be not less than the principal amount of the Notes showing marketable title to the Mortgaged Property to be in the Mortgagor, subject only to Permitted Encumbrances, which policy shall also insure the Mortgagee against all loss or damage sustained by reason of this Mortgage, not being a first and paramount lien at the date of such policy upon title to the Mortgaged Property and which policy shall show recordation of this Mortgage, the Assignment of Leases and Rents, and fixture filing statements, if any, shall

be dated the date of the Original Mortgage, shall contain such endorsements as are reasonably required by the Mortgagee, as directed by the Required Holders, and shall otherwise be in form and substance satisfactory to the Mortgagee, as directed by the Required Holders.

*Section 2.8. Payment of Certain Taxes*. The Mortgagor covenants and agrees to pay all taxes, assessments and governmental charges or levies imposed upon this Mortgage or any other Indebtedness Hereby Secured.

*Section 2.9. Ownership of Mortgaged Property*. The Mortgagor covenants and warrants that it has good and marketable title (with respect to the Property) and otherwise fee title to the Mortgaged Property hereinbefore conveyed to the Mortgagee free and clear of all liens, charges and encumbrances whatever except Permitted Encumbrances, and the Mortgagor has full right, power and authority to grant, warrant, mortgage, pledge, assign, sell, demise, bargain, hypothecate, convey, grant a security interest in, transfer and set over the same to the Mortgagee for the uses and purposes in this Mortgage, set forth; and the Mortgagor will warrant and defend the title to the Mortgaged Property against all claims and demands whatsoever. Without limiting the foregoing, the Mortgagor represents and warrants that the restrictions, exceptions, reservations, limitations, interests and other matters, if any, set forth immediately following the specific descriptions of the parcels of land in Exhibit A attached hereto, together with all other restrictions, exceptions, reservations, limitations, interests and other matters, if any, existing on the date of execution and delivery of this Mortgage, do not in the aggregate impair the value of the Mortgaged Property or adversely affect the utility, structural integrity or beneficial enjoyment of the Mortgaged Property for the uses to which the Mortgaged Property is being put.

*Section 2.10. Further Assurances*. The Mortgagor will, at its own expense, do, execute, acknowledge and deliver all and every further act, deed, conveyance, transfer and assurance necessary or proper for the better assuring, conveying, assigning and confirming unto the Mortgagee all of the Mortgaged Property, or property intended so to be, whether now owned or hereafter acquired.

*Section 2.11. Payment of Principal and Interest*. The Mortgagor will duly and punctually pay the principal of, and premium of, if any, and interest on the Notes secured hereby according to the terms thereof.

*Section 2.12. Prepayment of Notes*. No prepayment of the Notes may be made except to the extent and in the manner expressly permitted by this Section 2.12.

(a) *Mandatory Prepayment*. The Mortgagor shall prepay with the Final Sales Proceeds (i) first, the outstanding Series A1 Notes by payment in immediately available funds of the outstanding principal amount of the Series A1 Notes, and accrued interest thereon to the date of such prepayment and (ii) second, to the extent of any remaining Final Sales Proceeds after the prepayment in the previous clause (i), the outstanding Series A2 Notes by payment in immediately available funds of the outstanding principal amount of the Series A2 Notes, and accrued interest thereon to the date of such prepayment (each without the Make-Whole Amount)

upon the sale of the Project and Mortgaged Property or the sale, transfer, exchange or otherwise of the equity, ownership, membership, partnership, or controlling interest of the Mortgagor and the Mortgagor shall deposit such Final Sale Proceeds in accordance with Section 3.2(j) of the Escrow and Servicing Agreement.

(b) *Optional Prepayment with Make-Whole Amount.* The Mortgagor shall have the privilege, at any time and from time to time, of prepaying the outstanding Notes, in whole but not in part, by payment of the principal amount of the Notes, and accrued interest thereon to the date of such prepayment, together with a premium equal to the Make-Whole Amount, determined as of two (2) business days prior to the date of such prepayment pursuant to this Section 2.12(b); *provided, however*, that no Make-Whole Amount shall be due in the event of a prepayment within ninety (90) days of the Maturity Date.

(c) Intentionally Omitted.

(d) Intentionally Omitted.

(e) *Notice of Prepayments.* The Mortgagor will give notice of any intended prepayment of the Notes, pursuant to Sections 2.12(b), to the Mortgagee not less than thirty (30) days nor more than sixty (60) days before the date fixed for such prepayment specifying (i) such date and (ii) the principal amount of the Notes, to be prepaid on such date. Notice of prepayment having been so given, the principal amount of the Notes, specified in such notice, together with accrued interest thereon and the premium, if any, payable with respect thereto shall become due and payable on the prepayment date specified in said notice, unless such notice of prepayment is revoked by written notice to the Mortgagee not less than ten (10) days prior to the prepayment date. Not later than two (2) business days prior to the prepayment date specified in such notice, the Mortgagee shall provide the Mortgagor written notice of the principal amount, accrued interest thereon to the date of such prepayments and Make-Whole Amount, if any, due and payable by the Mortgagor on the prepayment date together with a calculation of the Make-Whole Amount and such calculation by the Mortgagee shall be presumptively correct absent manifest error.

*Section 2.13. Method and Place of Payment of Principal and Interest*. Anything in the Notes to the contrary notwithstanding, the Mortgagor will promptly and punctually pay, or cause the Escrow Agent to pay, the principal of the Notes, and premium, if any, and interest thereon, without any presentment thereof, at the address set forth for payment on Schedule I attached to the Escrow and Servicing Agreement (or to any nominee designated by the Holder of such Note) as payee, at its address specified in writing to, and received by, the Mortgagor at least ten (10) days prior to the date fixed for such payment) and if a bank account is designated for such Holder in said Schedule I, payments will be made in immediately available funds to such bank account, or payments will be made in such other manner or such other place within the continental limits of the United States as such Holder may reasonably direct in writing. If any Holder shall sell or transfer any of the Notes, the Mortgagee will, prior to the delivery of the

Notes, and in accordance with Section 4.11 of the Note Purchase Agreement, update the Note Register.

*Section 2.14. Maintenance of Mortgaged Property, Other Liens, Compliance with Laws, Etc.* (a) The Mortgagor shall (i) subject to Sections 3 and 4 hereof, promptly repair, restore or rebuild or cause any such repair, restoration or rebuilding of, any buildings or Improvements now or hereafter located on the Mortgaged Property which may become damaged or be destroyed, (ii) keep, or cause to be kept, the Mortgaged Property in good condition and repair, ordinary wear and tear excepted, without waste, and free from all claims, liens, charges and encumbrances other than Permitted Encumbrances, (iii) pay, or cause to be paid, when due any indebtedness which may be secured by a lien or charge on the Mortgaged Property which does not constitute a Permitted Encumbrance, and upon request exhibit satisfactory evidence of the discharge of such lien to the Mortgagee, (iv) comply with, or cause to be complied with, all requirements of law or municipal ordinances with respect to the Mortgaged Property and the use thereof (including, without limitation, any Environmental Legal Requirement, failure to comply with which would result in any material interference with the use or operation of the Mortgaged Property by the Mortgagor, (v) promptly procure, maintain and comply with, or cause to be promptly procured, maintained and complied with, all permits, licenses and other authorizations required for the use of the Mortgaged Property or any erection, installation, operation and maintenance of the Mortgaged Property or any part thereof, and (vi) make no material alterations in said Mortgaged Property that impair the market value or usefulness of the Mortgaged Property for use in the ordinary course of business, except as required by law or municipal ordinance or as permitted by any Assigned Contract or the UPS Contract.

(b) The Mortgagor may (i) construct upon the Mortgaged Property additional buildings, structures and other improvements and (ii) install, assemble and place upon the Mortgaged Property any trade fixtures, signs, furniture, furnishings, equipment, machinery and other tangible personal property used or useful in the business of the Mortgagor or any Tenant, as the case may be, whether or not classified as fixtures under applicable law. All such buildings, structures and other improvements shall be and remain part of the realty and shall be subject to this Mortgage. Such trade fixtures, signs, furniture, furnishings, equipment, machinery and other tangible personal property shall be and remain the property of the Mortgagor or any Tenant as the case may be, shall not be deemed part of the Mortgaged Property for purposes of condemnation or casualty, and the Mortgagor or any Tenant, as the case may be, may remove the same from the Mortgaged Property at any time prior to the expiration or earlier termination of this Mortgage, *provided* that the Mortgagor, at its expense, shall repair any damage to the Granted Property resulting from such removal.

(c) Any repair, restoration, rebuilding, substitution, replacement, modification, alteration of or addition to the Mortgaged Property pursuant to this Section 2.14 must not impair the market value or usefulness of the Mortgaged Property for use in the ordinary course of business; shall be expeditiously performed in a good and workmanlike manner and be completed in compliance with all laws, ordinances, orders, rules, regulations and requirements applicable thereto, including to the extent necessary to maintain in full force and effect the policies of

insurance required by Section 2.15 hereof. All costs and expenses of each such repair, restoration, rebuilding, substitution, replacement, the discharge of all liens filed against the Mortgaged Property arising out of the same, together with all costs and expenses necessary to obtain any permits or licenses required in connection therewith shall be promptly paid by the Mortgagor.

(d) The Mortgagor will only use and operate the Mortgaged Property, or permit the same to be used and operated, for any lawful purpose. The Mortgagor will not initiate, join in, acquiesce in, or consent to any change in any legal requirements, limiting or defining the use that may be made of the Mortgaged Property without the express written consent of the Mortgagee, as directed by the Required Holders. If, under applicable zoning provisions, the use of all or a portion of the Mortgaged Property is or will become a nonconforming use, the Mortgagor will not cause or permit such nonconforming use to be discontinued or abandoned without the Mortgagee's express written consent, as directed by the Required Holders.

(e) Prior to entering into any management agreement or other agreement with respect to the management of the Mortgaged Property (a *"Management Agreement"*), the Mortgagor shall execute and deliver to the Mortgagee, or cause to be executed and delivered to the Mortgagee, a Subordination of Management Agreement, in form and substance satisfactory to the Mortgagee, pursuant to which the party who shall act as manager of the Mortgaged Property under such Management Agreement shall, among other things, subordinate its right to payment for services rendered in managing the Mortgaged Property to the payment of the debt service to the Mortgagee with respect to the Notes.

*Section 2.15. Insurance.* (a) The Mortgagor will continuously maintain, or will cause to be continuously maintained, the following described insurance coverage, all of which must be satisfactory to the Mortgagee, as directed by the Required Holders, as to form of policy, amounts, deductibles, sublimits, types of coverages, exclusions and companies underwriting these coverages:

(i) Insurance with respect to the Improvements and Personal Property insuring against any peril now or hereafter included within the classification "Cause of Loss – Special Form" (sometimes referred to as "All Risk of Physical Loss"), expressly providing for coverage for terrorism events, and flood risks (if Property located in a special flood hazard area) and business income and rent loss insurance of not less than eighteen (18) months, and together with an "Ordinance and Law" endorsement, in amounts at all times sufficient to prevent the Mortgagee from becoming a co-insurer within the terms of the policies and under applicable law, but in any event such insurance shall be maintained in an amount which, after application of deductible, shall be equal to the full insurable value of the Plant, Improvements and Personal Property, the term "full insurable value" to mean the actual replacement cost of the Plant, Improvements and Personal Property (without taking into account any depreciation, and exclusive of excavations, footings and foundations, landscaping and paving) determined annually by an insurer, a recognized independent insurance broker or an independent appraiser

selected and paid by the Mortgagor and in no event less than the coverage required pursuant to the terms of any Assigned Contract;

(ii) Comprehensive public liability insurance on an *"occurrence basis"* or a *"claims made basis"* against claims for *"personal injury"* including without limitation bodily injury, death or property damage occurring on, in or about the Mortgaged Property and the adjoining streets, sidewalks and passageways, *provided* that such insurance shall afford immediate minimum protection to a combined single limit of at least $5,000,000 per person and accident and at least $3,000,000 for property damage liability; and

(iii) During the period of any construction or renovation or alteration of the Improvements, a so-called "Builder's All Risk" insurance policy for any Improvements under construction, renovation or alteration including, without limitation, for demolition and increased cost of construction or renovation, in an amount not less than all hard and soft costs of construction and including an occupancy endorsement and worker's compensation insurance covering all persons engaged in the construction, renovation or alteration in an amount at least equal to the minimum required by statutory limits of the State of Wisconsin.

(b) Any insurance coverage maintained in accordance with Section 2.15(a) shall at all times be written by insurance companies of recognized national standing and with a rating of A- or better by A.M. Best Mortgagor or an equivalent rating by an NAIC-approved rating organization and authorized to do business in the State of Wisconsin and: (A) shall name the Mortgagor and the Mortgagee as insureds, additional insureds or loss payee (as applicable), as their interests may appear, (B) in the case of policies covering loss or damage to the Mortgaged Property, shall provide that such losses, if any, shall be payable solely to the Mortgagee or, at the direction of the Mortgagee, the depository under a standard mortgagee or mortgagee loss payable clause satisfactory to the Mortgagee, (C) shall provide that the Mortgagee's interest shall be insured regardless of any breach or violation by the Mortgagor of any warranties, declarations or conditions contained in such policies, (D) such insurance, as to the interest of the Mortgagee therein, shall not be invalidated by the use or operation of the Mortgaged Property for purposes which are not permitted by such policies, nor by any foreclosure or other proceedings relating to the Mortgaged Property, nor by change in title to or ownership of the Mortgaged Property, (E) the insurers shall waive any right of subrogation of the insurers to any set-off or counterclaim or any other deduction, whether by attachment or otherwise, in respect of any liability of the Mortgagor, (F) if any premium or installment is not paid when due, or if such insurance would lapse or be canceled, terminated or materially changed for any reason whatsoever, the insurers will promptly notify the Mortgagee in writing and any such lapse, cancellation, termination or change shall not be effective as to the Mortgagee for thirty (30) days after receipt of such notice, (G) appropriate certification shall be made to the Mortgagee by each insurer with respect thereto, and (H) shall provide for deductibles in amounts not in excess of amounts as is customary for companies similarly situated and owning properties in the State of Wisconsin similar to the Mortgaged Property. Provided no Default or Event of Default has occurred or is continuing, the loss, if any, under any policy pertaining to loss by reason of damage to or destruction of any

portion of the Mortgaged Property shall be adjusted with the insurance companies by the Mortgagor, subject to the reasonable approval of the Mortgagee, as directed by the Required Holders, if the loss exceeds $250,000. The loss so adjusted shall be paid to the Mortgagee pursuant to said loss payable clause unless said loss is $250,000 or less in which case said loss shall be paid directly to the Mortgagor, *provided* no Default or Event of Default has occurred and is continuing, in which event any such loss shall be paid to the Mortgagee.

(c) The Mortgagor shall furnish the Mortgagee with certificates or other satisfactory evidence of maintenance of the insurance required hereunder and with respect to any renewal policy or policies shall furnish certificates evidencing such renewal not less than thirty (30) days prior to the expiration date of the original policy or renewal policies. All such policies shall provide that the same shall not be canceled without at least thirty (30) days' prior written notice to each insured named therein.

*Section 2.16. Payment of Taxes and Other Charges.* (a) The Mortgagor will pay and discharge (if they are not otherwise paid by a Tenant under any lease), before the same shall become delinquent, together with interest and penalties thereon, if any, (i) all taxes, assessments (including assessments for benefits from public works or improvements whenever begun or completed), levies, fees, water, sewer, electrical and other utility service rents and charges, and all other governmental charges, general and special, ordinary and extraordinary, and whether or not within the contemplation of the parties hereto, which are at any time levied upon or assessed against it or the Mortgaged Property or any part thereof or upon this Mortgage or the Notes secured hereby, or upon the revenues, rents, issues, income and profits in respect of the Mortgaged Property, or arising in respect of the occupancy, use or possession thereof, which failure to pay would result in the creation of a lien upon the Mortgaged Property or any part thereof, or upon the revenues, rents, issues, income and profits of the Mortgaged Property or in the diminution thereof or would result in any material interference with the use or operation of the Mortgaged Property by the Mortgagor, (ii) all franchise, excise and other taxes, fees and charges assessed, levied or imposed in respect of its existence or its right to do business in any state, (iii) all income, excess profits, excise, sales, franchise, gross receipts and other taxes, duties or imposts, whether of a like or different nature, assessed, levied or imposed by any governmental authority on it or the Mortgaged Property, or any portion thereof, or upon the revenues, rents, issues, income and profits of the Mortgaged Property if the failure to pay any such tax, duty or impost might result in the creation of a lien upon any asset of the Mortgagor or the Mortgaged Property or any part thereof or upon the revenues, rents, issues, income and profits of the Mortgaged Property or in the diminution thereof, and whether or not any such tax, duty or impost is payable directly by the Mortgagor or is subject to withholding at the source and (iv) all lawful claims and demands of mechanics, laborers, materialmen and others which, if unpaid, might result in the creation of a lien on the Mortgaged Property or upon the revenues, rents, issues, income and profits of the Mortgaged Property and, in general, will do or cause to be done everything necessary so that the lien hereof shall be fully preserved, at the cost of the Mortgagor, without expense to the Mortgagee (items (i) through (iv), inclusive, are collectively, the *"Taxes"*).

(b) After prior written notice to the Mortgagee, the Mortgagor, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes, *provided* that (i) no Event of Default has occurred and is continuing under any of the Operative Agreements, (ii) such proceeding shall suspend the collection of the Taxes from the Mortgagor and from the Mortgaged Property or the Mortgagor shall have paid all of the Taxes under protest, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which the Mortgagor is subject and shall not constitute a default thereunder, (iv) neither the Mortgaged Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost and (v) the Mortgagor shall have maintained adequate reserves for the payment of the Taxes, together with all interest and penalties thereon, unless the Mortgagor has paid all of the Taxes under protest, or the Mortgagor shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by the Mortgagee, as directed by the Required Holders, to insure the payment of any contested Taxes, together with all interest and penalties thereon. Nothing in this Section 2.16(b) shall prohibit the Mortgagor from contesting the payment of Taxes to the extent the Mortgagor is permitted to do so under the terms and conditions of the Assigned Contracts, and the Mortgagor shall not be deemed in default of its obligations hereunder so long as the Mortgagor is diligently contesting the payment of such Taxes in compliance with the terms of any Assigned Contract.

*Section 2.17. Limitation on Liens.* The Mortgagor will not create or incur or suffer to be incurred or to exist, any mortgage, pledge, security interest, encumbrance, lien or charge of any kind upon the Mortgaged Property, whether now owned or hereafter acquired, or upon any income or proceeds therefrom, except the following:

(a) liens for property taxes and assessments or governmental charges or levies and liens securing claims or demands of mechanics and materialmen, *provided* that payment thereof is not overdue or, if overdue, is being contested in good faith by appropriate actions or proceedings;

(b) liens of or resulting from any judgment or award, the time for the appeal or petition for rehearing of which shall not have expired, or in respect of which the Mortgagor or Tenant shall at any time in good faith be prosecuting an appeal or proceeding for a review and in respect of which a stay of execution pending such appeal or proceeding for review shall have been secured;

(c) liens, charges, encumbrances and priority claims incidental to the conduct of business or the ownership of properties and assets (including warehousemen's and attorneys' liens and statutory landlords' liens) and deposits, pledges or liens to secure payment of premiums on insurance purchased in the usual course of business or in connection with self-insurance or in connection with workmen's compensation, unemployment insurance or social security legislation, or to secure the performance of bids, tenders or trade contracts, or to secure statutory obligations, surety or appeal bonds

or other liens of like general nature incurred in the ordinary course of business and not in connection with the borrowing of money, *provided* in each case, the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate actions or proceedings;

(d) minor survey exceptions or minor encumbrances, easements or reservations of, or rights of others for rights-of-way, utilities and other similar purposes, or zoning or other restrictions as to the use of real properties, which encumbrances, easements, reservations, rights and restrictions do not in the aggregate materially detract from the value of said properties or materially impair their use in the operation of the business of the Mortgagor;

(e) the lien of this Mortgage;

(f) easements, rights of way, reservations, restrictive agreements, servitudes and rights of others against the Mortgaged Property and any other matters which are listed on Schedule B to the ALTA Title Insurance Policy delivered to the Mortgagee following the issuance and delivery of the Notes;

(g) utility easements, rights of way or reservations granted or to be granted to service providers in connection with the development of the Mortgaged Property, which such utility easements, rights of way or reservations do not in the aggregate detract from or impair the value of or use of the Mortgaged Property; and

(h) liens securing Indebtedness that is subordinate in all respects to the Indebtedness Hereby Secured and for which the Mortgagor and the holders of such Indebtedness enter into a subordination and inter-creditor agreement reasonably acceptable to the Mortgagee, as directed by the Required Holders, and special counsel to the Holders, including liens securing Permitted Subordinated Financing (as defined and described below in Section 2.17(i).

*Section 2.18. Assignment; Obligations and Terms Respecting any Lease, the Assigned Contracts, the Other Contracts and any Lease Guaranties.*

(a) *Assignment.* The Mortgagor, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to further secure the payment and performance by the Mortgagor of all Indebtedness Hereby Secured hereby absolutely and unconditionally assigns, transfers and grants to the Mortgagee the following property, rights, interests and estates, now owned, or hereafter acquired, by the Mortgagor:

(i) *Lease*. Any lease and the right, title and interest of the Mortgagor, its successors and assigns, therein and thereunder.

(ii) *Assigned Contracts and Agreements*. The Assigned Contracts and the Assigned Construction Agreements, and the right, title and interest of the Mortgagor, its successors and assigns, therein and thereunder.

(iii) *Other Contracts and Agreements.* All other leases, subleases and other contracts or agreements, whether or not in writing, affecting the use, enjoyment or occupancy of the Mortgaged Property or relating to the operation of the Mortgaged Property or any portion thereof now or hereafter made, together with any extension, renewal or replacement of the same (collectively, the *"Other Contracts"*), this assignment of the Other Contracts being effective without further or supplemental assignment.

(iv) *Rents/Payments*. All rents, additional rents, percentage rents, revenues, income, proceeds, payments, reimbursable amounts, issues and profits arising from the operation of the Project or any lease, the Assigned Contracts, the Other Contracts and any Lease Guaranties and any cash or security deposited in connection therewith (including, without limitation, all commissions and all oil and gas and other mineral royalties and bonuses) payable by any Tenant under any lease, under each Assigned Contract or any other tenant under the Other Contracts or any Lease Guarantor under any Lease Guaranty or otherwise, for or in connection with the use, enjoyment and occupancy of the Mortgaged Property (collectively, the *"Rents"*).

(vi) *Bankruptcy Claims*. All of the Mortgagor's claims and rights (the *"Bankruptcy Claims"*) to the payment of damages arising from any rejection by American Foods under each of their respective Assigned Contracts or any other tenant under any lease or the Other Contracts under the Bankruptcy Code, 11 U.S.C. §101 *et seq*., as the same may be amended (the *"Bankruptcy Code"*) or under any comparable federal or state statute or law.

(vii) *Lease Guaranties*. All of the Mortgagor's right, title and interest in and to any and all lease guaranties, letters of credit and any other credit support given in connection with any lease, any of the Assigned Contracts, and the Other Contracts to the Mortgagor or predecessors (individually, a *"Lease Guaranty"*, and, collectively, the *"Lease Guaranties"*) by any guarantor (individually, a *"Lease Guarantor,"* and, collectively, the *"Lease Guarantors"*).

(viii) *Proceeds*. All proceeds from the sale or other disposition of any lease, any of the Assigned Contracts, the Other Contracts, the Rents, any Lease Guaranties and the Bankruptcy Claims.

(ix) *Other*. All rights, powers, privileges, options and other benefits of the Mortgagor as lessee under any lease, the Mortgagor as lessor under any lease and the Other Contracts, as party to the Assigned Contracts, and the Mortgagee under any Lease Guaranties, including without limitation, (A) the immediate and continuing right to make

claims for, receive, collect and receipt for, all Rents payable or receivable under any lease, the Other Contracts and all sums payable under the Assigned Contracts and any Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Indebtedness Hereby Secured) and to do all other things which the Mortgagor or any lessor is or may become entitled to do under any lease, any Other Contract, any of the Assigned Contracts, or any Lease Guaranties; (B) the right to pursue and collect any claim in bankruptcy or receivership proceedings of any tenant under the Other Contracts or any Lease Guarantor; (C) the right to accept or reject any offer made by any tenant under the Other Contracts or any Lease Guarantor to purchase the Mortgaged Property or any part thereof and any other property subject to any lease, the Assigned Contracts, the Other Contracts or any Lease Guaranty and to perform all other necessary or appropriate acts with respect to such purchases; provided that the Mortgagor retains such rights if the Notes, will be paid in full and all other obligations of the Mortgagor under the Operative Agreements are satisfied as a result of such event and the Mortgagee agrees to provide such consent as is necessary to the Mortgagor's rejection of American Foods's offer pursuant to the terms of any Assigned Contract to purchase any portion of the Mortgaged Property; (D) the right to make all waivers and agreements, to give and receive all notices, consents and releases, and to take such action upon the happening of a default beyond applicable cure periods, if any, under any lease, the Assigned Contracts, the Other Contracts, or any Lease Guaranty as the Mortgagor shall have the right under any lease, the Assigned Contracts, the Other Contracts or any Lease Guaranty or at law to take, including the right to commence, conduct and consummate eviction proceedings; (E) the right, at the Mortgagee's option to enter upon the Mortgaged Property or any portion thereof in person, by agent or by court-appointed receiver; and (F) the Mortgagor's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in this Mortgage, and any or all other actions designated by the Mortgagee, as directed by the Required Holders, for the proper management and preservation of the Mortgaged Property if an Event of Default has occurred and is then continuing.

This assignment is a perfected present, absolute, direct and unconditional assignment and transfer of all the Mortgagor's right, title and interest in and to, but not the obligations under, any lease, the Assigned Contracts, the Other Contracts, any Lease Guaranties and the Rents made in consideration of the loan to the Mortgagor and as additional security for the repayment of the Indebtedness Hereby Secured.

(b) *Obligations and Terms Respecting any Lease, the Assigned Contracts, the Other Contracts and any Lease Guaranties.*

(i) The Mortgagor will punctually perform (or cause to be performed) all obligations, covenants and agreements by it to be performed under any lease, the Assigned Contracts, the Other Contracts and any Lease Guaranties strictly in accordance with the terms thereof, and will at all times use commercially reasonable efforts to compel performance by any other counterparty or tenant under any lease, the Other

Contracts, and any Lease Guarantors of all covenants and agreements by them to be performed under any lease, the Assigned Contracts, the Other Contracts or any Lease Guaranties, as applicable. The Mortgagor will take no action and permit no action to be taken by other Persons which will release any party from their obligations and liabilities under the Assigned Contracts or result in the termination, amendment or modification of, or impair the validity of the Assigned Contracts. The Mortgagor will give to the Mortgagee written notice of all defaults by under the Assigned Contracts promptly after they have become known to the Mortgagor. Unless and until the Mortgagee, as directed by the Required Holders, takes possession of the Mortgaged Property, neither this Mortgage, nor any action or inaction on the part of the Mortgagee shall constitute an assumption on the part of the Mortgagee of any obligation to any other tenant under the Other Contracts or any Lease Guarantor or any other Person under any lease, the Assigned Contracts, the Other Contracts or any Lease Guaranties. No action or inaction on the part of the Mortgagor shall adversely affect or limit in any way the rights of the Mortgagee under this Mortgage, or, through this Mortgage, under the Assigned Contracts.

(ii) The Mortgagor will not, except with the prior written consent of the Mortgagee at the direction of the Required Holders, take or suffer to be taken any action or consent to or permit any prepayment or discount of Rents or payment of Rents more than one month in advance, under the Assigned Contracts.

(iii) The Mortgagor will not, without the prior written consent of the Mortgagee at the direction of the Required Holders:

(A) declare a default or exercise the remedies of the landlord, or tenant, as applicable, under, or terminate, modify or accept a surrender of, or exercise any recapture rights with respect to, or offer or permit any termination, modification or surrender of any Assigned Contract or any reciprocal easement or restrictive covenant agreement or similar agreement running with the land (unless such termination, modification or acceptance of a surrender of is not reasonably expected to cause a Material Adverse Change) or create or consent to the creation or existence of any mortgage or other lien to secure the payment of indebtedness upon the landlord's interest under any lease or any leasehold estate created thereby or any Assigned Contract; or

(B) other than to the Mortgagee or Escrow Agent, assign, transfer or hypothecate any Rents or other payment due or to become due under any lease, the Assigned Contracts, the Other Contracts or any Lease Guaranties or anticipate any Rents or other payment thereunder.

(iv) The Mortgagor hereby agrees that it shall obtain a collateral assignment and consent to such assignment from any counterparty to any Assigned Contract and shall direct each counterparty to any Assignment Contract to deliver or remit directly to

the Escrow Agent, all Rents (including, without limitation, all fixed rent, basic rent, percentage rent and all additional rent), income, revenues, issues, profits, insurance proceeds, condemnation awards, liquidated damages, purchase price proceeds and other payments, tenders and security now or hereafter due and payable to or receivable by the Mortgagor, or any Tenant, respectively, under any lease and the Assigned Contracts, such amounts to be paid directly to the Escrow Agent in the manner provided therein or in such other manner as the Mortgagee, as directed by the Required Holders, may from time to time designate. All amounts received by the Escrow Agent shall be applied in the manner provided herein and in the Escrow and Servicing Agreement. The Mortgagor hereby agrees to send to the Mortgagee, in accordance with Section 6.3 hereof, copies of all notices given by the Mortgagor under the Assigned Contracts that allege a default thereunder by the other party to such Assigned Contract.

(v) Notwithstanding anything to the contrary set forth in the Consents to Assignments or any other document, the Mortgagor agrees that it will not enter into any agreement subordinating, amending, supplementing, hypothecating, waiving, discharging or terminating the Assigned Contracts (unless any such agreement is not reasonably expected to cause a Material Adverse Change) or this Mortgage without the Mortgagee's prior written consent thereto, which consent shall be given or withheld at the direction of and pursuant to the discretion of the Required Holders, and that any attempted subordination, amendment, supplement, hypothecation, waiver, discharge or termination without such consent shall be void. The Mortgagor will not terminate the Assigned Contracts in the event of default without the express prior written consent of the Mortgagee, which consent shall be given or withheld at the direction of and pursuant to the discretion of the Required Holders. In the event that the Assigned Contracts shall be amended or supplemented as herein permitted, any of the Assigned Contracts as so amended or supplemented shall continue to be subject to the provisions of this Mortgage, without the necessity of any further act by any of the parties hereto.

(vi) Any Assignment set forth in this Section 2.18 and Granting Clause Second of this Mortgage, shall run with the land and be good and valid against the Mortgagor or those claiming by, under or through the Mortgagor, from the date hereof and such assignment shall continue to be operative during the foreclosure or any other proceeding taken to enforce this Mortgage. In the event of a sale or foreclosure which shall result in a deficiency, such assignment shall stand as security during the redemption period for the payment of such deficiency. The Mortgagee, as directed by the Required Holders, shall be permitted, at its sole option, to exercise remedies under such assignment separately from remedies exercised against other portions of the Mortgaged Property.

*Section 2.19.* *Advances.* If the Mortgagor shall fail to comply with the covenants contained herein or in the Note Purchase Agreement or in any other Operative Agreement and incorporated herein by reference, the Mortgagee, as directed by the Required Holders, after five (5) days' prior written notice to the Mortgagor, and without waiving or releasing any obligation or Default, may (but shall be under no obligation to) at any time thereafter make such payment or

perform such act for the account and at the expense of the Mortgagor, and may enter upon the Mortgaged Property or any part thereof for such purpose and take all such action thereon as, in the opinion of the Mortgagee, as directed by the Required Holders, may be necessary or appropriate therefor. All sums so paid by the Mortgagee and all fees, costs and expenses (including without limitation, reasonable attorneys' fees, costs expenses or court costs) so incurred, together with interest thereon at the Default Rate from the date of payment or incurrence, shall be secured hereby in priority to the indebtedness evidenced by the Notes, and shall be paid by the Mortgagor to the Mortgagee on demand. The Mortgagee, as directed by the Required Holders, in making any payment authorized under this Section relating to taxes or assessments may do so according to any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien or title or claim thereof.

*Section 2.20. Recordation.* The Mortgagor will, at its own expense, cause this Mortgage, a memorandum of any lease, all supplements hereto and thereto, and any financing statements required by law, including the Uniform Commercial Code, in respect hereof and thereof at all times to be kept recorded and filed at its own expense in such manner and in such places as may be required by law in order to fully preserve and protect the rights of the Mortgagee hereunder and thereunder, and will furnish to the Mortgagee promptly after the execution and delivery of this Mortgage, a memorandum of any lease, and any financing statements and each supplement hereto and thereto an opinion of counsel stating that, in the opinion of such counsel, this Mortgage, a memorandum of any lease, and any financing statements or such supplement, as the case may be, has been properly recorded or filed for record so as to make effective of record the lien intended to be created hereby and/or thereby. The Mortgagor hereby specifically consents to any financing statements and/or financing statements and continuation statements or other filings related to this Mortgage, being made electronically, to the extent permitted by law. Notwithstanding the foregoing, in no event shall the Mortgagor be responsible for the filing of any continuation statements and the Mortgagor hereby authorizes the Mortgagee, as directed by the Required Holders, and its agents or counsel, at the Mortgagor's expense, to file, in the name of the Mortgagor or otherwise, financing statements and continuation statements with regard to any filed financing statements. The Mortgagor hereby irrevocably appoints the Mortgagee or any agent designated by the Mortgagee its true and lawful attorney-in-fact, which power is coupled with an interest and with full power of substitution, to execute, acknowledge, file and deliver financing statements in the name of the Mortgagor. Furthermore, the Mortgagor hereby authorizes Chapman and Cutler LLP, the Mortgagee and its agents or counsel to file financing statements that indicate the collateral (i) as all assets of the Mortgagor or words of similar effect or (ii) as being of an equal, greater or lesser scope, or with greater or lesser detail, than as set forth in the Collateral Assignments and this Mortgage, on behalf of the Mortgagor. The Mortgagor also hereby ratifies its authorization for Chapman and Cutler LLP, the Mortgagee and its agents or counsel to have filed in any jurisdiction any Uniform Commercial Code financing statements or amendments thereto if filed prior to the Closing Date. The Mortgagor shall not terminate, amend or file a correction statement with respect to any financing statement or fixture filing filed pursuant to this Mortgage, without the Mortgagee's, as directed by the Required Holders, prior written consent.

*Section 2.21.* *After-Acquired Property.* Any and all property hereafter acquired which is of the kind or nature described in the Granting Clauses hereof and is or intended to become a part thereof, shall ipso facto, and without any further conveyance, assignment or act on the part of the Mortgagor or the Mortgagee become and be, subject to the lien of this Mortgage, as fully and completely as though specifically described herein; but nevertheless the Mortgagor shall from time to time, if requested by the Mortgagee, as directed by the Required Holders, execute and deliver any and all such further assurances, conveyances and assignments thereof as the Mortgagee, as directed by the Required Holders, may reasonably require for the purpose of expressly and specifically subjecting to the lien of this Mortgage, any and all such property.

*Section 2.22.* *Environmental Indemnity*. The Mortgagor agrees to defend, indemnify and hold the Mortgagee and the Holders harmless from and against any and all fees, costs, penalties, damages, expenses, and/or liabilities (including reasonable attorneys' fees, costs, expenses or court costs) which the Mortgagee or the Holders may suffer as a result of a claim, suit, or action regarding the existence (or claimed existence) on or under the Mortgaged Property of any Hazardous Material (whether caused by the Mortgagor, any Indemnitor or any Tenant under any lease or any other party, except the Mortgagee or any Holder, or any assignee of either the Mortgagee or any Holder), and/or regarding the removal, remediation and clean-up of same.

*Section 2.23.* *Separate Identity.* The Mortgagor will maintain books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party and the Mortgagor will file its own tax returns (if filing of tax returns is required by applicable law). The Mortgagor shall maintain its books, records, resolutions and agreements as official records. The Mortgagor will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of the Mortgagor or any constituent party of the Mortgagor, or any affiliate of any constituent party), and shall conduct business in its own name and shall maintain and utilize separate invoices and checks. The Mortgagor shall correct any known misunderstanding regarding its status as a separate entity and shall not identify itself or any of its affiliates as a division or part of the other. The Mortgagor will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations, provided that nothing contained in this sentence shall be deemed to require any equity owner of the Mortgagor to contribute additional capital to the Mortgagor. Neither the Mortgagor nor any constituent party will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of the Mortgagor. The Mortgagor will not commingle the funds and other assets of the Mortgagor with those of any affiliate or constituent party, or any affiliate of any constituent party, or any other person. The Mortgagor has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party, or any affiliate of any constituent party, or any other person. The Mortgagor does not and will not hold itself out to be responsible for the debts or obligations of any other person.

*Section 2.24.* *General Indemnity*. In addition to any other indemnifications provided herein, or in the other Operative Agreements, the Mortgagor will, at its sole cost and expense

protect, defend, indemnify and save harmless the Holders and the Mortgagee on an after-tax basis from and against all liabilities, losses, damages, demands, claims, obligations, suits or other proceedings (including, causes of action, litigation and defenses), settlement proceeds, fines, penalties, assessments, citations, directives, judgments, fees, costs, disbursements or other expenses of any kind or of any nature whatsoever (including, reasonable attorneys', consultants', and experts' fees, court costs and disbursements actually incurred in investigating, defending, settling or prosecuting any demand, claim, obligation, suit or other similar proceeding (collectively, *"Indemnified Liabilities"*) (except to the extent caused solely by the gross negligence or willful misconduct of the Holders or the Mortgagee, as applicable) which may be imposed on, incurred by or asserted or awarded against the Holders or the Mortgagee because of (i) ownership of the Operative Agreements, the Mortgaged Property or receipt of any Rents or amounts due under any Assigned Contract; (ii) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Mortgaged Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (iii) any use, non-use or condition in, on or about the Mortgaged Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (iv) any failure on the Mortgagor's part to perform or comply with any of the material terms of the Operative Agreements; (v) the performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property; (vi) to the extent not covered by insurance, any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to Hazardous Materials or asbestos; (vii) the Mortgaged Property's failure to comply with any legal requirements; (viii) the occupation, condition, operation, service, design, maintenance or management of the Mortgaged Property; and (ix) any tax, duty, assessment or other charge imposed by any governmental authority on the making and recording of this Mortgage. Any Indemnified Liabilities payable to the Holders, or the Mortgagee because of the application of this Section 2.24 will be secured by this Mortgage, and will become immediately due and payable and will bear interest at the Default Rate from the date such Indemnified Liability is sustained by the Holders and/or the Mortgagee until paid. The Mortgagor's obligations and liabilities under this Section 2.24 will survive any termination, satisfaction or assignment of the Operative Agreements and the exercise by the Holders and/or the Mortgagee of any of its rights or remedies under the Operative Agreements including, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure as to events occurring prior thereto.

*Section 2.25. No Forfeiture.* The Mortgagor represents and warrants to the Mortgagee that, as of the Closing Date, the Mortgagor has not committed any act or omission affording any governmental authority the right of forfeiture against the Mortgaged Property or any monies paid in performance of the Mortgagor's obligations under the Operative Agreements. The Mortgagor agrees not to commit, permit or suffer to exist any act, omission or circumstance affording such right of forfeiture. In furtherance thereof, the Mortgagor indemnifies the Holders and the Mortgagee and agrees to defend and hold the Holders and the Mortgagee harmless from and against any costs because of the breach of the agreements or the representations and warranties set forth in this Section 2.25.

*Section 2.26. Bankruptcy Proceedings.*

*Bankruptcy.* If any lease or any Assigned Contract is rejected in any case, proceeding or other action commenced by or against the Mortgagor under any lease or any Assigned Contract, or any person or party constituting or having an interest under any lease or any Assigned Contract, under the Bankruptcy Code, or any comparable federal or state statute or law: (i) the Mortgagor, immediately upon receiving notice thereof, shall give written notice thereof to the Holders and the Mortgagee; (ii) the Mortgagor, without the prior written consent of the Mortgagee at the direction of the Holders, shall not elect to treat any lease or Assigned Contract as terminated pursuant to Section 365(h) of the Bankruptcy Code or any comparable federal or state statute or law, and any election made by the Mortgagor without such consent shall be void; and (iii) unless the Mortgagee otherwise consents in writing at the direction of the Holders, the Mortgagor shall elect in a timely manner to remain in possession of the property demised by any lease; and (iv) this Mortgage, and all liens, terms, covenants, and conditions of this Mortgage, shall extend to and cover the Mortgagor's possessory rights under Section 365(h) of the Bankruptcy Code or any comparable federal or state statute or law and to any claim for damages, loss, or offset arising from the Mortgagor's rejection of any lease or any Assigned Contract. The Mortgagor hereby assigns to the Mortgagee, as additional collateral under this Mortgage, , to secure the Indebtedness thereby secured, the Mortgagor's rights to remain in possession of the demised premises under any lease, and to offset rents under Section 365(h) of the Bankruptcy Code or any comparable federal or state statute or law. The Mortgagor shall not offset against rents proceeds or other charges arising under any lease or any Assigned Contract any losses or damages arising or alleged to have arisen from the Mortgagor's rejection of any lease or any Assigned Contract without the prior written consent of the Mortgagee at the direction of the Holders and subject to such terms and conditions as the Mortgagee may specify. If the lessor under any lease proposes to sell the Premises free and clear of any lease under Section 363 of the Bankruptcy Code or any comparable federal or state statute or law, or otherwise, the Mortgagor shall immediately give notice thereof to the Holders and the Mortgagee in writing and shall object to such sale, and hereby authorizes the Mortgagee on behalf of the Holders to appear and contest any such sale and to seek adequate protection for its interest in the Mortgaged Property upon such terms and conditions as the Mortgagee shall determine at the direction of the Holders.

*Section 2.27. Conversion to Delaware Statutory Trust.* At any time that the Mortgagor is a limited liability company organized under the laws of the State of Wisconsin, notwithstanding anything to the contrary contained in this Mortgage, or elsewhere in any other Operative Agreement, the Mortgagor may convert (a *"DST Conversion"*) its form from a Wisconsin limited liability company to a Delaware statutory trust (the *"DST Borrower"*), subject to satisfaction of the following conditions:

(i) The Mortgagor shall give the Mortgagee not less than sixty (60) days' prior written notice of its intent to effect a DST Conversion;

(ii) Net Lease Capital Advisors, LLC, DFB Holdings LLC, Million Trust Servicing LLC, or an Affiliate of any thereof or another Person reasonably acceptable to

the Mortgagee shall be the trustee of the DST Borrower (provided that the Mortgagee shall have the right to reasonably approve or not approve any party proposed to serve as the trustee of the DST Borrower at the time of the proposal);

(iii) The trust agreement or other organizational documents of the DST Borrower shall provide separateness covenants that will cause the DST Borrower to satisfy the requirements of Section 2.23 hereof;

(iv) The DST Borrower shall have qualified itself as a foreign entity authorized to conduct business in the State of Wisconsin, shall be then in good standing in both the State of Wisconsin and the State of Delaware and shall provide proof of same to the Mortgagee;

(v) The Mortgagor, the DST Borrower and any Tenant shall enter into an agreement to reflect change of name, novation agreement or other documentation evidencing the succession of the DST Borrower to the Mortgagor as lessor under any lease;

(vi) The Mortgagor or the DST Borrower shall cause amendments to all UCC financing statements to be filed in all appropriate offices, evidencing the DST Conversion;

(vii) Amendments to the respective recordable Operative Agreements shall be recorded and/or filed, as applicable, to the extent necessary, solely to evidence the DST Conversion and the continuation of the security interests and rights of the Mortgagee;

(viii) The other Operative Agreements shall be amended, to the extent necessary, solely to evidence the DST Conversion and the DST Borrower shall expressly assume and/or ratify, as appropriate, all obligations of the Mortgagor under the Operative Agreements;

(ix) The DST Borrower shall deliver such other agreements, instruments and legal opinions relating solely to the DST Conversion as shall be reasonably requested by the Mortgagee, each of which shall be a form acceptable to the Mortgagee in its sole discretion (as directed by the Required Holders); and

(x) The Mortgagor shall promptly pay all taxes, fees, recording costs and the costs of the Mortgagee and the Holders, including the cost of attorneys, their fees, expenses and court costs, in effectuating the DST Conversion, all such costs to be Indebtedness Hereby Secured until paid.

*Section 2.28. Maintenance of Rating.* The Mortgagor, at the Mortgagor's sole expense, shall cause a credit rating for the Notes to be issued and maintained by the Active Rating Agency no later than _______, 2027 ("*Notes Rating Date*") and in accordance with the terms of

Section 3.2(h) of the Escrow and Servicing Agreement, written evidence of such rating shall be provided to the Mortgagee no later than the date that is sixty (60) days prior to each anniversary of the Notes Rating Date. Notwithstanding anything contained herein to the contrary, an Event of Default shall not have occurred if, after the Mortgagor has exhausted all commercially reasonable efforts to maintain or obtain such rating for the Notes, an Acceptable Rating Agency will not re-issue or issue a rating, as the case may be, for the Notes.

*Section 2.29. Final Sale.* Notwithstanding anything to the contrary contained in this Section 2.3(g) or (h) or in any other Operative Agreements, the Mortgagor shall actively market in good faith the Project, Mortgaged Property and the Mortgagor's business, operations and assets for sale in accordance with the Plan (the "*Final Sale*"). The Mortgagor shall provide prior written notice to the Mortgagee and Purchasers and Mortgagee shall reasonably approve all efforts and agreements entered into in connection with the Final Sale, including (but not limited to) selection of the broker, marketing efforts, buyer targets, offers received, any LOI and related purchase agreement, credits or conditions of sale, and timeline of sale. The Purchasers shall have the right to request ongoing marketing and sale status calls no more than once every thirty (30) days with the Mortgagor to obtain updates related to the Final Sale of the Project and Purchasers shall have the right to request all material documentation related thereto. All proceeds of such sale of the Project and Mortgaged Property or the sale, transfer, exchange or otherwise of the equity, ownership, membership, partnership, or controlling interest of the Mortgagor (including the Net Proceeds (as defined in the Plan)) (the "*Final Sale Proceeds*") shall be paid in accordance with Section 2.12(a) and the other Operative Agreements.

*Section 2.30. Collateral Assignment of $CO_2$ Contracts.* If the Mortgagor enters into any contract with any Person for the sale of $CO_2$ generated from the Project, the Mortgagor shall collaterally assign such contract pursuant to a collateral assignment and security agreement in substantially the same form as the Collateral Assignments, and shall use all reasonable efforts to cause such Person to consent to such collateral assignment pursuant to a consent agreement in substantially the same for as the Consents to Assignments and Agreements.

*Section 2.31. Compliance with Reporting Requirements in Conditional Use Permits.* The Mortgagor shall timely file any and all monthly, quarterly, annual, or other reporting requirements as set forth in any Conditional Use Permit.

SECTION 3. POSSESSION, USE AND RELEASE OF PROPERTY.

*Section 3.1. The Mortgagor's Right of Possession.* Provided no Default or Event of Default has occurred and is continuing, the Mortgagor shall be permitted to remain in full possession, enjoyment and control of the Mortgaged Property subject always to the observance and performance of the terms of this Mortgage, and the other Operative Agreements. It is expressly understood that the use and possession of the Mortgaged Property by the Mortgagor, or any of its permitted Tenants, subtenants, any other party to the Assigned Contracts and/or the Other Contracts shall not constitute a violation of this Section 3.1.

*Section 3.2. Release of Mortgaged Property - Event of Loss and Prepayment of Notes.* Upon the occurrence of any Event of Loss in respect of the Mortgaged Property, the Mortgagor shall give the Mortgagee, within thirty (30) days after the occurrence thereof, written notice of such Event of Loss, which notice shall specify (a) in the case of a casualty, whether (i) the Mortgagor, any Tenant, as the case may be, is obligated to repair or rebuild the Mortgaged Property as provided in any of the Assigned Contracts or any lease, or (ii) the American Foods will terminate any Assigned Contract as provided therein, or (b) in the case of a condemnation, whether American Foods will terminate any Assigned Contract.

*Section 3.3. Eminent Domain.* The Mortgagor, immediately upon obtaining knowledge of the institution of any proceedings for the condemnation of the Mortgaged Property or any portion thereof, shall notify the Mortgagee in writing of the pendency of such proceedings. The Mortgagee may participate in any such proceedings, and the Mortgagor from time to time will deliver or cause to be delivered to the Mortgagee all instruments requested by it to permit such participation. In the event of such condemnation proceedings, the award or compensation payable to the Mortgagor shall be paid to the Mortgagee (except that the Mortgagor shall be entitled to retain awards of $250,000 or less), and such award or compensation shall be retained by the Mortgagee as part of the Mortgaged Property and applied in accordance with Section 4.1(a)(i) or (ii) hereof. The Mortgagee shall be under no obligation to question the amount of the award or compensation and the Mortgagee may accept any such award or compensation. In any such condemnation proceedings the Mortgagee may be represented by counsel, whose reasonable costs and disbursements shall be paid by the Mortgagor.

## SECTION 4. APPLICATION OF INSURANCE AND CERTAIN OTHER MONEYS RECEIVED BY THE MORTGAGEE.

*Section 4.1. Insurance Proceeds and Condemnation Awards.* . (a) Subject to Section 4.4 hereof, the amounts received by or payable to the Mortgagee from time to time which constitute insurance proceeds in respect of any damage to or destruction or condemnation of the Mortgaged Property or any part thereof, condemnation awards or compensation covering the Mortgaged Property (less the actual costs, fees and expenses incurred in the collection thereof) shall be held by the Mortgagee as part of the Mortgaged Property, the Mortgagor shall be required to repair, rebuild or restore the Mortgaged Property as required pursuant to any Assigned Contract, all casualty insurance proceeds resulting from such casualty and/or all condemnation awards and condemnation insurance proceeds resulting from such condemnation (if in excess of $250,000) shall be paid over by the Mortgagee to the Mortgagor (or as the Mortgagor may direct from time to time) upon a written application of the Mortgagor and accompanied by such evidence in reasonable detail as may be satisfactory to the Mortgagee supporting such application for the purpose of paying, or reimbursing the Mortgagor for the payment of, the reasonable cost, as shown by such certificate, of repairing, rebuilding or restoring part or all of the Mortgaged Property damaged, destroyed or taken (*"Restoration"*), but only for and to the extent that the Mortgagor shows by such evidence of costs that the proceeds, award or compensation (*"Restoration Funds"*) remaining on deposit with the Mortgagee, together with any additional funds irrevocably allocated or otherwise provided for in a manner satisfactory to the Mortgagee

for such purpose, shall be sufficient to complete such Restoration and restore the Mortgaged Property (as nearly as practicable) at least to the market value, functionality and condition which existed immediately prior to the damage, destruction, condemnation or taking, as the case may be, free from liens or encumbrances except Permitted Encumbrances. The Mortgagor shall deliver to the Mortgagee any additional funds needed to complete the Restoration prior to the disbursement of any Restoration Funds. Every such application for the payment of such proceeds, award or compensation shall state that no Event of Default has occurred and is continuing. Any proceeds in excess of the amount needed for Restoration remaining after the Restoration has been completed shall be (i) if the amount payable under any Assigned Contract has been reduced as a result of such condemnation or casualty, such amounts shall be held by the Mortgagee and at the option of the Mortgagee as directed by the Required Holders either (y) applied to future payments on the Notes, as they come due (or as otherwise required to satisfy any obligations of the Mortgagor under any of the Operative Agreements) to the extent necessary after the application of each rent payment thereafter received or (z) applied to the outstanding principal (without premium) and interest then due on the Notes (*provided* that, if amounts are applied to principal, the amortization schedule on the Notes, shall be adjusted to, if possible, avoid a future payment default while at the same time amortize the outstanding principal on the Notes, in full by the original maturity date of the Notes) or (ii) if the amount payable under any Assigned Contract has not been so reduced as a result of such condemnation or casualty and so long as no Default or Event of Default is then existing, such amounts shall be disbursed to the Mortgagor. The Mortgagee shall receive a supplement hereto, as insured by appropriate title insurance acceptable to the Mortgagee.

(b) Subject to Section 2.15(b) hereof with respect to adjustments of losses, any appraisal or adjustment of such loss or any settlement or payment of indemnity therefor which shall be agreed upon between the Mortgagor and the relevant insurance company shall be accepted by the Mortgagee.

*Section 4.2. Title Insurance.* Any moneys received by the Mortgagee as payment for any loss under any policy of title insurance which was delivered by the Mortgagor shall become part of the Mortgaged Property and shall be paid and applied in the same manner contemplated by Section 5.3 hereof.

*Section 4.3. Investment of Insurance Proceeds and Condemnation Awards or Compensation*. All insurance proceeds, condemnation awards or compensation received by the Mortgagee as payment for any casualty occurrence or condemnation relating to the Mortgaged Property under any policy of insurance or as an award or compensation for the taking in condemnation or other eminent domain proceedings relating to the Mortgaged Property or any part thereof which is to be disbursed pursuant to Section 4.1(a) hereof shall, at the written request of the Mortgagor in form satisfactory to the Mortgagee, be invested or reinvested by the Mortgagee in (a) direct obligations of the United States of America maturing in not more than ninety (90) days from the date of such investment, (b) commercial paper maturing within two hundred and seventy (270) days from the date of acquisition and rated in the highest rating classification by at least one national rating agency, or (c) deposit accounts or certificates of

deposit of commercial banks in the United States of America with capital and surplus of $100,000,000 or more (including the Mortgagee or any agent of the Mortgagee, acting in its commercial capacity) maturing in not more than five (5) days from the date of such investment. Any amounts earned on such investments shall accrue to the benefit of the Mortgagor and shall be disbursed in accordance with the terms of Section 4.1 hereof. Upon a written request of the Mortgagor in accordance with the terms of this Mortgage, or at any time when the Mortgagee shall determine at the direction of the Required Holders that cash is required pursuant to Section 4.1 hereof, the Mortgagee shall sell all or any designated part of such investments at the then market price therefor and shall pay and apply the proceeds in accordance with the terms of Section 4.1. The Mortgagee shall have no liability for the performance or security for any such investments that are invested as instructed by the Mortgagor or for any loss, including without limitation any loss of principal or interest, or for any breakage fees or penalties in connection with the purchase or liquidation of any investment made in accordance with the written instructions of the Mortgagor pursuant to this Section 4.3. the Mortgagor acknowledges that upon its written request and at no additional cost, it has the right to receive notification after the completion of each purchase and sale of investments. The Mortgagor agrees that such notifications shall not be provided by the Mortgagee hereunder, and the Mortgagee shall make available, upon request and in lieu of notifications, periodic account statements that reflect such investment activity. No statement need be made available for any fund/account if no activity has occurred in such fund/account during such period. Uninvested funds held hereunder shall not earn or accrue interest.

*Section 4.4. Application If Event of Default Exists.* Notwithstanding anything to the contrary contained in this Section 4, if an Event of Default has occurred and is continuing to the knowledge of the Mortgagee, all amounts received by the Mortgagee under this Mortgage, shall be applied in the manner provided for in Section 5 hereof in respect of proceeds and avails of the Mortgaged Property.

SECTION 5. DEFAULTS AND REMEDIES THEREFOR.

*Section 5.1. Events of Default.* Any one or more of the following shall constitute an Event of Default as the term is used herein:

(a) Default in the payment of interest or principal or premium, if any, on the Notes, when the same shall have become due and such Default shall continue for five (5) days; or

(b) Default shall occur in the observance and performance of any covenant or agreement contained in Section 2.3, Section 2.4, or Section 2.29 hereof, or if the Mortgagor shall fail to maintain insurance as required by Section 2.15 hereof or if a material violation of Section 2.18(b) hereof occurs; or

(c) Default shall occur in the observance or performance of any other provision of this Mortgage, not specifically described in the foregoing subparagraphs of

this Section 5.1 which is not remedied within thirty (30) days after the earlier of (i) written notice thereof from the Mortgagee or the Escrow Agent to the Mortgagor, or (ii) the first date on which an officer, member, partner, trustee or beneficial owner of the Mortgagor shall have actual knowledge of such a Default, *provided that*, if the Mortgagor is diligently working to remedy such Default within such thirty (30) day period, then an additional period of time as is necessary, not to exceed a total period of ninety (90) days (including such first thirty (30) day period), for the Mortgagor to cure such Default shall be permitted; or

(d) The Mortgagor defaults under any Assigned Contract, such default shall continue beyond the period of grace, if any, allowed under such Assigned Contract, and as a result of such default and the non-defaulting party to such Assigned Contract exercises remedies thereunder that could reasonably be expected to (a) cause a material adverse change in the status of the business, result of operations or condition (financial or otherwise) of the Mortgagor, or (b) result in a material adverse effect on the Mortgagor's ability to perform its obligations under this Mortgage and the Notes; or

(e) An Escrow Shortfall shall occur under the Escrow and Servicing Agreement, and such Escrow Shortfall is not cured within five (5) Business Days following the Mortgagor's receipt of notice of such Escrow Shortfall from Escrow Agent under the Escrow and Servicing Agreement; or

(f) If any statement, certification, representation or warranty made by the Mortgagor herein or in any other Operative Agreement, or made by or on behalf of the Mortgagor in any statement or certificate furnished by or on behalf of the Mortgagor in connection with the consummation of the issuance and sale of the Notes, or pursuant to the Note Purchase Agreement, or furnished by or on behalf of the Mortgagor with respect to any other Operative Agreement, proves untrue in any material respect as of the date of the issuance or making thereof (provided that with respect to statements or certifications made by the Mortgagor after the date hereof, an Event of Default shall not exist hereunder if a statement or certification made by the Mortgagor is untrue in any material respect as of the date of the issuance or making thereof if such misstatement was unintentional and is cured by the Mortgagor within thirty (30) days after the Mortgagor receives notice of such untruth); or

(g) If any statement, certification, representation or warranty made by any Guarantor in any Operative Agreement to which it is a party or made by any Guarantor in any statement or certificate furnished by such Guarantor in connection with the consummation of the issuance and sale of the Notes, or furnished by any Guarantor pursuant to any Operative Agreement proves untrue in any material respect as of the date of issuance or making thereof; or

(h) If final judgment for the payment of money shall be rendered against the Mortgagor and the Mortgagor shall not discharge or cause the same to be discharged

within sixty (60) days from the entry thereof and shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered and secure a stay of execution pending such appeal; or

(i) If the Mortgagor defaults under any other mortgage or security agreement covering any part of the Mortgaged Property whether it be superior or junior in lien priority to this Mortgage, and the same is accelerated as a result of such default; or

(j) Other than in connection with the Chapter 11 Filing, the Mortgagor: (1) admits in writing its inability to pay its debts generally as they become due other than to the Mortgagee or any Holder; (2) files a petition in bankruptcy or a petition to take advantage of any insolvency act; (3) makes an assignment for the benefit of creditors generally; (4) consents to, or acquiesces in, the appointment of a receiver, liquidator or trustee of itself or of the whole or any substantial part of its properties or assets; (5) files a petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the federal bankruptcy laws or any other comparable federal or state statute or law; (6) has a court of competent jurisdiction enter an order, judgment or decree appointing a receiver, liquidator or trustee of the Mortgagor, or of the whole or any substantial part of the property or assets of the Mortgagor; (7) has a petition filed against it seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the federal bankruptcy laws or any other comparable federal or state statute or law and such petition shall remain undismissed for sixty (60) days; (8) under the provisions of any other law for the relief or aid of debtors, has any court of competent jurisdiction assume custody or control of the Mortgagor or of the whole or any substantial part of its property or assets; (9) has an attachment or execution levied against any substantial portion of any property of the Mortgagor which is not discharged or dissolved by a bond within thirty (30) days; or (10) ceases to exist, is liquidated, or is dissolved; or

(k) Intentionally omitted; or

(l) An event of default shall occur under or with respect to any provision of any Operative Agreement, which event of default is not specifically described in any other subparagraph of this Section 5.1.

*Section 5.2. Remedies*. When any Event of Default described in subparagraph (j) of Section 5.1 has occurred, then the Notes, shall immediately become due and payable without presentment, demand or notice of any kind and when any Event of Default has occurred and is continuing, the Mortgagee (or the Mortgage Trustee if required by law), at the direction of the Required Holders, may exercise any one or more or all, and in any order, of the remedies hereinafter set forth, it being expressly understood that no remedy herein conferred is intended to be exclusive of any other remedy or remedies; but each and every remedy shall be cumulative and shall be in addition to every other remedy given herein or now or hereafter existing at law or in equity or by statute:

(a) The Mortgagee may, by notice in writing to the Mortgagor declare the entire unpaid balance of the Notes, to be immediately due and payable; and thereupon all such unpaid balance, together with all accrued interest thereon and premium, if any, shall be and become immediately due and payable without any presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived. Upon the Notes, becoming due and payable as a result of any Event of Default as aforesaid, the Mortgagor will forthwith pay to the Mortgagee the entire principal and interest accrued on the Notes, and, to the extent permitted by law and as liquidated damages and not as a penalty, an additional amount equal to the then applicable Make-Whole Amount determined as of the date on which the Notes, shall so become due and payable. No course of dealing on the part of the Mortgagee nor any delay or failure on the part of the Mortgagee to exercise any right shall operate as a waiver of such right or otherwise prejudice the Mortgagee's rights, powers and remedies. The Mortgagor further agrees, to the extent permitted by law, to pay to the Mortgagee all costs, fees and expenses incurred by it in the collection of the Notes, upon any default hereunder or thereon, including the reasonable compensation to the Mortgagee's attorneys, the Holders' attorneys for all services rendered in connection therewith (including all attorneys' fees, costs, expenses and court costs).

(b) Subject always to the then existing rights, if any, of American Foods under any Assigned Contract, or any Tenant under any lease or any other party to the Other Contracts, to the extent permitted by law (i) enter into and take possession of all or any part of the Mortgaged Property, and may forthwith use, operate, manage, insure, repair and improve the Mortgaged Property and take any other action which, in the Required Holder's judgment, is necessary or proper to conserve the value of the Mortgaged Property, (ii) collect and receive all earnings, revenues, rents, issues, profits and income from the Mortgaged Property or any part thereof (and for such purpose the Mortgagor does hereby irrevocably constitute and appoint the Mortgagee its true and lawful attorney-in-fact for it and in its name, place and stead to receive, collect and receipt for all of the foregoing, the Mortgagor irrevocably acknowledging that any payment made to the Mortgagee hereunder shall be a good receipt and acquittance against the Mortgagor to the extent so made), (iii) pay all principal charges including taxes and assessments levied thereon and operating and maintenance expenses and all disbursements and liabilities of the Mortgagor hereunder or (iv) apply the net proceeds arising from any such operation of the Mortgaged Property as provided in Section 5.3 hereof in respect of the proceeds of a sale of the Mortgaged Property. The right to enter and take possession of the Mortgaged Property and use any personal property therein, to manage, operate and conserve the same, and to collect the rents, issues and profits thereof, shall be in addition to all other rights or remedies of the Mortgagee hereunder or afforded by law, and may be exercised concurrently therewith or independently thereof. The expenses, costs and fees (including any reasonable receiver's fees, counsel fees, costs, expenses, court costs and agent's compensation) incurred pursuant to the powers herein contained shall be secured hereby which the Mortgagor promises to pay upon demand together with interest at the Default Rate. The Mortgagee shall not be liable to account to the Mortgagor for any

action taken pursuant hereto other than to account for any rents actually received by the Mortgagee. Without taking possession of the Mortgaged Property, the Mortgagee (or the Mortgage Trustee, if required by law) may, in the event the Mortgaged Property becomes vacant or is abandoned, take such steps as it deems appropriate to protect and secure the Mortgaged Property (including hiring watchmen therefor) and all costs incurred in so doing shall constitute so much additional Indebtedness Hereby Secured payable upon demand with interest thereon at the Default Rate.

(c) The Mortgagee may, but shall be under no obligation to, if at the time such action may be lawful and always subject to compliance with any mandatory legal requirements, either with or without taking possession and either before or after taking possession, and without instituting any legal proceedings whatsoever, and having first given notice of such sale to the Mortgagor at least thirty (30) days prior to the date of such sale and having given any other notice which may be required by law, sell and dispose of said Mortgaged Property or any part thereof at public auction or private sale to the highest bidder, which may be the Mortgagee in one lot as an entirety or in separate lots (the Mortgagor for itself and for all who may claim by, through or under it hereby expressly waiving and releasing all rights to have the Mortgaged Property marshalled to the extent permitted by law), and either for cash or on credit and on such terms as the Mortgagee may determine at the direction of the Required Holders and at any place (whether or not it be the location of the Mortgaged Property or any part thereof) designated in the notice above referred to. Any such sale or sales may be adjourned from time to time by announcement at the time and place appointed for such sale or sales or for any such adjourned sale or sales, without further published notice.

(d) The Mortgagee may, but shall be under no obligation to, proceed to protect and enforce its rights by a suit or suits in equity or at law, or for the specific performance of any covenant or agreement contained herein or in the Notes, or in aid of the execution of any power herein or therein granted, or for the foreclosure of this Mortgage, or for the enforcement of any other appropriate legal or equitable remedy. Upon the bringing of any suit to foreclose this Mortgage, or to enforce any other remedy available hereunder, the plaintiff shall be entitled as a matter of right, without notice and without giving bond to the Mortgagor or anyone claiming under, by or through it, and without regard to the solvency or insolvency of the Mortgagor or the then value of the Mortgaged Property, to apply to an appropriate court to have a receiver appointed of all the Mortgaged Property and of the earnings, income, rents, issues, profits and proceeds thereof, with such power as the court making such appointment shall confer and the Mortgagor does hereby irrevocably consent to such appointment.

(e) In case of any sale of the Mortgaged Property, or of any part thereof, pursuant to any judgment or decree of any court or otherwise in connection with the enforcement of any of the terms of this Mortgage, the Mortgagee may bid and become the purchaser, and the purchaser or purchasers, for the purpose of making settlement for or payment of the purchase price, shall be entitled to turn in and use the Notes, and any

claims for interest and premium matured and unpaid thereon, in order that there may be credited as paid on the purchase price the sum apportionable and applicable to the Notes, including principal and interest and premium thereof, out of the net proceeds of such sale after allowing for the proportion of the total purchase price required to be paid in actual cash. If at any foreclosure proceeding the Mortgaged Property shall be sold for a sum less than the total amount of indebtedness for which judgment is therein given, the Mortgagee shall be entitled to the entry of a deficiency decree against the Mortgagor and against the property of the Mortgagor for the amount of such deficiency.

(f) The Mortgagee shall have any and all rights and remedies (including, without limitation, extra judicial power of sale) provided to a secured party by the Uniform Commercial Code with respect to any and all parts of the Mortgaged Property which are and which are deemed to be governed by the Uniform Commercial Code. Without limiting the generality of the foregoing, the Mortgagee shall, with respect to any part of the Mortgaged Property constituting property of the type in respect of which realization on a lien or security interest granted therein is governed by the Uniform Commercial Code, have all the rights, options and remedies of a secured party under the Uniform Commercial Code, including, without limitation, the right to the possession of any such property, or any part thereof, and the right to enter without legal process any premises where any such property may be found. Any requirement of said Uniform Commercial Code for reasonable notification shall be met by mailing written notice to the Mortgagor at its address set forth in Section 6.3 at least thirty (30) days prior to the sale or other event for which such notice is required.

(g) Intentionally omitted.

(h) The provisions of this Section 5.2 are subject to the condition that if at any time after the Notes, has been declared due and payable by reason of the occurrence of any Event of Default described in Section 5.1, then in every such case the Mortgagee may, at the direction of the Required Holders, by notice in writing sent to the Mortgagor, rescind and annul any such declaration and its consequences with respect to the Notes, and in any such event the Mortgagor and the Mortgagee shall be restored to their former positions and rights hereunder, respectively; *provided* that at the time such declaration is annulled and rescinded:

(i) no judgment or decree has been entered for the payment of any monies due pursuant to the Notes, or this Mortgage;

(ii) all arrears of interest upon the Notes, and all other sums payable under the Notes, and under this Mortgage (except any principal, interest or premium on the Notes, which has become due and payable solely by reason of such declaration under Section 5.2) shall have been duly paid; and

(iii) each and every other Default and Event of Default shall have been made good, cured or waived pursuant to Section 5.1;

and *provided further,* that no such rescission and annulment shall extend to or affect any subsequent Default or Event of Default or impair any right consequent thereto.

*Section 5.3. Application of Proceeds*. The purchase money proceeds and/or avails of any sale of the Mortgaged Property, or any part thereof, and the proceeds and the avails of any remedy hereunder and/or amounts held pursuant to Section 4 hereof shall be paid to and applied as follows:

(a) first, to the payment of costs, fees and expenses of foreclosure or suit, if any (including any attorneys' fees, costs, expenses or court costs), and of such sale, and to the extent permitted by applicable law, the reasonable compensation of the Mortgagee, its agents, attorneys and counsel and of all proper expenses, liability and advances incurred or made hereunder by the Mortgagee or any Holder, and of all taxes, assessments or liens superior to the lien of these presents, except any taxes, assessments or other superior lien subject to which said sale may have been made; and

(b) second, to the amount then owing or unpaid on the Notes, for principal, premium, if any, and interest; and in case such proceeds shall be insufficient to pay in full the whole amount so due, owing or unpaid upon the Notes, then to the Mortgagee, with application on the Notes, to be made, first, to unpaid premium, if any, second, to the unpaid interest thereon, and third, to unpaid principal thereof; and

(c) third, to the payment of any other Indebtedness Hereby Secured; and

(d) fourth, to the payment of the surplus, if any, to the Mortgagor, its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

*Section 5.4. Waiver of Extension, Appraisement and Stay Laws*. The Mortgagor covenants that, upon the occurrence of an Event of Default and the acceleration of the Notes, pursuant to Section 5.2 and to the extent that such rights may then be lawfully waived, it will not at any time thereafter insist upon or plead, or in any manner whatever claim or take any benefit or advantage of, any stay or extension or moratorium law now or at any time hereafter in force, or claim, take or insist upon any benefit or advantage of or from any law now or hereafter in force providing for the valuation or appraisement of the Mortgaged Property or any part thereof prior to any sale or sales thereof to be made pursuant to any provision herein contained, or to the decree, judgment or order of any court of competent jurisdiction or, after confirmation of any such sale or sales claim or exercise any right under any statute now or hereafter made or enacted by any state or otherwise to redeem the property so sold or any part thereof, and hereby expressly waives for itself and on behalf of each and every Person, all benefit and advantage of any such law or laws which would otherwise be available to any such Person in connection with the enforcement of any of the Mortgagee's remedies hereunder; and covenants that it will not in

connection with any such enforcement proceedings invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any power herein granted and delegated to the Mortgagee but will suffer and permit the execution of every such power as though no such law or laws had been made or enacted. The Mortgagor hereby waives any and all rights of redemption from sale under any order or decree of foreclosure pursuant to rights herein granted, on behalf of the Mortgagor, and each and every Person acquiring any interest in, or title to the Mortgaged Property described herein subsequent to the date of this Mortgage, and on behalf of all other Persons to the extent permitted by applicable law.

Any sale, whether under any power of sale hereby given or by virtue of judicial proceedings, shall operate to divest all right, title, interest, claim and demand whatsoever, either at law or in equity, of the Mortgagor in and to the property sold and shall be a perpetual bar, both at law and in equity, against the Mortgagor, its successors and assigns, and against any and all persons claiming the property sold or any part thereof under, by or through the Mortgagor, its successors or assigns.

*Section 5.5. Costs and Expenses of Foreclosure*. In any suit to foreclose the lien hereon there shall be allowed and included as additional Indebtedness Hereby Secured in the decree for sale all reasonable expenditures and expenses which may be paid or incurred by or on behalf of the Mortgagee and the Holders for attorney's fees, appraiser's fees, outlays for documentary and expert evidence, stenographic charges, publication costs and costs (which may be estimated as the items to be expended after the entry of the decree) of procuring all such abstracts of title, title searches and examination, guarantee policies, and similar data and assurances with respect to title as the Mortgagee, at the direction of the Required Holders, may deem to be reasonably necessary either to prosecute any foreclosure action or to evidence to the bidder at any sale pursuant thereto the true condition of the title to or the value of the Mortgaged Property, all of which expenditures shall become so much additional Indebtedness Hereby Secured which the Mortgagor agrees to pay and all of such shall be immediately due and payable with interest thereon from the date of expenditure until paid at the Default Rate.

*Section 5.6. Delay or Omission Not a Waiver*. No delay, failure or omission of the Mortgagee to exercise any right, power or remedy arising from any Default on the part of the Mortgagor shall exhaust or impair any such right or power or prevent its exercise during the continuance of such Default. No waiver by the Mortgagee of any such Default, whether such waiver be full or partial, shall extend to or be taken to affect any subsequent Default, or to impair the rights resulting therefrom, except as may be otherwise provided herein. No right, power or remedy hereunder is intended to be exclusive of any other right, power or remedy but each and every right, power and remedy shall be cumulative and in addition to any and every other right, power and remedy given hereunder or otherwise existing. Nor shall the giving, taking or enforcement of any other or additional security, collateral or guaranty for the payment of the Indebtedness Hereby Secured operate to prejudice, waive or affect the security of this Mortgage, or any rights, powers or remedies hereunder; nor shall the Mortgagee be required to first look to, enforce or exhaust such other or additional security, collateral or guaranties.

*Section 5.7. Restoration of Positions*. If the Mortgagee has instituted any proceeding to enforce any right or remedy under this Mortgage, by foreclosure, entry or otherwise and such proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Mortgagee, then and in every such case the Mortgagor and the Mortgagee shall, subject to any determination in such proceeding, be restored to their former positions hereunder, and thereafter all rights and remedies of the Mortgagee shall continue as though no such proceedings had been instituted.

*Section 5.8. Notes to Become Due upon Sale*. Upon any sale under or by virtue of this Mortgage, except as permitted under Section 2.3(g) or (h) hereof, whether pursuant to foreclosure, power of sale or otherwise, the entire unpaid principal amount of the Notes, shall, if not previously declared due and payable, immediately become due and payable, together with interest accrued thereon and premium, if any, and all other Indebtedness Hereby Secured, anything contrary in this Mortgage, the Notes, or any other instrument serving the Notes, notwithstanding.

SECTION 6. MISCELLANEOUS.

*Section 6.1. Successors and Assigns*. Whenever any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party; and all the covenants, premises and agreements in this Mortgage, contained by or on behalf of the Mortgagor, or by or on behalf of the Mortgagee, shall bind and inure to the benefit of the respective successors and assigns of such parties whether so expressed or not.

*Section 6.2. Severability*. The unenforceability or invalidity of any provision or provisions of this Mortgage, as amended by the Second Amendment to Mortgage, shall not render any other provision or provisions herein contained unenforceable or invalid.

*Section 6.3. Addresses for Notices and Demands*. All communications provided for herein shall be in writing and shall be deemed to have been given (unless otherwise required by the specific provisions hereof in respect of any matter) when received (or refused) delivered personally or when deposited in the United States mail, registered or certified, postage prepaid, or by prepaid overnight air courier, addressed as follows:

If to the Mortgagor:

NLC ENERGY DENMARK LLC
c/o Net Lease Capital Advisors, Inc.
Ten Tara Boulevard, Suite 501
Nashua, New Hampshire 03062
Attention: Douglas F. Blough

with a copy to:

Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attention: Dean E. Loventhal, Esq.

If to the Mortgagee:

Wells Fargo Trust Company, National Association, as Collateral Trustee
c/o Computershare Trust Company, N.A.
9062 Old Annapolis Rd.
Columbia, MD 21045

with a copy to:

Chapman and Cutler LLP
320 South Canal Street
Chicago, Illinois 60606
Attention: Philip M. J. Edison, Esq.

or as to either party at such other address as such party may designate by notice duly given in accordance with this Section to the other party.

*Section 6.4. Headings and Table of Contents*. The headings of the sections of this Mortgage, and the table of contents are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

*Section 6.5. Release of Mortgage*. The Mortgagee shall release this Mortgage, and the lien hereof by proper instrument or instruments upon (i) payment in full of all Indebtedness Hereby Secured or (ii) so long as no Default or Event of Default has occurred and is continuing at such time and all terms and the applicable conditions in the Restructuring Letter Agreement are satisfied or will be satisfied at the closing of the Final Sale (in a manner satisfactory to the Mortgagee, at the direction of the Required Holders), prepayment of the Notes with the Final Sales Proceeds in accordance with Section 2.12(a) and the Operative Agreements upon a Final Sale conducted in accordance with Section 2.29.

*Section 6.6. Counterparts*. This Mortgage shall be valid, binding, and enforceable against a party only when executed and delivered by an authorized individual on behalf of the party by means of (i) any electronic signature permitted by the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, and/or any other relevant electronic signatures law, including relevant provisions of the Uniform Commercial Code (collectively, "*Signature Law*"); (ii) an original manual signature; or (iii) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal

effect, and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. This Mortgage may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute one and the same instrument. For avoidance of doubt, original manual signatures shall be used for execution or indorsement of writings when required under the UCC or other Signature Law due to the character or intended character of the writings.

*Section 6.7. Governing Law.* **MORTGAGOR AND MORTGAGEE AGREE THAT THE STATE OF NEW YORK HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY AND BY THE OTHER OPERATIVE AGREEMENTS, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS MORTGAGE, THE NOTE AND THE OTHER OPERATIVE AGREEMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER OPERATIVE AGREEMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL OPERATIVE AGREEMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, THE MORTGAGOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS MORTGAGE, THE NOTE AND THE OTHER OPERATIVE AGREEMENTS, AND THIS MORTGAGE, THE NOTE AND THE OTHER OPERATIVE AGREEMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK**

**GENERAL OBLIGATIONS LAW EXCEPT AS SPECIFICALLY SET FORTH ABOVE.** The Mortgagor agrees to the exclusive jurisdiction of any federal court located in the State of New York or the State in which the Property is located and waives any objection based on forum non conveniens, and any objection to venue of any judicial action instituted in any of the aforementioned courts.

THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS DEED OF TRUST.

*Section 6.8.* *Time.* Time shall be of the essence for this Mortgage.

*Section 6.9.* *Limitations of Liability*. Notwithstanding anything to the contrary contained in the Operative Agreements, except as set forth in the Indemnity and Guaranty Agreement and the Hazardous Material Indemnity Agreement, no Person who directly or indirectly owns any membership or other equity interest in the Mortgagor or any manager, trustee, director, officer, employee or agent of the Mortgagor (each, a *"Non-Recourse Person"*) shall have any personal liability for (i) the payment of any sum of money which is or may be payable under the Notes, or any other Operative Agreement, including, but not limited to, the repayment of the Notes, or (ii) the performance or discharge of any covenants, obligation or undertakings of the Mortgagor under any Operative Agreement, and no monetary or deficiency judgment shall be sought or enforced against any Non-Recourse Person with respect thereto. Nothing in this Section 6.9 is intended to or shall in any way affect or invalidate any lien or security interest created by this Mortgage. This Section 6.9 shall not be construed to prohibit the joining of the Mortgagor in any foreclosure procedure involving the Mortgaged Property. This Section 6.9 shall not in any way affect the obligations of American Foods under the Assigned Contracts or any Tenant under any lease, any other party to the Assigned Contracts, any other tenant under the Other Contracts or any Lease Guarantor under any Lease Guaranty.

*Section 6.10.* *Expenses, Stamp Tax Indemnity*. Whether or not the Notes, are sold, the Mortgagor will pay all reasonable expenses relating to the Operative Agreements, including but not limited to: (i) the cost of reproducing the Operative Agreements; (ii) the reasonable fees and disbursements of Chapman and Cutler LLP, special counsel for the Holders; (iii) the Mortgagee's reasonable out-of-pocket expenses; (iv) all recording and filing fees and stamp taxes in connection with the recordation or filing and re-recordation or re-filing of the items referred to in Section 3.1(b) of the Note Purchase Agreement; (v) the reasonable fees and disbursements of the title company referred to in Section 3.2(c) of the Note Purchase Agreement in connection with the issuance of the title insurance policy and the reasonable fees and disbursements of the civil engineer or surveyor which conducted the survey referred to in Section 3.2(b) of the Note Purchase Agreement in connection with the preparation of such survey; (vi) the reasonable fees and disbursements of (a) the Person that prepared the Environmental Assessment referred to in Section 3.2(d) of the Note Purchase Agreement and (b) the Person that prepared the appraisal referred to in Section 3.2(e) of the Note Purchase

Agreement; (vii) the reasonable fees and disbursements of the Escrow Agent in connection with its duties under the Escrow and Servicing Agreement; and (viii) all reasonable expenses relating to any amendments, waivers or consents pursuant to the provisions of any of the Operative Agreements, except those requested by the Mortgagee, including without limitation, any amendments, waivers or consents resulting from any work-out, restructuring or similar proceedings relating to the performance by the Mortgagor of its obligations under any of the Operative Agreements, relating to the performance by any Tenant of its obligations under any lease or relating to any party under the Assigned Contracts. The obligations of the Mortgagor under this Section 6.10 shall survive the payment or prepayment of the Notes, and the termination of any of the Operative Agreements.

*Section 6.11. Cooperation.* The Mortgagor acknowledges that the Mortgagee or the Holders and/or their successors and assigns may (a) sell, transfer or assign this Mortgage, the Notes, and the Operative Agreements to one or more investors as a whole loan, in a rated or unrated public offering or private placement, (b) participate the loan (the *"Loan"*) secured by this Mortgage, to one or more investors in a rated or unrated public offering or private placement, (c) deposit this Mortgage, the Notes, and the Operative Agreements with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets in a rated or unrated public offering or private placement, or (d) otherwise sell the Loan, the Notes, or any interest therein to investors in a rated or unrated public offering or private placement (the transactions referred to in clauses (a) through (d) are hereinafter referred to as *"Secondary Market Transactions"*). The Mortgagor shall, at the Mortgagee's expense, cooperate in good faith with the Mortgagee in effecting any such Secondary Market Transaction and shall cooperate in good faith to implement all requirements reasonably imposed by the participants involved in any Secondary Market Transaction (including without limitation, an institutional purchaser, participant or investor) including, without limitation, all structural or other changes to the Loan, modifications to any documents evidencing or securing the Loan, delivery of opinions of counsel reasonably acceptable to such other purchasers, participants or investors may require; *provided, however,* that the Mortgagor shall not be required to modify any documents evidencing or securing the Loan which would modify (i) the interest rate payable under the Notes, (ii) the stated maturity of the Notes, (iii) the amortization of principal of the Notes, or (iv) any other material terms or covenants of the Loan. The Mortgagor shall provide such information and documents relating to the Mortgagor, the Mortgaged Property and American Foods, as the Mortgagee shall reasonably request. The Mortgagor acknowledges that certain information regarding the Loan and the parties thereto and the Mortgaged Property may be included in a private placement memorandum, prospectus or other disclosure documents.

*Section 6.12. No Merger of Estates.* There shall be no merger of any lease or any leasehold estate created thereby with the fee estate in the Mortgaged Property or any part thereof by reason of the same person or entity acquiring or holding, directly or indirectly, any interest in any lease or any leasehold estate created thereby as well as the fee estate in the Mortgaged Property.

*Section 6.13. NAIC Filing.* The Mortgagor hereby represents and warrants to, and covenants with, the Mortgage Trustee, the Holders and the Mortgagee that as of the date hereof and until such time as the Indebtedness Hereby Secured shall be indefeasibly paid in full, the Mortgagor will take all such actions and otherwise cooperate with any request made by the Mortgagee, the Holders, or any of their respective special counsel which is reasonably necessary to obtain the eligibility expected and as related to reporting on the NAIC Annual Statements of the Holders; *provided*, *however,* that the Mortgagee and the Holders acknowledge and agree that the Mortgagor shall not be required to make any change or amendments which would have a material adverse effect on the Mortgagor or materially increase the obligations of the Mortgagor under the Operative Agreements. For purposes of this Section 6.14, any reference to the Mortgagee and the Holders shall also include any beneficial owner of the Mortgagee or any beneficial Holder or other Holder of the Notes, or any portion thereof.

*Section 6.14. Commitment.* The terms and conditions of the commitment and/or loan application entered into by or on behalf of the Mortgagor with respect to the transactions contemplated by the Operative Agreements are hereby incorporated herein by this reference and the Indebtedness Hereby Secured is hereby made expressly subject thereto. In the event of a conflict between the terms and conditions contained in such commitment and/or loan application on the one hand and the terms and conditions contained herein and in the other Operative Agreements on the other hand, the terms and conditions contained herein and in the other Operative Agreements shall control.

*Section 6.16. Usury Savings Clause.* Interest on the Indebtedness Hereby Secured by this Mortgage, shall not exceed the maximum amount of non-usurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited on the principal of the Indebtedness Hereby Secured or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be cancelled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the Indebtedness Hereby Secured or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this Mortgage, and all other Operative Agreement and instruments concerning the Indebtedness Hereby Secured.

SECTION 7. [RESERVED].

SECTION 8. CONCERNING THE MORTGAGEE.

*Section 8.1. Concerning the Mortgagee.* It is expressly understood and agreed by the parties hereto that (a) this Mortgage, is executed and delivered by the Mortgagee not in its individual or personal capacity but solely in its representative capacity as Collateral Trustee under the Collateral Trust Indenture, in the exercise of the powers and authority conferred and vested in it as Collateral Trustee under the Collateral Trust Indenture, subject to the protections, indemnities and limitations from liability afforded to the Collateral Trustee thereunder; (b) in no event shall Wells Fargo Trust Company, National Association, in its individual or personal capacity have any liability or responsibility for the representations, warranties, covenants,

agreements or other obligations of the Mortgagee hereunder; (c) nothing contained herein shall be construed as creating any liability or responsibility on Wells Fargo Trust Company, National Association, individually or personally, to perform any expressed or implied covenant, duty or obligation of any kind whatsoever contained herein; and (d) under no circumstances shall Wells Fargo Trust Company, National Association, be personally or individually liable for the payment of any fees, costs, indebtedness or expenses of any kind (including attorneys' fees, costs, expenses or court costs) whatsoever or be personally or individually liable for the breach or failure of any obligation, representation, agreement, warranty or covenant whatsoever made or undertaken by the Purchasers hereunder, except to the extent of the Mortgagee's willful misconduct, bad faith or gross negligence. Further, in addition to the rights, protections, privileges, benefits, immunities, indemnities, and limitations of liability set forth in this Mortgage, the Mortgagee shall also be entitled to the rights, protections, privileges, benefits, immunities, indemnities, and limitations of liability of the Collateral Trustee set forth in the Collateral Trust Indenture, all of which are incorporated herein by reference and shall apply mutatis mutandis to the Mortgagee under this Mortgage.

**SECTION 9. STATE SPECIFIC PROVISIONS.**

The addendum attached hereto (*"Addendum A"*) contains state specific provisions and is hereby made a part of this Mortgage. To the extent of any conflict between the terms and provisions of Addendum A and the terms and provisions of this Mortgage, the terms and provisions of Addendum A shall govern and control the rights and obligations of the parties.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the Mortgagor has caused this Mortgage to be executed, all as of the day and year first above written.

NLC ENERGY DENMARK LLC,
a Wisconsin limited liability company

By:__________________________________
Name:
Title:

**Addendum 4.5(C)**

STATE OF )
) SS
COUNTY OF )

I, __________________________, a Notary Public in and for the County and State aforesaid, do hereby certify that ___________ to me known, who declared and acknowledged that he is a _________ of __________ of NLC ENERGY DENMARK LLC, a limited liability company organized under the laws of the State of Wisconsin, subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that he, being thereunto duly authorized, signed and delivered the said instrument as the free and voluntary act of said limited liability company and as his own free and voluntary act, for the uses and purposes therein set forth.

Given under by hand and notarial seal this ____ day of _____________, ____.

__________________________________
Notary Public

Printed Name: ___________________________

(SEAL)

Commission expires:



Case 25-24634-kmp Doc 77 Filed 10/17/25 Page 94 of 230

**Addendum 4.5(C)**

**EXHIBIT A**

**LEGAL DESCRIPTION**

Lot 1 of Certified Survey Map No. 9113, said map recorded on October 9, 2019, as Document No. 2878788, being all of Lot 1 and Lot 2 of Certified Survey Map, Volume 60 Page 361 #8591, being part of the Northeast of the Southwest of Section 35, Town 22 North, Range 22 East, Town of New Denmark, Brown County, Wisconsin.

That part of the Southwest 1/4 of the Southwest 1/4 of Section 21, Township 22 North, Range 22 East, in the Village of Denmark, Brown County, Wisconsin, being and lying West of U.S. Highway 141 as it existed on August 26, 1955, AND Part of the Southwest 1/4 of the Southwest 1/4 of Section 21, Township 22 North, Range 22 East, in the Village of Denmark, Brown County, Wisconsin described in Document No. 2259769, excepting therefrom that part thereof described in Volume 329 of Deeds on Page 143 and excepting that part thereof used for highway purposes. Also excepting part described in Jacket 5779 of records, image 26 as Document No. 988395.

EXCEPTING THEREFROM that part located and described as follows: Commencing at the Northwest corner of the said Southwest 1/4 of the Southwest 1/4, thence South 0°32' East 262.60 feet; thence North 89°01' East 521.9 feet to the centerline of old U.S. Highway 141; thence Northwesterly along the centerline of old U.S. Highway 141; 267.1 feet to the North line of the aforementioned Southwest 1/4 of the Southwest 1/4; thence South 89°01' West 473.5 feet to the point of commencement.

**Addendum 4.5(C)**

**ADDENDUM A**
**State Specific Provisions**

None.

# Addendum 4.5(D)

Document Number

Amended and Restated
Assignment of Leases, Rents and Assigned Contracts

Recording Area

Name and Return Address

Philip M. J. Edison, Esq.
Chapman and Cutler LLP
320 South Canal Street
Chicago, Illinois 60606

Parcel Identification Number (PIN)

Tax Key No.: VD-ND436-2
Address: 5856 CTH R

Tax Key No: ND 756-2
Address: 6541-6587 CTH R

Tax Key No: ND 756-1
Address: 6601 CTH R

**THIS PAGE IS PART OF THIS LEGAL DOCUMENT – DO NOT REMOVE.**

This inf as
the granting clause, legal description, etc., may be placed on this first page of the document or may be placed on additional pages of the document.

WRDA Rev. 12/22/2010

Town of New Denmark
County of Brown, Wisconsin

This instrument was prepared by and when recorded return to:
Philip M. J. Edison, Esq.
Chapman and Cutler LLP
320 South Canal Street
Chicago, Illinois 60606

---

NLC ENERGY DENMARK LLC, a Wisconsin limited liability company,
as assignor

(Assignor)

to

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS REPRESENTATIVE CAPACITY AS COLLATERAL TRUSTEE,
as assignee

(Assignee)

AMENDED AND RESTATED ASSIGNMENT OF LEASES, RENTS AND ASSIGNED CONTRACTS

| | |
|---|---|
| DATED: | As of _______ |
| LOCATION: | TOWN OF NEW Denmark, Wisconsin |
| COUNTY: | Brown |

---

This AMENDED AND RESTATED ASSIGNMENT OF LEASES, RENTS AND ASSIGNED CONTRACTS (*"Assignment"*) made as of _______, by NLC ENERGY DENMARK LLC, a Wisconsin limited liability company, having its principal office at c/o Net Lease Capital Advisors, Inc., Ten Tara Boulevard, Suite 501, Nashua, New Hampshire 03062, as assignor (*"Assignor"*) to WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION (formerly known as Wells Fargo Bank Northwest, N.A.), a national banking association, not in its individual capacity but solely in its representative capacity as collateral trustee, having an address at 299 South Main Street, 5th Floor, MAC: U1228-051, Salt Lake City, Utah 84111, Attention: Corporate Trust Lease Group, as assignee (*"Assignee"*).

**WITNESSETH:**

WHEREAS, Assignor is the record fee owner of the real estate in Denmark, Wisconsin more particularly described on ***Exhibit A*** attached hereto and made a part hereof (the *"Property"*), upon which a biomass digester/biogas production and sanitary sewer pretreatment plant (the *"Plant"*) and certain other improvements (the *"Improvements"*) are to be constructed and expanded, or caused to be constructed and expanded, by Assignor (the Plant and the Improvements being referred to herein collectively as the *"Project"*).

WHEREAS, Assignor has executed and delivered to Assignee that certain Assignment of Leases, Rents and Assigned Contracts, dated September 28, 2017 encumbering the Property described therein and as described in Exhibit A attached hereto, which was recorded in the land records of Brown County, Wisconsin on October 12, 2017 as Document Number 2803295, as amended by that certain First Amendment to Assignment of Leases, Rents and Assigned Contracts dated as of June 9, 2021 and recorded in the land records of Brown County, Green Bay, Wisconsin as Document Number 2964645 and as amended by that certain Second Amendment to Assignment of Leases, Rents and Assigned Contracts dated as of March 24, 2023 and recorded in the land records of Brown County, Green Bay, Wisconsin as Document Number 3031543 (as amended, the "*Original Assignment of Leases and Rents*").

WHEREAS, Assignor and certain purchasers (the *"Purchasers"*) have executed and delivered the Amended and Restated Note Purchase Agreement dated the date hereof (the *"Note Purchase Agreement"*) providing for the commitment of the Purchasers to purchase (i) 6.25% Amended and Restated Series A1 Senior Secured Notes in the original aggregate principal amount of $20,000,000 (the *"Series A1 Notes"*) and (ii) 6.25% Amended and Restated Series A2 Senior Secured Notes in the original aggregate principal amount of $55,086,791.99 (the *"Series A2 Notes"* together with the Series A1 Notes, collectively, the *"Notes"*) of the Assignor. All Notes to be dated the date of issue, will bear interest from the date of issue until maturity at the respective rate per annum and principal and interest thereon will be paid in installments as provided in the respective amortization schedules attached as Annex I to the Notes. Interest on the Notes will be computed on the basis of a 360-day year of twelve 30-day months. The Assignor shall use the proceeds of the Notes to construct and expand the Project upon the Property and pay related transaction expenses.

WHEREAS, Assignor and American Foods Group, LLC (*"American Foods"*) are party to that certain Services Agreement dated as of March 12, 2021 (as amended, supplemented or modified from time to time in accordance with the terms hereof and thereof, the *"American Foods Contract"* and together with all other contracts assigned in accordance with this Mortgage, the *"Assigned Contracts"*).

WHEREAS, Assignor has assigned all of its right, title and interest in that certain Collateral Assignment and Security Agreement, American Foods dated as of the date hereof (the *"Collateral Assignment"*).

WHEREAS, Assignor is assigning all of its right, title and interest in and to any existing or future lease from Assignor to another party (a or any *"lease"*) to the Assignee pursuant to this Assignment and pursuant to that certain Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents, and Assigned Contracts and Fixture Filing Statement (the *"Mortgage"*) given by Assignor to Assignee for the benefit of the Purchasers, dated the date hereof, covering the Property, the Project, any lease, and the Assigned Contracts, each as may be further amended or otherwise modified from time to time (collectively, the *"Mortgaged Property"*).

WHEREAS, Assignor desires to secure the payment of the principal sum, interest, make whole amount or other premium and all other sums due and payable under the Notes, the Mortgage, this Assignment, the Collateral Assignment, and the other Operative Agreements and the performance of all of its obligations under the Notes and the Indebtedness Hereby Secured as defined in the Mortgage.

WHEREAS, this Assignment amends and restates the Original Assignment of Leases and Rents and from and after the date hereof, the Original Assignment of Leases and Rents shall be amended and restated by this Assignment, and the priority of this Assignment shall relate to September 28, 2017.

WHEREAS, capitalized terms not otherwise defined in this Assignment shall have the meaning ascribed to such terms in the Mortgage.

## ARTICLE 1
## ASSIGNMENT

*Section 1.1. Assignment.* In addition to, and not in contravention of, Granting Clause Second or Section 2.18 of the Mortgage, Assignor, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to further secure the payment and performance by Assignor of all Indebtedness Hereby Secured hereby absolutely and unconditionally assigns, transfers and grants to Assignee the following property, rights, interests and estates, now owned, or hereafter acquired, by Assignor (none of which, for the avoidance of doubt, shall be interpreted as obligations of the Assignee):

(a) *Any Lease.* Any leases, subleases and other agreements, if any, whether or not in writing, affecting the use, enjoyment or occupancy of the Mortgaged Property or any portion thereof now or hereafter made, together with any extension, renewal or replacement of the same and for which Assignor is entitled to receive payment of the rent thereunder.

(b) *Assigned Contract.* The Assigned Contracts, each as may be further amended or otherwise modified from time to time, and the Assigned Construction Agreements, and the right, title and interest of the Assignor, its successors and assigns, therein and thereunder.

(c) *Other Contracts and Agreements.* All other contracts, construction contracts and other agreements, if any, whether or not in writing, affecting the use, enjoyment or occupancy of the Mortgaged Property or any portion thereof now or hereafter made, together with any extension, renewal or replacement of the same and for which Assignor is entitled to receive payments thereunder (collectively, the *"Other Contracts"*), this assignment of the Other Contracts being effective without further or supplemental assignment.

(e) *Rents/Payments*. To the extent of Assignor's interest, rents, additional rents, percentage rents, revenues, income, proceeds, payments, reimbursable amounts, issues and profits arising from any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts and any guarantees thereof (any *"Guaranty"*) and any cash or security deposited in connection therewith (including, without limitation, all commissions and all oil and gas and other mineral royalties and bonuses) payable by any tenant (a or any *"Tenant"*) under any lease, any Off-taker under its respective Assigned Contracts, or any other party under the Other Contracts or any Guarantor under any Guaranty or otherwise, for or in connection with the use, enjoyment and occupancy of the Mortgaged Property (collectively, the *"Rents"*).

(f) *Bankruptcy Claims*. All of Assignor's claims and rights (the *"Bankruptcy Claims"*) to the payment of damages arising from any rejection by any Tenant of any lease, any Off-taker of its respective Assigned Contracts, or any other party under the Other Contracts under the Bankruptcy Code, 11 U.S.C. §101 *et seq*., as the same may be amended (the *"Bankruptcy Code"*) or under similar State bankruptcy or receivership laws.

(g) *Guaranties*. All of Assignor's right, title and interest in and to any and all lease guaranties, letters of credit and any other credit support given in connection with any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, and the Other Contracts to the Assignor or predecessors (individually, a *"Lease Guaranty"*, and, collectively, the *"Lease Guaranties"*) by any guarantor (individually, a *"Lease Guarantor,"* and, collectively, the *"Lease Guarantors"*).

(h) *Proceeds*. All proceeds from the sale or other disposition of any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts, the Rents, any Lease Guaranties and the Bankruptcy Claims.

(i) *Other*. All rights, powers, privileges, options and other benefits of the Assignor as lessee under any lease, Assignor as lessor under any lease and the Other Contracts, as party to the Assigned Contracts, each as may be further amended or otherwise modified from time to time, and Assignee under any Lease Guaranties, including without limitation, (A) the immediate and continuing right to make claims for, receive, collect and receipt for, all Rents payable or receivable under any lease, the Other Contracts and all sums payable under the Assigned Contracts, as may be further amended or otherwise modified from time to time and any Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Indebtedness Hereby Secured) and to do all other things which the Assignor or any lessor is or may become entitled to do under any lease, any Other Contract, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, or any Lease Guaranties; (B) the right to pursue and collect any claim in bankruptcy or receivership proceedings of American Foods, any other tenant under the Other Contracts or any Lease Guarantor; (C) the right to accept or reject any offer made by American Foods, any other tenant under the Other Contracts or any Lease Guarantor to purchase the Mortgaged Property or any part thereof and any other property subject to any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts or any Lease Guaranty and to perform all other necessary or appropriate acts with respect to such purchases; provided that Assignor retains such rights if the Notes will be paid in full and all other obligations of the Assignor under the Operative Agreements are satisfied as a result of such event and Assignee agrees to provide such consent as is necessary to Assignor's rejection of American Foods's offer pursuant to the terms of any Assigned Contracts to purchase any portion of the Mortgaged Property; (D) the right to make all waivers and agreements, to give and receive all notices, consents and releases, and to take such action upon the happening of a default beyond applicable cure periods, if any, under any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts, or any Lease Guaranty as the Assignor shall have the right under any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts or any Lease Guaranty or at law to take, including the right to commence, conduct and consummate eviction proceedings; (E) the right, at Assignee's option to enter upon the Mortgaged Property or any portion thereof in person, by agent or by court-appointed receiver; and (F) the Assignor's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in this Assignment and any or all other actions designated by Assignee, as directed by the Required Holders, for the proper management and preservation of the Mortgaged Property if an Event of Default has occurred and is then continuing.

*Section 1.2.* *Consideration*. This Assignment is made in consideration of that certain extension of credit made by Assignee to Assignor evidenced by the Notes and secured by the

Mortgage given by Assignor to Assignee for the benefit of the Purchasers, dated the date hereof, covering the Mortgaged Property and intended to be duly recorded.

## ARTICLE 2
## COVENANTS

*Section 2.1. Obligations and Terms Respecting any Lease, the Assigned Contractss, the Other Contracts and any Guaranties.*

(i) The Assignor will punctually perform (or cause to be performed) all obligations, covenants and agreements by it to be performed under any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts and any Lease Guaranties strictly in accordance with the terms thereof, and will at all times use commercially reasonable efforts to compel performance by American Foods, any other tenant under any lease, the Other Contracts, and any Lease Guarantors of all covenants and agreements by them to be performed under any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts or any Lease Guaranties, as applicable. Subject to Section 2.1(v) below, the Assignor will take no action and permit no action to be taken by other Persons (other than American Foods pursuant to the express terms of the American Foods Contract) which will release American Foods from its obligations and liabilities under the Assigned Contracts, each as may be further amended or otherwise modified from time to time or result in the termination, amendment or modification of, or impair the validity of the Assigned Contracts, each as may be further amended or otherwise modified from time to time. The Assignor will give to the Assignee notice of all defaults by American Foods under the Assigned Contracts, each as may be further amended or otherwise modified from time to time promptly after they have become known to the Assignor. Unless and until Assignee, as directed by the Required Holders, takes possession of the Mortgaged Property, neither this Assignment nor any action or inaction on the part of the Assignee shall constitute an assumption on the part of the Assignee of any obligation to American Foods any other tenant under the Other Contracts or any Lease Guarantor or any other Person under any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts or any Lease Guaranties. No action or inaction on the part of the Assignor shall adversely affect or limit in any way the rights of the Assignee under this Assignment, or, through this Assignment, under the Assigned Contracts, as may be further amended or otherwise modified from time to time.

(ii) The Assignor will not, except with the prior written consent of the Assignee at the direction of the Required Holders, take or suffer to be taken any action or consent to or permit any prepayment or discount of Rents or payment of Rents more than one month in advance, under the Assigned Contracts, each as may be further amended or otherwise modified from time to time.

(iii) The Assignor will not, without the prior written consent of the Assignee, as directed by the Required Holders:

(A) declare a default or exercise the remedies of the landlord, or tenant, as applicable, under, or terminate, modify or accept a surrender of, or exercise any recapture rights with respect to, or offer or permit any termination, modification or surrender of any Assigned Contracts or any reciprocal easement or restrictive covenant agreement or similar agreement running with the land (unless such termination, modification or acceptance of a surrender of is not reasonably expected to cause a Material Adverse Change) or create or consent to the creation or existence of any mortgage or other lien to secure the payment of indebtedness upon the landlord's interest under any lease or any leasehold estate created thereby or any Assigned Contracts; or

(B) other than to the Assignee or Escrow Agent, assign, transfer or hypothecate any Rents or other payment due or to become due under any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts or any Lease Guaranties or anticipate any Rents or other payment thereunder.

(iv) The Assignor acknowledges that the Assignee has directed American Foods in its Consents to Assignment (or will direct any future Tenant) to deliver or remit directly to the Escrow Agent, all Rents (including, without limitation, all fixed rent, basic rent, percentage rent and all additional rent), income, revenues, issues, profits, insurance proceeds, condemnation awards, liquidated damages, purchase price proceeds and other payments, tenders and security now or hereafter due and payable to or receivable by the Assignor, American Foods or any Tenant, respectively, under any lease and the Assigned Contracts, each as may be further amended or otherwise modified from time to time, such amounts to be paid directly to the Escrow Agent in the manner provided therein or in such other manner as the Assignee, as directed by the Required Holders, may from time to time designate. All amounts received by the Escrow Agent shall be applied in the manner provided herein and in the Escrow and Servicing Agreement. The Assignor hereby agrees to send to the Assignee, in accordance with Section 6.3 hereof, copies of all notices given by the Assignor under the Assigned Contracts, each as may be further amended or otherwise modified from time to time that allege a default thereunder by the other party to such Assigned Contracts.

(v) Notwithstanding anything to the contrary set forth in the Consents to Assignments or any other document, the Assignor agrees that it will not enter into any agreement subordinating, amending, supplementing, hypothecating, waiving, discharging or terminating the Assigned Contracts, as may be further amended or otherwise modified from time to time (unless any such agreement is not reasonably expected to cause a Material Adverse Change) or this Assignment without the Assignee's prior written consent thereto, which consent shall be given or withheld at the direction of and pursuant to the discretion of the Required Holders, and that any attempted subordination,

amendment, supplement, hypothecation, waiver, discharge or termination without such consent shall be void. The Assignor will not terminate the Assigned Contracts, each as may be further amended or otherwise modified from time to time in the event of default without the express prior written consent of the Assignee, which consent shall be given or withheld at the direction of and pursuant to the discretion of the Required Holders. In the event that the Assigned Contracts, as may be further amended or otherwise modified from time to time, shall be amended or supplemented as herein permitted, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, as so amended or supplemented shall continue to be subject to the provisions of this Assignment without the necessity of any further act by any of the parties hereto.

(vi) The assignment set forth in this Section 2.1 and Granting Clause Second of the Mortgage shall run with the land and be good and valid against the Assignor or those claiming by, under or through the Assignor, from the date hereof and such assignment shall continue to be operative during the foreclosure or any other proceeding taken to enforce this Assignment. In the event of a sale or foreclosure which shall result in a deficiency, such assignment shall stand as security during the redemption period for the payment of such deficiency. The Assignee, as directed by the Required Holders, shall be permitted, at its sole option, to exercise remedies under such assignment separately from remedies exercised against other portions of the Mortgaged Property.

*Section 2.2. Excepted Rights.* Notwithstanding anything to the contrary contained in this Assignment, this Assignment is in all respects subject to Assignor's right prior to the occurrence of a Default or an Event of Default, but not to Assignee's exclusion (a) to receive from any Tenant under any lease and American Foods under the Assigned Contracts, each as may be further amended or otherwise modified from time to time, as the case may be, payments, or certificates and other documents and information that any Tenant and American Foods is required to give or furnish to Assignor in accordance with any lease or the Assigned Contracts, each as may be further amended or otherwise modified from time to time, respectively (b) to inspect the Mortgaged Property and all records relating thereto, and (c) to demand performance or observance by any Tenant under any lease and American Foods under the Assigned Contracts, as may be further amended or otherwise modified from time to time, of the applicable terms, conditions and agreements of any lease and the Assigned Contracts, each as may be further amended or otherwise modified from time to time, respectively, as allowed by law, equity, any lease or the Assigned Contracts between Assignor and American Foods, each as may be further amended or otherwise modified from time to time; *provided*, *however*, Assignor may not (1) accelerate payments due under any lease or any Assigned Contracts or (2) give any notice, sue or pursue any remedy or take any action under any lease or any Assigned Contracts that might have the effect of (A) terminating any lease or the Assigned Contracts, each as may be further amended or otherwise modified from time to time, (B) dispossessing any Tenant or American Foods, , (C) declaring any lease or the Assigned Contracts, each as may be further amended or otherwise modified from time to time, forfeited or terminated, (D) reducing any of any Tenant's obligations under any lease or any of the obligations of American Foods under the Assigned Contracts, each as may be further amended or otherwise modified from time to time, or (E) adversely affecting the rights of Assignor as landlord under any lease, party to the Assigned

Contracts, each as may be further amended or otherwise modified from time to time, the value of the Mortgaged Property or the rights or interests of Assignee under the Operative Agreements, without in each instance Assignee's prior written consent which Assignee may grant or withhold in its sole discretion.

## ARTICLE 3
## TERMS OF ASSIGNMENT

*Section 3.1. Present Assignment.* Assignor hereby absolutely and unconditionally assigns to Assignee Assignor's right, title and interest in and to any lease or future lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, all current and future Other Contracts, Rents or other amounts owed to Assignor under any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, and all current and future Other Contracts; it being intended by Assignor that this assignment constitutes a present, absolute and unconditional assignment and not an assignment for additional security only. Assignor hereby presently, unconditionally and irrevocably designates Assignee to receive, and directs any Tenant and the Off-takers to pay to Assignee or its designated servicer, all payments, payable or receivable under any lease and the Assigned Contracts, each as may be further amended or otherwise modified from time to time, respectively. Any Rents collected by Assignor shall be held in trust by Assignor for the sole and exclusive benefit of Assignee, and Assignor shall, within one (1) business day after receipt of any Rents, pay the same to Assignee. All payments received by Assignee shall be applied as set forth in the Mortgage and the Escrow and Servicing Agreement. Assignor agrees to execute and deliver to Assignee such additional instruments, in form and substance reasonably satisfactory to Assignee, as may hereinafter be requested by Assignee to further evidence and confirm said assignment, *provided* that no such documents shall increase Assignor's obligations or decrease Assignor's rights. Assignee, as directed by the Required Holders, is hereby granted and assigned by Assignor the right to enter the Mortgaged Property for the purposes of enforcing its interest in any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time and the Other Contracts and the Rents. Upon and during the continuance of an Event of Default, Assignee, as directed by the Required Holders, shall immediately be entitled to possess any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time and the Other Contracts and exercise all rights of landlord under any lease and as a party to the Other Contracts and as party to the Assigned Contracts, each as may be further amended or otherwise modified from time to time, whether or not Assignee enters upon and takes control of the Mortgaged Property. Assignor hereby grants and assigns to Assignee, as directed by the Required Holders, the right, upon direction from the Required Holders, to enter upon the Mortgaged Property in person, by agent or by court-appointed receiver, subject to Tenant's rights under any lease, and the applicable parties to the Assigned Contracts, each as may be further amended or otherwise modified from time to time and the Other Contracts.

## ARTICLE 4
## REMEDIES

*Section 4.1. Remedies of Assignee*. Upon or at any time after the occurrence of a default beyond the expiration of any applicable cure period under this Assignment or an Event of Default occurs under the Mortgage (a *"Default"*), Assignee, as directed by the Required Holders, personally or by agents or attorneys may, subject always to the then existing rights, if any, of any Tenant, the Off-takers, or any permitted subtenant or assignee under any lease or the applicable parties to the Assigned Contracts, each as may be further amended or otherwise modified from time to time and to the extent permitted by law (i) enter into and take possession of all or any part of the Mortgaged Property, and may forthwith use, operate, manage, insure, repair and improve the Mortgaged Property and take any other action which, in Assignee's judgment, as directed by the Required Holders, is necessary or proper to conserve the value of the Mortgaged Property, (ii) collect and receive all earnings, revenues, rents, issues, profits and income from the Mortgaged Property or any part thereof (and for such purpose Assignor does hereby irrevocably constitute and appoint Assignee its true and lawful attorney-in-fact for it and in its name, place and stead to receive, collect and receipt for all of the foregoing, Assignor irrevocably acknowledging that any payment made to Assignee hereunder shall be a good receipt and acquittance against Assignor to the extent so made), (iii) pay all principal charges including taxes and assessments levied thereon and operating and maintenance expenses and all disbursements and liabilities of Assignor hereunder and (iv) apply the net proceeds arising from any such operation of the Mortgaged Property as provided in Section 5.3 of the Mortgage in respect of the proceeds of a sale of the Mortgaged Property. The right to enter and take possession of the Mortgaged Property and use any personal property therein, to manage, operate and conserve the same, and to collect the rents, issues and profits thereof, shall be in addition to all other rights or remedies of Assignee hereunder or afforded by law, and may be exercised concurrently therewith or independently thereof. The costs, fees, and expenses (including any reasonable receiver's fees, counsel fees, costs and agent's compensation) incurred pursuant to the powers herein contained shall be secured hereby and which Assignor promises to pay upon demand together with interest at the Default Rate. The Assignee shall not be liable to account to Assignor for any action taken pursuant hereto other than to account for any rents actually received by Assignee. Without taking possession of the Mortgaged Property, Assignee may, in the event the Mortgaged Property becomes vacant or is abandoned, take such steps, as directed by the Required Holders, as it deems appropriate to protect and secure the Mortgaged Property (including hiring watchmen therefor) and all costs incurred in so doing shall constitute additional Indebtedness Hereby Secured payable upon demand with interest thereon at the Default Rate.

*Section 4.2. Other Remedies*. Nothing contained in this Assignment and no act done or omitted by Assignee pursuant to the power and rights granted to Assignee hereunder shall be deemed to be a waiver by Assignee of its rights and remedies under the Notes, the Mortgage, or the other Operative Agreements and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms thereof. The right of Assignee to collect the Indebtedness Hereby Secured and to enforce any other security therefor held by it may be exercised by Assignee, as directed by the Required Holders, either prior to, simultaneously with, or subsequent to any action taken by it hereunder. Assignor hereby

absolutely, unconditionally and irrevocably waives any and all rights to assert any setoff, counterclaim or crossclaim of any nature whatsoever with respect to the obligations of Assignor under this Assignment, the Notes the Mortgage, the other Operative Agreements or otherwise with respect to the Notes secured hereby (other than payment or performance thereof) in any action or proceeding brought by Assignee, as directed by the Required Holders, to collect the same, or any portion thereof, or to enforce and realize upon the lien and security interest created by this Assignment, the Notes, the Mortgage, or any of the other Operative Agreements (*provided, however*, that the foregoing shall not be deemed a waiver of Assignor's right to assert any compulsory counterclaim if such counterclaim is compelled under local law or rule of procedure, nor shall the foregoing be deemed a waiver of Assignor's right to assert any claim which would constitute a defense, setoff, counterclaim or crossclaim of any nature whatsoever against Assignee in any separate action or proceeding).

*Section 4.3. Other Security*. Assignee, as directed by the Required Holders may take or release other security for the payment of the Indebtedness Hereby Secured, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the reduction or satisfaction of the Indebtedness Hereby Secured without prejudice to any of its rights under this Assignment.

*Section 4.4. Non-Waiver*. The collection of the Rents and sums due under any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts, and Guaranties and the application thereof as herein provided by Assignee, as directed by the Required Holders, shall not be considered a waiver of any default by Assignor under the Notes, the Mortgage, any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts, this Assignment or the other Operative Agreements. The failure of Assignee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment. Assignor shall not be relieved of Assignor's obligations hereunder by reason of (a) the failure of Assignee to comply with any request of Assignor or any other party to take any action to enforce any of the provisions hereof or of the Mortgage, the Notes or the other Operative Agreements, (b) the release, regardless of consideration, of the whole or any part of the Mortgaged Property, or (c) any agreement or stipulation by Assignee, as directed by the Required Holders, extending the time of payment or otherwise modifying or supplementing the terms of this Assignment, the Notes, the Mortgage or the other Operative Agreements. Assignee, as directed by the Required Holders, may resort for the payment of the Indebtedness Hereby Secured to any other security held by Assignee in such order and manner as Assignee, as directed by the Required Holders, in its discretion, may elect. Assignee, as directed by the Required Holders, may take any action to recover the Indebtedness Hereby Secured, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Assignee thereafter to enforce its rights under this Assignment. The rights of Assignee under this Assignment shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Assignee, as directed by the Required Holders, shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

*Section 4.5.* *Bankruptcy*. Assignee, as directed by the Required Holders, shall have the right to proceed in its own name or in the name of Assignor in respect of any claim, suit, action or proceeding relating to the rejection of any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time or any Other Contract, including, without limitation, the right to file and prosecute, to the exclusion of Assignor, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of any Tenant or any other party under any lease or any Other Contracts, or the Off-takers under the Assigned Contracts, each as may be further amended or otherwise modified from time to time, under the Bankruptcy Code or any applicable State bankruptcy or receivership laws.

## ARTICLE 5
## NO LIABILITY, FURTHER ASSURANCES

*Section 5.1.* *No Liability of Assignee*. Unless and until Assignee, as directed by the Required Holders, takes possession of the Mortgaged Property, this Assignment shall not be construed to bind Assignee to the performance of any of the covenants, conditions or provisions contained in any lease or Lease Guaranty, the Assigned Contracts, each as may be further amended or otherwise modified from time to time or otherwise impose any obligation upon Assignee. Assignee shall not be liable or responsible for any loss sustained by Assignor resulting from Assignee's failure to let the Mortgaged Property after a Default or from any other act or omission of Assignee in managing the Mortgaged Property after a Default. Unless and until Assignee, as directed by the Required Holders, takes possession of the Mortgaged Property, Assignee shall not be obligated to perform or discharge any obligation, duty or liability under any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts or any Guaranties or by reason of this Assignment. Unless and until Assignee, as directed by the Required Holders, takes possession of the Mortgaged Property, this Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Mortgaged Property upon Assignee, nor for the carrying out of any of the terms and conditions of any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts or any Guaranties; nor shall it operate to make Assignee responsible or liable for any waste committed on the Mortgaged Property by the tenants or any other parties, or for any dangerous or defective condition of the Mortgaged Property, including without limitation the presence of any Hazardous Material (as defined in the Mortgage), or for any negligence in the management, upkeep, repair or control of the Mortgaged Property resulting in loss or injury or death to any tenant, licensee, employee or stranger unless resulting from the intentional misconduct or bad faith of Assignee. Further, in addition to the rights, protections, privileges, benefits, immunities, indemnities, and limitations of liability set forth in this Assignment, the Assignee shall also be entitled to the rights, protections, privileges, benefits, immunities, indemnities, and limitations of liability of the Assignee as collateral trustee set forth in the Collateral Indenture, all of which are incorporated herein by reference and shall apply mutatis mutandis to the Assignee under this Assignment.

*Section 5.2.* *No Mortgagee in Possession*. Nothing herein contained shall be construed as constituting Assignee a "mortgagee in possession" in the absence of the taking of actual possession of the Mortgaged Property by Assignee, as directed by the Required Holders.

*Section 5.3. Further Assurances*. Assignor will, at the cost of Assignor, and without expense to Assignee, do, execute, acknowledge and deliver all and every such further acts, conveyances, assignments, notices of assignments, transfers and assurances as Assignee, as directed by the Required Holders, shall, from time to time, reasonably require for the better assuring, conveying, assigning, transferring and confirming unto Assignee the property and rights hereby assigned, or which Assignor may be or may hereafter become bound to convey or assign to Assignee, or for carrying out the intention or facilitating the performance of the terms of this Assignment or for filing, registering or recording this Assignment and, on demand, will execute and deliver and hereby authorizes Assignee to execute in the name of Assignor to the extent Assignee may lawfully do so, one or more financing statements, chattel mortgages or comparable mortgages, to evidence more effectively the lien and security interest hereof in and upon any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time or the Other Contracts, *provided* that no such documents shall increase Assignor's obligations or decrease Assignor's rights thereunder.

*Section 5.4. Limitations of Liability*. Notwithstanding anything to the contrary contained in the Operative Agreements, no Person who directly or indirectly owns any membership or other equity interest in the Assignor (each, a *"Non-Recourse Person"*) shall have any personal liability for (i) the payment of any sum of money which is or may be payable under the Notes or any other Operative Agreement, including, but not limited to, the repayment of the Notes or amounts due under the Mortgage or (ii) the performance or discharge of any covenants, obligation or undertakings of the Assignor under any Operative Agreement, and no monetary or deficiency judgment shall be sought or enforced against any Non-Recourse Person with respect thereto. Nothing in this Section 5.4 is intended to or shall in any way affect or invalidate any lien or security interest created by the Mortgage or this Assignment or to limit the liability of the Existing Guarantor and the Existing Indemnitor as identified in the Mortgage. This Section 5.4 shall not be construed to prohibit the joining of the Assignor in any foreclosure procedure involving the Mortgaged Property. This Section 5.4 shall not in any way affect the obligations of any Tenant under any lease, any other party under the Other Contracts, the Off-takers under the Assigned Contracts, each as may be further amended or otherwise modified from time to time or any Guarantor under any Guaranty.

## ARTICLE 6
## DEPOSITS, RELOCATIONS

*Section 6.1. Security Deposits*. All security deposits of tenants, if any, whether held in cash or any other form, shall be deposited in escrow with Assignee.

## ARTICLE 7
## MISCELLANEOUS PROVISIONS

*Section 7.1. Conflict of Terms*. In case of any conflict between the terms of this Assignment and the terms of the Mortgage, the terms of the Mortgage shall prevail.

*Section 7.2. No Oral Change*. This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or failure to act on the part of Assignor or Assignee, but only by an agreement in writing signed by the party against whom the enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

*Section 7.3. Certain Definitions*. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in singular or plural form and the word "Assignor" shall mean "each Assignor and any subsequent owner or owners of the Mortgaged Property or any part thereof or interest therein," the word "Assignee" shall mean "Assignee and any subsequent Collateral trustee for the Purchasers of the Notes," the word "Notes" shall mean "the Notes and any other evidence of indebtedness secured by the Mortgage," the word "person" shall include an individual, corporation, partnership, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Mortgaged Property and any interest therein, the phrases "attorneys' fees" and "counsel fees" shall include any and all reasonable attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Assignee, as directed by the Required Holders, in protecting its interest in the Mortgaged Property, any lease, the Assigned Contracts, each as may be further amended or otherwise modified from time to time, the Other Contracts and the Rents and enforcing its rights hereunder, and the word "Indebtedness Hereby Secured" shall mean the principal balance of the Notes with interest thereon as provided in the Notes and the Mortgage and all other sums due pursuant to the Notes, the Mortgage, this Assignment and the other Operative Agreements.

*Section 7.4. Authority*. Assignor represents and warrants that it has full power and authority to execute and deliver this Assignment and the execution and delivery of this Assignment has been duly authorized and does not conflict with or constitute a default under any law, judicial order or other agreement affecting Assignor or the Mortgaged Property.

*Section 7.5. Inapplicable Provisions*. If any term, covenant or condition of this Assignment is held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

*Section 7.6. Duplicate Originals; Counterparts*. This Assignment shall be valid, binding, and enforceable against a party only when executed and delivered by an authorized individual on behalf of the party by means of (i) any electronic signature permitted by the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, and/or any other relevant electronic signatures law, including relevant provisions of the Uniform Commercial Code (collectively, "*Signature Law*"); (ii) an original manual signature; or (iii) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic

signature, of any party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. This Assignment may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute one and the same instrument. For avoidance of doubt, original manual signatures shall be used for execution or indorsement of writings when required under the UCC or other Signature Law due to the character or intended character of the writings..

*Section 7.7.* *Choice of Law.* This Assignment shall be governed by and construed in accordance with the applicable federal laws and laws of the state where the Mortgaged Property is located, without reference or giving effect to any choice of law doctrine.

*Section 7.8.* *Termination of Assignment.* Upon payment in full of the Indebtedness Hereby Secured, this Assignment shall be void and of no effect, as evidenced by the recording of an instrument of full reconveyance of the Mortgage.

*Section 7.9.* *Notices.* All communications provided for herein shall be in writing and shall be deemed to have been given (unless otherwise required by the specific provisions hereof in respect of any matter) when received (or refused) delivered personally or when deposited in the United States mail, registered or certified, postage prepaid, or by prepaid overnight air courier, addressed as follows:

If to Assignor:

NLC Energy Denmark LLC
c/o Net Lease Capital Advisors, Inc.
Ten Tara Boulevard, Suite 501

Nashua, New Hampshire 03062
Attention: Douglas F. Blough

If to Assignee:

Wells Fargo Trust Company, as Trustee
299 South Main Street, 5th Floor
MAC: U1228-051
Salt Lake City, Utah 84111
Attention: Corporate Trust Lease Group

or as to either party at such other address as such party may designate by notice duly given in accordance with this Section to the other party.

*Section 7.10.* *Waiver of Trial by Jury.* Assignor and Assignee each waive, to the fullest extent permitted by law, the right to trial by jury in any action, proceeding or counterclaim, whether in contract, tort or otherwise, relating directly or indirectly to the loan evidenced by the Notes, the application for the extension of credit evidenced by the Notes, this Assignment, the Notes, the Mortgage or the other Operative Agreements or any acts or omissions of Assignee or Assignor, their officers, employees, directors or agents in connection therewith.

*Section 7.11.* *Liability*. If Assignor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

*Section 7.12.* *Headings, Etc*. The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

*Section 7.13.* *Number and Gender.* Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

*Section 7.14.* *Sole Discretion of Assignee, as directed by the Required Holders.* Wherever pursuant to this Assignment (a) Assignee exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Assignee, or (c) any other decision or determination is to be made by Assignee, the decision of Assignee to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Assignee, shall be in the sole discretion of Assignee, as directed by the Required Holders, and no such exercise, decision, or determination shall be construed as an obligation of the Asignee, except as may be otherwise expressly and specifically provided herein.

*Section 7.15.* *Successors and Assigns.* This Assignment, together with the covenants and warranties therein contained, shall inure to the benefit of Assignee and its successors and assigns, including any subsequent holder of the Mortgage, and shall be binding upon Assignor, its heirs, executors, administrators, successors and assigns and any subsequent owner of the Mortgaged Property.

*Section 7.16.* *Recitals.* The recitals are a substantive portion of this Assignment and are incorporated by reference as though set forth herein in full.

*[signature page follows]*

IN WITNESS WHEREOF, Assignor has executed this Assignment of Leases and Rents as of the day and year first above written.

ASSIGNOR:

NLC ENERGY DENMARK LLC,
a Wisconsin limited liability company

By:____________________________________
Name:
Title:

**Addendum 4.5(D)**

STATE OF ______________ )
) ss.
COUNTY OF ______________ )

On _________ ___, before me, ______________________, a Notary Public, personally appeared ____________ who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under penalty of perjury that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____________________________(Seal)

## EXHIBIT A

**LEGAL DESCRIPTION**

Lot 1 of Certified Survey Map No. 9113, said map recorded on October 9, 2019, as Document No. 2878788, being all of Lot 1 and Lot 2 of Certified Survey Map, Volume 60 Page 361 #8591, being part of the Northeast of the Southwest of Section 35, Town 22 North, Range 22 East, Town of New Denmark, Brown County, Wisconsin.

That part of the Southwest 1/4 of the Southwest 1/4 of Section 21, Township 22 North, Range 22 East, in the Village of Denmark, Brown County, Wisconsin, being and lying West of U.S. Highway 141 as it existed on August 26, 1955, AND Part of the Southwest 1/4 of the Southwest 1/4 of Section 21, Township 22 North, Range 22 East, in the Village of Denmark, Brown County, Wisconsin described in Document No. 2259769, excepting therefrom that part thereof described in Volume 329 of Deeds on Page 143 and excepting that part thereof used for highway purposes. Also excepting part described in Jacket 5779 of records, image 26 as Document No. 988395.

EXCEPTING THEREFROM that part located and described as follows: Commencing at the Northwest corner of the said Southwest 1/4 of the Southwest 1/4, thence South 0°32' East 262.60 feet; thence North 89°01' East 521.9 feet to the centerline of old U.S. Highway 141; thence Northwesterly along the centerline of old U.S. Highway 141; 267.1 feet to the North line of the aforementioned Southwest 1/4 of the Southwest 1/4; thence South 89°01' West 473.5 feet to the point of commencement.

**Addendum 4.5(E)**

**REAFFIRMATION OF INDEMNITOR AND GUARANTOR OBLIGATIONS**

THIS REAFFIRMATION OF INDEMNITOR AND GUARANTOR OBLIGATIONS (this *"Reaffirmation"*), made as of ________ (the "*Effective Date*"), by DOUGLAS F. BLOUGH, an individual (the *"Indemnitor"*), in favor of WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION (formerly Wells Fargo Bank Northwest, N.A.), not in its individual capacity but solely in its representative capacity as Collateral Trustee on behalf of the Purchasers (the *"Collateral Trustee,"* and together with the Purchasers, the *"Beneficiaries"*).

**W I T N E S S E T H:**

WHEREAS, pursuant to that certain Amended and Restated Senior Note Purchase Agreement dated as of ______ among the Purchasers listed on Schedule I attached thereto and NLC Energy Denmark LLC, a Wisconsin limited liability company (the *"Company"*) (as may be amended from time to time, the "*Note Purchase Agreement*"), which amends and restates that certain Note Purchase Agreement dated as of September 28, 2017 (as amended or supplemented from time to time, the *"Original Note Purchase Agreement"*) and pursuant to which the Purchasers purchased the Company (i) 6.25% Amended and Restated Series A1 Senior Secured Notes in the aggregate original principal amount of $20,000,000.00 (the *"Series A1 Notes"*), which amend and restates the Company's $67,500,000 original aggregate principal amount and $76,550,505 aggregate fully-accreted principal amount 6.25% Series A1 Senior Secured Notes, dated September 28, 2017 (as amended or supplemented from time to time, collectively, the *"Original Series A1 Notes"*) and (ii) 6.25% Amended and Restated Series A2 Senior Secured Notes in the aggregate original principal amount of $55,086,791.99 (the *"Series A2 Notes"*), which amend and restates the Company's $10,500,000 original aggregate principal amount and $7,829,055 aggregate fully-accreted principal amount 7.75% Series A2 Senior Secured Notes, dated September 28, 2017 (as amended or supplemented from time to time, the *"Original Series A2 Notes"* and together with the Original Series A1 Notes, collectively, the *"Original Notes"*);

WHEREAS, the Notes are secured by, among other things, the Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement, dated as of ______ from the Company to the Collateral Trustee (as amended or supplemented from time to time, the *"Mortgage"*) which amends and restates that certain Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement, dated as of September 28, 2017 from the Company to the Collateral Trustee and recorded in the land records of Brown County, Green Bay, Wisconsin as document number 2803294 on October 12, 2017 (as amended or supplemented from time to time, the *"Original Mortgage"*) under that certain Collateral Trust Indenture dated as of September 28, 2017 (as amended or supplemented from time to time, the *"Collateral Indenture"*), which creates a valid and perfected first mortgage lien on the Mortgaged Property described therein;

WHEREAS, as a condition to purchasing the Notes from the Company, (i) the Indemnitor and the Company entered into that certain Hazardous Material Indemnity Agreement dated as of September 28, 2017 (as amended or supplemented from time to time, *"Hazardous Indemnity Agreement"*) whereby the Company and the Indemnitor guaranteed certain obligations arising out of the Operative Agreements, (ii) the Indemnitor entered into that certain Indemnity and Guaranty Agreement dated as of September 28, 2017 (as amended or supplemented from time to time,

*"Guaranty Agreement"*) whereby the Indemnitor guaranteed certain obligations arising out of the Operative Agreements, and (iii) the Indemnitor entered into that certain Construction Completion Guaranty Agreement dated as of September 28, 2017 (as amended or supplemented from time to time, *"Construction Guaranty Agreement"*) whereby the Indemnitor guaranteed certain obligations relating to construction of the Project and other matters as such are set forth therein;

WHEREAS, the Collateral Trustee, the Purchasers party thereto and the Company have agreed to enter into certain amendments to the Operative Agreements as of the date hereof and in connection therewith, desire for the Indemnitor to reaffirm its obligations under the Guaranty Agreement, the Hazardous Indemnity Agreement and the Construction Guaranty Agreement; and

WHEREAS, capitalized terms not otherwise defined in this Reaffirmation shall have the meaning ascribed to such terms in the Mortgage.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Indemnitor hereby covenants and agrees for the benefit of the Beneficiaries, as follows:

SECTION 1. REAFFIRMATION.

By execution hereof, Indemnitor reaffirms that after giving effect to the amendments to the Operative Agreements, the guarantee and indemnity given by it under each of the Guaranty Agreement, the Hazardous Indemnity Agreement and the Construction Guaranty Agreement, as applicable, shall:

(i) continue in full force and effect;

(ii) not be released, reduced or impaired by the execution, delivery and performance of any document or agreement entered into pursuant to or contemplated by any amendment to the Operative Agreements; and

(iii) continue to secure the payment of liabilities and performance of obligations under the Operative Agreements, subject to and in accordance with the terms and provisions of each of the Guaranty Agreement, the Hazardous Indemnity Agreement and the Construction Guaranty Agreement, including any of the same that are amended, supplemented, extended, novated, replaced, restated and varied from time to time (however fundamental) and accordingly that the obligations under the Guaranty Agreement, the Hazardous Indemnity Agreement and the Construction Guaranty Agreement, as applicable, are intended to apply (subject to and in accordance with the terms and provisions of each of the Guaranty Agreement, the Hazardous Indemnity Agreement and the Construction Guaranty Agreement (as such may have been amended)), to any variation or increase in the liabilities or obligations of the Company at any time as a result (directly or indirectly) of the execution, delivery or performance of this Reaffirmation or any amendment to the Operative Agreements.

SECTION 2. GENERAL PROVISIONS.

**Addendum 4.5(E)**

(a) This Reaffirmation shall be deemed to be continuing in nature and shall remain in full force and effect and shall survive the exercise of any remedy by the Collateral Trustee under the Mortgage or any of the other Operative Agreements, including, without limitation, any foreclosure or deed in lieu thereof, even if, as a part of such remedy, the Notes are paid or satisfied in full.

(b) This Reaffirmation shall be governed by and construed in accordance with the laws of the state of New York except to the extent that the applicability of any of such laws may now or hereafter be preempted by federal law, in which case such federal law shall so govern and be controlling.

(c) This Reaffirmation shall be valid, binding, and enforceable against a party only when executed and delivered by an authorized individual on behalf of the party by means of (i) any electronic signature permitted by the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, and/or any other relevant electronic signatures law, including relevant provisions of the Uniform Commercial Code (collectively, "*Signature Law*"); (ii) an original manual signature; or (iii) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. This Reaffirmation may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute one and the same instrument. For avoidance of doubt, original manual signatures shall be used for execution or indorsement of writings when required under the Uniform Commercial Code or other Signature Law due to the character or intended character of the writings..

[SIGNATURES ON NEXT PAGE]

**Addendum 4.5(E)**

IN WITNESS WHEREOF, Indemnitor has executed this Reaffirmation as of the day and year first above written.

INDEMNITOR:

DOUGLAS F. BLOUGH, an individual

________________________________________
Douglas F. Blough

**Addendum 4.5(G)**

---

THIRD AMENDED AND RESTATED ESCROW AND SERVICING AGREEMENT

Dated as of ________

Among

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS REPRESENTATIVE CAPACITY, as Collateral Trustee,

NLC ENERGY DENMARK LLC, a Wisconsin limited liability company, as the Company

and

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, as Escrow Agent

---

**Addendum 4.5(G)**

**THIRD AMENDED AND RESTATED ESCROW AND SERVICING AGREEMENT**

THIS THIRD AMENDED AND RESTATED ESCROW AND SERVICING AGREEMENT (this *"Agreement"*), dated as of ________, is made and entered into by and among WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION (formerly known as Wells Fargo Bank Northwest, N.A.), not in its individual capacity, but solely in its representative capacity, as Collateral Trustee on behalf of the Holders (as defined in the Mortgage) (the *"Beneficiary"*), NLC ENERGY DENMARK LLC, a limited liability company organized under the laws of the State of Wisconsin (the *"Company"*), and WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION (formerly known as Wells Fargo Bank Northwest, N.A.), in its capacity as Escrow Agent (the *"Escrow Agent"*);

**WITNESSETH:**

Whereas, pursuant to the terms of the Note Purchase Agreement dated as of September 28, 2017 (the *"Note Agreement"*), between the Company and the purchasers listed on Schedule I thereto (the *"Purchasers"*), the Company agreed to offer and sell to the Purchasers, and the Purchasers purchased from the Company, its (i) $67,500,000 original aggregate principal amount and $76,550,505 aggregate fully-accreted principal amount of 6.25% Series A1 Senior Secured Notes due on the Maturity Date (as defined in the below described Mortgage) (as amended, the *"Series A1 Notes"*) and (ii) $10,500,000 original aggregate principal amount and $7,829,055 aggregate fully-accreted principal amount of 7.75% Series A2 Senior Secured Notes due on the Maturity Date (as defined in the Mortgage) (as amended, the *"Series A2 Notes"*; and, together with the Series A1 Notes, the *"Original Notes"*); and

WHEREAS, in connection with the issuance of the Original Note, certain escrow reserves were established and maintained as set forth in that certain Amended and Restated Escrow and Servicing Agreement, dated as of June 9, 2021, between the Beneficiary, the Escrow Agent and the Company (as amended or supplemented from time to time, the "*Original Escrow and Servicing Agreement*"); and

WHEREAS, the Company filed a voluntary petition for relief on or about August 16, 2025 (the "*Chapter 11 Filing*") under chapter 11 of title 11 of the United States Code (the "*BK Code*") with the United States Bankruptcy Court in the Eastern District of Wisconsin (the "*WI Bankruptcy Court*") in accordance with the Prepackaged Plan of Reorganization of NLC Energy Denmark LLC filed in the WI Bankruptcy Court (the "*Plan*"); and

WHEREAS, in connection with the Plan and restructuring of the Original Notes and related amendments as described in that certain Fourth Omnibus Amendment, dated as of ________ between the Company, the Holders and the Beneficiary (the "*Third Amendment*"), the Company issued (i) 6.25% Amended and Restated Series A1 Senior Secured Notes in the original aggregate principal amount of $20,000,000 due on the Maturity Date (as defined therein) (the *"Series A1 Notes"*) of the Mortgagor and (ii) 6.25% Amended and Restated Series A2 Senior Secured Notes in the original aggregate principal amount of $55,086,791.99 due on the Maturity Date (as defined therein) (the *"Series A2 Notes"* together with the Series A1 Notes, collectively, as amended, the *"Notes"*) to the Beneficiary, which amended and restated the Original Notes; and

WHEREAS, to induce the Holders to vote in accordance with the Plan, Douglas F. Blough, an individual (the "*Indemnitor*") entered into that certain Restructuring Side Letter Agreement (the "*Restructuring Letter Agreement*") as of August 15, 2025 with each of the Holders and the Beneficiary in which the Indemnitor agreed to fund certain amounts related to the Plant, Mortgaged Property, the Original Notes and the Notes as more fully set forth therein; and

WHEREAS, to induce the Holders to vote in accordance with the Plan, the Beneficiary, the Escrow Agent and the Company executed that certain Second Amended and Restated Escrow and Servicing Agreement (as amended or supplemented from time to time, the "*Second A&R Escrow and Servicing Agreement*") which amended and restated the Original Escrow and Servicing Agreement and established certain escrow reserves to be maintained from the date the Chapter 11 Filing was filed to the date the Plan was confirmed; and

WHEREAS, the Notes are secured by, among other things, (i) an Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents, Assigned Contracts and Fixture Filing Statement dated as of ________ from the Company to the Beneficiary (as amended, the "*Mortgage*"), which shall amend and restate that certain Mortgage, Security Agreement, Assignment of Leases, Rents, Assigned Contracts and Fixture Filing Statement dated as of September 28, 2017 from the Company to the Beneficiary (as amended, the "*Original Mortgage*") on certain real property located in the Town of New Denmark, County of Brown, State of Wisconsin and more particularly described in the Mortgage (together with the improvements thereon being the *"Mortgaged Property"*); (ii) direct assignments of the Company's right, title and interest in and to that certain Services Agreement dated as of March 12, 2021 (as amended, supplemented or modified from time to time, the *"American Foods Contract"*) between the Company and American Foods Group, LLC (*"American Foods"*) (as amended, supplemented or modified from time to time in accordance with the terms of the Mortgage and thereof, collectively, the *"Assigned Contract"*); and (iii) by other documents and instruments; and

WHEREAS, in connection with the confirmation of the Plan and related amendments as described in that certain Fourth Omnibus Amendment, dated as of the date hereof between the Company, the Holders and the Beneficiary (the "*Fourth Amendment*"), the parties thereto agree to amend the Operative Agreements as set forth therein; and

WHEREAS, escrow reserves were established and shall be maintained as set forth herein in order that funds will be available to pay for certain obligations of the Company as owner of the Mortgaged Property and as issuer of the Notes; and

WHEREAS, as one of the conditions precedent to the Beneficiary entering into the Fourth Amendment, the Company, the Beneficiary and the Escrow Agent desire to amend and restate the Original Escrow and Servicing Agreement; and

WHEREAS, capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Mortgage as in effect on the date of this Agreement or the Fourth Amendment, as applicable.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend and restate the Second A&R Escrow and Servicing Agreement in its entirety as follows:

SECTION 1. APPOINTMENT.

Wells Fargo Trust Company, National Association is hereby appointed the Escrow Agent hereunder and agrees to act in such capacity in accordance with the terms and conditions of this Agreement and agrees to hold the funds on deposit in the Escrow Account described below in trust for the benefit of the Beneficiary subject to the terms hereof. In servicing and administering the loan evidenced by the Notes, the Escrow Agent shall employ procedures and adhere to the standards that the Escrow Agent customarily employs and exercises acting as an escrow agent in similar transactions with respect to the duties expressly set forth in this Agreement.

SECTION 2. ESCROW ACCOUNT.

*Section 2.1. Establishment of Escrow Account.* The Escrow Agent shall establish and maintain a single escrow account (the *"Escrow Account"*) for receipt and disbursement of funds as set forth below. For that purpose, the Company and the Beneficiary hereby appoint and constitute the Escrow Agent their true and lawful attorney, to deposit and endorse for payment in the name of the Escrow Agent, all checks, wires or drafts received from the Off-takers in payment of sums due to the Company under the Assigned Contracts, from counterparties under any lease and the Other Contracts or from any other source in connection with the Mortgaged Property and/or the Project. The Escrow Account shall be a FDIC-insured account at a commercial banking institution and shall be composed of the following separate reserves (which may be maintained as separate accounts or subaccounts at the option of the Escrow Agent):

(a) the Note Payment Reserve;
(b) the Monthly Servicing Fee Reserve;
(c) the Operating Expenses and Third Party Obligation Reserve;
(d) the Property Tax Reserve;
(e) the Insurance Reserve;
(f) the Liquidity Reserve;
(g) the Rating Expense Reserve;
(h) the Sale Proceeds Reserve; and
(i) the Balance Reserve.

The foregoing reserves are hereinafter referred to individually as an *"Escrow Reserve"* and collectively as the *"Escrow Reserves"*. The Company may at any time and from time to time provide funds to make up any shortfall in any of the Escrow Reserves. Wherever in this Agreement reference is made to receipt of funds by the Escrow Agent, such funds shall be considered received only upon the making with the Escrow Agent of a deposit in cash or collected funds.

At the written direction of the Company in form satisfactory to Escrow Agent, amounts allocated to the Escrow Reserves shall be invested by the Escrow Agent in a Wells Fargo deposit

account and all earnings thereon shall be allocated to the Escrow Reserves and held and disbursed in accordance with this Agreement but shall be income of the Company for tax purposes. Any change to the investment shall require the prior written consent of the Beneficiary. The Escrow Agent shall bear no liability or responsibility for any losses incurred as a result of investing the funds in accordance with this paragraph, or for the failure of Company to give Escrow Agent written instructions to invest or reinvest the Escrow Reserves. Uninvested funds held hereunder shall not earn or accrue interest.

SECTION 3. DEPOSITS TO ESCROW ACCOUNT.

*Section 3.1. Deposits on the Closing Date.*

(a) *Allocation to the Note Payment Reserve*. On the Closing Date, the Company shall cause to be deposited with Beneficiary an installment payment in immediately available funds in the amount of $_______, which is the aggregate amount of interest only due on the Notes (and any additional interest or fees owed pursuant to the Operative Agreements) through ______ as set forth on Annex I to the Notes. Beneficiary shall deposit such amount in the Account and allocate it to the Note Payment Reserve.

(b) *Allocation to the Servicing Fee Reserve*. On the Closing Date, Company shall cause to be deposited with Beneficiary the Monthly Administration Fee set forth on **Schedule III** hereto (the "*Monthly Servicing Fee*") (which amount represents compensation of Escrow Agent for administration of the financing evidenced by the Notes) through ______. Beneficiary shall deposit such amount in the Account and allocate it to the Servicing Fee Reserve.

*Section 3.2. Deposits of Property Payments or Sale Proceeds.* It is anticipated that from time to time, the Escrow Agent shall receive (i) from the Off-takers amounts due under the Assigned Contract (each an *"Assigned Contract Payment"*), each such Assigned Contract Payment and any other payment received under any lease and any Other Contract (the *"Other Payments"*) and other payments received in connection with the Mortgaged Property and/or the Project (collectively with the Other Payments, the *"Property Payments"*) (ii) funds deposited by the Indemnitor or on behalf of the Indemnitor or the Company in accordance with the Restructuring Letter Agreement (collectively, the "*Equity Funds*"), and (iii) upon sale of the Project and Mortgaged Property or the sale, transfer, exchange or otherwise of the controlling equity, ownership, membership, partnership, or interest of the Company, all proceeds from such sale, and such amounts shall be deposited by the Escrow Agent in the Escrow Account and, to the extent available, allocated to the Escrow Reserves in the amounts set forth below (which amounts are on a monthly basis taking into account all Property Payments and Equity Funds in the aggregate for such month, rather than such amounts applying to each such Assigned Contract Payment and Other Payment, individually) and in the following order for disposition as described in Sections 4.2 below:

(a) *Monthly Servicing Fee*. On the first Business Day of each month or such later date in such calendar month in which sufficient Property Payments and Equity Funds are received, the Escrow Agent shall allocate Property Payments and Equity Funds in an

amount equal to the Monthly Servicing Fee to the Monthly Servicing Fee Reserve as set forth on **Schedule III** hereto.

(b) *[Reserved]*

(c) *Note Payment Reserve*. On the first Business Day of each month or such later date in such calendar month in which sufficient Property Payments and Equity Funds are received, the Escrow Agent shall allocate to the Note Payment Reserve an amount necessary so that the balance in the Note Payment Reserve shall be equal to the installment of interest and/or principal next due on the Notes and due in accordance with the Restructuring Letter Agreement.

(d) *Operating Expenses and Third Party Obligations Reserve*. On the first Business Day of each month and within three (3) Business Days after each later date in such calendar month in which Property Payments and Equity Funds are received until such time, if any, as the Escrow Agent has disbursed to the Company the full amount of the applicable Monthly Expenses pursuant to the terms of this Agreement, the Escrow Agent shall allocate to the Operating Expenses and Third Party Obligations Reserve a portion of the Property Payments and Equity Funds received (after the deposits contemplated in Sections 3.2(a) through (c) are made), in the following amounts:

(i) An amount equal to the operating expenses for such month relating to the Mortgaged Property (excluding amounts for the payment of real estate taxes and insurance premiums) set forth in the applicable Monthly Budget (as herein defined) and such other amounts as may be approved in writing by the Required Holders; and

(ii) An amount equal to the line item contained in the applicable Monthly Budget relating to payments due and owing for such calendar month from the company to Farmers, UPS, etc. (each a "*Counterparty Participant*") under each respective agreement with a Counterparty Participant relating to the Mortgaged Property to the extent the Beneficiary at the direction of Required Holders have provided their prior written consent to each such agreement (collectively, the "*Counterparty Participant Contracts*").

(e) *[Reserved]*.

(f) *Property Tax Reserve*. On the first Business Day of each month or such later date in such calendar month in which sufficient Property Payments and Equity Funds are received (after the deposits contemplated in Sections 3.2(a) through (e) are made), each month the Escrow Agent shall allocate to the Property Tax Reserve an amount equal to one twelfth (1/12) of the real estate taxes payable for the previous period of twelve (12) consecutive months (such payment defined as the *"Monthly Tax Reserve Amount"*), which Monthly Tax Reserve Amount shall be $32,822.76 initially. It is hereby agreed and acknowledged that if on any given month the amount allocated to the Property Tax Reserve by the Escrow Agent from Property Payments and Equity Funds is less than the amount

required to fully fund the Monthly Tax Reserve Amount (the "*Tax Deficiency*"), then (i) such Tax Deficiency shall not constitute a default hereunder, (ii) the amount of such Tax Deficiency shall be added to the next succeeding Monthly Tax Reserve Amount until such time as the Tax Deficiency is cured, and (ii) the Escrow Agent shall give immediate written notice of such Tax Deficiency to the Beneficiary and the Company.

(g) *Insurance Reserve*. On the first Business Day of each month or such later date in such calendar month in which sufficient Property Payments and Equity Funds are received (after the deposits contemplated in Sections 3.2(a) through (f) are made), each month the Escrow Agent shall allocate to the Insurance Reserve Account an amount equal to one twelfth (1/12) of the insurance premiums paid for the previous period of twelve (12) consecutive months (such payment defined as the "*Monthly Insurance Reserve Amount*"), which Monthly Insurance Reserve Amount shall be $145,156.97 initially; provided that no amounts shall be allocated to the Insurance Reserve at any time the total amount of funds in the Insurance Reserve equals 100% of the insurance premiums paid for the previous period of twelve (12) consecutive months. It is hereby agreed and acknowledged that if on any given month the amount allocated to the Property Insurance Reserve by the Escrow Agent from Property Payments and Equity Funds is less than the amount required to fully fund the Monthly Insurance Reserve Amount (the "*Insurance Deficiency*"), then (i) such Insurance Deficiency shall not constitute a default hereunder, (ii) the amount of such Insurance Deficiency shall be added to the next succeeding Monthly Insurance Reserve Amount until such time as the Insurance Deficiency is cured, and (ii) the Escrow Agent shall give immediate written notice of such Insurance Deficiency to the Beneficiary and the Company.

(h) *Rating Reserve*. On the first Business Day of each month starting on ______, 2027, each month the Escrow Agent shall allocate to the Rating Expense Reserve an amount equal to the lesser of (i) $[500.00] and (ii) the amount, if any, by which the amounts allocated to the Rating Expense Reserve are less than the $[6,000] annual rating agency fee (divided by 12).

(i) *Balance Reserve*. On the first Business Day of each month or such later date in such calendar month in which Property Payments and Equity Funds are received (after the deposits contemplated in Sections 3.3(a) through (h) are made and subject to Section 4.2(d)), the Escrow Agent shall allocate the remaining Property Payments and Equity Funds to the Balance Reserve.

(j) *Sale Proceeds Reserve*. Upon receipt, the Escrow Agent shall immediately allocate to the Sale Proceeds Reserve any amounts received in connection with the sale of the Plant or Mortgaged Property or the sale, transfer, exchange or otherwise of the controlling equity, ownership, membership, partnership, or interest of the Company. The Company shall provide notice to Beneficiary at such time as Company expects an amount to be deposited into the Escrow Account for allocation to the Sale Proceeds Reserve, such notice to contain a statement of the amount Company expects to be deposited.

SECTION 4. ADMINISTRATION AND DISBURSEMENTS.

Except as otherwise set forth herein, so long as a Responsible Officer of the Escrow Agent has not received written notice of an Event of Default, the Escrow Funds shall be administered and disbursed by the Escrow Agent upon the following terms and conditions; *provided, however,* if the aggregate amount received by the Escrow Agent from Property Payments and Equity Funds on the date being three (3) days prior to the date in which debt service payments are due under the Notes is less than the amount required to fully fund each of the Escrow Reserves pursuant to Section 3.2 hereof in the respective amounts specified therein, the Escrow Agent shall give immediate written notice of such shortfall to the Beneficiary, and the Company and thereafter the Escrow Agent may, at the direction of the Required Holders, (i) request such shortfall from Indemnitor pursuant to the Restructuring Letter Agreement to be deposited with Escrow Agent in accordance with this Agreement or (i) use funds in the Liquidity Reserve, if any, to offset any shortfall that exists in the Escrow Reserves.

*Section 4.1.* *[Reserved]*

*Section 4.2.* *Disbursement from Amounts Deposited from Property Payments and Equity Funds.*

(a) *Monthly Servicing Fee*. Escrow Agent shall disburse an amount equal to the Monthly Servicing Fee as set forth on **Schedule III** hereto to Escrow Agent for performing the services set forth herein.

(b) *[Reserved]*.

(c) *Note Payment Reserve*. From and after the earlier of ______ and each due date thereafter, amounts allocated to the Note Payment Reserve from Property Payments and Equity Funds (or from the Liquidity Reserve if directed by the Required Holders) shall be disbursed to the Beneficiary in the amounts set forth on (1) Annex I to the Notes and (2) Schedules 2-A and 2-B to the Restructuring Letter Agreement, both on the later to occur of (x) the due date therefor, or (y) the date such amounts are received by the Escrow Agent.

(d) *Operating Expenses and Third Party Obligations Reserve*. With respect to amounts deposited into the Operating Expenses and Third Party Obligations Reserve, each calendar month, but no more than once per calendar month, a request for Monthly Expenses shall be submitted by the Company to the Escrow Agent with backup documentation including invoices, receipts, cancelled checks, etc., as applicable. The "*Monthly Expenses*" shall be set forth in a manner compared to the budget for each calendar month to be prepared by the Company and delivered to the Escrow Agent for such calendar month (each a "*Monthly Budget*") for the payment or reimbursement of (i) operating expenses and (ii) fees and other amounts owed in connection with the Mortgaged Property which are the obligation of the Company to pay to third-parties each month under any applicable Counterparty Participant Contracts as such Counterparty Participant Contracts have been approved by the Required Holders. Each Monthly Budget shall include the projected (x) operating expenses and Counterparty Participant Contract expenses to be paid during the

applicable calendar month, and/or (y) the Counterparty Participant Contract expense incurred and paid for prior to the date thereof. The Escrow Agent shall disburse Monthly Expenses only upon receipt of written confirmation of approval from the Required Holders or counsel to the Holders of such amount. To the extent the actual Monthly Expenses to be paid during any calendar month exceed the amount available in the Operating Expenses and Third Party Obligations Reserve for such calendar month, including (but not limited to) as a result of there being insufficient Property Payments and Equity Funds available for deposit into the Operating Expenses and Third Party Obligations Reserve for such month (a "*Monthly Shortfall*"), Escrow Agent shall request in writing such Monthly Shortfall from Indemnitor pursuant to the Restructuring Letter Agreement in immediately available funds to be deposited with Escrow Agent in the Operating Expenses and Third Party Obligations Reserve. In no event shall the Company request from the Operating Expenses and Third Party Obligations Reserve during any calendar month more than the actual Monthly Expenses due and payable for such calendar month and any excess in the Operating Expenses and Third Party Obligations Reserve shall be held in the Operating Expenses and Third Party Obligations Reserve and applied by Escrow Agent to Monthly Expenses in subsequent months and any Monthly Shortfall. For the avoidance of doubt, any excess in the Operating Expenses and Third Party Obligations Reserve shall not be released to the Balance Reserve without approval from the Required Holders or counsel to the Holders; *provided, however*, any amount remaining in the Operating Expenses and Third Party Obligations Reserve after the Notes have been paid in full shall be allocated to the Balance Reserve. At such time after the occurrence of an Event of Default, the Escrow Agent, at the direction of the Required Holders and upon prior written notice to the Company, shall have the right, but not the obligation, to apply any portion of the funds allocated to the Operating Expenses and Third Party Obligations Reserve for such purpose as determined reasonably necessary, proper or advisable by the Required Holders.

To the extent the approval of any party is required with respect to a disbursement request under this Section 4.2(d), if Deemed Approval Requirements are fully satisfied in connection with any such request and Escrow Agent or Beneficiary thereafter fails to respond, Escrow Agent's and such Beneficiary's approval shall be deemed given with respect to the matter for which approval was requested. The *Deemed Approval Requirements* are (i) the Company shall have sent Escrow Agent and Beneficiary a written request for disbursement including all information or documentation required herein and which Escrow Agent and/or any Beneficiary reasonably deems necessary to evaluate the disbursement request, (ii) the Company includes in the transmittal of the written request, "PRIORITY DEEMED APPROVAL NOTICE", (iii) the Company includes a legend, prominently displayed stating that approval is required in accordance with Section 4.2 of this Agreement and Escrow Agent or Beneficiary's failure to respond to such request within two (2) Business Days of its receipt of such request shall be deemed approval, and (iv) the Company shall have submitted a second written request for approval and Escrow Agent or Beneficiary shall have failed to respond to such second request within two (2) Business Days.

(e) *[Reserved]*.

(f) *Property Tax Reserve*. The Company shall provide to the Escrow Agent all applicable tax bills or invoices and payment instructions promptly upon the Company's receipt of the same (and, in any event, no later than 30 days prior to the due date for such bills or invoices) and, upon Escrow Agent's receipt thereof, subject to the following provisions of this Section 4.2(f), the Escrow Agent shall disburse from amounts allocated to the Property Tax Reserve amounts sufficient to satisfy said tax bills or invoices. Amounts held in the Property Tax Reserve shall be disbursed to the applicable taxing authority on the date payment of real property taxes are due, unless not less than five (5) Business Days prior to such due date the Escrow Agent has received (i) a written notice from the Company that the Company has paid (or caused to be paid) such amounts directly, such notice to include satisfactory evidence of such payment or (ii) evidence that such taxes are being appealed and during the pendency of such appeal are not due and payable or, if payable, then payable at a lower amount and paid by the Escrow Agent at such lower amount. If the Company shall pay for such items directly then the Company may request reimbursement of such amounts from the Property Tax Reserve and, upon the Escrow Agent's receipt and approval of the applicable tax bill or invoice therefor and a copy of the canceled check(s), receipts or other appropriate evidence of payment, the Escrow Agent shall reimburse the Company for such amounts. Any amounts remaining in the Property Tax Reserve after satisfaction of all tax liabilities of the Company for a given tax period and delivery to the Escrow Agent of satisfactory evidence therefor shall be allocated to the Balance Reserve; *provided, however*, that funds contained in the Property Tax Reserve shall not be released to the Balance Reserve to the extent that the amounts to be allocated to the Property Tax Reserve in accordance with Section 3.2(f) between the date that all tax liabilities of the Company for a given tax period were satisfied and the date that the next coming due property tax invoice is payable would not be sufficient to pay such next coming due property tax invoice. Any amount remaining in the Property Tax Reserve after the Notes have been paid in full shall be allocated to the Balance Reserve.

(g) *Insurance Reserve*. The Company shall provide to the Escrow Agent all applicable invoices and payment instructions for the premiums for casualty, liability and other insurance required under Section 2.15 of the Mortgage promptly upon the Company's receipt of the same (and, in any event, no later than 30 days prior to the earlier of the due date for such invoices or the expiration of any such insurance policies) and, upon the Escrow Agent's receipt thereof, subject to the following provisions of this Section 4.2(g), the Escrow Agent shall promptly disburse from amounts allocated to the Insurance Reserve amounts sufficient to satisfy said invoices. Amounts allocated to the Insurance Reserve shall be disbursed to the appropriate party on the date such premiums are due, unless not less than five (5) Business Days prior to such due date the Escrow Agent has received (i) a written notice from the Company that the Company has paid such amounts directly and (ii) satisfactory evidence of such payment, then upon the Escrow Agent's receipt and approval of the applicable invoice therefor and a copy of the cancelled check(s), receipts or other appropriate evidence of payment, the Escrow Agent shall reimburse the Company for such amounts. Escrow Agent hereby acknowledges and agrees that the Company may make monthly premium payments and, upon the Company's request, Escrow Agent shall disburse to the appropriate party (or to the Company as a reimbursement in the event the Company has paid such amounts directly) each calendar month from amounts allocated to

the Insurance Reserve amounts sufficient to satisfy such monthly payments pursuant to applicable invoices and payment instructions. Any amounts remaining in the Insurance Reserve after payment of all casualty, liability and other insurance premiums required under Section 2.15 of the Mortgage for a given period shall be allocated to the Balance Reserve; *provided, however*, that funds contained in the Insurance Reserve shall not be released to the Balance Reserve to the extent that the amounts to be allocated to the Insurance Reserve in accordance with Sections 3.2(g) between the date that such premiums for a given period were paid and the date that the next coming due insurance invoice is payable would not be sufficient to pay such next coming due insurance invoice. Any amount remaining in the Insurance Reserve after the Notes have been paid in full shall be allocated to the Balance Reserve.

(h) *Rating Expense Reserve*. Amounts allocated to the Rating Expense Reserve shall be used to pay the cost of obtaining the annual rating letters for the Notes required under Section 2.28 of the Mortgage. The Active Rating Agency (as defined in the Mortgage) shall annually provide the Escrow Agent and the Beneficiary with all applicable invoices, tax forms, and payment instructions for such rating letters and upon the Escrow Agent's and the Beneficiary's receipt and approval of such items for the rating on the Notes, the Escrow Agent shall disburse funds from the Rating Expense Reserve to satisfy such invoices; *provided*, *however*, that the Escrow Agent shall have no duty to monitor the receipt of the annual rating confirmation for the Notes nor to determine when the rating agency fee is due for payment (other than when the Escrow Agent and the Beneficiary receives such annual invoices). Any amounts remaining in the Rating Expense Reserve at such time as the Notes are paid in full shall be disbursed to the Balance Reserve.

(i) *Liquidity Reserve*. Amounts held in the Liquidity Reserve shall be disbursed at the direction of the Required Holders to pay for any shortfalls in the Note Payment Reserve or to eliminate any deficiency in the Property Tax Reserve, Insurance Reserve or for operating expenses. All disbursements from the Liquidity Reserve shall be made at the direction of the Required Holders. Any amount remaining in the Liquidity Reserve after the Notes have been paid in full shall be allocated to the Balance Reserve.

(j) *Balance Reserve*. Amounts allocated to the Balance Reserve, if any, shall be disbursed monthly on the date that the Notes are paid pursuant to the schedule set forth on Annex I to the Notes to the Liquidity Reserve.

(k) *Sale Proceeds Reserve*. Amounts allocated to the Sale Proceeds Reserve, if any, shall be held in escrow and only used by Beneficiary to apply to the amount then outstanding on the Note in accordance with Section 2.12(a) of the Mortgage.

*Section 4.3. Reimbursement from the Off-Takers.* If any Off-taker is required under its respective Assigned Contract to reimburse the Company for the payment of any of the items reserved for in any of the Escrow Reserves, then promptly after the payment of such amounts, the Company or the Escrow Agent, as the case may be, shall deliver to such Off-taker a written reimbursement request for such amounts, together with evidence of the payment thereof, and the Company shall use its commercially reasonable efforts to cause such reimbursement to be paid to

the Escrow Agent. Any such reimbursed funds or any other amounts received from the Off-takers (other than Assigned Contract Payments) shall be deposited by the Escrow Agent in the Escrow Account and allocated to all shortfalls, if any, in the Escrow Reserves and any amounts remaining after satisfying such shortfalls shall be deposited in the Balance Reserve.

*Section 4.4. Disbursement Instructions, Etc.* All disbursements made by the Escrow Agent to the Beneficiary shall be made to the account or pursuant to the instructions set forth on ***Schedule I*** hereto or pursuant to any other written instructions of the Beneficiary. All disbursements made by the Escrow Agent to the Company shall be made to the account or pursuant to the instructions set forth on ***Schedule II*** hereto or pursuant to any other written instructions of the Company. The Escrow Agent shall only be required to make disbursements hereunder to the extent that funds are available for such disbursement from amounts allocated to the applicable Escrow Reserve.

*Section 4.5 Income Tax Withholding and Reporting*. The Company agrees to provide to Escrow Agent, upon request, documents and information necessary to determine whether any tax or withholding obligations apply to any distributions hereunder, including reasonably appropriate forms W-9 or W-8 and such other forms and documents that the Escrow Agent may request. The Company acknowledges and agrees that the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, to withhold a portion of any distribution hereunder if required by law. To the extent that the Escrow Agent becomes liable or responsible for the payment of any taxes in respect of any payment received by the Escrow Agent or income thereon, the Company shall pay such amounts to the Escrow Agent on demand. The Company shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to any payments received by the Escrow Agent hereunder and the investment thereof unless such tax, late payment, interest, penalty or other expense was directly caused by the gross negligence or willful misconduct of the Escrow Agent. The indemnification provided by this Section 4.5 in addition to the indemnification provided in Section 8 and shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement.

SECTION 5. SUMMARY OF ACCOUNT ACTIVITIES.

Escrow Agent shall provide the Company, and the Holders with monthly statements with respect to each Escrow Reserve for the prior calendar month including: (i) month-end balances allocated to each separate Escrow Reserve, (ii) a description of disbursements made from funds allocated to each separate Escrow Reserve for the prior calendar month and the purpose of each such disbursement, and (iii) an itemized description of the dates and amounts of deposits made from Property Payments and Equity Funds to each separate Escrow Reserve for the prior calendar month and the date, amount and source of each such Property Payment and Equity Funds. Not later than sixty (60) days after the end of each calendar year, the Escrow Agent shall submit to the Holders and the Company a summary of the activities with respect to each Escrow Reserve for such calendar year including: (i) year-end balances allocated to each separate Escrow Reserve, (ii) a description of disbursements made from funds allocated to each separate Escrow Reserve and the purpose of each such disbursement, and (iii) expenses incurred by the Escrow Agent, if

any, in performing its duties hereunder, it being understood that the Escrow Agent will not receive a separate fee for providing the reports set forth in this Section 5. Such obligation of the Escrow Agent shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Escrow Agent in the form of account statements. The Holders and the Company may at any time request further information about any activities with respect to any Escrow Reserve maintained hereunder.

SECTION 6. DEFICIENCIES; EVENTS OF DEFAULT; PLEDGE OF ESCROW ACCOUNT.

If, on any date that a payment is due under the Notes, either (i) the amount of Property Payments, Equity Funds and amounts deposited with Escrow Agent pursuant to Section 3.2 hereof that have been received by Escrow Agent on or prior to such date shall be less than the sum of the amounts required to be allocated to the Escrow Reserves under Section 3.2, or (ii) the aggregate amounts allocated to the Escrow Reserves are less than the amounts required to be allocated thereto after applying all Property Payments, Equity Funds and amounts deposited with Escrow Agent pursuant to Section 3.2 hereof, then the Escrow Agent shall give written notice to the Beneficiary and the Company within five (5) Business Days of the occurrence of either (i) or (ii) above (such shortfall is herein referred to as an *"Escrow Shortfall"*), then the Company shall promptly (but in no case later than three (3) Business Days after such notice) deposit funds with the Escrow Agent or make payments to any appropriate party in amounts sufficient to remedy any Escrow Shortfall.

In the event that the Escrow Agent is notified in writing by the Beneficiary or the Company of an Event of Default under the Mortgage, the Escrow Agent shall cease to make disbursements from the Escrow Account and, upon the request of the Beneficiary as directed by the Required Holders, shall promptly disburse the amounts in the Escrow Account to the Beneficiary for application to the indebtedness evidenced by the Notes and secured by the Mortgage or in such other manner as the Beneficiary shall direct in accordance with the Mortgage.

The funds held in the Escrow Account, including any earnings thereon, are hereby pledged as additional security for the indebtedness evidenced by the Notes and secured by the Mortgage, Collateral Assignment, and the Assignment of Leases and Rents. The Company hereby grants to the Beneficiary a first and continuing security interest in and to all of the Company's interest in the Escrow Account as additional security for the Secured Obligations, and agrees to execute and deliver such documents and instruments as the Beneficiary may require to evidence and perfect such security interests. The Escrow Agent is holding the Escrow Account as bailee, representative, nominee and financial intermediary for the Beneficiary. If any Event of Default occurs under any of the Operative Agreements, then the Beneficiary, in its sole and absolute discretion, may (i) apply the funds in the Escrow Account or any portion of such funds to the payment of the indebtedness evidenced by the Notes, and to any unpaid fees, costs or other expenses that the Company is required to pay under this Agreement or any of the other Operative Agreements; *provided, however,* that such application of funds shall not cure or be deemed to cure such Event of Default; (ii) apply the funds in the Escrow Account to reimburse the Beneficiary or the Escrow Agent for any losses or expenses (including, without limitation, any legal fees and disbursements) suffered or incurred by the Beneficiary or the Escrow Agent as a result of such Event of Default; or (iii) apply the funds in the Escrow Account in connection with the exercise of any rights or

remedies available to the Beneficiary or the Escrow Agent at law or in equity or under this Agreement or any other Operative Agreements

SECTION 7. ESCROW AGENT DUTIES; LIABILITIES.

*Section 7.1. Escrow Agent Duties*. Escrow Agent shall monitor taxes and insurance with respect to the Mortgaged Property and timely file continuation statements necessary under the Uniform Commercial Code as in effect in any relevant jurisdiction to continue the effectiveness of the UCC-1 Financing Statements in connection with the loan evidenced by the Senior Note, provided that Escrow Agent has been provided with copies of such UCC-1 Financing Statements which shall be deemed to be satisfied upon receipt by Escrow Agent of the Senior Mortgage File Certification if the Senior Mortgage File contains copies of such UCC-1 Financing Statements, or copies in connection with any amendment, interest transfer or other modification transaction in connection with the loan evidenced by the Senior Note. Except as set forth in the preceding sentence, Escrow Agent shall otherwise not have any responsibility independently to take any action, or to determine from time to time whether any action is required to be taken, to perfect or to maintain the effectiveness of the perfection of any security interest granted in connection with the loan evidenced by the Senior Note. Other than as provided for herein, Escrow Agent shall have no duty (A) to see to any recording, filing, or depositing of the Senior Deed of Trust or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any rerecording, refiling or re-depositing of any thereof, or to discover any name changes of any debtor in any UCC Financing Statement, (B) to see to any insurance, or (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Granted Property. Notwithstanding anything to the contrary contained herein, neither the Escrow Agent nor the Beneficiary shall be under any duty to advance funds.

*Section 7.2. Escrow Agent Liabilities*. In performing any of its duties under this Agreement, or upon the claimed failure to perform its duties hereunder, the Escrow Agent shall not be liable or responsible to anyone for any damages, losses, or expenses which they may incur as a result of the Escrow Agent's so acting or failing to act; provided, however, that the Escrow Agent shall be liable for damages arising out of its gross negligence or willful misconduct under this Agreement as determined by a final order of a court of competent jurisdiction. Accordingly, except in the event of the Escrow Agent's gross negligence or willful misconduct as determined by a final order of a court of competent jurisdiction, the Escrow Agent shall not incur any such liability or responsibility with respect to (i) any action taken or not taken in good faith upon advice of its counsel given with respect to any questions relating to the duties and responsibilities of the Escrow Agent hereunder, or (ii) any action taken or not taken in reliance upon any document, including any written notice of instructions provided for in this Agreement, not only as to its provisions, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the proper person or persons (without further inquiry into the person's or persons' authority) and to conform with the provisions of this Agreement. In no event shall the Escrow Agent be liable or responsible for any special, indirect or consequential damages or losses of any kind whatsoever (including without limitation lost profits) even if the Escrow Agent has been advised of the

possibility of such losses or damages and regardless of the form of action. The Escrow Agent may request and may rely conclusively, and shall be protected in acting or refraining from acting, without liability or responsibility (the fees, costs, and expenses (including attorneys' fees and court costs) of which shall be paid by the party requesting the action or inaction), upon any written notice, instruction, request, opinions, certificates, or reports furnished to it hereunder or pursuant hereto and believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent agrees to provide to the Beneficiary originals or copies, as requested by the Beneficiary, of all notices and documentation received by the Escrow Agent under this Agreement. Without limiting the foregoing, the Escrow Agent may at its expense enter into sub-servicing agreements with one or more co-escrow agents; provided, however, that any sub-servicing agreements shall not be deemed to relieve the Escrow Agent of its obligations hereunder. The Escrow Agent shall not be responsible or liable for any misconduct or negligence on the part of any such co-escrow agent or co-escrow agents appointed by it with due care. The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees, and the Escrow Agent shall not be liable or responsible for the acts, omissions, negligence or misconduct of any such person appointed by it with reasonable care. In no event shall the Escrow Agent be liable or responsible for the acts or omissions of the Company, or any other party. Absent an explicit obligation stated in this Agreement, the Escrow Agent shall not be deemed to have knowledge of any Default, Event of Default, report or information, or be required to act upon any Default, Event of Default, report or information (including the sending of any notice) unless a Responsible Officer of the Escrow Agent (i) receives written notice or (ii) has "actual knowledge" of such an event or information. Publicly available information and the Escrow Agent's receipt of any reports, information and documents delivered to the Escrow Agent pursuant to this Agreement shall not constitute constructive notice of any information contained therein or determinable from information contained therein. The Escrow Agent shall not be liable or responsible for any action taken or omitted, or errors in judgment made, by it in good faith. Any discretion, permissive right or privilege of the Escrow Agent to do things enumerated in this Agreement shall not be deemed or otherwise construed as duties or obligations. Further, the Escrow Agent shall not be required to take discretionary action absent direction from the Required Holders and indemnification to the Escrow Agent's satisfaction.

*Section 7.3. Discharge of Escrow Agent Duties*. In the event of a dispute with the Beneficiary or the Company, sufficient in the sole reasonable discretion of the Escrow Agent to justify its doing so, the Escrow Agent shall be entitled to tender into the registry or custody of any court of competent jurisdiction all money or property in its hands under the terms of this Agreement, together with such legal proceedings as it deems appropriate, and thereupon to be discharged from all further duties under this Agreement. The Company shall reimburse the Escrow Agent upon demand for all fees, costs and expenses (including reasonable attorney's fees, costs, expenses and court costs) actually incurred by the Escrow Agent in connection with any such legal proceeding.

SECTION 8. INDEMNIFICATION.

The Company joins with the Beneficiary in this authorization and direction for the purpose of confirming to the Escrow Agent the instructions and agreements herein set forth, but the Company acknowledges and agrees that it has no right, title or interest in and to any of the funds

from time to time in the Escrow Account except to the extent specifically herein provided, and the Company agrees that the Escrow Agent may in good faith rely solely on the instructions of the Beneficiary given to the Escrow Agent from time to time as to the disposition of funds from time to time to the credit of the Escrow Account, notwithstanding any instruction or direction by the Company to the contrary. A copy of such instructions shall be mailed to the Company at the address provided for in Section 13(d) hereof by the Beneficiary at the same time said instructions are given to the Escrow Agent. In order to induce the Escrow Agent to act hereunder and to rely on the instructions and directions of the Beneficiary from time to time given to the Escrow Agent with respect to the Escrow Account, the Company agrees to indemnify and protect and save the Escrow Agent harmless from and against any and all actions, proceedings, claims, damages or liabilities asserted against the Escrow Agent or incurred by the Escrow Agent in so acting hereunder except actions which arise from its gross negligence or willful misconduct as stipulated in Section 7.2 hereof, as determined by a final judgment of a court of competent jurisdiction, and the Company agrees to reimburse the Escrow Agent for all of its reasonable expenses (including, without limitation, reasonable attorneys' fees and costs) incurred by reason of its position hereunder or activities taken pursuant hereto (including, without limitation, any legal fees, costs, and expenses actually incurred in connection with any enforcement, including any action, claim, or suit brought, by the Escrow Agent of any indemnification or other obligation of the Company or other transaction party). Each party hereto agrees that the Escrow Agent shall not be liable or responsible to any of them for actions taken by the Escrow Agent pursuant to the terms hereof except actions which arise from the Escrow Agent's gross negligence or willful misconduct as determined by a final order of a court of competent jurisdiction as stipulated in Section 7.2 hereof. This Section shall survive the termination of this Agreement or the resignation or removal of the Escrow Agent.

SECTION 9. COMPANY'S SUBORDINATION.

The Company understands and agrees that any right, title or interest which it may have in or to any Assigned Contract Payments, any sums due or to become due under any leases or any Other Contract or from any other source in connection with the Mortgaged Property and/or the Project shall be and are in all respects subject and subordinate to the right of (a) the Beneficiary, in the second place, to receive, pay and apply such payments and monies to the payment in full of the Notes as and when the same becomes due and payable and (b) the Escrow Agent, in the third place, to receive and apply such payments and monies pursuant to this Agreement, and that if for any reason whatsoever a Default or Event of Default under the Mortgage or an Escrow Shortfall under this Agreement has occurred and is then continuing, the Escrow Agent shall not disburse any amounts to the Company unless and until the Escrow Agent has received written notice from the Beneficiary that such Default or Event of Default under the Mortgage or Escrow Shortfall hereunder has been cured in full and that no other such Default or Event of Default under the Mortgage or Escrow Shortfall hereunder has occurred and is then continuing.

SECTION 10. SECURITY PROCEDURE FOR FUNDS TRANSFERS.

The Escrow Agent shall confirm each funds transfer instruction received in the name of a party by means of the security procedure selected by such party and communicated to the Escrow Agent through a signed certificate in the form of Schedule IV attached hereto, which upon receipt

by the Escrow Agent shall become a part of this Agreement. Once delivered to the Escrow Agent, Schedule IV may be revised or rescinded only by a writing signed by an authorized representative of the party. Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford the Escrow Agent a reasonable opportunity to act on it. If a revised Schedule IV or a rescission of an existing Schedule IV is delivered to the Escrow Agent by an entity that is a successor-in-interest to a party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of the party under this Agreement. The parties understand that the Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to the security procedure selected by such party may result in a delay in accomplishing such funds transfer, and agree that the Escrow Agent shall not be liable or responsible for any loss caused by any such delay.

Escrow Agent shall have the right, but not the obligation, to accept and act upon instructions, including funds transfer instructions ("*Instructions"*) given pursuant to this Agreement and delivered using Electronic Means. If any Party elects to give Escrow Agent Instructions using Electronic Means and Escrow Agent in its discretion elects to act upon such Instructions, Escrow Agent's understanding of such Instructions shall be deemed controlling. The Party giving such Instruction shall be responsible for ensuring that only officers authorized by the Party ("*Authorized Officers*") transmit disbursement instructions to Escrow Agent and that the Party giving such Instructions and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Party. The Parties understand and agree that Escrow Agent cannot determine the identity of the actual sender of such Instructions and that Escrow Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer have been sent by such Authorized Officer. Escrow Agent shall not be liable or responsible for any losses, costs or expenses arising directly or indirectly from Escrow Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction. Each Party agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to Escrow Agent, including without limitation the risk of Escrow Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to Escrow Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Party; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify Escrow Agent in writing immediately upon learning of any compromise or unauthorized use of the security procedures.

SECTION 11. SUCCESSOR TO ESCROW AGENT.

*Section 11.1. Escrow Agent Resignation*. The Escrow Agent may resign and be discharged of the trusts hereby created by mailing sixty (60) days' prior written notice specifying the date when such resignation will take effect to the Company and the Beneficiary at their respective addresses provided for in Section 13(d) hereof. Such resignation shall take effect on the earlier of (a) the date specified in such notice (being not less than sixty days after the mailing of such notice)

and (b) the date on which a successor Escrow Agent has been appointed pursuant Section 11.4. In the event that the Beneficiary fails to appoint a successor within sixty (60) days of the Escrow Agent's resignation, the Escrow Agent shall have the right, but not the obligation, to petition a court of competent jurisdiction to appoint a successor Escrow Agent and the Beneficiary shall pay all expenses, fees and costs (including attorneys' fees, costs, expenses and court costs) related to such petition. Each successor Escrow Agent appointed hereunder shall:

(a) be a trust company or banking corporation or national association having an office in the State of Wisconsin or any other State of the United States of America in good standing, with the power, authority and capacity to act as "Escrow Agent" under this Agreement,

(b) have capital, surplus and undivided profit aggregating at least $250,000,000, and

(c) have long term debt obligations (or if such successor shall not have long term debt obligations and such successor is a subsidiary of a holding company, such holding company shall have long term debt obligations) having a rating of "A" or better from Standard & Poor's Rating Services, a division of the McGraw Hill Companies, Inc., or "A2" or better from Moody's Investors Services, Inc. or an equivalent or better rating from another rating agency of national reputation.

*Section 11.2. Escrow Agent Removal*. The Escrow Agent may be removed at any time by the Beneficiary acting in good faith, by an instrument in writing from the Beneficiary delivered to the Company and the Escrow Agent no less than thirty (30) days prior to the effective date of such removal unless such removal is for cause. In addition, if the Escrow Agent has in any material respect failed to perform its duties under this Agreement, the Company may request the Beneficiary to remove the Escrow Agent and, upon delivery to the Beneficiary of evidence of such nonperformance satisfactory to the Beneficiary, the Beneficiary shall remove the Escrow Agent by an instrument in writing describing the nature of such nonperformance delivered to the Company and the Escrow Agent. Upon the removal of the Escrow Agent pursuant to this Section 11.2 or upon the resignation of the Escrow Agent pursuant to Section 11.1 hereof, the Beneficiary shall appoint a successor Escrow Agent and written notice of such removal or resignation, as the case may be, shall be provided by the Beneficiary to such successor Escrow Agent, and written notice of such removal or resignation, as the case may be, together with the name and mailing address of the successor Escrow Agent shall be provided by the Beneficiary to the Company. In the event that the Beneficiary fails to appoint a successor within sixty (60) days of the Escrow Agent's resignation, the Escrow Agent shall have the right, but not the obligation, to petition to a court of competent jurisdiction to appoint a successor and the Beneficiary shall pay all expenses, fees and costs related to such petition.

*Section 11.3. Escrow Agent Merger, Etc*. Any company into which the Escrow Agent or any successor to it may be merged or converted or with which it or any successor to it may be consolidated or any company resulting from any merger or consolidation to which the Escrow Agent or any successor to it shall be a party (*provided* such company shall be organized under the laws of the United States of America or of a state thereof), shall be the successor to the Escrow

Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto.

*Section 11.4. Successor Escrow Agent*. Any new agent appointed pursuant to any of the provisions hereof shall execute, acknowledge and deliver to the Company and the Beneficiary an instrument accepting such appointment, and thereupon such new agent, without any further act, deed or conveyance, shall assume all obligations of the Escrow Agent hereunder and shall become vested with all the estates, properties, rights, powers and trusts of its predecessor in the rights hereunder with like effect as if originally named as agent herein; but, nevertheless, on the written request of the Beneficiary, the Company or the successor Escrow Agent, the retiring Escrow Agent shall, upon payment of any amounts then due it pursuant to any of the provisions hereof, execute and deliver any instrument transferring to such successor Escrow Agent all the estates, properties, rights, powers and trusts of the retiring Escrow Agent and shall transfer and deliver to such successor Escrow Agent all property, files, correspondence and money held by such retiring Escrow Agent hereunder and such retiring Escrow Agent shall provide to the Beneficiary, and the Company a final accounting of all disbursals and other activities undertaken by such retiring Escrow Agent under this Agreement.

SECTION 12. TERMINATION.

This Agreement shall terminate and be of no further force and effect upon the earliest to occur of (i) the date that the Escrow Agent has received written notification of termination from the Company and the Beneficiary or (ii) the date that the Escrow Agent has received written notification from the Beneficiary that the Notes have been paid in full. Any amounts remaining in the Escrow Account after termination of this Agreement pursuant to this Section 11 and the payment of all amounts owing to the Escrow Agent hereunder shall be disbursed to the Company as set forth in Section 4.5 hereof.

SECTION 13. MISCELLANEOUS.

(a) The Escrow Agent shall not have any duties hereunder except those specifically set forth herein and shall have no duty to take any action if such action would expose it to personal liability or responsibility, is contrary to the terms hereof, or is contrary to law. No provision of this Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or responsibility, or potential financial liability or responsibility in the performance of its duties or the exercise of its rights under this Agreement.

(b) This Agreement shall be governed and construed by and under the laws of the State of New York. The Escrow Agent, the Company and the Beneficiary agree to the exclusive jurisdiction of any federal court located in the State of New York and waive any objection based on forum non conveniens, and any objection to venue of any action instituted in any of the aforementioned courts.

(c) No modification or amendment to this Agreement shall be valid unless reduced to writing and signed by all parties hereto. In connection with any such amendment or proposed amendment, the Escrow Agent may consult with counsel of its own choice, obtain opinions from

such counsel, and act according to the opinions of such counsel, and the Company shall indemnify, pay and reimburse the Escrow Agent for all costs, fees and expenses, including reasonable attorneys' fees, costs, expenses and court costs, actually incurred by the Escrow Agent, pursuant to the terms of Section 8.

(d) Notice to any of the parties hereto shall be in writing and sent by personal delivery or certified mail, postage prepaid, to the appropriate party at the following addresses:

To the Escrow Agent:

Wells Fargo Trust Company, National Association, as Trustee
c/o Computershare Trust Company, N.A.
9062 Old Annapolis Rd.
Columbia, MD 21045
Email: cctleasenotices@computershare.com

With a copy to:
Wells Fargo Trust Company, National Association
c/o Wells Fargo Bank, National Association
Attn: Corporate Trust Lease Group
MAC: N9300-070
600 South 4th Street, 7th Floor
Minneapolis, MN 55415

To the Company:

NLC Energy Denmark LLC
c/o Net Lease Capital Advisors LLC
Ten Tara Boulevard, Suite 501
Nashua, New Hampshire 03062
Attention: Douglas Blough
Phone: 978-618-6434
Fax: 603-598-9900
Email: dblough@netleasecapital.com

With a Copy to:

Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Attention: Dean Loventhal, Esq.
Phone: 212-808-7653
Fax: 212-808-7897
Email: dloventhal@kelleydrye.com

To the Beneficiary:

Wells Fargo Trust Company, National Association, as Trustee
c/o Computershare Trust Company, N.A.
9062 Old Annapolis Rd.
Columbia, MD 21045
Email: cctleasenotices@computershare.com

With a copy to:

Wells Fargo Trust Company, National Association
c/o Wells Fargo Bank, National Association
Attn: Corporate Trust Lease Group
MAC: N9300-070
600 South 4th Street, 7th Floor
Minneapolis, MN 55415

or as to any party at such other address as such party may designate by notice duly given in accordance with this Section to the other parties. Notwithstanding the foregoing, any notices from Escrow Agent to the Company in connection with an Escrow Shortfall shall be sent by email or fax only.

(e) [Reserved].

(f) It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by the Beneficiary not in its individual or personal capacity but solely in its capacity as "Collateral Trustee" under the Collateral Trust Indenture dated as of September 28, 2017 (the *"Trust Indenture"*) on behalf of the Purchasers, in the exercise of the powers and authority conferred and vested in it as Collateral Trustee under the Trust Indenture, subject to any and all of the protections, indemnities and limitations from liability and/or responsibility afforded to the Collateral Trustee thereunder; (b) in no event shall Wells Fargo Trust Company, National Association, in its individual or personal capacity have any liability or responsibility for the representations, warranties, covenants, agreements or other obligations of the Purchasers hereunder or under any other Operative Agreement as to all of which recourse shall be had solely to the collateral, other than with respect to the duties of the Escrow Agent contained herein; (c) nothing contained herein shall be construed as creating any liability or responsibility on Wells Fargo Trust Company, National Association, individually or personally, to perform any expressed or implied covenant, duty or obligation of the Beneficiary of any kind whatsoever contained herein; and (d) under no circumstances shall Wells Fargo Trust Company, National Association, be personally or individually liable or responsible for the payment of any fees, costs, indebtedness or expenses of any kind (including attorneys' fees, costs, expenses and court costs) whatsoever or be personally or individually liable or responsible for the breach or failure of any obligation, representation, agreement, warranty or covenant whatsoever made or undertaken by the Collateral Trustee, it being understood that the foregoing shall not limit the obligations and liabilities of the Wells Fargo Trust Company, National Association in its capacity as Escrow Agent hereunder. Further, in addition to the rights, protections, privileges, benefits, immunities, indemnities, and

limitations of liability set forth in this Agreement, the Collateral Trustee shall also be entitled to the rights, protections, privileges, benefits, immunities, indemnities, and limitations of liability of the Collateral Trustee set forth in the Collateral Trust Indenture, all of which are incorporated herein by reference and shall apply mutatis mutandis to the Collateral Trustee under this Agreement.

(g) THE ESCROW AGENT, THE COMPANY AND THE BENEFICIARY HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OR OMISSIONS OF ESCROW AGENT RELATING TO THIS AGREEMENT.

(h) In acting pursuant to this Agreement, Wells Fargo Trust Company, National Association (*"Wells Fargo"*), in its capacity as Escrow Agent, shall have the benefit of any and all of the rights, protections, limitations on liability and responsibility, and indemnities as provided to it in its capacity as Collateral Trustee under the Collateral Trust Indenture.

(i) Each party hereto hereby acknowledges that Wells Fargo is acting in this transaction as Collateral Trustee under the Collateral Trust Indenture and as Escrow Agent hereunder. Each party agrees and acknowledges that such roles are separate and distinct legal roles and that Wells Fargo, acting in each capacity, may take any actions, or refrain from taking such actions, that it has the legal or contractual right to take or refrain from taking in such roles, including, but not limited to, in connection with the enforcement of any right and/or remedy available to it. Each party agrees that it will not (i) make or assert any claim whatsoever against Wells Fargo, (ii) allege any breach of any fiduciary duty, duty of care or other duty whatsoever against Wells Fargo, or (iii) assert in any action any defense to the extent that, in the case of (i), (ii) and (iii) above, any such claim, action or assertion is based solely on the fact that Wells Fargo is acting in such multiple roles or that there may be a conflict of interest inherent in acting in such roles.

(j) The Escrow Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions, loss or malfunctions of utilities or computer (hardware or software) or communications services; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with current accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

(k) *US Patriot Act.* The Company acknowledges that in accordance with the Customer Identification Program (CIP) requirements established under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations (collectively, USA PATRIOT Act), the Escrow Agent, in order to help fight the

funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Escrow Agent. The Company agrees that it shall provide the Escrow Agent with such information as the Escrow Agent may reasonably request from time to time in order to comply with any applicable requirements of the Patriot Act.

(l) *Electronic Signature.* This Agreement shall be valid, binding, and enforceable against a party only when executed and delivered by an authorized individual on behalf of the party by means of (i) any electronic signature permitted by the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, and/or any other relevant electronic signatures law, including relevant provisions of the Uniform Commercial Code (collectively, "Signature Law"); (ii) an original manual signature; or (iii) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute one and the same instrument. For avoidance of doubt, original manual signatures shall be used for execution or indorsement of writings when required under the Uniform Commercial Code or other Signature Law due to the character or intended character of the writings.

*[SIGNATURE PAGES TO FOLLOW]*

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed for and in their respective names by their duly authorized respective officials, on the day and year first hereinabove written.

BENEFICIARY:

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, as Collateral Trustee

By: Computershare Trust Company, National Association, as Agent

By ________________________________
Name: ____________________________
Title: _____________________________

ESCROW AGENT:

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, as Escrow Agent

By: Computershare Trust Company, National Association, as Agent

By ________________________________
Name: ____________________________
Title: _____________________________

COMPANY:

NLC ENERGY DENMARK LLC,
a Wisconsin limited liability company

By: ________________________________
Name:
Title:

**Addendum 4.5(G)**

**SCHEDULE I**

**PAYMENT INSTRUCTIONS FOR BENEFICIARY**

## Wire Transfer

| | |
|---|---|
| Bank Name: | Wells Fargo Bank, N.A. |
| Bank Address: | 420 Montgomery<br>San Francisco, CA 94104 |
| ABA: | 121000248 |
| International Swift: | WFBIUS6S |
| Account Name: | Computershare Trust Company NA |
| Account #: | 510922115 |
| Reference: | DS#54722 NLC Energy Denmark LLC |

## ACH Transfer (EFT)

| | |
|---|---|
| Bank Name: | Wells Fargo Bank, N.A. |
| Bank Address: | 299 S Main St, 5th FL, U1228-051<br>Salt Lake City, UT 84111 |
| ABA: | 124002971 |
| Account Name: | Computershare Trust Company NA |
| Account #: | 510922115 |
| Reference: | DS#54722 NLC Energy Denmark LLC |

## Check - by Mail

Computershare Trust Company NA
Corporate Trust Services
P.O. Box 858949
Minneapolis, MN 55485-8949

## Check – Overnight delivery

Wells Fargo Lockbox Services 858949
Computershare Trust Company NA (CTS)
1801 Parkview Drive, 1st Floor
Shoreview, MN 55126

Include Memo or Reference: DS#54722 NLC Energy Denmark LLC

## Addendum 4.5(G)

### SCHEDULE II

### PAYMENT INSTRUCTIONS FOR THE COMPANY

**Account Information**
Account Title: NLC ENERGY DENMARK LLC
Subtitle: OPERATIONS
Account #: 1411521576
Address: PO BOX 610 DENMARK WI 54208

**Bank Information**
Name: CITIZENS BANK, NA
Address: 1 CITIZENS DRIVE
RIVERSIDE RI, 02915
Wire Routing /ABA: 011500120
ACH-Check/ ABA: 211070175
SWIFT: CTZIUS33

**Addendum 4.5(G)**

**SCHEDULE III**

Monthly Servicing Fee: $1033.33

**Addendum 4.5(G)**

## SCHEDULE IV

I hereby certify that I am authorized to deliver this Schedule IV on behalf of ________________________________ (the *"Organization"*), and hereby further certify that the names, titles, telephone numbers, email addresses and specimen signatures set forth below identify the persons authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of the Organization, and that the option checked in Part C of this Schedule IV is the security procedure selected by the Organization for use in verifying that a funds transfer instruction received by the Escrow Agent is that of the Organization.

The Organization has reviewed each of these security procedures and has determined that the option checked in Part C of this Schedule IV best meets its requirements; given the size, type and frequency of the instructions it will issue to the Escrow Agent. By selecting the security procedure specified in Part C of this Schedule IV, the Organization acknowledges that it has elected to not use the other security procedures described below and agrees to be bound by any funds transfer instruction, whether or not authorized, issued in its name and accepted by the Escrow Agent in compliance with the particular security procedure chosen by the Organization.

NOTICE: The security procedure selected by the Organization will not be used to detect errors in the funds transfer instructions given by the Organization. If a funds transfer instruction describes the beneficiary of the payment inconsistently by name and account number, payment may be made on the basis of the account number even if it identifies a person different from the named beneficiary. If a funds transfer instruction describes a participating financial institution inconsistently by name and identification number, the identification number may be relied upon as the proper identification of the financial institution. Therefore, it is important that the Organization take such steps as it deems prudent to ensure that there are no such inconsistencies in the funds transfer instructions it sends to the Escrow Agent.

## Addendum 4.5(G)

### PART A

Name, Title, Telephone Number, Email Address and Specimen Signature for Person(s) Designated to give Funds Transfer Instructions and otherwise act on behalf of the Organization

| Name | Title | Telephone Number | Email Address | Specimen Signature |
|---|---|---|---|---|
| ______________ | ______________ | ______________ | ___________ | ______________ |
| ______________ | ______________ | ______________ | ___________ | ______________ |
| ______________ | ______________ | ______________ | ___________ | ______________ |

[list more if desired]

### PART B

Name, Title, Telephone Number and Email Address for
Person(s) Designated to Confirm Funds Transfer Instructions

| Name | Title | Telephone Number | Email Address |
|---|---|---|---|
| ________________ | _________________ | ______________ | __________ |
| ________________ | _________________ | ______________ | __________ |
| ________________ | _________________ | ______________ | __________ |

[list more if desired]

**Addendum 4.5(G)**

**PART C**

**Means for delivery of instructions and/or confirmations**

The security procedure to be used with respect to funds transfer instructions is checked below:

☐ *Option 1. Confirmation by telephone call-back*. The Escrow Agent shall confirm funds transfer instructions by telephone call back to a person at the telephone number designated on Part B above. The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts A and B of this Schedule IV.

☐ CHECK box, if applicable:

If the Escrow Agent is unable to obtain confirmation by telephone call-back, the Escrow Agent may, at its discretion, confirm by email, as described in Option 2.

☐ *Option 2. Confirmation by email*. The Escrow Agent shall confirm funds transfer instructions by email to a person at the email address specified for such person in Part B of this Schedule. The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts A and B of this Schedule IV. The Organization understands the risks associated with communicating sensitive matters, including time sensitive matters, by email. The Organization further acknowledges that instructions and data sent by email may be less confidential or secure than instructions or data transmitted by other methods. The Escrow Agent shall not be liable or responsible for any loss of the confidentiality of instructions and data prior to receipt by the Escrow Agent.

☐ CHECK box, if applicable:

If the Escrow Agent is unable to obtain confirmation by email, the Escrow Agent may, at its discretion, confirm by telephone call-back, as described in Option 1.

☐ *Option 3. Delivery of funds transfer instructions by password protected file transfer system only - no confirmation*. The Escrow Agent offers the option to deliver funds transfer instructions through a password protected file transfer system. If the Organization wishes to use the password protected file transfer system, further instructions will be provided by the Escrow Agent. There may be an additional charge to use the password protected file transfer system. If the Organization chooses this Option 3, it agrees that no further confirmation of funds transfer instructions will be performed by the Escrow Agent.

☐ *Option 4. Delivery of funds transfer instructions by password protected file transfer system with confirmation*. Same as Option 3 above, but the Escrow Agent shall confirm funds transfer instructions by ☐ telephone call-back or ☐ email (must check at least one, may check both) to a person at the telephone number or email address designated on Part B

above. By checking a box in the prior sentence, the party shall be deemed to have agreed to the terms of such confirmation option as more fully described in Option 1 and Option 2 above.

Dated this _____ day of ___________, _____.

By _______________________________________
Name:
Title:

**Addendum 4.5(H)**

---

NLC ENERGY DENMARK LLC,
the *"Company"*,

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, not in its individual capacity but solely in its representative capacity as Collateral Trustee
*"Collateral Trustee"*

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, not in its individual capacity but solely in its representative capacity as Escrow Agent
*"Escrow Agent"*

and

EACH OF THE HOLDERS PARTY HERETO
*"Holders"*

FOURTH OMNIBUS AMENDMENT

Dated ______

---

**Addendum 4.5(H)**

**FOURTH OMNIBUS AMENDMENT**

This Fourth Omnibus Amendment (this *"Amendment"*) is entered into as of ______ among NLC ENERGY DENMARK LLC, a Wisconsin limited liability company (the *"Company"*), WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION (formerly known as Wells Fargo Bank Northwest, N.A.), not in its individual capacity but solely in its representative capacity as Collateral Trustee under the Trust Indenture (as defined below), WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION (formerly known as Wells Fargo Bank Northwest, N.A.), not in its individual capacity but solely in its representative capacity as Escrow Agent and each of the Holders party hereto. Capitalized terms not otherwise defined herein shall have the respective meanings ascribed thereto in the Mortgage (as defined below).

**RECITALS**

WHEREAS, pursuant to that certain Amended and Restated Note Purchase Agreement dated as of ______ among the Purchasers listed on Schedule I attached thereto and Company (as may be amended from time to time, the "*Note Purchase Agreement*"), which amends and restates that certain Note Purchase Agreement dated as of September 28, 2017 (as amended or supplemented from time to time, the *"Original Note Purchase Agreement"*) and pursuant to which the Purchasers purchased the Company (i) 6.25% Amended and Restated Series A1 Senior Secured Notes in the aggregate original principal amount of $20,000,000.00 (the *"Series A1 Notes"*), which amend and restates the Company's $67,500,000 original aggregate principal amount and $76,550,505 aggregate fully-accreted principal amount 6.25% Series A1 Senior Secured Notes, dated September 28, 2017 (as amended or supplemented from time to time, collectively, the *"Original Series A1 Notes"*) and (ii) 6.25% Amended and Restated Series A2 Senior Secured Notes in the aggregate original principal amount of $55,086,791.99 (the *"Series A2 Notes"* and together with the Series A1 Note, collectively, the "*Notes*"), which amend and restates the Company's $10,500,000 original aggregate principal amount and $7,829,055 aggregate fully-accreted principal amount 7.75% Series A2 Senior Secured Notes, dated September 28, 2017 (as amended or supplemented from time to time, the *"Original Series A2 Notes"* and together with the Original Series A1 Notes, collectively, the *"Original Notes"*);

WHEREAS, the Company has entered into that certain Collateral Trust Indenture dated September 28, 2017 (the *"Trust Indenture"*) with the Collateral Trustee and each of the Purchasers listed on Schedule I attached to the Note Purchase Agreement whereby the Collateral Trustee holds certain collateral on behalf of the Holders of the Notes;

WHEREAS, the Notes are secured by, among other things, the Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement, dated as of ______ from the Company to the Collateral Trustee (as amended or supplemented from time to time, the *"Mortgage"*) which amends and restates that certain Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement, dated as of September 28, 2017 from the Company to the Collateral Trustee and recorded in the land records of Brown County, Green Bay, Wisconsin as document number 2803294 on October 12, 2017 (as amended or supplemented from time to time, the *"Original Mortgage"*);

**Addendum 4.5(H)**

WHEREAS, in addition to the Original Mortgage, the Company and the Collateral Trustee have entered into certain other agreements (defined in the Original Mortgage as the Operative Agreements) in connection with the sale by the Company of the Original Notes and in addition to the Mortgage, the Company and the Purchasers have entered into certain other agreements (defined in the Mortgage as the Operative Agreements (hereinafter the "*Operative Agreements*")) in connection with the sale of the Notes;

WHEREAS, to induce the Purchasers to purchase the Notes, Douglas F. Blough entered into that certain (i) Construction Completion Guaranty dated September 28, 2017 in favor of the Purchasers and the Collateral Trustee (the *"Construction Completion Guaranty"*), (ii) Hazardous Material Indemnity Agreement dated September 28, 2017 in favor of the Purchasers and the Collateral Trustee (the *"Hazardous Material Indemnity Agreement"*), and (iii) Indemnity and Guaranty Agreement dated September 28, 2017 in favor of the Purchasers and the Collateral Trustee (the *"Indemnity and Guaranty Agreement"*);

WHEREAS, pursuant to that certain (i) Omnibus Amendment dated as of February 15, 2019 (the *"First Amendment"*) among the Company, the Collateral Trustee and each of the holders party thereto, (ii) Second Omnibus Amendment dated as of June 9, 2021 (the *"Second Amendment"*) among the Company, the Collateral Trustee and each of the holders party thereto and (iii) Third Omnibus Amendment, dated as of August 15, 2025 (the *"Third Amendment"*) among the Company, the Collateral Trustee and each of the holders party thereto, the Company entered into certain amendments of the Operative Agreements, amended and restated the Original Notes and the Collateral Trustee waived certain Events of Default under the Operative Agreements;

WHEREAS, pursuant to separate reaffirmation agreements dated as of February 15, 2019, June 9, 2021, __________ and the date hereof Douglas F. Blough agreed to reaffirm his obligations under the Construction Completion Guaranty, the Hazardous Material Indemnity Agreement and the Indemnity and Guaranty Agreement and to consented to certain amendments of the Operative Agreements;

WHEREAS, the Company has agreed to reaffirm its obligations under the Operative Agreements, and to enter into certain amendments of the Operative Agreements, as set forth in this Amendment;

WHEREAS, pursuant to a separate reaffirmation agreement dated the date hereof, Douglas F. Blough has agreed to further reaffirm his obligations under the Construction Completion Guaranty, the Hazardous Material Indemnity Agreement and the Indemnity and Guaranty Agreement (such agreement defined as the *"Reaffirmation"*), and to consent to certain amendments of the Operative Agreements, as such are set forth in this Amendment;

WHEREAS, the Company filed a voluntary petition for relief on or about August 16, 2025 (the "*Chapter 11 Filing*") under chapter 11 of title 11 of the United States Code (the "*BK Code*") with the United States Bankruptcy Court in the Eastern District of Wisconsin (the "*WI Bankruptcy Court*") in accordance with the Prepackaged Plan of Reorganization of NLC Energy Denmark LLC filed in the WI Bankruptcy Court (the "*Plan*");

**Addendum 4.5(H)**

WHEREAS, in connection with the confirmed Plan, the Company and the Purchasers set forth therein agreed to enter into the Note Purchase Agreement providing for the issuance of the Notes by the Company;

WHEREAS, to induce the Purchasers to vote in accordance with the Plan, Douglas F. Blough, an individual (the "*Indemnitor*") entered into that certain Restructuring Side Letter Agreement (the "*Restructuring Letter Agreement*") as of August 15, 2025 with each of the Purchasers and the Collateral Trustee in which the Indemnitor agreed to fund certain amounts related to the Plant, Mortgaged Property, the Original Notes and the Notes as more fully set forth therein; and

WHEREAS, in connection with the execution and delivery of this Amendment, the following documents will be executed and delivered by the signatories thereto (i) the Mortgage, (ii) the Notes, (iii) the Note Purchase Agreement, (iv) the Third Amended and Restated Escrow and Servicing Agreement dated as of the date hereof (the *"A&R Escrow and Servicing Agreement"*), (v) the Amendment to Collateral Assignment and Security Agreement, American Foods dated as of the date hereof (the "*Amendment to American Foods Collateral Assignment*"), (vi) the Amended and Restated Assignment of Leases, Rents and Assigned Contracts dated as of the date hereof (the *"Assignment of Leases and Rents"*), (vii) the Restructuring Side Letter, and (viii) this Amendment and whereas the Company will cause Douglas F. Blough to deliver the Reaffirmation (collectively defined as the *"Fourth Amendment Documents"*).

NOW THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby covenant and agree as follows:

1. *Amendments to Operative Agreements*. The Operative Agreements, as applicable, are hereby amended as follows:

   a. replacing each reference to "NEW Organic Digestion LLC" as Company with "NLC Energy Denmark LLC" as Company;

   b. replacing each reference to "(i) $67,500,000 original aggregate principal amount and $76,550,505 aggregate fully-accreted principal amount of 6.25% Series A1 Senior Secured Notes (the "*Series A1 Notes*")" or "(i) $67,500,000 aggregate principal amount of 6.25% Series A1 Senior Secured Notes due on the Maturity Date" with "(i) $20,000,000 original aggregate principal amount of 6.25% Amended and Restated Series A1 Senior Secured Notes (the "*Series A1 Notes*")".

   c. replacing each reference to (ii) "$10,500,000 original aggregate principal amount and $7,829,055 aggregate fully-accreted principal amount of 7.75% Series A2 Senior Secured Notes (the "*Series A2 Notes*")" or "(ii) $10,500,000.00 aggregate principal amount of 7.75% Series A2 Senior Secured Notes due on the Maturity Date" with "$55,086,791.99 original aggregate

principal amount of 6.25% Amended and Restated Series A2 Senior Secured Notes (the "*Series A2 Notes*")".

d. deleting all references to "that certain Base Contract for Sale and Purchase of Natural Gas dated as of August 12, 2016 (the "Base Contract") between the Regents of the University of California, an instrumentality of the State of California ("UCal") and EEC Denmark Tenant LLC, a Delaware limited liability company ("EEC Denmark"), together with that certain Transaction Confirmation # 001 dated as of August 12, 2016 (the "Transaction Confirmation"), as amended by that certain Amendment 1 to Transaction Confirmation # 001 dated as of February 1, 2017 (the "Amendment 1 to Transaction Confirmation"), as assigned by EEC Denmark to the Company pursuant to that certain Assignment and Assumption of Agreement dated as of August 3, 2017 (the "Assignment"), as further amended by that certain Amendment 2 to Transaction Confirmation # 001 dated as of September 27, 2017, together with an attached NAESB Credit Support Addendum (the "Amendment 2 to Transaction Confirmation"), together with that certain Letter dated as of September 26, 2017 waiving the credit rating requirements for the Letter of Credit issuer (the "LOC Letter") (the Base Contract, the Special Provisions, the Transaction Confirmation, the Amendment 1 to Transaction Confirmation, the Assignment, the Amendment 2 to Transaction Confirmation, the LOC Letter, and any further amendment, supplement or modification from time to time in accordance with the terms thereof, collectively, the "UCal Contract")".

e. deleting all references to "EEC Market Group LLC ("EECMG"), an Affiliate of the Company, and United Parcel Service, Inc., an Ohio corporation ("UPS") party to that certain Master Exchange Agreement dated as of July 26, 2017, together with that certain Transaction Confirmation No. 1 dated as of July 26, 2017, as amended by that certain Amendment 1 to Transaction Confirmation No. 1 dated as of August 31, 2017 (the "UPS Agreement") and "Base Contract for Sale and Purchase of Natural Gas dated as of August 7, 2017, together with that certain Special Provisions to the Base Contract for Sale and Purchase of Natural Gas between EECMG and the Company dated as of August 7, 2017, together with that certain Transaction Confirmation # 001 between EECMG and the Company dated as of August 7, 2017".

f. (i) replacing each reference to the "Notes" with the "Notes, as amended by the Fourth Omnibus Amendment dated as of _______"; (ii) replacing each reference to the "Escrow and Servicing Agreement" with the "Third Amended and Restated Escrow and Servicing Agreement dated as of _______"; (iii) replacing each reference to the "Construction Escrow Agreement" with the "Construction Escrow Agreement, as amended by the Fourth Omnibus Amendment dated as of _______"; (iv) replacing each reference to the "Mortgage" with the "Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing

Statement dated as of _______"; (v) replacing each reference to the "Trust Indenture" with the "Trust Indenture, as amended by the Fourth Omnibus Amendment dated as of _______"; (vi) replacing each reference to the "ALR" with the "Amended and Restated Assignment of Leases, Rents and Assigned Contracts dated as of _______"; and (vii) replacing each reference to _______".

g. the definition of "Operative Agreements" shall be and is hereby amended to include each of the Fourth Amendment Documents and that certain Deposit Account Control Agreement with respect to a certain bank account with Citizens Bank, N.A., dated as of August 15, 2025 among the Collateral Trustee, the Company and Citizens Bank, N.A.

2. *Payment of Operating Expenses and Capital Improvements*. Notwithstanding anything contained to the contrary in any Operative Agreement or the Fourth Amendment Documents, the Company shall continue to promptly pay or cause to be paid all taxes, costs and expenses relating to the Mortgaged Property and the Project as they become due and payable, including any penalties, damages, expenses, and/or liabilities and shall not permit the creation of accounts payable or a lien on the Mortgaged Property or upon the revenues, rents, issues, income or profits of the Mortgaged Property.

3. *Construction Escrow and Security Agreement*. Schedule 4 attached to the Construction Escrow and Security Agreement is hereby deleted in its entirety and Annex I attached hereto is inserted in its place.

4. *Amendments to the Trust Indenture*. The Trust Indenture is hereby amended by deleting Schedule 3 attached thereto in its entirety and Annex I attached hereto are inserted in its place.

5. *[Reserved]*.

6. *Conditions to Effectiveness of this Amendment.* This Amendment shall be effective as of the date (the *"Fourth Amendment Effective Date"*) on which the Company and Douglas F. Blough, as the case may be, shall have delivered the following items in a form satisfactory to the Required Holders and the Holders' special counsel:

(a) a counterpart of this Amendment and each of the other Fourth Amendment Documents (each in form and substance satisfactory to the Holders) executed and delivered by the respective parties thereto;

(b) each of the representations and warranties of the Company set forth in the Note Purchase Agreement shall be correct as of the Fourth Amendment Effective Date in all material respects (except for any representation and warranty that relates by its terms to a specified prior date) and the Company, by executing this Amendment, hereby certifies that such representations and warranties are true and correct in all material respects as of the date of this Amendment;

(c) opinions from special counsel to the Company (which may be separate counsel) to the effect that this Amendment and the other Fourth Amendment Documents have been duly authorized, executed and delivered by the Company or Douglas F. Blough, as the case may be, and constitute the legal, valid and binding obligations of the Company or Douglas F. Blough, as the case may be, enforceable against the Company or Douglas F. Blough, as the case may be, in accordance with its terms, subject to customary and reasonable exceptions and assumptions under the circumstances; notwithstanding anything to the contrary contained herein;

(d) the Company has paid (i) the fees and disbursements of Chapman and Cutler LLP, special counsel to the Holders, relating to the transactions contemplated by this Amendment, as set forth in an invoice delivered to the Company by the date hereof, (ii) all fees and expenses, including any Monthly Servicing Fee (as defined in the A&R Escrow and Servicing Agreement), a fee to Collateral Trustee in the amount of $_______, and interest, penalties and past-due amounts due and owing to the Collateral Trustee or Escrow Agent (as defined in the A&R Escrow and Servicing Agreement) as of the date hereof, and (iii) any other fees or expenses related to the Project; and

(e) evidence from the applicable taxing authority that the full amount, including any interest, penalties or fees, of all taxes, assessments, levies, fees, and all other governmental charges, general and special, ordinary and extraordinary, levied upon or assessed against the Mortgaged Property has been paid in full.

7. *Additional Amendment Representations and Warranties*. The Company represents and warrants as of the Fourth Amendment Effective Date as follows:

(a) Authorization, Etc. This Amendment has been duly authorized by all necessary limited liability company action on the part of the Company, and this Amendment constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

(b) Compliance with Laws. The execution, delivery and performance by the Company of this Amendment will not (a) conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default under the Organizational Documents of the Company or any indenture or other agreement or instrument to which the Company is a party or by which it may be bound or result in the imposition of any liens or encumbrances on any property of the Company or (b) violate any provisions of any law or any order of any court or governmental authority or agency.

(c) Governmental Authorizations, Etc. No consent, approval or withholding of objection on the part of any regulatory body, state, federal or local, is required in connection with the execution, delivery or performance by the Company of this Amendment.

(d) Full Disclosure. None of the statements made in this Amendment nor any other written statements furnished by or on behalf of the Company to the Collateral Trustee in connection with the proposal and negotiation of this Amendment, taken as a whole,

contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein and herein not misleading.

8. *Powers and Rights Not Waived; Remedies Cumulative*. Except as otherwise specifically provided herein, no delay or failure on the part of the Collateral Trustee in the exercise of any power or right shall operate as a waiver thereof; nor shall any single or partial exercise of the same preclude any other or further exercise thereof, or the exercise of any other power or right, and the rights and remedies of the Collateral Trustee are cumulative to and are not exclusive of any rights or remedies any such holder would otherwise have, and no waiver or consent shall extend to or affect any obligation or right not expressly waived or consented to. No right or power of the Collateral Trustee shall be in any way construed as an obligation of the Collateral Trustee to so act. Except as expressly set forth herein to the contrary, nothing contained herein shall serve as a waiver or release of any expectation (including with respect to interest expected to be earned), claim or remedy that the Collateral Trustee may have under the Operative Agreements.

9. *Notices*. All notices and communications provided for hereunder shall be made in accordance with Section 6.3 of the Mortgage.

10. *Counterparts*. This Amendment may be executed in any number of counterparts, each counterpart constituting an original, but all together only one Amendment.

11. *Successors and Assigns; Survival of Representation*. This Amendment and all covenants herein contained shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereunder. All covenants, representations and warranties made by the Company herein and made by the Company in any certificates delivered pursuant hereto, whether or not in connection with the closing of this Amendment, shall survive the closing and the delivery of this Amendment.

12. *Severability*. Should any part of this Amendment for any reason be declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Amendment had been executed with the invalid portion thereof eliminated and it is hereby declared the intention of the parties hereto that they would have executed the remaining portion of this Amendment without including therein any such part, parts, or portion which may, for any reason, be hereafter declared invalid.

13. *Governing Law*. This Amendment shall be governed by and construed in accordance with the laws of the State of New York.

14. *Captions*. The descriptive headings of the various Sections or parts of this Amendment are for convenience only and shall not affect the meaning or construction of any of the provisions hereof.

15. *Full Effect*. Except as modified herein or in the Fourth Amendment Documents, the Operative Agreements and all of the terms and provisions thereof shall remain unmodified and in full force and effect, as originally written. Regardless of whether specifically amended by this Amendment or the Fourth Amendment Documents, all of the terms and provisions of the Operative

Agreements are hereby amended to the extent necessary to give effect to the purpose and intent of this Amendment.

16. *Integration*. In the event of any conflict between the provisions of this Amendment and those of any other Operative Agreements, the provisions of this Amendment shall control.

17. *Concerning the Collateral Trustee*. In connection with this Amendment, the undersigned Holders hereby irrevocably agree and consent to the adoption of such Amendment, the Fourth Amendment Documents and the changes to the Operative Agreements contemplated thereunder and irrevocably authorize, empower and instruct Collateral Trustee to consent to and execute this Amendment and the Fourth Amendment Documents. Each of the Holders acknowledge that the Collateral Trustee has not verified, and is not required to verify, the accuracy of any financial or other information or documents (including, but not limited to, business plans, budgets, production schedules, applications and permits) provided to the Holders and the Collateral Trustee in connection with the amendments contemplated by this Amendment and the Fourth Amendment Documents and each of the Holders has been furnished with such financial information concerning the Property and parties that it deems necessary to enable it to make informed decisions with respect to the amendments and the consent and direction to Collateral Trustee. It is expressly understood and agreed by the parties hereto that (a) this Amendment is executed and delivered by the Collateral Trustee not in its individual or personal capacity but solely in its capacity as Collateral Trustee under the Trust Indenture, in the exercise of the powers and authority conferred and vested in it as Collateral Trustee under the Trust Indenture, subject to any and all of the rights, protections, privileges, benefits, immunities, indemnities and limitations from liability afforded to the Collateral Trustee thereunder.

25. *Electronic Signature.* This Amendment shall be valid, binding, and enforceable against a party only when executed and delivered by an authorized individual on behalf of the party by means of (i) any electronic signature permitted by the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, and/or any other relevant electronic signatures law, including relevant provisions of the Uniform Commercial Code (collectively, "*Signature Law*"); (ii) an original manual signature; or (iii) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute one and the same instrument. For avoidance of doubt, original manual signatures shall be used for execution or indorsement of writings when required under the Uniform Commercial Code or other Signature Law due to the character or intended character of the writings.

[Remainder of page left intentionally blank]

**Addendum 4.5(H)**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed for and in their respective names by their duly authorized respective officials, on the day and year first hereinabove written.

NLC ENERGY DENMARK LLC,
a Wisconsin limited liability company

By: ____________________________________
Name:
Title:

[Signature Page to Fourth Omnibus Amendment]

**Addendum 4.5(H)**

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, as Collateral Trustee

By: Computershare Trust Company, National Association, as Agent

By: ___________________________________
Name:
Title:

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, as Escrow Agent

By: Computershare Trust Company, National Association, as Agent

By: ___________________________________
Name:
Title:

**Addendum 4.5(H)**

FEDERATED MUTUAL INSURANCE COMPANY

By ______________________________
Name: Donna Ennis
Title: Vice President & Portfolio Manager

FEDERATED LIFE INSURANCE COMPANY

By ______________________________
Name: Donna Ennis
Title: Vice President & Portfolio Manager

FEDERATED SERVICE INSURANCE COMPANY

By ______________________________
Name: Donna Ennis
Title: Vice President & Portfolio Manager

GRANITE RE, INC

By ______________________________
Name: Donna Ennis
Title: Vice President & Portfolio Manager

FIDELITY & GUARANTY LIFE INSURANCE COMPANY, pursuant to powers of attorney now and hereafter granted to Blackstone ISG-I Advisors L.L.C.

By: Blackstone ISG-I Advisors L.L.C.

By: Blackstone Liquid Credit Advisors II LLC, as Sub-Advisers

By ____________________________________
Name:
Title:

**Addendum 4.5(H)**

LIFE INSURANCE COMPANY OF THE SOUTHWEST

By ___________________________________
Name: Andrew Ebersole
Title: Head of Private Placements Sentinel Asset Management, Inc.

NATIONAL LIFE INSURANCE COMPANY

By ___________________________________
Name: Andrew Ebersole
Title: Head of Private Placements Sentinel Asset Management, Inc.

SAFETY NATIONAL CASUALTY CORPORATION

By: Sit Investment Associates, Inc., its
Registered Investment Advisor

By _____________________________________
Name:
Title:

**Addendum 4.5(H)**

CATHOLIC ORDER OF FORESTERS

By ____________________________________
Name:
Title:

**Addendum 4.5(H)**

FIRST FARMERS BANK & TRUST

By ____________________________________
Name:
Title:

[Signature Page to Fourth Omnibus Amendment]

**Addendum 4.5(H)**

**ANNEX I**

[See attached]

**Addendum 4.5(I)**

---

NLC ENERGY DENMARK LLC

$20,000,000 6.25% Amended and Restated Series A1 Senior Secured Notes
$55,086,791.99 6.25% Amended and Restated Series A2 Senior Secured Notes

______________

AMENDED AND RESTATED NOTE PURCHASE AGREEMENT

______________

Dated _______

---

**Addendum 4.5(I)**

**NLC ENERGY DENMARK LLC**
c/o Net Lease Capital Advisors, LLC
Ten Tara Boulevard, Suite 501
Nashua, New Hampshire 03062
Attention: Douglas F. Blough

**AMENDED AND RESTATED NOTE PURCHASE AGREEMENT**

Re: $20,000,000 6.25% Amended and Restated Series A1 Senior Secured Notes
$55,086,791.99 6.25% Amended and Restated Series A2 Senior Secured Notes
Due on the Maturity Date (as defined in the Notes)

Dated as of ________

To the Purchasers listed on
Schedule I attached hereto

This Amended and Restated Note Purchase Agreement (this "*Agreement*") is made as of this ___ day of ________, by and among NLC Energy Denmark LLC, a limited liability company organized under the laws of the State of Wisconsin (the *"Company"*) and each of the purchasers listed on Schedule I attached hereto (each a *"Purchaser"* and, collectively, the *"Purchasers"*) in which the parties hereto agree and acknowledge shall collectively amend and restate the Original Note Purchase Agreement (as hereinafter defined).

SECTION 1. DESCRIPTION OF NOTES AND COMMITMENT.

*Section 1.1. Nature of Financing*. The Company secures repayment of such borrowing with (i) the Company's interest in the Property described below and the Company's right, title and interest in and to any rental payments due and payable under any leases of all or any part of the Property (a or any *"lease"* or the *"Other Leases"*) between the Company, as landlord, and any such lessee, as tenant (the real estate which is owned by the Company (the *"Property"*) is more fully described in the Mortgage (hereinafter defined)); and (ii) direct assignments of the Company's right, title and interest in and to (a) that certain Services Agreement dated as of March 12, 2021 (as amended, the *"American Foods Contract"*) between the Company and American Foods Group, LLC (*"American Foods"*) (as amended, supplemented or modified from time to time in accordance with the terms hereof and thereof, collectively, the *"Assigned Contract"*).

*Section 1.2. Original Notes.* The Company and the Purchasers have executed and delivered the Note Purchase Agreement dated as of September 28, 2017 (the "*Original Closing Date*") (the "*Original Note Purchase Agreement*") providing for the commitment of the Purchasers to purchase (i) $67,500,000 original aggregate principal amount and $76,550,505 aggregate fully-accreted principal amount of 6.25% Series A1 Senior Secured Notes (the "*Original Series A1 Notes*") and (ii) $10,500,000 original aggregate principal amount and $7,829,055 aggregate fully-accreted principal amount of 7.75% Series A2 Senior Secured Notes (the "*Original Series A2 Notes*"; and collectively with the Original Series A1 Notes, the "*Original Notes*") of the Company.

*Section 1.3. Description of Notes*. In connection with the restructuring of the Original Notes and related amendments as described in the Mortgage (as defined below), the Company will authorize the issue and sale of its (i) 6.25% Amended and Restated Series A1 Senior Secured Notes in the original aggregate principal amount of $20,000,000 due on the Maturity Date (as defined in therein) (the *"Series A1 Notes"*) of the Mortgagor and (ii) 6.25% Amended and Restated Series A2 Senior Secured Notes in the original aggregate principal amount of $55,086,791.99 due on the Maturity Date (as defined therein) (the *"Series A2 Notes"* together with the Series A1 Notes, collectively, as amended, the *"Notes"*), which the parties hereto agree and acknowledge shall collectively amend and restate the Original Notes. The Series A1 Notes will be dated the date of issue, will bear interest from the date of issue until maturity at the respective rate per annum and with respect to the Series A1 Notes, (i) interest thereon shall be paid in installments for twenty four (24) months as provided in the schedules attached as Annex I to the Series A1 Notes and (ii) commencing on the twenty fifth (25th) month after the Closing Date, principal and interest thereon shall be paid in installments as provided in the schedules attached as Annex I to the Series A1 Notes until the Maturity Date (as defined therein). The Series A2 Notes will be dated the date of issue, will bear interest from the date of issue until maturity at the respective rate per annum and with respect to the Series A2 Notes, interest thereon shall be paid in kind (in lieu of payment in cash) and accrue to the principal balance as provided in the schedules attached as Annex I to the Series A2 Notes until the Maturity Date (as defined therein). The Series A1 Notes will be otherwise substantially in the forms attached hereto as Exhibit A-1. The Series A2 Notes will be otherwise substantially in the forms attached hereto as Exhibit A-2. Interest on the Notes will be computed on the basis of a 360-day year of twelve 30-day months.

*Section 1.4. Security for the Notes*. The Company has entered into that certain Amended and Restated Collateral Trust Indenture dated the date hereof (the *"Trust Indenture"*) with Wells Fargo Trust Company, National Association (formerly Wells Fargo Bank Northwest, N.A.), not in its individual capacity but solely in its representative capacity as collateral trustee (the *"Collateral Trustee"*) whereby the Collateral Trustee agrees, among other things, to hold certain collateral on behalf of the holders of the Notes. The Notes will be secured by (i) an Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement Mortgage dated as of the date hereof (the *"Mortgage"*) from the Company to the Collateral Trustee for the benefit of the Purchasers, creating a valid and perfected first mortgage lien on the Company's right, title and interest in the Property, together with the buildings, structures and improvements now or hereafter located thereon and the Company's right, title and interest in and to any lease and to the Collateral Assignments (defined below), (ii) an Amended and Restated Assignment of Leases and Rents, from the Company to the Collateral Trustee assigning the Company's right, title and interest in and to any lease and any Other Leases and rents, (iii) a Collateral Assignment and Security Agreement, American Foods dated the date hereof (the *"Collateral Assignment"*) from the Company, assigning all of its right, title and interest in the American Foods Contract to the Collateral Trustee, and (iv) that certain Construction Completion Guaranty Agreement dated as of September 28, 2017 (the *"Construction Completion Guaranty"*) from Douglas F. Blough, an individual (*"Construction Completion Guarantor"*) whereby the Construction Completion Guarantor guarantees certain obligations of the Company during the construction of the Project (as defined therein), as reaffirmed by the Reaffirmations (as defined in the Mortgage). This Agreement, the Notes, the Mortgage, the Assignment of Leases and Rents, the Collateral Assignment, the Construction Completion Guaranty Agreement, Indemnity and

Guaranty Agreement, and the Hazardous Materials Indemnity, the Collateral Trust Indenture, the Construction Escrow Agreement, the Account Control Agreement, and, as such are referred to in Section 3.1 or in the Mortgage, the Reaffirmations, the Second Amended and Restated Escrow and Servicing Agreement, the Omnibus Amendments and the Amended and Restated Collateral Assignment(s) of Contracts are herein collectively referred to as the *"Operative Agreements."*

*Section 1.5. Sale of Notes*. Subject to the terms and conditions herein contained and on the basis of the representations and warranties hereinafter set forth, the Company agrees to issue to the Purchasers and the Purchasers accept from the Company on the dates hereinafter specified, the Notes. The Notes will be delivered to the Purchasers thereof on _______ (the *"Closing Date"*). Notwithstanding anything contained in this Note Purchase Agreement or in any of the other Operative Agreements, neither the Purchasers nor any other person shall have any obligation to advance funds to the Company in connection with the delivery of the Notes to the Purchasers and all parties hereto acknowledge and agree that the Company has previously received all loan proceeds to be advanced in connection with the transactions contemplated by the Original Notes and the Operative Agreements. The Delivery of the Notes on the Closing Date will be made at the offices of Chapman and Cutler LLP, 320 South Canal Street, Chicago, Illinois 60606. The Notes will be delivered to the Purchasers on the Closing Date, registered in the Purchasers name or in the name of such nominee as specified on Schedule I attached hereto.

*Section 1.6. Proceeds of Sale of Notes.* Proceeds of the sale of the Notes were deposited with the Collateral Trustee and were remitted in accordance with the provisions of the Construction Escrow Agreement.

*Section 1.7. Definitions*. Capitalized terms not otherwise defined herein shall have the respective meanings ascribed thereto in the Mortgage.

SECTION 2. REPRESENTATIONS.

*Section 2.1. Representations of the Company*. The Company represents and warrants that all representations set forth in Exhibit B hereto are true and correct in all material respects as of the Closing Date and are hereby incorporated herein by reference with the same force and effect as though herein set forth in full.

*Section 2.2. Representations of the Purchasers*. Each Purchaser represents that it is purchasing the Notes for such Purchaser's own account, for the purpose of investment and not with a view to the distribution thereof, and that such Purchaser has no present intention of selling, negotiating, or otherwise disposing of the Notes it being understood that the disposition of such Purchaser's property shall at all times be and remain within such Purchaser's control.

SECTION 3. CLOSING CONDITIONS.

The Purchasers' obligation to purchase and pay for the Notes shall be subject to the following conditions precedent:

*Section 3.1. Execution and Recordation of Agreements.* (a) On or prior to the Closing Date the following documents, in a form and substance satisfactory to the Purchasers and their special counsel, shall have been duly executed, acknowledged and delivered by all parties thereto, and shall be in full force and effect:

(i) Mortgage;

(ii) Assignment of Leases and Rents;

(iii) Series A1 Notes;

(iv) Series A2 Notes;

(v) Second Amended and Restated Escrow and Servicing Agreement dated as of the date hereof, among the Company, the Collateral Trustee and Wells Fargo Trust Company, National Association, as Escrow Agent;

(vi) Reaffirmation of Indemnitor and Guarantor Obligations ("*Reaffirmation*") dated as of the date hereof by Douglas F. Blough in favor of the Purchasers;

(vii) Restructuring Side Letter Agreement (the "*Restructuring Letter Agreement*") dated as of the date hereof among Douglas F. Blough, each of the Purchasers and the Collateral Trustee; and

(viii) Third Omnibus Amendment dated as of the date hereof among the Company, each of the Purchasers, the Collateral Trustee and the Escrow Agent.

(b) On or prior to the Closing Date the foregoing documents described in clauses (i) and (ii), and all necessary financing statements and similar notices, if and to the extent permitted or required by applicable law, shall have been submitted for recording or filing for record in each public office wherein such recording or filing is deemed necessary or appropriate by the Purchasers or their special counsel to perfect the liens thereof as against creditors of or purchasers from the Company. Without limiting the foregoing, all taxes, fees and other charges in connection with the execution, delivery, recording and filing of the foregoing instruments shall have been paid by the Company or allowance therefor shall have been made by the Company.

*Section 3.2. Delivery of Closing Items.* On or prior to the Original Closing Date the Company shall have delivered (or the Purchasers shall have otherwise received) the following items in a form satisfactory to the Purchasers and their special counsel and on the Closing Date shall deliver updated or supplemental versions of such items as reasonably requested by the Purchasers in a form reasonably satisfactory to the Purchasers and their special counsel:

(a) Permits;

(b) ALTA survey;

(c) Title Policy (or firm commitment to issue the Title Policy) from a title company acceptable to the Purchasers;

(d) Phase I Environmental Assessment (no more than six months old);

(e) MAI Appraisal (no more than six months old);

(f) Legal opinion of Chapman and Cutler LLP, the Purchasers special counsel, substantially in the form of Exhibit C hereto;

(g) Legal opinion of Kelley Drye & Warren LLP, counsel for the Company, substantially in the form of Exhibit D hereto;

(h) Non-Consolidation Opinion of Kelley Drye & Warren LLP, substantially in the form of Exhibit E hereto;

(i) Legal opinion of von Briesen & Roper, s.c., local counsel for the Company, substantially in the form of Exhibit F hereto;

(j) Evidence of any other insurance required by Section 2.15 of the Mortgage;

(k) Such documents and evidence to establish the existence and good standing of the Company and the authorization of the transactions contemplated by the Operative Agreements and issuance of the Notes.

*Section 3.3. Payment of Special Counsel Fees and Expenses*. On or prior to the Closing Date, the Company shall have paid all reasonable fees and disbursements of the Purchasers' special counsel for which the Company is responsible, as reflected in the statement of such special counsel delivered prior to the date of required payment.

*Section 3.4. Waiver of Conditions*. If on the Closing Date the Company fails to tender the Notes or if the conditions specified in this Section 3 have not been fulfilled, the Purchasers may thereupon elect to be relieved of all further obligations under this Agreement. Without limiting the foregoing, if the conditions specified in this Section 3 have not been fulfilled, the Purchasers may waive compliance by the Company with any such condition to such extent as the Purchasers may in their sole discretion determine. Nothing in this Section 3.4 shall operate to relieve the Company of any of its respective obligations hereunder or to waive any of the Purchasers' rights against the Company.

SECTION 4. MISCELLANEOUS.

*Section 4.1. Transfer of Notes*. At any time and from time to time the holder of a Note may transfer or exchange the Note by delivery to the Collateral Trustee of such Note presented or surrendered for registration of transfer or exchange duly endorsed or accompanied by a written instrument of transfer in form satisfactory to the Collateral Trustee duly executed by the holder thereof or his attorney duly authorized in writing and specifying the name and address of the

transferee and any other documentation reasonably required by the Collateral Trustee with a corresponding notice delivered to Company which notice shall include a copy of the instrument of transfer. Upon written direction, the Collateral Trustee shall create and deliver, in the name of the designated transferee or transferees, one or more new Notes in authorized denominations and of a like aggregate principal amount. Company shall duly execute such new Notes presented for registration of transfer or exchange upon receipt of new Notes from Collateral Trustee and copy of the request for transfer from the holder of such Note. All transfers shall be noted on the Note Register (see Section 4.11 hereof). All Notes surrendered for registration of transfer and exchange shall be cancelled and subsequently destroyed by the Collateral Trustee.

The Collateral Trustee is not obligated to register or qualify the Notes under the Securities Act or any state securities law or to take any action not otherwise required under this Note Purchase Agreement to permit the transfer of any Note without registration or qualification, nor shall the Collateral Trustee bear any liability or responsibility for any actions hereunder.

*Section 4.2. Loss, Theft, Etc. of Note*. Upon receipt of evidence satisfactory to the Collateral Trustee and the Company of the loss, theft, mutilation or destruction of a Note, and in the case of any such loss, theft or destruction upon delivery of a security, bond or indemnity in such form and amount as shall be reasonably satisfactory to the Collateral Trustee and the Company , or in the event of such mutilation upon surrender and cancellation of the Note, the Collateral trustee will make and deliver a new Note, of like tenor, in lieu of such lost, stolen, destroyed or mutilated Note. The Collateral Trustee may require the payment of a sum sufficient to cover any stamp tax or governmental charge imposed upon such reissuance.

*Section 4.3. Powers and Rights Not Waived; Remedies Cumulative.* No delay or failure on the part of a holder of a Note in the exercise of any power or right shall operate as a waiver thereof; nor shall any single or partial exercise of the same preclude any other or further exercise thereof, or the exercise of any other power or right, and the rights and remedies of such holder of a Note are cumulative to and are not exclusive of any rights or remedies any such holder would otherwise have, and no waiver or consent shall extend to or affect any obligation or right not expressly waived or consented to.

*Section 4.4. Notices*. All communications provided for hereunder shall be in writing and mailed by registered or certified mail or by prepaid overnight air courier and if to a Purchaser, addressed to such Purchaser at the address set forth in Schedule I attached hereto, or if to the Company, addressed to the Company, at C/O NET LEASE CAPITAL ADVISORS, LLC, TEN TARA BOULEVARD, SUITE 501, Nashua, New Hampshire 03062, Attention: Douglas F. Blough or to such other address as a Purchaser or the Company shall designate by written notice to the other.

*Section 4.5. Reproduction of Documents*. The Operative Agreements and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by the Purchasers at the closing of the Purchasers' purchase of the Notes (except the Notes themselves), and (c) financial statements, certificates and other information previously or hereafter furnished to the Purchasers, may be reproduced by the Purchasers by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and the Purchasers may destroy any original document so reproduced. The

Company agrees and stipulates that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by the Purchasers in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

*Section 4.6. Counterparts*. This Agreement may be executed in any number of counterparts, each counterpart constituting an original but all together only one Agreement.

*Section 4.7. Successors and Assigns; Survival of Representations.* This Agreement and all covenants herein contained shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereunder. All covenants, representations and warranties made by the Company and the Purchasers herein and made by the Company in any certificates delivered pursuant hereto, whether or not in connection with the closing, shall survive the closing and the delivery of this Agreement and the Notes.

*Section 4.8. Severability.* Should any part of this Agreement for any reason be declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated and it is hereby declared the intention of the parties hereto that they would have executed the remaining portion of this Agreement without including therein any such part, parts, or portion which may, for any reason, be hereafter declared invalid.

*Section 4.9. Governing Law*. This Agreement and the Notes shall be governed by and construed in accordance with the laws of the State of New York.

*Section 4.10. Captions*. The descriptive headings of the various Sections or parts of this Agreement are for convenience only and shall not affect the meaning or construction of any of the provisions hereof.

*Section 4.11. Note Register*. The Collateral Trustee shall maintain and keep a record reflecting the ownership from time to time of the Notes (the *"Note Register"*). The Note Register shall be open for inspection by all Holders and the Company upon request made to Collateral Trustee. Upon transfer of any Note (or interest therein) the Collateral Trustee shall reflect the identity and address for notice purposes of such transferee(s). Persons identified on the Note Register shall be deemed and regarded by the Collateral Trustee, the Escrow Agent and the Company as the owner of the applicable Note(s) for all purposes hereunder and under the Operative Agreements, and payment(s) to such person shall be valid and effective to satisfy the obligation of the Company to the extent of, but in no event any more than, the sum or sums so paid.

*Section 4.12. Concerning the Collateral Trustee.* It is expressly understood and agreed by the parties hereto that, (a) this Note Purchase Agreement is executed and delivered by Wells Fargo Trust Company, National Association, as Collateral Trustee not in its individual or personal capacity but solely in its representative capacity as Collateral Trustee under the Collateral Trust Indenture, in the exercise of the powers and authority conferred and vested in it as Collateral

Trustee under the Collateral Trust Indenture subject to any and all of the protections, indemnities and limitations from liability afforded to the Collateral Trustee thereunder; (b) in no event shall Wells Fargo Trust Company, National Association, in its individual or personal capacity have any liability or responsibility for the representations, warranties, covenants, agreements or other obligations of the Purchasers hereunder; (c) nothing contained herein shall be construed as creating any liability or responsibility on Wells Fargo Trust Company, National Association, individually or personally, to perform any expressed or implied covenant, duty or obligation of any kind whatsoever contained herein; and (d) under no circumstances shall Wells Fargo Trust Company, National Association, be personally or individually liable or responsible for the payment of any fees, costs, indebtedness or expenses of any kind whatsoever (including attorneys' fees, costs, expenses and court costs) or, except as set forth in the Collateral Trust Indenture, be personally or individually liable or responsible for the breach or failure of any obligation, representation, agreement, warranty or covenant whatsoever made or undertaken by the Collateral Trustee or the Purchasers hereunder. Further, in addition to the rights, protections, privileges, benefits, immunities, indemnities, and limitations of liability set forth in this Note Purchase Agreement, the Collateral Trustee shall also be entitled to the rights, protections, privileges, benefits, immunities, indemnities, and limitations of liability of the Trustee set forth in the Collateral Trust Indenture, all of which are incorporated herein by reference and shall apply mutatis mutandis to the Collateral Trustee under this Note Purchase Agreement.

*Section 4.13. Jurisdiction and Venue.* Each of the Purchasers and the Company hereby irrevocably (i) submit to the exclusive jurisdiction of the courts of the State of New York and of the United States District Court for the Southern District of New York in any action or proceeding brought against it by you under this Agreement or under any document delivered hereunder, (ii) agree that valid service of summons or other legal process on it may be effected by serving a copy of the summons and other legal process in any such action or proceeding on the Company and on each of the Purchasers by mailing or delivering the same by hand to the Company or the Purchaser at the address indicated for notices in this Agreement, and (iii) waives any defense of inconvenient forum in respect of such courts. The service, as herein provided or in any other manner allowed by law, of such summons or other legal process in any such action or proceeding shall be deemed personal service and accepted by each Purchaser and Company as such, and shall be legal and binding upon each Purchaser and the Company for all the purposes of any such action or proceeding. Final judgment against any Purchaser or the Company in any such legal action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment. Each Purchaser and the Company shall advise Collateral Trustee promptly of any change of address of such Purchaser or the Company for the purpose of service of process. Notwithstanding anything herein to the contrary, Collateral Trustee may bring any legal action or proceeding in any other competent jurisdiction.

*Section 4.14. Waiver of Trial by Jury.* Company and each Purchaser hereby waives, to the fullest extent permitted by law, the right to trial by jury in any action, proceeding or counterclaim, whether in contract, tort or otherwise, relating directly or indirectly to the loan evidenced by the Notes, the application for the extension of credit evidenced by the Notes, the Mortgage or the other Operative Agreements.

*[Signature Pages Follow]*

**Addendum 4.5(I)**

The execution hereof by the Purchasers shall constitute a contract between the Purchasers and the Company for the uses and purposes hereinabove set forth, and this Amended and Restated Note Purchase Agreement may be executed in any number of counterparts, each executed counterpart constituting an original but all together only one agreement.

NLC ENERGY DENMARK LLC,
a Wisconsin limited liability company

By:____________________________________
Name:
Title:

**Addendum 4.5(I)**

The foregoing Agreement is hereby confirmed and accepted.

[VARIOUS]

By ______________________________
Name: ______________________________
Title: ______________________________

**Addendum 4.5(I)**

**SCHEDULE I**

**INFORMATION RELATING TO PURCHASERS**

| NAME AND ADDRESS OF PURCHASER | PRINCIPAL AMOUNT OF SERIES A1 NOTES TO BE PURCHASED | PRINCIPAL AMOUNT OF SERIES A2 NOTES TO BE PURCHASED |
|---|---|---|
| **FEDERATED MUTUAL INSURANCE COMPANY** | **$[_____]** | **$[_____]** |

**Payments**
All payments on or in respect of the Notes to be by bank wire transfer of immediately available funds (identifying each payment by Issuer and interest rate) to:

[__________]

**Notices**
All notices and communications, including with respect to payments shall be sent to:

[__________]

**Physical Delivery**

[__________]

**Taxpayer I.D. Number**:

[__________]

**Addendum 4.5(I)**

| Name and Address of Purchaser | Principal Amount of Series A1 Notes to be Purchased | Principal Amount of Series A2 Notes to be Purchased |
|---|---|---|
| **Federated Life Insurance Company** | **$[_____]** | **$[_____]** |

**Payments**
All payments on or in respect of the Notes to be by bank wire transfer of immediately available funds (identifying each payment by Issuer and interest rate) to:

[__________]

**Notices**
All notices and communications, including with respect to payments shall be sent to:

[__________]

**Physical Delivery**

[__________]

**Taxpayer I.D. Number**:

[__________]

**Addendum 4.5(I)**

| NAME AND ADDRESS OF PURCHASER | PRINCIPAL AMOUNT OF SERIES A1 NOTES TO BE PURCHASED | PRINCIPAL AMOUNT OF SERIES A2 NOTES TO BE PURCHASED |
|---|---|---|
| **FEDERATED SERVICE INSURANCE COMPANY** | **$[_____]** | **$[_____]** |

**Payments**
All payments on or in respect of the Notes to be by bank wire transfer of immediately available funds (identifying each payment by Issuer and interest rate) to:

[__________]

**Notices**
All notices and communications, including with respect to payments shall be sent to:

[__________]

**Physical Delivery**

[__________]

**Taxpayer I.D. Number**:

[__________]

**Addendum 4.5(I)**

| NAME AND ADDRESS OF PURCHASER | PRINCIPAL AMOUNT OF SERIES A1 NOTES TO BE PURCHASED | PRINCIPAL AMOUNT OF SERIES A2 NOTES TO BE PURCHASED |
|---|---|---|
| **GRANITE RE, INC.** | **$[_____]** | **$[_____]** |

**Payments**
All payments on or in respect of the Notes to be by bank wire transfer of immediately available funds (identifying each payment by Issuer and interest rate) to:

[__________]

**Notices**
All notices and communications, including with respect to payments shall be sent to:

[__________]

**Physical Delivery**

[__________]

**Taxpayer I.D. Number**:

[__________]

## Addendum 4.5(I)

| Name and Address of Purchaser | Principal Amount of Series A1 Notes to be Purchased | Principal Amount of Series A2 Notes to be Purchased |
|---|---|---|
| **Fidelity & Guaranty Life Insurance Company** | **$[_____]** | **$[_____]** |

**<u>Payments</u>**
All payments on or in respect of the Notes to be by bank wire transfer of immediately available funds (identifying each payment by Issuer and interest rate) to:

[__________]

**<u>Notices</u>**
All notices and communications, including with respect to payments shall be sent to:

[__________]

**<u>Physical Delivery</u>**

[__________]

**<u>Taxpayer I.D. Number</u>**:

[__________]

**Addendum 4.5(I)**

| NAME AND ADDRESS OF PURCHASER | PRINCIPAL AMOUNT OF SERIES A1 NOTES TO BE PURCHASED | PRINCIPAL AMOUNT OF SERIES A2 NOTES TO BE PURCHASED |
|---|---|---|
| **LIFE INSURANCE COMPANY OF THE SOUTHWEST**<br>One National Life Drive<br>Montpelier, VT 05604<br>Attention: Private Placements | **$[_____]** | **$[_____]** |

**Payments**
All payments on or in respect of the Notes to be by bank wire transfer of immediately available funds (identifying each payment by Issuer and interest rate) to:

[__________]

**Notices**
All notices and communications, including with respect to payments shall be sent to:

[__________]

**Physical Delivery**

[__________]

**Taxpayer I.D. Number**:

[__________]

**Addendum 4.5(I)**

| NAME AND ADDRESS OF PURCHASER | PRINCIPAL AMOUNT OF SERIES A1 NOTES TO BE PURCHASED | PRINCIPAL AMOUNT OF SERIES A2 NOTES TO BE PURCHASED |
|---|---|---|
| **NATIONAL LIFE INSURANCE COMPANY**<br>One National Life Drive<br>Montpelier, VT 05604<br>Attention: Private Placements | **$[_____]** | **$[_____]** |

**Payments**
All payments on or in respect of the Notes to be by bank wire transfer of immediately available funds (identifying each payment by Issuer and interest rate) to:

[__________]

**Notices**
All notices and communications, including with respect to payments shall be sent to:

[__________]

**Physical Delivery**

[__________]

**Taxpayer I.D. Number**:

[__________]

## Addendum 4.5(I)

| NAME AND ADDRESS OF PURCHASER | PRINCIPAL AMOUNT OF SERIES A1 NOTES TO BE PURCHASED | PRINCIPAL AMOUNT OF SERIES A2 NOTES TO BE PURCHASED |
|---|---|---|
| **SAFETY NATIONAL CASUALTY CORPORATION** | **$[_____]** | **$[_____]** |

**Payments**

All payments on or in respect of the Notes to be by bank wire transfer of immediately available funds (identifying each payment by Issuer and interest rate) to:

[__________]

**Notices**

All notices and communications, including with respect to payments shall be sent to:

[__________]

**Physical Delivery**

[__________]

**Taxpayer I.D. Number**:

[__________]

**Addendum 4.5(I)**

| NAME AND ADDRESS OF PURCHASER | PRINCIPAL AMOUNT OF SERIES A1 NOTES TO BE PURCHASED | PRINCIPAL AMOUNT OF SERIES A2 NOTES TO BE PURCHASED |
| --- | --- | --- |
| **CATHOLIC ORDER OF FORESTERS**<br>355 Shuman Boulevard<br>Naperville, Illinois 60563-8494<br>Attention: Investment Department | **$[_____]** | **$[_____]** |

**Payments**
All payments on or in respect of the Notes to be by bank wire transfer of immediately available funds (identifying each payment by Issuer and interest rate) to:

[__________]

**Notices**
All notices and communications, including with respect to payments shall be sent to:

[__________]

**Physical Delivery**

[__________]

**Taxpayer I.D. Number**:

[__________]

## Addendum 4.5(I)

| Name and Address of Purchaser | Principal Amount of Series A1 Notes to be Purchased | Principal Amount of Series A2 Notes to be Purchased |
| --- | --- | --- |
| **First Farmers Bank & Trust**<br>123 North Jefferson<br>P.O. Box 690<br>Converse, Indiana 46919<br>(765) 395-3316<br>Fax: (765) 395-3486 | **$[_____]** | **$[_____]** |

**Payments**
All payments on or in respect of the Notes to be by bank wire transfer of immediately available funds (identifying each payment by Issuer and interest rate) to:

[__________]

**Notices**
All notices and communications, including with respect to payments shall be sent to:

[__________]

**Physical Delivery**

[__________]

**Taxpayer I.D. Number**:

[__________]

**Addendum 4.5(I)**

**EXHIBIT A-1**

**NLC Energy Denmark LLC**

6.25% Amended and Restated Series A1 Senior Secured Note Due on the Maturity Date (defined herein)

No. RA1-[_____] [________]
$[___________] PPN 64758# AA4

NLC Energy Denmark LLC, a limited liability company organized under the laws of the State of Wisconsin (the *"Company"*), for value received, hereby promises to pay to or to the order of [_____________] or registered assigns, the original principal amount of $[___________________] together with interest from the date hereof until maturity at the rate of 6.25% per annum (computed on the basis of a 360-day year of 12 consecutive 30-day months) in installments as follows:

(i) installments of interest only, if any, each in the amount of as set forth on the schedule attached hereto as Annex I due and payable on the fifteenth (15th) day of each calendar month during the period beginning on [_______] until [______][1];

(ii) [________] installments, each consisting of principal and interest in the amount as set forth on the schedule attached hereto as Annex I due and payable on the fifteenth (15th) day of each month thereafter to but not including the Maturity Date; and

(iii) an amount equal to the outstanding principal and accrued interest due and payable on the Maturity Date.

As used herein, the term *"Maturity Date"* shall mean [_______].

The Company further promises to pay interest at the rate of 8.25% per annum (i) on each overdue installment of principal, premium, if any, and (to the extent legally enforceable) upon each overdue installment of interest in each case from and after the due date of each such installment, whether by acceleration or otherwise, until paid and (ii) during the continuance of an Event of Default, on the unpaid balance hereof and on any overdue payment of any Make-Whole Amount. Payments of principal, premium, if any, and interest shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for the payment of public and private debts by check mailed and addressed to the holder hereof at the address set forth on page 1 of the Note Purchase Agreement described below, or, at the option of the holder hereof, in such manner and at such other place in the United States of America as the holder hereof shall have designated to the Company in writing.

---

[1] The date that is 24 months later.

**Addendum 4.5(I)**

This Note is issued under and pursuant to the terms and provisions of the Amended and Restated Note Purchase Agreement dated as of [_______] (the *"Note Purchase Agreement"*) entered into by the Company and the purchasers listed on Schedule I attached thereto (the *"Purchasers"*) and secured by (i) an Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts, and Fixture Filing Statement (the *"Mortgage"*) from the Company to the Collateral Trustee for the benefit of the purchasers of the Note, (ii) an Amended and Restated Assignment of Leases and Rents from the Company to the Collateral Trustee assigning the Company's right, title and interest in and to any lease, any other leases and rents, (iii) a Collateral Assignment and Security Agreement, American Foods dated as of the date hereof (the *"Collateral Assignment"*) from the Company, assigning all of its right, title and interest in the American Foods Contract to the Collateral Trustee and (iv) that certain Construction Completion Guaranty dated as of September 28, 2017 (the *"Construction Completion Guaranty"*) from Douglas F. Blough, an individual (*"Construction Completion Guarantor"*) whereby the Construction Completion Guarantor guarantees certain obligations of the Company during construction of the Project, as reaffirmed by the Reaffirmations (as defined in the Mortgage). This Note and the holder hereof are entitled to all the benefits provided for by the Note Purchase Agreement, the Collateral Trust Indenture, the Mortgage, the Collateral Assignments, Assigned Contracts and the other Operative Agreements to which reference is hereby made for the statement thereof, including a description of the Mortgaged Property (as defined in the Mortgage), the nature and extent of the security and the rights of the holder of the Note and of the Company in respect thereof. Capitalized terms not otherwise defined herein shall have the respective meanings ascribed thereto in the Mortgage.

This Note and the other notes issued to the Purchasers on the date hereof under the Note Purchase Agreement hereby amend and restate those certain $67,500,000 original aggregate principal amount and $76,550,505 aggregate fully-accreted principal amount of 6.25% Series A1 Senior Secured Notes, dated as of September 28, 2017 (the "*Original Notes*") of the Company. This Note shall not constitute, nor be construed as, a novation of (a) any of the Original Notes or (b) the indebtedness or other obligations evidenced by the Original Notes.

**Addendum 4.5(I)**

This Note may be declared due prior to its expressed maturity date, voluntary prepayments may be made thereon by the Company and certain prepayments are required to be made thereon, all in the events, on the terms and in the manner and amounts as provided in the Mortgage.

NLC ENERGY DENMARK LLC,
a Wisconsin limited liability company

By:_________________________________
Name:
Title:

**Addendum 4.5(I)**

**ANNEX I**

**SCHEDULE**

**Addendum 4.5(I)**

**EXHIBIT A-2**

**NLC Energy Denmark LLC**

6.25% Amended and Restated Series A2 Senior Secured Note Due on the Maturity Date (defined herein)

No. RA2-[_____] [________]
$[___________] PPN 64758# AB2

NLC Energy Denmark LLC, a limited liability company organized under the laws of the State of Wisconsin (the *"Company"*), for value received, hereby promises to pay to or to the order of [_____________] or registered assigns, the original principal amount of $[___________________] together with interest from the date hereof until maturity at the rate of 6.25% per annum (computed on the basis of a 360-day year of 12 consecutive 30-day months) in installments as follows:

(i) installments of interest, each in the amount of as set forth on the schedule attached hereto as Annex I due and payable in kind (in lieu of payment in cash) and added to the outstanding principal balance on the fifteenth (15th) day of each calendar month to but not including the Maturity Date; *provided, however*, interest paid in cash under the Restructuring Side Letter (as defined in the Mortgage) to the holder hereof as set forth on the schedule attached hereto as Annex I shall reduce the amount to be paid in kind hereunder; and

(ii) an amount equal to the outstanding principal and accrued interest due and payable on the Maturity Date.

As used herein, the term *"Maturity Date"* shall mean [_______].

The Company further promises to pay interest at the rate of 8.25% per annum (i) on each overdue installment of principal, premium, if any, and (to the extent legally enforceable) upon each overdue installment of interest in each case from and after the due date of each such installment, whether by acceleration or otherwise, until paid and (ii) during the continuance of an Event of Default, on the unpaid balance hereof and on any overdue payment of any Make-Whole Amount. Payments of principal, premium, if any, and interest shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for the payment of public and private debts by check mailed and addressed to the holder hereof at the address set forth on page 1 of the Note Purchase Agreement described below, or, at the option of the holder hereof, in such manner and at such other place in the United States of America as the holder hereof shall have designated to the Company in writing.

This Note is issued under and pursuant to the terms and provisions of the Amended and Restated Note Purchase Agreement dated as of [_______] (the *"Note Purchase Agreement"*)

entered into by the Company and the purchasers listed on Schedule I attached thereto (the *"Purchasers"*) and secured by (i) an Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts, and Fixture Filing Statement (the *"Mortgage"*) from the Company to the Collateral Trustee for the benefit of the purchasers of the Note, (ii) an Amended and Restated Assignment of Leases and Rents from the Company to the Collateral Trustee assigning the Company's right, title and interest in and to any lease, any other leases and rents, (iii) a Collateral Assignment and Security Agreement, American Foods dated as of the date hereof (the *"Collateral Assignment"*) from the Company, assigning all of its right, title and interest in the American Foods Contract to the Collateral Trustee and (iv) that certain Construction Completion Guaranty dated as of September 28, 2017 (the *"Construction Completion Guaranty"*) from Douglas F. Blough, an individual (*"Construction Completion Guarantor"*) whereby the Construction Completion Guarantor guarantees certain obligations of the Company during construction of the Project, as reaffirmed by the Reaffirmations (as defined in the Mortgage). This Note and the holder hereof are entitled to all the benefits provided for by the Note Purchase Agreement, the Collateral Trust Indenture, the Mortgage, the Collateral Assignments, Assigned Contracts and the other Operative Agreements to which reference is hereby made for the statement thereof, including a description of the Mortgaged Property (as defined in the Mortgage), the nature and extent of the security and the rights of the holder of the Note and of the Company in respect thereof. Capitalized terms not otherwise defined herein shall have the respective meanings ascribed thereto in the Mortgage.

This Note and the other notes issued to the Purchasers on the date hereof under the Note Purchase Agreement hereby amend and restate those certain $10,500,000 original aggregate principal amount and $7,829,055 aggregate fully-accreted principal amount of 7.75% Series A2 Senior Secured Notes, dated as of September 28, 2017 (the "*Original Notes*") of the Company. This Note shall not constitute, nor be construed as, a novation of (a) any of the Original Notes or (b) the indebtedness or other obligations evidenced by the Original Notes.

**Addendum 4.5(I)**

This Note may be declared due prior to its expressed maturity date, voluntary prepayments may be made thereon by the Company and certain prepayments are required to be made thereon, all in the events, on the terms and in the manner and amounts as provided in the Mortgage.

NLC ENERGY DENMARK LLC,
a Wisconsin limited liability company

By:_________________________________
Name:
Title:

**Addendum 4.5(I)**

**ANNEX I**

**SCHEDULE**

## Addendum 4.5(I)

### REPRESENTATIONS AND WARRANTIES

The Company represents and warrants to the Purchasers as follows:

1. *Subsidiaries*. The Company has no Subsidiaries.

2. *Organization and Authority*. (a) The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Wisconsin. The Company has all requisite power and authority to enter into or perform its obligations under the Operative Agreements to which the Company is a party and the Notes, and to incur the indebtedness evidenced thereby.

(b) The Company is a single purpose entity organized solely for the purpose of (i) acquiring, developing, owning and operating the Property and a leasehold interest in adjacent land to the Property which contains a lagoon that is used in connection with operating the Property and (ii) constructing certain improvements on the Property, as set forth in the Operative Agreements.

(c) The Company has all requisite power and authority and has or will have all necessary licenses and permits to own and operate its properties and to carry on its business as now conducted and as presently proposed to be conducted.

(d) The Company is not transacting business in any jurisdiction other than Wisconsin.

3. *Indebtedness*. The Company has no indebtedness, guaranties, liabilities or other obligations other than as permitted in the Mortgage.

4. *Full Disclosure*. No written statement furnished to the Purchasers or the Collateral Trustee by the Company or by any person, agent or other entity authorized by the Company as financial advisor, agent controlled by the Company, broker, dealer or otherwise in connection with the offering or sale of the Notes, or the negotiation of the transactions contemplated by the Note Purchase Agreement, contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained therein or herein not materially misleading. There is no fact peculiar to the Company which the Company has not disclosed to the Purchasers in writing which materially adversely affects nor, so far as the Company can now foresee, will materially affect adversely the properties, business, prospects, profits or condition (financial or otherwise) of the Company or the ability of the Company to perform its obligations under the Operative Agreements to which it is a party or the Notes.

5. *Pending Litigation*. Other than the Chapter 11 Filing, there are no proceedings pending, or to the knowledge of the Company, threatened against or affecting the Company in any court or before any governmental authority or arbitration board or

tribunal. The Company is not in default with respect to any order of any court or governmental authority or arbitration board or tribunal.

6. *Title to Properties*. The Company has good and marketable title in fee simple (or its equivalent under applicable law) to all the Property and has good title to all the other property it purports to own (except as sold or otherwise disposed of in the ordinary course of business and except for minor survey exceptions, or minor encumbrances, easements or reservations of, or rights of others for, rights of way, utilities and other similar purposes, or zoning or other restrictions as to the use of real properties, which encumbrances, easements, reservations, rights and restrictions do not in the aggregate materially detract from the value of any of said properties or materially impair their use in the operation of the business of the Company). Without limiting the foregoing, the Company has good and marketable title in fee simple (or its equivalent under applicable law) to the Property subject to matters set forth in the commitment for the Title Policy.

7. *Sale is Legal and Authorized*. The sale of the Notes, and compliance by the Company with all of the provisions of the Operative Agreements to which it is a party and the Notes:

(a) are within the powers of the Company;

(b) will not violate any provisions of any law or any order of any court or governmental authority or agency and will not conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute a default under the Organizational Documents of the Company or any indenture or other agreement or instrument to which the Company is a party or by which it may be bound or result in the imposition of any liens or encumbrances on any property of the Company; and

(c) have been duly authorized by proper action on the part of the Company (no further action by the shareholders, owners, members or partners of the Company being required by law, the Organizational Documents of the Company or otherwise), and the Operative Agreements to which it is a party and the Notes, have been executed and delivered by the Company and constitute the legal, valid and binding obligations, contracts and agreements of the Company enforceable in accordance with their respective terms.

The term *"Organizational Documents"* of any entity shall mean (a) in the case of a corporation, the articles or certificate of incorporation and the by-laws of such corporation, (b) in the case of a limited liability company (as applicable), the articles of organization and the operating agreement of such limited liability company, (c) in the case of a limited partnership, the certificate of limited partnership and limited partnership agreement of such limited partnership and the Organizational Documents of the general partner of such limited partnership, (d) in the case of a trust, the certificate of formation (if applicable) and the trust agreement for such trust, and (e) any documents similar or equivalent to the foregoing under the laws of the State where such entity was organized or formed.

**Addendum 4.5(I)**

8. *No Defaults*. No Default or Event of Default as defined in the Mortgage has occurred and is continuing.

9. *Governmental Consent*. No approval, consent or withholding of objection on the part of any regulatory body, state, federal or local, is necessary in connection with the execution and delivery by the Company of the Operative Agreements or the Notes, or compliance by the Company with any of the provisions of the Operative Agreements or the Notes.

10. *Taxes*. All tax returns required to be filed by the Company in any jurisdiction have, in fact, been filed, and all taxes, assessments, fees and other governmental charges upon the Company or upon any of its properties, income or franchises which are shown to be due and payable in such returns have been paid. The Company does not know of any proposed additional tax assessment against it.

11. *Receipt of Proceeds.* On the Original Closing Date, the Company received from the Purchasers in escrow pursuant to the terms of the Construction Escrow Agreement, without any right or claim of rescission, abatement, offset, counterclaim or defense, Original Notes proceeds in the amount of $78,000,000. There is no requirement for any future advances by the Purchasers under the Operative Agreements.

12. *Use of Proceeds*. The proceeds from the sale of the Original Notes were used to finance the purchase and/or leasing, development, construction, furnishing and equipping of the Project. None of the transactions contemplated in the Note Purchase Agreement (including without limitation thereof, the use of proceeds from the issuance of the Notes) will violate or result in the violation of Section 7 of the Securities Exchange Act of 1934, as amended, or any regulation issued pursuant thereto, including, without limitation, Regulations U, T and X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II. The Company does not own or intend to carry or purchase any "margin security" within the meaning of said Regulation U. None of the proceeds from the sale of the Notes will be used to purchase any "security" within the meaning of the Securities Exchange Act of 1934, as amended.

13. *Investment Company Act Status*. The Company is not an "investment company," or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

14. *Compliance with Law*. The Company is not in violation of any law, ordinance, governmental rule or regulation to which it is subject nor, to the actual knowledge of the Company, is any Off-taker in violation of any such laws, ordinances, rules or regulations relating to the Project to which it is subject, including in each case without limitation, the Occupational Safety and Health Act of 1970, as amended, the Employee Retirement Income Security Act of 1974, as amended (together with any successor statute and all regulations thereunder, *"ERISA"*) and all Environmental Legal Requirements (defined below), the violation of which would materially and adversely affect the properties, business, or condition (financial or otherwise) of the Company. The

term *"Environmental Legal Requirement"* shall mean any applicable law, statute or ordinance relating to public health, or the environment, including, without limitation, relating to releases, discharges or emissions to air, water, land or groundwater, to the withdrawal or use of groundwater, to the use and handling of polychlorinated biphenyls or asbestos, to the disposal, transportation, treatment, storage or management of solid or hazardous wastes or to exposure to toxic or hazardous materials, to the handling, transportation, discharge or release of gaseous or liquid hazardous substances and any regulation, order, notice or demand issued pursuant to such law, statute or ordinance, in each case applicable to the property of the Company or the operation, construction or modification of any thereof, including without limitation the following: the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Toxic Substances Control Act, the Comprehensive Environmental Response Compensation and Liability Act as amended by the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act as amended by the Solid and Hazardous Waste amendments of 1984, the Occupational Safety and Health Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Solid Waste Disposal Act, and any state statutes addressing similar matters, and any state statute providing for financial responsibility for cleanup or other actions with respect to the release or threatened release of hazardous substances and any state nuisance statute related to the environment.

15. *ERISA*. The Company has no *"employee pension benefit plans"* as such term is defined in Section 3 of ERISA. The Company is not entering into the Operative Agreements to which it is a party or any other transaction contemplated hereby or thereby, directly or indirectly, in connection with any arrangement in any way involving any employee benefit plan or related trust with respect to which it in its individual capacity or any of the other parties hereto or any of their affiliates, is a party-in-interest, all within the meaning of ERISA and the Internal Revenue Code of 1986, as amended.

16. *Intentionally Omitted.*

17. *Private Offering*. Neither the Company, directly or indirectly, nor any agent on its behalf has offered or will offer the Notes, or any Security (as defined in Section 2(1) of the Securities Act of 1933, as amended) to, or has solicited or will solicit an offer to acquire the Notes, or any similar Security from, or has otherwise approached or will approach or negotiate in respect of the Notes, or any similar Security with, any person or entity other than the Purchasers and certain other institutional investors, each of whom was offered the Notes, at private sale for investment and the Company represents and warrants that neither the Company, directly or indirectly, nor any agent on its behalf has offered or will offer the Notes, or any similar Security to, or has solicited or will solicit an offer to acquire the Notes, or any similar Security from, any person or entity so as to bring the issuance and sale of the Notes, within the provisions of Section 5 of the Securities Act of 1933, as amended.

18. *The Property*. The Property has not suffered damage or destruction which renders it unusable for the use intended by the Company and, upon completion of construction, under applicable zoning, use, environmental protection and other laws,

ordinances, rules and regulations, the Project may be used in the ordinary course of the Company's business. Without limiting the foregoing, no portion of the real property constituting a portion of the Property is located in an "area of special flood hazard," as that term is defined in the regulations of the Federal Insurance Administration, Department of Housing and Urban Development, under the National Flood Insurance Act of 1968, as amended (24 CFR §1909.1).

19. *[Reserved]*.

20. *Property Taxed as Two Separate Tax Lots*. The Property is taxed as two (2) separate and distinct tax lots. No part of the Property shares a tax lot with any adjoining lands and for all purposes the Property may be mortgaged, conveyed and otherwise dealt with as two (2) independent parcels.

21. *Trading with the Enemy Act*. Neither the issuance and sale of the Notes, nor the use of the proceeds thereof will violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or the Anti-Terrorism Order or any enabling legislation or executive order relating to any of the same. Without limiting the generality of the foregoing, neither the Company nor any of its Affiliates (a) is or will become a blocked person described in Section 1 of the Anti-Terrorism Order or (b) engages or will engage in any dealings or transactions or be otherwise associated with any such blocked person. For purposes hereof, "Anti-Terrorism Order" means Executive Order No. 13,224, 66 Fed. Reg. 49,079 (2001), issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons who Commit, threaten to Commit or Support Terrorism).

22. *Management Agreement*. There is no Management Agreement in effect with respect to the Property.

23. *Construction Permits and Approvals*. The Company has obtained or will obtain all available permits and approvals that are required for the construction of the Project (given the state of construction) under any and all applicable laws, ordinances, rules, regulations, covenants and restrictions. Such permits and approvals have been or will be duly and validly issued by the governmental authorities or persons having jurisdiction or rights with respect thereto, are in full force and effect and are not subject to appeal, any applicable period for appealing such actions having expired. Upon completion of construction, the Company shall promptly obtain or cause to be obtained all permits and approvals that are required for the use and occupancy of the Project under any and all applicable laws, ordinances, rules, regulations, covenants and restrictions, all of which shall have been duly and validly issued by the governmental authorities or persons having jurisdiction or rights with respect thereto, and which permits and approvals shall be in full force and effect. If any such permits and approvals shall be subject to appeal and if an appeal shall be filed, the Company shall undertake, on a commercially reasonable basis, to cause such appeal to be dismissed. Upon completion of the construction, the Project will comply in all material respects with all requirements of all laws, ordinances, rules,

regulations, covenants and restrictions affecting the construction, occupancy, intended use(s) and operation thereof as set forth in any lease.

24. *Zoning*. The zoning classifications applicable to the Property permit or will permit the occupancy, use and operation of the Property as a biomass digester/biogas production and sanitary sewer pretreatment plant. Upon completion, the Property and the occupancy, use and operation thereof are in compliance in all respects with all applicable requirements of state, county and municipal law and all licenses, permits and approvals required for the occupancy, use and operation of the Property as a biomass digester/biogas production and sanitary sewer pretreatment plant have been obtained and are in full force and effect.

25. *[Reserved]*.

26. *[Reserved]*.

27. *American Foods Contract*. The American Foods Contract is in full force and effect and has not been modified or amended. The Company is not in default under the American Foods Contract and, to the Company's knowledge, no other default has occurred and is continuing under the American Foods Contract and no other event has occurred which with the lapse of time or notice, or both, would constitute a default under the American Foods Contract.

28. *[Reserved]*.

29. *Security Interest; Liens; Collateral*.

(a) The Mortgage, the Assignment of Leases and Rents, and the Collateral Assignment (collectively, the *"Security Documents"*) are effective to grant to the Collateral Trustee (for the benefit of the Purchasers), a legal, valid and enforceable perfected first priority Lien on the Mortgaged Property and on the assignment of the Assigned Contracts.

(b) The security interests granted to the Collateral Trustee (for the benefit of the Purchasers) pursuant to the Security Documents consisting of personal property subject to the Uniform Commercial Code have been perfected (i) with respect to any property that can be perfected by filing under the Uniform Commercial Code and (ii) with respect to any property (if any) that can be perfected solely by possession, upon the Collateral Trustee receiving possession thereof, and in each case such security interest will be, as to the Security Documents, perfected under the Uniform Commercial Code, superior and prior to the rights of all third Persons, and in each case subject only to Permitted Encumbrances (as defined in the Mortgage).

(c) No filing, recording, re-filing or rerecording is necessary to perfect and maintain (other than UCC continuation statements) the perfection and priority

of the security interests granted to the Collateral Trustee (for the benefit of the Purchasers) pursuant to the Security Documents. No filing or recording other than the recording of the Mortgage, and the Assignment of Leases and Rents, in the office of the Clerk of Brown County of the State of Wisconsin is necessary to create Liens on the real property interests granted to the Collateral Trustee (for the benefit of the Purchasers) pursuant to Security Documents. The Collateral Trustee has for its own benefit and the benefit of the Purchasers a valid and perfected first priority Lien on the Mortgaged Property and on the assignment of the Assigned Contracts, subject only to Permitted Encumbrances. As of the date hereof, all such filings and recordings have been made (or reasonably satisfactory arrangements shall have been made for such filing or recording at Closing).

## Addendum 4.5(I)

### DESCRIPTION OF SPECIAL COUNSEL'S CLOSING OPINION

The closing opinion of Chapman and Cutler LLP, special counsel to the Purchaser, which is called for by Section 3.2(g) of the Note Purchase Agreement, shall be dated the Closing Date and addressed to the Purchasers, shall be satisfactory in form and substance to the Purchasers and shall be to the effect that:

1. The issuance, sale and delivery of the Notes, under the circumstances contemplated by the Note Purchase Agreement does not under existing law require the registration of the Notes, under the Securities Act of 1933, as amended, or the qualification of an indenture under the Trust Indenture Act of 1939, as amended.

In rendering the opinions set forth in paragraph 1, Chapman and Cutler LLP may rely solely upon an examination of the Company's Organizational Documents and good standing certificate. With respect to matters of fact upon which such opinion is based, Chapman and Cutler LLP may rely on the representations contained in the Note Purchase Agreement or exhibits thereto and on appropriate certificates of public officials and officers of the Company.

## Addendum 4.5(I)

### DESCRIPTION OF CLOSING OPINION OF COUNSEL FOR THE COMPANY

The closing opinion of Kelley Drye & Warren LLP, counsel for the Company which is called for by Section 3.2(l) of the Note Purchase Agreement, shall be dated the Closing Date and addressed to the Purchasers shall be satisfactory in form and substance to the Purchasers.

[Form to be Attached]

**Addendum 4.5(I)**

**NON-CONSOLIDATION OPINION OF KELLEY DRYE & WARREN LLP**

## Addendum 4.5(I)

### LEGAL OPINION OF WISCONSIN LOCAL COUNSEL

**Addendum 4.5(J)**

**RESTRUCTURING SIDE LETTER AGREEMENT**

This RESTRUCTURING SIDE LETTER AGREEMENT (this *"Letter Agreement"*) is entered into as of August 15, 2025 by and among Douglas F. Blough, an individual (*"Indemnitor"*), each of the purchasers party hereto (each a "*Purchaser*" and collectively, the "*Purchasers*"), and Wells Fargo Trust Company, National Association (formerly Wells Fargo Bank Northwest, N.A.), not in its individual capacity but solely in its representative capacity as Collateral Trustee on behalf of the Purchasers (the "*Collateral Trustee*"). Capitalized terms not otherwise defined herein shall have the respective meanings ascribed thereto in the Mortgage (as defined below) or the Plan (as defined below) as the context requires.

**RECITALS**

WHEREAS, NLC Energy Denmark LLC, formerly known as NEW Organic Digestion LLC, a limited liability company organized under the laws of the State of Wisconsin (the *"Company"*) is the record fee owner of the real estate described in **Exhibit A** attached hereto and made a part hereof and has a fee interest in certain improvements constructed thereon (the "*Premises*");

WHEREAS, pursuant to that certain Note Purchase Agreement dated as of September 28, 2017 (as amended by the First Amendment and the Second Amendment (each as defined below) and as further amended or supplemented from time to time, the *"Note Purchase Agreement"*) among the Company and each of the Purchasers listed on Schedule I attached thereto, the Company issued its 6.25% Series A1 Senior Secured Notes in the original principal amount of $67,500,000 and 7.75% Series A2 Senior Secured Notes in the original principal amount of $10,500,000 (as amended by the First Amendment (as defined further below) and the Second Amendment (as defined further below) and as further amended or supplemented from time to time, collectively, the *"Notes"*);

WHEREAS, the Company has entered into that certain Collateral Trust Indenture dated September 28, 2017 with the Collateral Trustee and each of the Purchasers listed on Schedule I attached to the Note Purchase Agreement whereby the Collateral Trustee holds certain collateral on behalf of the Purchasers of the Notes;

WHEREAS, the Notes are secured by, among other things, the Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement, dated as of September 28, 2017 from the Company to the Collateral Trustee and recorded in the land records of Brown County, Green Bay, Wisconsin (the *"Land Records"*) as document number 2803294 (as amended by the First Amendment to Mortgage, the Second Amendment to Mortgage and the Third Amendment to Mortgage (each as defined below) and as further amended or supplemented from time to time, the *"Mortgage"*);

**Addendum 4.5(J)**

WHEREAS, in addition to the Mortgage, the Company and the Collateral Trustee have entered into certain other agreements (defined in the Mortgage as the Operative Agreements) in connection with the sale by the Company of the Notes;

WHEREAS, Indemnitor entered into that certain (i) Construction Completion Guaranty dated September 28, 2017 in favor of the Purchasers and the Collateral Trustee (the *"Construction Completion Guaranty"*), (ii) Hazardous Material Indemnity Agreement dated September 28, 2017 in favor of the Purchasers and the Collateral Trustee (the *"Hazardous Material Indemnity Agreement"*), and (iii) Indemnity and Guaranty Agreement dated September 28, 2017 in favor of the Purchasers and the Collateral Trustee (the *"Indemnity and Guaranty Agreement"* and, together with the Construction Completion Guaranty and the Hazardous Material Indemnity Agreement, collectively, the *"Guaranties"*);

WHEREAS, pursuant to that certain (i) Omnibus Amendment dated as of February 15, 2019 (the *"First Amendment"*) among the Company, the Collateral Trustee and each of the purchasers party thereto, (ii) Second Omnibus Amendment dated as of June 9, 2021 (the *"Second Amendment"*) among the Company, the Collateral Trustee and each of the purchasers party thereto, (iii) First Amendment to Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement dated February 15, 2019 and recorded in the Land Records as document number 2851278 (the *"First Amendment to Mortgage"*), (iv) Second Amendment to Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement dated June 9, 2021 and recorded in the Land Records as document number 2964644 (the *"Second Amendment to Mortgage"*) and (v) Third Amendment to Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement dated March 24, 2023 and recorded in the Land Records as document number 3031542 (the *"Third Amendment to Mortgage"*), the Company entered into certain amendments of the Operative Agreements and the Collateral Trustee waived certain Events of Default under the Operative Agreements;

WHEREAS, pursuant to separate reaffirmation agreements dated as of February 15, 2019 and June 9, 2021, Indemnitor agreed to reaffirm his obligations under the Construction Completion Guaranty, the Hazardous Material Indemnity Agreement and the Indemnity and Guaranty Agreement and consented to certain amendments of the Operative Agreements, as such are set forth in the First Amendment and the Second Amendment, respectively; and

WHEREAS, the Company intends to file a voluntary petition for relief on or about August 16, 2025 (the *"Chapter 11 Filing"*) under chapter 11 of title 11 of the United States Code (the *"BK Code"*) with the United States Bankruptcy Court in the Eastern District of Wisconsin (the *"WI Bankruptcy Court"*) in accordance with the Prepackaged Plan of Reorganization of NLC Energy Denmark LLC to be filed in the WI Bankruptcy Court (the "*Plan*").

**Addendum 4.5(J)**

NOW THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby covenant and agree as follows:

1. Pursuant to Section 1(a) of the Indemnity and Guaranty Agreement, the full amount of the Indebtedness Hereby Secured (as defined in the Mortgage) is fully recourse to the Indemnitor upon the occurrence of a voluntary bankruptcy, insolvency or similar debt relief proceeding initiated by the Company or the Indemnitor. Notwithstanding the foregoing, the Purchasers hereby agree not to exercise their rights and remedies under the Guaranties and, in their capacity as the Required Holders (as defined in the Collateral Trust Agreement), further direct the Collateral Trustee not to exercise rights and remedies under the Guaranties, *provided however*, that the forbearance and agreement in Section 1 of this Letter Agreement to refrain from exercising such remedies is expressly conditioned upon the satisfaction of the following conditions of this Letter Agreement (and such forbearance and agreement contained in this Section 1 of the Letter Agreement shall be void, and the Purchasers shall be permitted to exercise their rights and remedies under the Guaranties and/or to direct the Collateral Trustee to exercise any and all rights and remedies under the Guaranties, if the Indemnitor fails to satisfy any of the following conditions in the reasonable judgment of the Holders):

    a. Subject to application of funds in the Trustee Escrow Accounts (as such term is hereinafter defined) in accordance with Section 1(b) hereof, Indemnitor has funded and shall continue to fund (with funds unrelated to and not derived from the Company or the Premises) (i) any and all operating and maintenance costs of the Company, the Premises and the Project, including, but not limited to, taxes, utilities, and insurance, through the Sale (as defined herein) of the Premises ("*Operating Expenses*"), (ii) all costs and expenses (including the costs and expenses of the Purchasers and Collateral Trustee and any reasonable counsel fees, costs and agent's compensation) incurred pursuant to the Chapter 11 Filing, any related bankruptcy, insolvency or receivership proceeding, and the marketing and sale process of the Premises subsequent to the Chapter 11 Filing, (iii) all payments due on and after the Petition Date (as defined in the Plan) through the Confirmation Date (as defined in the Plan), including but not limited to the costs and fees of the Collateral Trustee and the Purchasers and (A) in accordance with **Schedule 1-A** attached hereto, interest only payments at the rate of 6.25% per annum on the outstanding principal balance (as of August 15, 2025) of the 6.25% Series A1 Senior Secured Notes of the Company issued on September 28, 2017 (collectively, the "*Original A1 Notes*") and (B) in accordance with **Schedule 1-B** attached hereto, interest only payments at the rate of 6.25% per annum on the outstanding principal balance (as of August 15, 2025) of the 7.75% Series A2 Senior Secured Notes of the Company issued on September 28, 2017 (collectively, the "*Original A2 Notes*" and together with the Original A1 Notes, the "*Original Notes*"), (iv) upon issuance of the Amended and Restated Series A1 Senior Secured Notes ("*A&R A1 Notes*") by the Company pursuant to the Plan on the Confirmation Date (as defined in the Plan), all payments in accordance with **Schedule 2-A** attached hereto which are

due and payable under the A&R A1 Notes (each an "*A&R A1 Notes Payment*"), and (v) upon issuance of the Amended and Restated Series A2 Senior Secured Notes ("*A&R A2 Notes*") by the Company pursuant to the Plan on the Confirmation Date, all payments in accordance with **Schedule 2-B** attached hereto, which shall be calculated at the rate of 6.25% per annum on the principal amount of $55,086,791.99 (such principal amount calculated by taking the outstanding balance of the Original Notes (as of August 15, 2025) of $75,845,244.43, minus the original principal balance of the A&R A1 Notes of $20,000,000, minus the Senior Secured Lenders' Unsecured Claim under the Plan of $758,452.44), and such accrued interest to be paid in accordance with **Schedule 2-B** attached hereto (which reflects (A) 75% of such accrued interest shall be paid in cash and (B) the remainder of such accrued interest shall accrue to the principal balance (in lieu of payment in cash) of the A&R A2 Notes) (all payments and amounts set forth in this Section 1(a) are hereby collectively referred to as the "*Funded Amounts*").

b. Indemnitor hereby acknowledges and agrees that (i) none of the funds currently held in, or which may be deposited after the date hereof into, the Escrow Account or any related sub-account held by the Escrow Agent under the Escrow and Servicing Agreement or Construction Escrow Agreement shall be requested or utilized to operate the Company or pay costs or expenses in accordance with the Chapter 11 Filing or any related bankruptcy, insolvency or receivership proceeding, other than the Funded Amounts in accordance with the Motion of the Debtor to Approve Stipulated Order with Senior Secured Lender (i) to Modify the Automatic Stay to Fund Escrow Reserves and Make Adequate Protection Payments to Senior Secured Lenders, (ii) to Permit the Debtor's Use of Cash Collateral, and (iii) to Provide Adequate Protection to Senior Secured Lenders (the "*Cash Collateral Motion*" to the extent such motion is granted and the proposed order is issued by the WI Bankruptcy Court, the "*Cash Collateral Order*") and the Amended Escrow Agreement (as defined in such Cash Collateral Motion) and (ii) Indemnitor shall cause the Company to file the Cash Collateral Motion with the WI Bankruptcy Court seeking approval to distribute the funds currently held in, or which may be deposited after the date hereof into, the Escrow Account or any related sub-account held by the Escrow Agent under the Amended Escrow Agreement (as defined in such Cash Collateral Motion) (collectively, the "*Trustee Escrow Accounts*") and the Debtor's Operating Account (as defined in such Cash Collateral Motion) and such funds shall be held and disbursed in accordance with the terms of such Cash Collateral Order entered by the WI Bankruptcy Court.

c. Neither the Company nor the Indemnitor shall enter into any agreement with The Regents of the University of California, an instrumentality of the State of California or any entity affiliated with or related thereto, to settle claims outside of the Plan without the prior written consent of the Purchasers.

d. Neither the Company nor the Indemnitor files a motion, pleading, stipulation or similar document with the WI Bankruptcy Court seeking to extend the

automatic stay contained in Section 362 of the Bankruptcy Code to the Indemnitor.

2. Subject to the conditional forbearance provisions set forth in Section 1 and the conditions to final waiver, release and discharge set forth in Section 3, the Purchasers shall preserve and this Letter Agreement shall not waive or be deemed to have waived any claims the Purchasers have against the Indemnitor that exist prior to or as of the date hereof under any other provisions of the Guaranties.

3. a. The Indemnitor shall cause the Company to actively market the Premises, Project and the Company's business, operations and assets for sale in accordance with the Plan. Upon the sale of the Premises, Project and the Company's business, operations and assets to a third party (the "*Sale*") subsequent to the Chapter 11 Filing and confirmation of the Plan in accordance with Section 2.29 of the Amended and Restated Mortgage, Security Agreement, Assignment of Leases, Rents and Assigned Contracts and Fixture Filing Statement to be entered into upon confirmation of the Plan, all Net Proceeds (as defined in the Plan) of the Sale shall be paid to Escrow Agent in accordance with the Amended and Restated Operative Agreements to be entered into upon confirmation of the Plan.

b. Indemnitor shall guarantee payment of Net Proceeds of $24,500,000.00 (the "*Minimum Recovery Amount*") to the Escrow Agent in connection with the Sale; provided that, for the avoidance of doubt, the calculation of the amount paid to Escrow Agent to count towards the Minimum Recovery Amount shall not include any Funded Amounts or any other fees, costs or expenses paid in connection with the Sale. To the extent the Net Proceeds of the Sale are less than the Minimum Recovery Amount, Indemnitor shall deposit or cause to be deposited the difference between the Net Proceeds received by Escrow Agent and the Minimum Recovery Amount with the Escrow Agent in immediately available funds simultaneously with closing of the Sale.

c. Upon receipt of the Minimum Recovery Amount by the Escrow Agent and provided that the Indemnitor has timely performed the other obligations of Indemnitor to be performed by Indemnitor hereunder, including advancing the Funded Amounts, the Purchasers hereby agree to waive, release and discharge Indemnitor from any claims, obligations or liability under the Guaranties and such Guaranties shall thereafter be of no further force and effect.

4. To the extent any of the foregoing conditions in Section 1 hereof are not complied with, all of Collateral Trustee's and Purchasers' rights and remedies under the Operative Agreements, including the right to demand the full amount of the Indebtedness Hereby Secured from the Indemnitor under Section 1(a) of the Guaranty and Indemnity Agreement and all other rights and remedies at law and in equity, shall be available without restriction or modification, as if the foregoing Section 1 above had not been in effect.

5. Indemnitor shall or shall cause Company to provide no later than the fifteenth (15th) day of each such month after the date of this Letter Agreement (endeavoring to provide on the first (1st) day of each such month), to Purchasers a summary of all (i) amounts deposited into the operating account, account number ending in 576 of the Company at Citizens Bank, N.A. (the *"Citizens Operating Account"*) for such prior month, and (ii) amounts debited from the Citizens Operating Account for such prior month to pay Operating Expenses and other Funded Amounts not otherwise paid or disbursed from the Escrow Account or any related sub-account held by the Escrow Agent along with a brief description of the purpose for which each debit was made.

6. Other than as expressly agreed herein, the Purchasers and Collateral Trustee specifically reserve all rights, remedies, claims and causes of action against the Company, Indemnitor and all other parties including without limitation, all rights with respect to the Chapter 11 Filing.

7. Except as modified herein, the Operative Agreements and all of the terms and provisions thereof shall remain unmodified and in full force and effect. No waiver or amendment of any provision of the Operative Agreements shall be effective unless the same shall be in writing and signed by the Collateral Trustee at the direction of the Purchasers, and then such waiver or amendment shall be effective only in the specific instance to which it relates and for the purpose for which it is given.

8. The Purchasers do hereby individually authorize and direct, in their capacities as Holders (as defined in the Collateral Trust Indenture), the Collateral Trustee to enter into and perform its obligations under this Letter Agreement. The Purchasers further, to the extent such amounts are not paid by the Indemnitor, agree to indemnify the Collateral Trustee for all losses, damages, costs, judgments, penalties, fines, obligations, suits, disbursements, liabilities of any kind or character whatsoever and related fees, costs (including reasonable attorneys' fees and expenses), and expenses that may be imposed upon, incurred by or asserted against the Collateral Trustee in connection with taking any action authorized by this Letter Agreement, except with respect to such liabilities determined by a final order of a court of competent jurisdiction to have arisen from any Collateral Trustee's gross negligence and willful misconduct.

9. This Letter Agreement may be executed in any number of counterparts, each counterpart constituting an original, but all together only one Agreement. In the event that any signature to this Agreement is executed by DocuSign (or similar secure electronic signature authentication software), or is delivered by transmission by electronic mail in form of any ".pdf", ".jpg", ".tiff", ".bmp", ".png", ".gif", and/or any other electronically-formatted image and/or document (collectively, an "Electronic Transmission"), such signature shall create a valid and legally binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page sent via Electronic Transmission were an original thereof.

**Addendum 4.5(J)**

[SIGNATURES ON NEXT PAGE]

**Addendum 4.5(J)**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed, all as of the day and year first above written.

______________________________________
Douglas F. Blough, an individual

**Addendum 4.5(J)**

WELLS FARGO TRUST COMPANY, NATIONAL ASSOCIATION, not in its individual capacity but solely as a Collateral Trustee

By: Computershare Trust Company, National Association, as Agent

By: ________________________________
Name:
Title:

[Signature Page to Restructuring Side Letter Agreement]

**Addendum 4.5(J)**

FEDERATED MUTUAL INSURANCE COMPANY

By ________________________________
Name: Donna Ennis
Title: Vice President & Portfolio Manager

FEDERATED LIFE INSURANCE COMPANY

By ________________________________
Name: Donna Ennis
Title: Vice President & Portfolio Manager

FEDERATED SERVICE INSURANCE COMPANY

By ________________________________
Name: Donna Ennis
Title: Vice President & Portfolio Manager

GRANITE RE, INC

By ________________________________
Name: Donna Ennis
Title: Vice President & Portfolio Manager

[Signature Page to Restructuring Side Letter Agreement]

**Addendum 4.5(J)**

FIDELITY & GUARANTY LIFE INSURANCE COMPANY, pursuant to powers of attorney now and hereafter granted to Blackstone ISG-I Advisors L.L.C.

By: Blackstone ISG-I Advisors L.L.C.

By: Blackstone Liquid Credit Advisors II LLC, as Sub-Advisers

By __________________________________
Name:
Title:

[Signature Page to Restructuring Side Letter Agreement]

**Addendum 4.5(J)**

LIFE INSURANCE COMPANY OF THE SOUTHWEST

By ____________________________________
Name:
Title:

NATIONAL LIFE INSURANCE COMPANY

By ____________________________________
Name:
Title:

[Signature Page to Restructuring Side Letter Agreement]

**Addendum 4.5(J)**

SAFETY NATIONAL CASUALTY CORPORATION

By: Sit Investment Associates, Inc., its
Registered Investment Advisor

By ___________________________________
Name:
Title:

[Signature Page to Restructuring Side Letter Agreement]

CATHOLIC ORDER OF FORESTERS

By ____________________________________
Name:
Title:

[Signature Page to Restructuring Side Letter Agreement]

**Addendum 4.5(J)**

FIRST FARMERS BANK & TRUST

By ______________________________________
Name:
Title:

[Signature Page to Restructuring Side Letter Agreement]

**Addendum 4.5(J)**

**SCHEDULE 1-A**

**INTEREST ONLY PAYMENTS OF EXISTING SERIES A1 SENIOR SECURED NOTES**

(see attached)

**Addendum 4.5(J)**

**SCHEDULE 1-B**

**INTEREST ONLY PAYMENTS OF EXISTING SERIES A2 SENIOR SECURED NOTES**

(see attached)

**Addendum 4.5(J)**

**SCHEDULE 2-A**

**PAYMENTS OF AMENDED AND RESTATED SERIES A1 SENIOR SECURED NOTES**

(see attached)

**Addendum 4.5(J)**

**SCHEDULE 2-B**

**PAYMENTS OF AMENDED AND RESTATED SERIES A2 SENIOR SECURED NOTES**

(see attached)

**Addendum 4.5(J)**

**EXHIBIT A**

**LEGAL DESCRIPTION**

Lot 1 of Certified Survey Map No. 9113, said map recorded on October 9, 2019, as Document No. 2878788, being all of Lot 1 and Lot 2 of Certified Survey Map, Volume 60 Page 361 #8591, being part of the Northeast of the Southwest of Section 35, Town 22 North, Range 22 East, Town of New Denmark, Brown County, Wisconsin.

That part of the Southwest 1/4 of the Southwest 1/4 of Section 21, Township 22 North, Range 22 East, in the Village of Denmark, Brown County, Wisconsin, being and lying West of U.S. Highway 141 as it existed on August 26, 1955, AND Part of the Southwest 1/4 of the Southwest 1/4 of Section 21, Township 22 North, Range 22 East, in the Village of Denmark, Brown County, Wisconsin described in Document No. 2259769, excepting therefrom that part thereof described in Volume 329 of Deeds on Page 143 and excepting that part thereof used for highway purposes. Also excepting part described in Jacket 5779 of records, image 26 as Document No. 988395.

EXCEPTING THEREFROM that part located and described as follows: Commencing at the Northwest corner of the said Southwest 1/4 of the Southwest 1/4, thence South 0°32' East 262.60 feet; thence North 89°01' East 521.9 feet to the centerline of old U.S. Highway 141; thence Northwesterly along the centerline of old U.S. Highway 141; 267.1 feet to the North line of the aforementioned Southwest 1/4 of the Southwest 1/4; thence South 89°01' West 473.5 feet to the point of commencement.